**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

IN RE: TASIGNA (NILOTINIB)
PRODUCTS LIABILITY LITIGATION

Case No. 6:21-md-03006-RBD-DAB
(MDL No. 3006)

This document relates to all actions.

_____

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION FROM NOVARTIS**
**PHARMACEUTICALS CORPORATION'S NON-CUSTODIAL SOURCES**

Plaintiffs, through their undersigned counsel, respectfully file this motion to compel production pursuant to Federal Rule of Civil Procedure 37 from certain of Defendant Novartis Pharmaceuticals Corporation's ("NPC") non-custodial sources; specifically, all documents related to clinical trials involving Tasigna from NPC's Clinical Regulatory Documentation and Information System ("CREDI"), as well as the underlying raw, patient-level data for a subset of those trials. The documents and data at issue are unique, highly relevant, and essential to assisting Plaintiffs in proving various elements of their causes of action, for which they bear the burden of proof at trial. The requested documents also present little to no burden to NPC to produce.

## **INTRODUCTION**

Through numerous and substantial communications, the parties have agreed on parameters for production from certain non-custodial sources and significantly narrowed the disputes surrounding others. The parties are at an impasse with regard to two of the disputes, which are now ripe for judicial intervention.

Specifically, Plaintiffs requested production of all documents from NPC's CREDI database for clinical trials involving Tasigna, as well as the underlying raw data for thirty-eight (38) trials.[1] These clinical trial documents from CREDI will include, amongst other documents, drafts and final versions of study protocols,

---

[1] The trials were identified through clinicaltrials.gov and the list is comprised of Phase II-IV Tasigna (nilotinib) trials that were industry-funded and included thirty (30) or more participants. These 38 trials were selected from the list of 226 trials involving Tasigna on the website. Plaintiffs also advised NPC that if there were trials implicated by the demand for which NPC did not have possession, custody, or control of the clinical trial data, Plaintiffs would consider withdrawing those requests upon sufficient showing of same by NPC. To date, NPC has not advised Plaintiffs of any such trial.

statistical analysis plans, and interim and final clinical study reports. *See* Declaration of David Madigan at ¶¶ 6-7, attached hereto as Exhibit A. Plaintiffs' request encompassed both clinical trials related to the treatment of CML—the indication for which Tasigna is approved—and "non-CML" trials. To be clear, NPC does not object to production from the CREDI database in general. *See* Letter from E. Shimada to R. Silverman dated January 25, 2022, attached hereto as Exhibit B. NPC has agreed to produce documents from CREDI for all CML indications/project codes without the use of search terms. *Id.* at 1. NPC's only objection to Plaintiffs' request for production for indications/project codes that are *not* related to CML is, purportedly, because CML is the indication for which Plaintiffs in this MDL were prescribed Tasigna. *Id.* Such an objection has no merit, particularly in the face of a request for highly relevant and unique information that places almost zero burden on NPC to produce. Regarding the raw, patient-level data from a small subset of these clinal trials, NPC appears to flatly object to its production, with little support. *Id.* at 2. Given its relevance to the litigation and the inability of NPC to articulate any plausible burden argument, this Court should order production of these materials forthwith.[2]

---

[2] At the discovery conference held February 7, 2022, NPC's counsel suggested to the Court that Plaintiffs had not served discovery requests that covered the materials addressed herein. This is patently untrue. For instance, Plaintiffs point NPC to the requests made in the *Colella* matter, one example of which was for "[a]ll documents that relate to proposed, completed, partially completed, and/or proposed but never begun clinical investigations, trials, studies and/or tests concerning the use and/or effects of Tasigna in humans." This is but one of the many requests that relate to clinical trial documents and raw, patient-level data. Moreover, the parties have been negotiating production of these documents for several months and NPC only raised, for the first time at the conference, the possibility that Plaintiffs had not made such requests. NPC has therefore waived any such objection.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 26(b)(1), parties may obtain discovery if it is relevant and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. "Relevancy is construed 'broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case.'" *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2020 WL 4043311, at *1–2 (N.D. Fla. July 17, 2020), *reconsideration denied*, No. 3:19-MD-2885, 2020 WL 5578938 (N.D. Fla. Aug. 19, 2020), citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Where a party "objects to the production of documents … the requesting party may file a motion to compel." *Id*. at *1, citing Fed. R. Civ. P. 37(a)(3)(B). The Court has "'broad discretion ... to compel or deny discovery.'" *Id*. at *1, citing *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011); Fed. R. Civ. P. 26(b).

NPC bears the burden here. *Id* at *1. ("The objecting party typically bears the burden to substantiate its objections." (citations omitted). Indeed, "[i]f a party objects to the relevance of propounded discovery requests, the objecting party must establish that the requested discovery (1) is not relevant under Rule 26(b)(1), or (2) is marginally relevant, such that production would cause potential harm outweighing the

4

presumption in favor of broad disclosure." *Id.* at *2, citing *Am. Fed'n of State, Cty. and Mun. Emps. (AFSCME) Council 79 v. Scott*, 277 F.R.D. 474, 477 (S.D. Fla. 2011); *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000).

## **ARGUMENT**

### I.   **Plaintiffs are entitled to discover documents associated with non-CML project codes for clinical trials involving Tasigna from NPC's CREDI database.**

Documents related to the non-CML clinical trial project codes are unquestionably material to the allegations set forth by Plaintiffs in this case. *See generally* Ex. A. Plaintiffs bear the burden of proving, generally, that Tasigna can cause the atherosclerotic-related injuries of which Plaintiffs complain, as well as each element of their failure to warn and negligence claims. In light of this heavy burden, *any* safety data stemming from clinical trials involving Tasigna, regardless of the indication for which the drug was used, are crucial. NPC's objection to the relevance of such information based on the indication for which the drug was used is baseless. Ex. B at 1.

The indication for which Tasigna was taken has no effect on the safety profile of the drug. Pharmaceutical companies are required to track and report all clinical trial adverse events related to a drug regardless of the indication under investigation. *See* Ex. A at ¶ 9. In fact, non-CML clinical trials have the same potential as CML trials to demonstrate a safety issue associated with the drug. *Id.* at ¶ 11-12. Indeed, an atherosclerotic-related adverse event related to Tasigna, occurring in a clinical trial for

gastrointestinal stromal tumors, is no less relevant than the same in a CML trial. The same can be said for any relevant adverse event that was not captured due to, for instance, the design of the trial, the statistical analyses that were run (or not run) pursuant to the statistical analyses plan, or patients who discontinued the trial because of issues which relate to atherosclerotic-related injuries. *Id*. at ¶ 9.

What NPC knew and should have known about the safety profile of Tasigna, and when, goes to the heart of this multi-district litigation, as it dictates when and how NPC should have adequately warned physicians about the risks of the drug.[3] There is no doubt safety information from clinical trials, regardless of indication, is integral to Plaintiffs' claims here. Accordingly, NPC cannot sustain its burden under Rule 26(b)(1) to overcome the presumption of broad disclosure. *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2020 WL 4043311, at *2.

Aside from its meritless contention that Plaintiffs are not entitled to certain clinical trial documents because only CML-related use of Tasigna is relevant to the safety profile of the drug, NPC further submitted to Plaintiffs that safety data arising from the use of Tasigna for non-CML indications has already been produced in the Tasigna regulatory file (REDI) and the adverse event safety database (ARGUS).[4] First, as *no* raw data has been produced [*see* § II below], the true safety data associated with

---

[3] The information is equally important for the three-hundred currently filed matters in the New Jersey multi-county litigation.

[4] As the Court is aware, the parties are continuing to meet and confer over the production from this important database. NPC made a limited production in the two prior Tasigna cases. At this time, Plaintiffs are not in possession of sufficient information about the database to determine whether the production was sufficient.

the non-CML studies likewise has not. Second, the fact that NPC has allegedly produced safety data from non-CML project codes belies any relevance argument it makes. Further, NPC cannot simply point Plaintiffs to sanitized safety data available in regulatory submissions, or events coded in ARGUS that cannot be easily traced back to the studies in which they occurred, when the information sought by Plaintiffs is neatly packaged in a finite repository within the custody and control of NPC (CREDI)—a database from which NPC has already agreed to produce. There is no source that is more convenient, less burdensome, or less expensive. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). In fact, the underlying clinical trial documents (*e.g.*, study protocols, statistical analysis plans, interim and final reports, *etc.*) related to the non-CML project codes are unlikely to be found anywhere else in NPC's document productions. NPC has elucidated no discernable burden to producing these documents in any prior meet and confer, which is why it feigns an "incremental" burden argument. *See* Ex. B at 1.

NPC's letter also contends that Plaintiffs have articulated no additional grounds for requesting all documents related to the clinical trials outside of seeking safety information. *Id*. This is inaccurate. While Plaintiffs are certainly interested and entitled to the safety data arising from the use of Tasigna for *any* indication, the final safety data, standing alone, is not complete and cannot be fully understood without the underlying and accompanying clinical trial documents (*e.g.*, study protocols, statistical analysis plans, interim and final reports, *etc.*). *See* Ex. A at ¶ 6-9. By way of example, knowing that an atherosclerotic-related adverse event occurred in a non-CML trial is certainly relevant to understanding whether Tasigna can cause such injuries and when

the event was reported to the company. However, the weight of that evidence can be further qualified by understanding certain elements of the clinical trial, like the exclusion criteria employed. *Id.* at ¶ 9. Knowing whether a patient was predisposed to cardiovascular issues or had a pre-existing condition that was exacerbated by use of the drug, versus whether the patient entirely lacked comorbidities and nonetheless developed an atherosclerotic-related injury is similarly relevant both to Plaintiffs and their experts. *Id.* at ¶¶ 9; 11. Without knowing how NPC defined certain endpoints, Plaintiffs cannot hope to fully understand how NPC chose to report and publish its data. *Id.* And this is merely one example of many different reasons why Plaintiffs also require complete production of all documents pertaining to these trials.

Without question, the clinical trial documents for non-CML indications requested by Plaintiffs are relevant and, since NPC can articulate no burden in opposition, Plaintiffs' motion to compel production of CREDI documents for non-CML project codes should be granted.

II.   **Plaintiffs are entitled to discover the raw data sets for a subset of clinical trials involving Tasigna.**

The ability for Plaintiffs to discover the raw, patient-level data sets associated with certain clinical trials involving Tasigna is equally important as obtaining the clinical trial documents associated with the non-CML project codes. Put simply, without access to the raw data from the clinical trials, Plaintiffs are limited to the published papers and clinical study reports authored by NPC. *Id.* While such documents have some utility, it is impossible for Plaintiffs to know what is *not*

8

included, which is often more telling than what is. *Id*. Though experts can attempt to reconstruct the patient-level data from interim and final clinical study reports, it is fraught with the possibility of error and it is impossible to run fresh and unbiased analyses. *Id*. at ¶¶ 8-10. In layman's terms, once any analyses are performed on the raw data, the resulting information is subject to decisions made by the owner of it, in this case NPC. *Id*. at ¶ 9. For example, if NPC chose to limit or exclude a certain safety analysis or define cardiovascular events in a certain way, Plaintiffs and their experts are forced to accept those determinations, without any ability to challenge them or perform their own analyses of the data. *Id*.

The type of data that Plaintiffs requested has routinely been discovered in complex litigations similar to this one. *See In re Denture Cream Products Liability Litigation*, 2013 WL 214672 (S.D. Fla. 2013) (wherein Plaintiffs' were provided with raw clinical trial data allowing their experts to conduct analyses that called into question the analyses done by the defendant and submitted to FDA); *see also In re Denture Cream Products Liability Litigation*, 2015 WL 392021, (S.D. Fla. 2015) (discussing analyses by Plaintiffs' experts of raw clinical trial data in the context of *Daubert* challenges); *Jones v. Novartis Pharmaceuticals Corporation*, 235 F.Supp.3d 1244, 1284 (N.D. Ala. 2017) (finding Plaintiff's expert's opinion unreliable in part because he did *not* analyze raw data, but instead performed a post hoc analysis based only on data published in an article); *In re Zyprexa Products Liability Litigation*, 2005 WL 2237793 (E.D.N.Y. 2005) (CMO requiring clinical trial data be produced "on a

portable external hard drive as industry standard SAS files…"); *In re: Taxotere (Docetaxel) Products Liability Litigation*, 2021 WL 311865 (E.D. La. 2021) (wherein Doctor Madigan found a discrepancy between the produced SAS data vs. other company produced documents); *In re Pfizer Inc. Securities Litigation*, 2010 WL 11579504 (S.D.N.Y 2010) (noting that Plaintiff's expert "relied on SAS data provided by Pfizer…"). Notably, in *Jones,* NPC, represented by the same counsel as it is here, argued that the "kind of post-hoc reclassification" employed by Plaintiffs' expert was "not a reliable methodology that passes muster under Daubert." *See Jones v. Novartis Pharmaceuticals Corporation*, 2016 WL 10100197, at *5 (N.D. Ala. 2016) (NPC's Memorandum in Support of Motion to Exclude Plaintiff's Expert). Yet, here, NPC seeks to restrict Plaintiffs from accessing the very data that would allow their experts to satisfy this anticipated criticism and avoid such an attack in this case.

Moreover, at least some Courts have ordered clinical trial data over objection. *See Timberlake v. Synthes Spine Company, L.P*, 2008 WL 11389429, *3 (S.D. Tex. 2008) (where the court found that "clinical trial data will shed light on the accuracy of the reports disseminated by Defendants and the Physicians prior to FDA approval and will enable Plaintiffs to compare the data with that reported to the FDA" and further noted: "Other courts have likewise found underlying clinical trial data prior to the product's approval to be relevant in a products liability action…[,]" citing *See In re Prempro Prods. Liab. Litig.*, 2006 WL 751299, at *2 (E.D. Ark. March 20, 2006); *In re*

*Zyprexa Prods. Liab. Litig.*, 2005 WL 2237793, at *1 (E.D.N.Y. April 7, 2005); *Grundberg v. Upjohn Co.*, 137 F.R.D. 365, 367 (D. Utah 1991)).

The issue of "open data" is becoming increasingly important in the medical and scientific communities. As noted by The BMJ (formerly known as the British Medical Journal), one of the world's oldest general medical journals:

> Hidden clinical trial data are systematically undermining doctors' abilities to prescribe treatments with confidence. A whole range of widely used drugs across all specialties in medicine have been represented as safer and more effective than they are, endangering people's lives and wasting public money. As of January 2013, *The BMJ* will no longer publish any trial of drugs or devices where the authors do not commit to making the relevant anonymised patient level data available, on reasonable request.

*BMJ Open Data Campaign*, The BMJ, https://www.bmj.com/open-data (last visited February 8, 2022). The BMJ continues: "[t]he potential of open data is realised only when those data are subject to independent scrutiny, and in a recent review Ebhrahim and colleagues identified just 37 published reanalyses of clinical trials." *Id.*, referencing Ebrahim S, Sohani ZN, Montoya L, et al. Reanalyses of Randomized Clinical Trial Data. *JAMA.* 2014;312(10):1024–1032.   doi:10.1001/jama.2014.9646   ("A small number of reanalyses of RCTs have been published to date. Only a few were conducted by entirely independent authors. Thirty-five percent of published reanalyses led to changes in findings that implied conclusions different from those of the original article about the types and number of patients who should be treated."). The BMJ open data campaign site lists examples of hidden data, including for the drug Vioxx.

> Rofecoxib was introduced in 1999 as an effective, safer alternative to NSAIDs for the treatment of pain associated with osteoarthritis. Safety concerns emerged about an increased risk of cardiovascular events in some patients, and the VIGOR study was set up to measure this potential problem. The results reported were negative, but subsequent litigation exposed the data manipulation that took place.

*BMJ Open Data Campaign*, The BMJ, https://www.bmj.com/open-data (last visited February 8, 2022). The BMJ cites a study authored by Harlan Krumholz and others, which discusses the improprieties that litigation uncovered, including that "Published studies of the drug obscured the risk" and that "Merck had influence over all aspects, including data analysis, safety monitoring, and reporting." The BMJ, https://www.bmj.com/content/334/7585/120; *see also* Krumholz H M, Ross J S, Presler A H, Egilman D S. What have we learnt from Vioxx? *BMJ* 2007; 334 :120 doi:10.1136/bmj.390224.487720.68. Plaintiffs here are hardly asking that NPC publish its raw data for the world to see—though if there is nothing to hide, there is no reason it should not—but merely requesting relevant discovery necessary to meet their burden of proof in this matter.

NPC's objection to Plaintiffs' request for raw clinical trial data centers almost exclusively on what an epidemiology expert did in the two prior matters. *See* Ex. B at 2. What an expert did in a previous case is of no moment here. Plaintiffs' current expert has requested the raw data from Tasigna clinical trials and clearly articulated its relevance and importance. *See generally* Ex. A. NPC's letter further states that Plaintiffs "have not articulated any rationale as to why they require raw statistical data on variables and topics unrelated to CVEs." Ex. B at 2. Plaintiffs are confused by this

position as their request is to obtain raw, patient-level data that has *not* been analyzed or manipulated by NPC in any way, including determinations as to how an adverse event should be coded (*e.g.*, CVE or something else).

Similarly, NPC's contention that manipulation or modification of the data by Plaintiffs' expert may be inadmissible or subject to *Daubert* challenges is both speculative and baseless at this stage. This is a discovery issue. Further, as with the CREDI database, there is no burden to NPC to produce the SAS data for the requested trials. It is relevant and readily available in an NPC-controlled database.

## CONCLUSION

As the documents demanded by Plaintiffs are plainly relevant and NPC can articulate no burden, Plaintiffs' motion to compel production should be granted.

Dated: February 11, 2022                              Respectfully Submitted,

                                                      By: */s/ Raymond C. Silverman*
                                                      Raymond C. Silverman, Esq.
                                                      Christopher Oxx, Esq.
                                                      Harrison M. Biggs, Esq.
                                                      Parker Waichman, LLP
                                                      6 Harbor Park Drive
                                                      Port Washington, NY 11050
                                                      (516) 466-6500
                                                      (516) 466-6665 (fax)
                                                      rsilverman@yourlawyer.com
                                                      oxx@yourlawyer.com
                                                      hbiggs@yourlawyer.com

                                                      By: */s/ Richard Elias*
                                                      Richard Elias
                                                      Elias LLC
                                                      231 S. Bemiston Ave. Ste. 800
                                                      St. Louis, MO 63105

314-391-6820
relias@EliasLLC.com

By: */s/ Lawana S. Wichmann*
Lawana S. Wichmann, Esq.
OnderLaw, LLC
110 E. Lockwood
St. Louis, MO 63119
314-963-9000
314-963-1700 (fax)
wichmann@onderlaw.com

*Attorneys for Plaintiff*

## **LOCAL RULE 3.01(g) CERTIFICATION**

In accordance with Local Rule 3.01(g), counsel for Plaintiffs certify that they have conferred telephonically and by email with counsel for Defendant Novartis Pharmaceuticals Corporation regarding NPC's production of documents from non-custodial sources, including CREDI and raw, patient-level data. The parties narrowed their disputes, but were unable to reach a resolution on the production from these sources.

## **CERTIFICATE OF SERVICE**

I certify that on this 11th day of February 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, causing all counsel of record be served by electronic means.

/s/ *Raymond C. Silverman*
Raymond C. Silverman, Esq.
*Attorney for Plaintiffs*