**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

IN RE: TASIGNA (NILOTINIB)
PRODUCTS LIABILITY LITIGATION

Case No. 6:21-md-03006-RBD-DAB
(MDL No. 3006)

This document relates to all actions.

**FILED UNDER SEAL**

**NOVARTIS PHARMACEUTICALS CORPORATION'S**
**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**REQUEST FOR THIRTEEN ADDITIONAL CUSTODIANS**

Novartis Pharmaceuticals Corporation ("NPC") opposes plaintiffs' request to compel the production of documents from an additional thirteen custodians.

In this litigation, NPC has produced over **1.1 million** electronic, responsive, non-privileged documents from **thirty-six custodians**. Plaintiffs now seek to expand the number of custodians to **forty-nine**. The additional requested custodians include six high-level executives. These executives had no direct involvement with the U.S. labeling and warning decisions regarding Tasigna®. The other seven requested custodians are in NPC's global strategic or global marketing units who were not responsible for developing or approving Tasigna® marketing materials for use in the United States.

Despite the Court's explicit instruction, plaintiffs fail to address "the marginal utility" component of proportionality built into Rule 26 of the Federal Rules of Civil Procedure. 2/7/2022 Status Conf. Tr. 26:4-11. As discussed below, plaintiffs must show how these thirteen additional custodians would have unique, non-cumulative information not already provided in the documents and other discovery that NPC has produced. While plaintiffs generally assert that the requested custodians were "involved" in "core issues," Pls.' Mot. at 2, they make no serious attempt to meet this burden with non-speculative specifics.

Because these additional custodians do not possess unique information on the relevant issues, the marginal utility from the requested additional discovery is low in light of the substantial amount of information that NPC already produced in this

litigation.[1] Plaintiffs' theoretical speculation that more relevant documents exist does not justify additional discovery or discovery will become interminable. Reviewing and producing documents from thirteen additional custodians is not proportional and would impose an undue burden on NPC that outweighs its likely benefit to plaintiffs. Accordingly, this Court should deny plaintiffs' request for NPC to produce documents from the thirteen additional custodians.

## I.    Background

Prior to this MDL, NPC produced to plaintiffs **468,215 documents** (totaling **9.2 million pages**), including relevant, non-privileged emails from fourteen custodians, along with deposition testimony of six company witnesses who held central roles on the Tasigna® team. *See* 7/20/2020 Ltr. from A. Reissaus to R. Silverman (**Ex. 1**).[2] In this MDL, NPC has more than doubled its production to **1,138,490** custodial documents (totaling over 240 gigabytes) and expanded the document custodians four-fold to **thirty-six**, using expanded date ranges and broad search terms that the Court approved in Discovery Order No. 1 (ECF No. 83). These **thirty-six custodians** include NPC employees who touched on the key issues in this litigation, such as three regulatory custodians who had primary responsibility for day-to-day interactions with FDA, six U.S. marketing custodians, and nine

---

[1] The elements for a failure-to-warn claim are that the defendant knew of the risk, but did not warn about the risk, and damages ensued. "Why" the warning was issued is irrelevant. *See* Restatement (Second) of Torts § 402A.

[2] These documents were originally produced nearly five years ago in a prior Tasigna® case, *Lauris v. Novartis AG*, No. 16-cv-00393 (E.D. Cal.), where plaintiffs were represented by one of plaintiffs' counsel in this MDL.

custodians in clinical studies, U.S. medical affairs, and safety. NPC has incurred significant costs and undergone tremendous effort to comply with Discovery Order No. 1. NPC added 176 new attorneys to expand its experienced review team from 47 attorneys to 223 attorneys.

The Court requested that plaintiffs' briefing "be informed by how much more you know now than you did two or three or four months ago." 2/7/2022 Status Conf. Tr. 26:4-11. Plaintiffs' counsel assured the Court that "most of them are new documents, that's why we're raising them to the Court." *Id.* at 27:21-24. Plaintiffs' submission contradicts that representation: Thirty-two of the forty-six total documents (69.5%) cited in plaintiffs' motion were produced in *Lauris*. As explained below, plaintiffs have not presented new information as required by the Court to warrant the production of the thirteen additional requested custodial files.

## II.    Legal Standard

Under Rule 26(b)(1), "[t]he party moving to compel discovery has the initial burden of proving the requested discovery is relevant and proportional." *Gov't Emps. Ins. Co. v. Merced*, No. 8:20-CV-802-KKM-AAS, 2021 WL 1405488, at *1 (M.D. Fla. Apr. 14, 2021). "[P]roportionality focuses on the marginal utility of the discovery sought." *Edmondson v. Velvet Lifestyles, LLC*, No. 15-24442-CIV, 2016 WL 5682591, at *5 (S.D. Fla. Oct. 3, 2016). Indeed, the Court instructed the plaintiffs' submission to "focus" on "the marginal utility of these documents compared to everything that's been done." 2/7/2022 Status Conf. Tr. 26:4-11.

It is not sufficient to show that the "additional individuals may have some connection to the events at issue in this action." *Enslin v. Coca-Cola Co.*, No. 2:14-CV-06476, 2016 WL 7013508, at *1 n.2 (E.D. Pa. May 13, 2016) (citing Fed. R. Civ. P. 26(b)(2)(C)). "Plaintiffs, as the requesting party, must demonstrate each custodian would provide unique, relevant information not already obtained." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 3100016, at *1 (N.D. Fla. June 11, 2020).[3]

Courts routinely reject requests for documents from additional custodians who are unlikely to possess unique information. *See Jabil, Inc. v. Essentium, Inc.*, No. 8:19-cv-1567-KKM-SPF, 2021 WL 2895524, at *3 (M.D. Fla. March 4, 2021) (denying nine additional custodians because it was unlikely they possessed documents not previously collected from 1.7 million electronic documents from twenty-seven custodians); *In Re Disposable Contact Lens Antitrust Litig.*, No. 3:15-MD-2626-J-20JRK, 2016 WL 6518660, at *3 (M.D. Fla. Nov. 1, 2016) (denying five additional custodians because the relevant information was already captured in twelve designated custodial files); *In re Photochromic Lens Antitrust Litig.*, No.

---

[3] Plaintiffs incorrectly state that "[NPC] bears the burden here." Pls.' Mot. at 4. Plaintiffs rely on another decision in the *3M Combat Arms Earplug* MDL for the proposition that "[t]he objecting party typically bears the burden to substantiate its objections." *Id.* (quoting *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 4043311, at *1-2 (N.D. Fla. July 17, 2020) (citing cases that pre-date the proportionality amendment to Rule 26)). That decision did *not* involve a dispute over additional custodians. Indeed, less than a month after the decision that plaintiffs cite, the MDL court reiterated that the burden is on the requesting party seeking additional custodians. *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 4501794, at *1 (N.D. Fla. Aug. 5, 2020) ("Plaintiffs, as the requesting party, must demonstrate each custodian would provide unique relevant information not already obtained.").

8:10-MD-2173-T-27EAJ, 2011 WL 13142136, at *2 (M.D. Fla. Sept. 1, 2011) (denying two additional custodians who were included on communications that were all sent to or from one or more of the thirty-five produced custodians).

## III.   Document Production from Six High-Level Executives is Not Warranted.

Plaintiffs seek documents from six high-level executives, including the Oncology and U.S. Country Head and President of NPC, and five vice presidents that include the Global Chief Commercial Officer and oncology and hematology franchise heads.[4]

NPC is not relying on the "apex doctrine" here, *see* Pls.' Mot. at 13-14, although similar principles apply. Cases addressing the production of documents from executive-level custodians have considered: "the executive's level of involvement in discussions and decisions serving as the basis of the claims in the case; whether the executive's relevant ESI is unique; and whether the executive's ESI is available from other designated custodians." *Houston v. Papa John's Int'l, Inc.*, No. 3:18-CV-00825-CHB, 2020 WL 6588505, at *2 (W.D. Ky. Oct. 30, 2020) (collecting cases); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018) (same).

In *Lauris*, the court denied a request for production from four executive-level custodians, including three of the six at issue here – Messrs. O'Dowd, Riva, and

---

[4] They are: 1) Hugh O'Dowd, Sr. VP, Global Chief Commercial Officer; 2) Alessandro Riva, EVP, Global Head of Oncology Development and Medical Affairs; 3) Christi Shaw, North America Region Head, Oncology and US Country Head and President; 4) Philippe Drouet, VP Hematology Business Franchise Head; 5) William Hinshaw, VP Hematology Business Franchise Head and Executive VP US Oncology; and 6) Harout Semerjian, Hematology Business Franchise Head.

Drouet. *See Lauris v. Novartis AG*, No. 1:16-cv-00393-LJO-SAB, 2016 WL 7178602, at *4 (E.D. Cal. Dec. 8, 2016). The Court ruled that although "[d]ue to their position within the organization, information regarding Tasigna and atherosclerosis related side effects would be expected to be communicated though these individuals," the "communications regarding Tasigna and atherosclerosis-related events would have passed through [the nine key non-senior level employees included as] document custodians." *Id.*

Plaintiffs do not cite documents that provide any evidence that these executive-level custodians have unique information, and therefore, the marginal utility from these custodians is low. Moreover, plaintiffs seek discovery from custodians involved in management functions regarding *all* of NPC's twenty-five oncology products. The broad search terms approved by the Court are likely to pull in documents concerning other non-relevant products. The executives' involvement with Tasigna® and its U.S. labeling would be manifested through their interactions with members of the Tasigna® team that constituted the functional group that implemented Tasigna® strategy and activities. These members' files that have been produced include **26,301 emails and attachments** sent to or from these executives. In similar circumstances, courts have refused to compel the production of executive-level custodians. *See Houston*, 2020 WL 6588505, at *3; *In re: EpiPen*, 2018 WL 1440923, at *2 (denying production of executive custodial files because any relevant documents would likely be in the files of other designated custodians).

Plaintiffs also assert that production of these executive-level custodians' files is justified because it will provide evidence of motive and intent. *See* Pls.' Mot. at 12. State of mind, including motive and intent, is not an element of strict liability and negligence claims.[5] This evidence could only be relevant to support a claim for punitive damages. But plaintiffs are not entitled to punitive damages because under New Jersey law (where NPC is headquartered), punitive damages are not available.[6] Accordingly, there is no basis for discovery into intent or motive.

## A.  Plaintiffs Have Not Demonstrated That Mr. Riva, Mr. O'Dowd, or Ms. Shaw Were Directly Involved in Relevant Issues.

Plaintiffs devote less than a full page to their argument that Mr. Riva, Mr. O'Dowd, or Ms. Shaw were senior leaders who made the final decisions to withhold warnings about atherosclerotic risks associated with Tasigna®. Pls.' Mot. at 8-9. However, the documents plaintiffs cite only show that current document custodians kept these executives informed of developments and plans regarding Tasigna® and do not show that these executives countermanded or directed action inconsistent with the recommendations of the Tasigna® team.

Plaintiffs have received more than one million documents – including more

---

[5] *See, e.g.*, *In re Fortner*, No. 12-60478-CIV, 2012 WL 3613879, at *4 (S.D. Fla. Aug. 21, 2012) ("[N]egligence does not contain the element of intent."); *Colville v. Pharmacia & Upjohn Co., LLC*, 565 F. Supp. 2d 1314, 1321 (N.D. Fla. 2008) ("Strict liability and negligent failure to warn boil down" to three elements: "1) that the warnings accompanying the item were inadequate; 2) that the inadequacy of the warnings proximately caused Plaintiff's injury; and 3) that Plaintiff in fact suffered injury by using the product."); Restatement (Second) of Torts § 402A.

[6] *See, e.g.,* *McWilliams v. Novartis AG*, No. 2:17-CV-14302, 2018 WL 3369655, at *8 (S.D. Fla. July 9, 2018) (holding in Tasigna® case that Florida plaintiffs' punitive damages claims are preempted, applying New Jersey law); *Dopson-Troutt v. Novartis Pharms. Corp.*, No. 8:06-CV-1708-T-24, 2013 WL 3808205, at *5 (M.D. Fla. July 22, 2013) (same).

than **5,000 emails and documents** sent to or from Mr. Riva, Mr. O'Dowd, or Ms. Shaw – yet plaintiffs break no new ground here. Plaintiffs cite only **<u>two</u>** emails that were produced more than four years ago in *Lauris* from Katie Chon (a document custodian) to Mr. Riva, Mr. O'Dowd, and Ms. Shaw (among others) ███████

████████████████████████████████████████ Pls.' Ex. 2-3. Plaintiffs fail to identify any evidence that one of the three executives responded to Ms. Chon. Had any of the three executives responded, their responses to Ms. Chon would have been captured already in Ms. Chon's custodial productions.[7]

████████████████████████████████████████

████████████████████████████████████████

██████ ████████████████████████████████

███████████████ Pls.' Ex. 4. The Global Program Team ("GPT") – which includes document custodians Ms. Chon (who reported to custodian Ms. Habucky) and Dr. Gallagher (who was the GPT head) – does not include Mr. Riva, Mr. O'Dowd, or Ms. Shaw. ████████████████████████

██████████████████████████ *See id.* ████████████

████████████ ████████████████████████

██████████████████ ████████████████ *See* Pls.'

Ex. 3. ████████████████████████████████

████████████

---

[7] Neil Gallagher and Karen Habucky, who are both document custodians and who were deposed in *Lauris*, were also cc'd on Ms. Chon's email.

Further, plaintiffs ignore the fact that the FDA issued new guidance regarding DHCPLs a day after the agency approved the January 2014 Tasigna® label that includes a Warning and Precaution for cardiovascular events.[8]



*See* 2/21/2014 Email from FDA to NPC (**Ex. 4**).

Plaintiffs also fail to inform the Court that, despite NPC not sending a formal DHCPL, NPC still informed oncologists about the January 2014 label update. *See* 2/22/2014 Internal NPC Email (**Ex. 5**) ███████████████████████████████████████████████████████████████████████████████████████ In April 2014, NPC provided oncologists a pamphlet with contents of the updated 2014 Tasigna® label with highlights to new additions, including the new Warnings and Precautions section for cardiovascular events (the same warning that plaintiffs argue required a formal DHCPL). *See* **Ex. 6**. Plaintiffs attempt to create an issue where there is none:

---

[8] *Guidance For Industry and FDA Staff Dear Health Care Provider Letters: Improving Communication of Important Safety Information* 79 Fed. Reg. 3827-28 (Jan. 23, 2014), https://www.govinfo.gov/content/pkg/FR-2014-01-23/pdf/2014-01305.pdf (**Ex. 2**); Ltr. from FDA to NPC (Jan. 22, 2014) (approving the Jan. 2014 Tasigna label), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/022068Orig1s017ltr.pdf and https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/022068s017lbl.pdf (approval letter and label) (**Ex. 3**).

NPC adequately warned about the potential risks based on the available science, and NPC communicated the updated labeling in 2014 to oncologists. The decision not to send a formal DHCPL based on new FDA guidance does not warrant additional discovery from executive-level personnel who had no direct involvement in that decision. Absent an indication that Mr. Riva, Mr. O'Dowd, or Ms. Shaw directed the team to act differently than planned, there is no reason to believe their files have unique, relevant information.

Plaintiffs must show more than mere "belief or speculation that there could be additional responsive documents." *Kogot v. L.L.J., Inc.*, No. 2:04-CV-0149-WCO, 2005 WL 8156174, at *3 (N.D. Ga. Mar. 10, 2005). "[I]f the theoretical possibility that more documents exist sufficed to justify additional discovery, discovery would never end." *Sowell v. GEICO Cas. Ins. Co.*, No. 3:12-CV-226-MCR-EMT, 2013 WL 11521847, at *5 (N.D. Fla. Nov. 26, 2013). Yet, that is just what plaintiffs seek here in their overt attempt at a fishing expedition with these custodians. *See* Pls.' Mot. at 13. ("Without searches of the custodial files of these senior leaders, [plaintiffs] cannot see how the executives interacted with each other and other [unspecified] employees whose custodial files were not searched"). The Court should decline plaintiffs' invitation for such an adventure and refuse to compel the production of files from Mr. O'Dowd, Mr. Riva, and Ms. Shaw.

### B.   Plaintiffs Fail to Make the Requisite Showing That Documents from Hematology Franchise Heads Would Be Unique.

Plaintiffs seek documents from three executives who served as NPC's

Hematology Business Franchise Heads at different times.[9] Although these executives were kept informed about Tasigna® by their direct reports (including the U.S. Tasigna® marketing leads who are already custodians), these executives were not responsible for the day-to-day decision-making for Tasigna®. To the extent there are communications with the franchise heads regarding Tasigna®, including labeling and cardiovascular-related issues, those communications would be in the custodial files of the U.S. marketing individuals whose files plaintiffs already have, including **six U.S. marketing custodians** who directly reported to these heads.[10]

Moreover, these executives are in functional areas that are not relevant to the central issues in these cases – whether Tasigna® can and did in fact cause plaintiffs' alleged injuries in these cases and whether Tasigna® is labeled adequately. *PB Prop. Mgmt., Inc. v. Goodman Mfg. Co.*, No. 3:12–cv–1366–J–20JBT, 2014 WL 12639955, at *1 (M.D. Fla. Dec. 18, 2014) ("[P]arties are not entitled to discovery that is not relevant to the claims or defenses, absent a showing of good cause.").

Notwithstanding the apparent lack of involvement with the relevant issues, plaintiffs argue that "[NPC]'s sales and finance teams, led by Drouet, were involved in the decision to kill the DHCP letter." Pls.' Mot. at 9. ███████████

████████████████████████████████████████████████████████

---

[9] They are Mr. Drouet, Mr. Hinshaw, and Mr. Semerjian. *See supra* n.3

[10] These include: 1) David Domsic, Executive Director of Marketing, Hematology; 2) Reshema Kemps-Polanco, Sr. Director, Leukemia Franchise Marketing, Novartis Oncology; 3) Anke Meyer, U.S. Brand Director; 4) Mark Sims, U.S. Brand Director / Sr. Director – US CML; 5) Michael Petroutsas, Sr. Director, Marketing, CML, CLL & Multiple Myeloma; and 6) Shilpa Shah-Mehta, Executive Director, Hematology Marketing.

██████████████████████████████████████████████████ *See* Pls.' Exs. 1, 7, 8. Such conduct is expected in a business unit at a company charged with evaluating current financial conditions and projecting the future business climate. Plaintiffs offer no evidence that Mr. Drouet played a role in NPC's decision to contact FDA about the DHCPL. It is pure speculation to conclude that Mr. Drouet or his team had any control or influence over the warnings that NPC issued for Tasigna®.

Indeed, all of the cited documents pertaining to Mr. Drouet and his team's analysis are dated *after* learning of decisions already made by other units at NPC regarding communications about reports of cardiovascular events. ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████ Pls.' Ex. 1. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████ *Id.*; *see also* Pls.' Ex. 7 ██████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ To date, NPC has produced **7,346 emails and documents** sent by or to Mr. Drouet. Plaintiffs fail to cite a single document that indicates that Mr. Drouet or his team did anything beyond conducting routine financial analyses or forecasting, nor do plaintiffs cite any documents that suggest Mr. Drouet had authority over the labeling or warnings

issued for Tasigna®. Plaintiffs are overreaching to suggest something sinister at play, when in reality, Mr. Drouet and his team were simply crunching numbers based on different real-world scenarios.

Plaintiffs' contentions regarding the other franchise heads fare no better. Plaintiffs argue that Mr. Semerjian and Mr. Hinshaw were directly involved in labeling decisions. Pls.' Mot. at 22-23. For Mr. Semerjian, ███████████████

████████████████████████████████████████

██████████████ ████ Pls.' Ex. 9 at 73-82.[11] ███████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████ *See id.* ████████████████

████████████████████████████████████████

███████████████████████ ████ In any event, at the time of the emails that plaintiffs cite, the Tasigna® label already included a dedicated Warning and Precaution for cardiovascular events. Further, FDA has continued to receive updated clinical trial data, including on cardiovascular events as evidenced in NPC's annual Periodic Safety Updated Reports ("PSUR"), which plaintiffs have already. *E.g.*, Tasigna® PSUR 10, at 24 (including 72-month clinical trial data) (**Ex. 7**).

For Mr. Hinshaw, █████████████████████████

---

[11] ██████████████████████████████████████████
██████████████████████████████████████████
Pls.' Ex. 9 at 83-84. █████████████████████████
████████████████████████████████ *Id.*



Pls.' Ex. 9 at 86-90

If there had been such direction to the Tasigna® team, plaintiffs would have found far more than three innocuous emails.

## IV.   The Files of Seven Global and Strategic Marketing Custodians Are Not Relevant or Proportional To The Litigation.

Plaintiffs renew their prior request for custodial files from seven global marketing and strategic marketing employees previously considered by the Court.[12]

Plaintiffs are not entitled to discovery on matters not relevant to the litigation. *See*, *e.g.*, *Herman v. SeaWorld Parks & Ent., Inc.*, No. 8:14-cv-3028-T-35JSS, 2016 WL 3746421, at *2 (M.D. Fla. July 13, 2016) ("Discovery is [] shaped by the allegations in the complaint in that discovery must be relevant to the claims at issue in the litigation."). Plaintiffs are mistaken that global and strategic marketing custodians have relevant information on the "core issues." Pls.' Mot. at 15.

Global marketing files are irrelevant in these cases, which involve plaintiffs treated with a product approved by the U.S. FDA, accompanied by product labeling approved by FDA. Plaintiffs omit the critical fact that the Rule 30(b)(6) deponent on

---

[12] These custodians are: 1) James Campbell, Sr. Brand Director; 2) Vivian Cheung, Global Brand Director / Sr. Product Director; 3) Richard D'Addabo, Associate Director; 4) Margaret Dean, Global Brand Director; 5) Elizabeth Rosenkrantz, Sr. Director, Global Brand Leader, Tasigna®; 6) Vanessa Thiron-Cullity, Global Brand Strategy Leader, Global Strategy Leader Leukemias; and 7) Jane Vesotsky, Sr. Product Director, Global Product Strategy.

NPC's corporate structure, Richard Fosko, testified that global marketing does not direct marketing activities in the United States; the U.S. marketing team is responsible for creating marketing materials and implementing marketing plans in the United States. Fosko Dep. 141:11-20 (**Ex. 8**) (testifying that global marketing is responsible for marketing materials *outside* the United States only); 162:10-21 ("So in the U.S., for example, the marketing folks would take that strategic plan and implement it . . . in compliance with FDA regulations.").

The strategic marketing function also is not relevant to the claims and defenses in these cases. Strategic marketing monitors meetings of the Global Program Team ("GPT") and reports back to the Executive Product Director (which later became the VP Global Disease Lead CML). Fosko Dep. 150:9-15. GPT meetings are attended by multiple other team members who are already custodians, such as Drug Regulatory Affairs, medical affairs, clinical, and safety. Those other team members are closely involved in the science and labeling decisions for Tasigna® – the issues relevant to these cases – and NPC has produced the custodial files of appropriate participants in the GPT in those functions.[13] Further, the strategic marketing function is not responsible for the sales force, medical affairs, or any other function that routinely conducts NPC's outreach to individual prescribing physicians to market products in the United States. Fosko Dep. 162:22-163:11.[14]

---

[13] This includes eight custodians in regulatory, seven custodians in safety, and three custodians in clinical studies.

[14] *Id.* ("Q: [D]id these strategic marketing individuals have responsibilities for designing brochures or other marketing materials of that nature? A: [I]t would be the U.S. marketing folks that would

The seven requested custodians in global and strategic marketing were not expected to play a role in U.S.-directed marketing activities and therefore, they are unlikely to have relevant or unique information. NPC has already produced documents from six U.S. marketing custodians, and therefore the production of global and strategic marketing custodial files will likely yield duplicative and irrelevant information. Indeed, NPC already produced **63,284 emails and documents (41,399 of which were produced *Lauris*)** sent to or from these seven requested custodians. It would be unduly burdensome for NPC to review and produce additional documents from these seven custodians.

### A.    Global Marketing

Plaintiffs have not identified anything unique to be gained from the custodial files of Ms. Dean or Ms. Rosenkrantz beyond that which has already been produced in this litigation from other custodians.[15]

Plaintiffs rely on five emails for their argument that the custodial files of these individuals should be discovered, all of which were produced in *Lauris*, *see* Pls.' Ex. 9 at 55-70. For Ms. Rosenkrantz, ███████████████████████████ ████████████████████████████████████ ██████████████████████████ Pls.' Mot. 21 & Pls.' Ex. 9 at 55-61. ████████ ████████████████████████████████████ ████████████████████████████████████

---

actually take that strategic communication plan and implement it in deciding how and what advertising material vehicles that would need to be developed").

[15] *See supra* n.10.



and thus, there is no indication that Ms. Rosenkrantz participated in Tasigna® messaging in the United States.

For Ms. Dean,

Pls.' Mot. 21 & Pls.' Ex. 9 at 62-70. Plaintiffs concede that Ms. Dean's role was in global marketing,

*Id.* at 65-70. Thus, plaintiffs cite no evidence that Ms. Dean played a role in marketing Tasigna® in the United States. Plaintiffs also argue that Ms. Dean

Pls.' Mot. at 21.

Pls.' Ex. 9 at 71-72.

## B. Strategic Marketing

For Mr. D'Addabbo, plaintiffs cite only two emails produced in *Lauris* to support their contention that Mr. D'Addabbo's documents should be produced. Pls.' Ex. 9 at 5-12. But plaintiffs are mistaken. Plaintiffs argue that Mr. D'Addabbo's

*See* Pls.' Mot. at 18-19. But those tasks do not concern the central scientific issue in these cases – whether Tasigna® can and did in fact cause plaintiffs' alleged cardiovascular-related injuries. Notably, Mr. D'Addabbo worked on Tasigna® from 2008-2010 before reports of PAOD in Tasigna® patients arose. Neither email that plaintiffs cite discusses cardiovascular-related issues.

Plaintiffs fail to show how Mr. D'Addabbo's documents (who is in marketing) are of marginal utility to plaintiffs' ability to prove that Tasigna® causes cardiovascular-related issues and that NPC failed to warn about this alleged risk.

For Mr. Campbell, plaintiffs cite two emails produced in *Lauris*

Pls.' Mot. at 19 & Pls.' Ex. 9 at 13-15 (emphasis added). Plaintiffs concede that Mr. Campbell was a global employee,

Pls.' Ex. 9 at 13-14 (emphasis added).

*Id.* at 15. Plaintiffs do not cite any

18

evidence that Mr. Campbell handled Tasigna® marketing in the United States.

For Ms. Vesotsky, plaintiffs cite four emails (three of which were produced in *Lauris*) that show her involvement with the CVE working group for Tasigna®. Pls.' Mot. at 19 & Ex. 9 at 16-36. NPC has already produced the files of thirteen custodians who were members of the CVE working group, and all of them were included in the emails that plaintiffs cite for Ms. Vesotsky. While Ms. Vesotsky attended CVE working group meetings, she was not responsible for the scientific evaluation of the issue or the decision to update the Tasigna® label. It is speculation that there is unique, relevant information regarding the CVE working group in Ms. Vesotsky's emails that are not already captured in other produced custodial files.

With Ms. Cheung,  Pls.' Mot. at 20, Pls.' Ex. 9 at 37-43.

*See id.* at 37

Moreover, the emails from Ms. Cheung that plaintiffs cite include other document custodians, like Robert Miranda and Darshan Wariabharaj. None of the documents plaintiffs cite has anything to do with the central issue in these cases – whether NPC allegedly failed to warn that Tasigna® can cause

cardiovascular events and that alleged failure to warn resulted in plaintiffs' injuries.

For Ms. Thirion-Cullity, 

Pls.' Mot. 20 & Pls.' Ex. 9 at 44-55.

*See id.* at 45

[16] Plaintiffs have not cited any documents that show Ms. Thirion-Cullity had any involvement with U.S. labeling.

*See* 9/25/2015 email (**Ex. 9**)

## V.    Conclusion

Plaintiffs have not identified any evidence indicating that the thirteen additional custodians had involvement related to relevant issues not already reflected in the productions made. There is low marginal utility from these custodial files that will likely yield cumulative, irrelevant information that is not proportional to the associated burden. Accordingly, this Court should deny plaintiffs' motion.

---

[16] NPC submitted the 72-month data to the FDA in the annual Tasigna® PSUR. *See* Ex. 7.

Dated: February 23, 2022                    Respectfully Submitted,

                                            By: /s/ Robert E. Johnston
                                            Joe G. Hollingsworth, Esq.
                                            Robert E. Johnston, Esq.
                                            Andrew L. Reissaus, Esq.
                                            Grant W. Hollingsworth, Esq.
                                            HOLLINGSWORTH LLP
                                            1350 I Street Northwest
                                            Washington, District of Columbia 20005
                                            (202) 898-5800

                                            *Attorneys for Defendant Novartis*
                                            *Pharmaceuticals Corporation*

## **CERTIFICATE OF SERVICE**

I certify that on this 23rd day of February 2022, copy of the foregoing was sent to plaintiffs' counsel by email, and the redacted copy was served on all counsel of record through the Court's CM/ECF system.

/s/Robert E. Johnston
Robert E. Johnston, Esq.
*Attorney for Defendant*
*Novartis Pharmaceuticals Corporation*

## **List of NPC Exhibits Filed Under Seal**

- **Ex. 4** – 2/21/2014 Email from FDA to NPC
- **Ex. 5** – 2/22/2014 Internal NPC Email
- **Ex. 7** – Annual NPC Report
- **Ex. 9** – 2/25/2015 Internal NPC Email