# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

IN RE: TASIGNA (NILOTINIB)
PRODUCTS LIABILITY LITIGATION

Case No. 6:21-md-03006-RBD-DAB
(MDL No. 3006)

This document relates to all actions.

---

## NOVARTIS PHARMACEUTICALS CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION FROM NOVARTIS PHARMACEUTICALS CORPORATION'S NON-CUSTODIAL SOURCES

Novartis Pharmaceuticals Corporation ("NPC") hereby opposes plaintiffs' Motion to Compel Production from NPC's Non-Custodial Sources (ECF No. 84).

## INTRODUCTION

NPC has produced in this litigation 84,878 documents (almost 75 gigabytes of data) from eleven non-custodial sources. This includes thousands of pages of documents from various databases, including, among several others, CREDI (NPC's clinical, regulatory documentation, and information system); ARGUS (NPC's safety database); and REDI (NPC's U.S. regulatory file). In its ongoing document search and production efforts, NPC has agreed to produce documents related to Tasigna® from CREDI for *all* CML project codes, and has already produced many of those documents.

Plaintiffs now insist on NPC adding clinical trial data from CREDI for Tasigna® indications and project codes entirely unrelated to CML, the indication for which they were prescribed Tasigna®. But plaintiffs are not entitled to discover these documents. Because plaintiffs already have access, through other sources, to voluminous Tasigna® safety data arising from the use of Tasigna® for non-CML indications, the information they demand is duplicative and cumulative, and plaintiffs should not be allowed to needlessly amplify NPC's document production burden. Plaintiffs attempt to compound that burden even further by insisting they are also entitled to discover raw, non-aggregated, SAS data related to Tasigna® clinical trials. But NPC has already produced much of that information in the form

1

of thousands of pages of individual anonymized patient-level data. To the extent plaintiffs demand more than NPC has already produced, they neither demonstrate that the information is relevant, nor can they overcome the fact that the burden to NPC in producing this data far exceeds any marginal benefit plaintiffs may have in obtaining it.

## LEGAL STANDARD

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Relevancy and proportionality are the guiding principles" governing discovery under this Rule. *McArdle v. City of Ocala, FL*, 451 F. Supp. 3d 1304, 1308 (M.D. Fla. 2020). As to relevance, discovery is not allowed if the information sought has "no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action." *DeMayo v. Palms W. Hosp.*, No. 11-CV-81211, 2012 WL 13076830, at *1 (S.D. Fla. Aug. 15, 2012). And proportionality "focuses on the marginal utility of the discovery sought." *Edmondson v. Velvet Lifestyles, LLC*, No. 15-CV-24442, 2016 WL 5682591, at *5 (S.D. Fla. Oct. 3, 2016) (internal quotation marks omitted).

Furthermore, the information sought cannot be "overly burdensome to the responding party" and must be "tailored to the issues involved in the particular case." *Rosenbaum v. Becker & Poliakoff, P.A.*, No. 08-CV-81004, 2010 WL 11505517, at *1 (S.D. Fla. Apr. 13, 2010). Thus, the Court must limit discovery if

the information at issue "can be obtained from some other source that is more convenient, less burdensome, or less expensive, or the burden or expense of [the] proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." *Walker v. Credit Prot. Ass'n, LP*, 309 F.R.D. 668, 671 (M.D. Fla. 2015) (citing Fed. R. Civ. P. 26(b)(2)(C)).

Plaintiffs contend that "NPC bears the burden" to substantiate its objections. Pls.' Mot. 4. But they neglect to point out the threshold requirement that "[t]he party moving to compel discovery has the ***initial*** burden of proving the requested discovery is relevant and proportional." *Gov't Emps. Ins. Co. v. Merced*, No. 8:20-CV-802, 2021 WL 1405488, at *1 (M.D. Fla. Apr. 14, 2021) (emphasis added); *see also, e.g.*, *Douglas v. Kohl's Dep't Stores, Inc.*, No. 6:15-CV-1185, 2016 WL 1637277, at *2 (M.D. Fla. Apr. 25, 2016) ("The proponent of a motion to compel discovery . . . bears the initial burden of proving that the information sought is relevant."); *Diamond State Ins. Co. v. His House, Inc.*, No. 10-CV-20039, 2011 WL 146837, at *5 (S.D. Fla. Jan. 18, 2011) (same). It is only after the moving party—here, plaintiffs—has proven relevance and proportionality that "[t]he responding party must then specifically show how the requested discovery is unreasonable or unduly burdensome." *Merced*, 2021 WL 1405488, at * 1. Plaintiffs rely on a decision in the *3M Combat Arms Earplug* MDL for the

3

proposition that NPC bears the burden. *See* Pls.' Mot. 4 (citing *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 4043311, at *1 (N.D. Fla. July 17, 2020) (citing cases that pre-date the proportionality amendment to Rule 26). Less than a month after that decision, however, that same MDL court reiterated that the burden is on the requesting party. *See In re 3M Combat Arms Earplug*, 2020 WL 4501794, at *1 (noting that "the requesting party" must demonstrate relevance of information sought).

## **ARGUMENT**

### I.    **Plaintiffs Are Not Entitled to Discover Documents Related to Non-CML Project Codes for Tasigna® Clinical Trials.**

NPC has emphasized repeatedly that it is willing to produce documents from its CREDI database for all CML indications and project codes. And in the meet and confer process, NPC agreed (at plaintiffs' insistence) to abandon the use of the court-ordered set of broad search terms to limit the production to only the documents most likely to be relevant to the cardiovascular claims in this litigation. But plaintiffs are not entitled to the production of documents from CREDI for Tasigna® indications/project codes that are unrelated to CML, which is the indication for which all plaintiffs received Tasigna® (non-CML indications were studied but are not approved indications).

Plaintiffs have Tasigna® safety data arising from the use of Tasigna® for non-CML indications through several other sources that NPC has already produced. This includes the Tasigna® U.S. regulatory file from the REDI database

(which contains, among other things, periodic safety updates and summaries of safety), adverse event safety data from the ARGUS database (which is not limited to just adverse events occurring in patients receiving Tasigna® for CML), and hundreds of thousands of emails produced from thirty-six custodial files (from which additional productions are ongoing). Plaintiffs cite no case law and have articulated no sound basis—other than seeking safety information to which they already have access—that might support the production of non-CML indications/project codes (*i.e.*, the possible uses of the medication to treat diseases unrelated to CML) from the CREDI database. This discovery is both duplicative and cumulative, and any incremental benefit of producing this information does not justify the burden to NPC, because plaintiffs already have the safety data regarding Tasigna®, regardless of indication. *See Wagner v. Viacost.com*, No. 06-CV-81113, 2007 WL 1879914, at *1 (S.D. Fla. June 29, 2007) (emphasizing that even relevant information is not discoverable if the information "is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure"). Because plaintiffs already have extensive safety data related to the use of Tasigna® for non-CML indications, the Court should not permit them to impose on NPC the undue burden of collecting and producing a duplicative set of documents.

II.     **Plaintiffs Are Not Entitled to Discovery of the Requested Raw SAS Data for Tasigna® Clinical Trials.**

Although NPC has agreed to produce voluminous amounts of information related to Tasigna® clinical trials, plaintiffs insist they are also entitled to discover "the underlying raw [SAS] data for thirty-eight" Tasigna® clinical trials. Pls.' Mot. 2. But plaintiffs have failed to demonstrate the relevance of any of the requested data. Moreover, to the extent any of the requested raw SAS data is relevant and has not been produced, the marginal utility of that data is far exceeded by the burden to NPC in producing it.

A.     **NPC Cannot Produce Raw Data Related to Ongoing, Non-U.S., and Third-Party Clinical Trials.**

As an initial matter, NPC simply cannot produce data from clinical trials that remain active and have not yet been submitted to the FDA. Six of the thirty-eight clinical trials for which plaintiffs seek data are ongoing trials that have not been finalized.[1] *See* Declaration of Richard Dennin, ¶ 12 (**Ex. A**). Any data that is prematurely disclosed from these ongoing clinical trials would be incomplete. *Id.* Moreover, premature data disclosure would undermine the clinical trial itself. As explained by other courts, "premature disclosure of data can undermine an ongoing study by exposing information before it is fully analyzed" and "disclosure of tentative analysis of data and drafts of articles can have an adverse impact on the abilities of researchers to exchange their thoughts and speculations about ongoing

---

[1] These include: CABL001E2201, CAMN107ADE20, CAMN107I2201, CAMN107A2409, CAMN107A2408, and CAMN107DDE06.

research." *Andrews v. Eli Lilly & Co.*, 97 F.R.D. 494, 502-03 (N.D. Ill. 1983) (quashing subpoena that sought to compel production of data related to ongoing clinical trial), *vacated on other grounds sub nom. Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556 (7th Cir. 1984); *see Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1276-78 (7th Cir. 1982) (affirming district court decision declining to compel production of raw research data before relevant and probative results could be reached).

In addition, eighteen of the remaining clinical trials (excluding non-NPC trials) do not have any U.S. patients.[2] *See* Decl. of Richard Dennin, ¶ 15. These trials are often used for publications and are generally not used to support the approval of a pharmaceutical product or to support a new indication for a marketed pharmaceutical product by the U.S. FDA. *See id.* In addition, there are considerable data privacy difficulties in sharing data from trials conducted outside the United States, as each country has its own data privacy laws and regulations that may restrict what patient-level data can be used and shared. *See id.* ¶ 16. Furthermore, because CML is rare, these varied privacy laws might be even more restrictive because of the small number of individuals with the disease enrolled in the clinical trials. *Id.* Given the small population of patients with CML, a

---

[2] These include: CAMN107ADE20, CAMN107ECN02E1, CAMN107AIC05, CAMN107DDE05, CAMN107A1101E1, CAMN107ECN02, CAMN107ETR02, CAMN107E2401, CAMN107AKR02, CAMN107EIC01, CAMN107FJP01, CAMN107A2404, CAMN107ABR03, CAMN107A2405, CAMN107DDE06, CAMN107DBR01, CAMN107D1201, and CAMN107A1101.

participant in a CML clinical trial may become identifiable using only a few data points. Compared with the general population or a population of people with a more common disease, only a few data points might reveal the identity of an individual participating in a CML clinical trial. Thus, before NPC could produce data from such trials, it would have to undertake an analysis of what data, if any, from particular trials would have to be redacted. *See id.*

Finally, as plaintiffs also acknowledge, *see* Pls.' Mot. 2 n.1, NPC also cannot produce data with respect to clinical trials conducted by third parties. *See cf. Mamani v. De Lozada Sanchez Bustamante*, No. 07-22459, 2017 WL 3456327, at *3-4 (S.D. Fla. Aug. 11, 2017) (holding that former corporate officer could not be compelled to produce corporate documents because they were not in his physical possession). Seven of the thirty-eight trials at issue fall into this category.[3] *See* Decl. of Richard Dennin, ¶ 11. NPC performed a reasonable investigation into these trials and determined that it does not have possession of raw SAS data for these third-party clinical trials.[4] *See id.*

---

[3] These include: NCT04126681, NCT03332511, NCT02891395, NCT02627677, NCT02086487, NCT01140568, and NCT00129740.

[4] Six of the clinical trials that plaintiffs requested—CAMN107DDE05, CAMN107B2301, CAMN107G2301, CAMN107DDE06, CAMN107DBR01, and CAMN107D1201—evaluate whether Tasigna® can be used as a treatment for something other than CML, such as gastrointestinal stromal tumors and melanoma. *See* Decl. of Richard Dennin ¶ 13. As previously argued, plaintiffs are not entitled to documents related to non-CML indications. *See supra* Section I. Similarly, plaintiffs do not need raw statistical data from clinical trials for other medications where some patients received nilotinib, because ARGUS captures data on any serious cardiovascular events experienced by clinical trial patients who received nilotinib.

**B.** **NPC Has Already Produced to Plaintiffs Much of the Data They Seek.**

Plaintiffs rely on their expert, Dr. David Madigan, to both identify the specific data at issue here and attempt to explain his need for that data. *See* Decl. of David Madigan ¶¶ 5-11 (Pls.' Ex. A). In his declaration, Madigan identified six previous product liability litigations in which he testified and notes that "[i]n each case, the sponsor provided me with complete study documentation (protocol, data analysis plan, clinical study reports, data dictionaries) as well as complete, final, patient-level trial data." *Id.* ¶ 11. He insists he needs these documents to understand the nature of each clinical trial and its findings. *Id.* ¶¶ 6-7.

NPC, however, has already produced most of these documents. In its ongoing efforts to fulfil its sizable discovery obligations in this litigation, NPC produced to plaintiffs ***thousands of pages*** of clinical trial protocols (including amendments made during the course of the trial), statistical analysis plans, and clinical trial reports (including both interim reports, when available, and final reports). These documents were produced for many of the clinical trials at issue here. *See, e.g.*, TREDI01044619-83 (clinical trial protocol); TREDI01361241-49 (statistical analysis plan); TREDI01360142-TREDI01362273 (clinical trial report).

At the core of this discovery dispute is plaintiffs' bid to secure raw, patient-level data that would supposedly enable Madigan to "run fresh and unbiased analyses." Pls.' Mot. 9. They point out that "[t]he issue of 'open data' is becoming increasingly important in the medical and scientific communities[,]" and that the

British Medical Journal now "no longer publish[es] any trial of drugs or devices where the authors do not commit to making the relevant anonymi[z]ed patient level data available, on reasonable request." Pls.' Mot. 11 (citing publication by British Medical Journal). But NPC has already provided voluminous patient-level trial data. *See, e.g.*, TREDI01361254-71. Indeed, in just one sample of the clinical trial reports NPC produced, plaintiffs will find, if they review it, ***1017 pages*** of ***individual*** anonymized ***patient-level*** data, including: demographic information such as each trial participant's history of disease, relevant medical history, and prior therapies; "compliance and drug concentration data"; "individual efficacy response data"; "adverse event listings" for "each patient"; "individual laboratory measurements by patient"; and individual "vital signs and other observations related to safety." NPC has produced the type of data a statistician might need to analyze the clinical trials at issue, and which plaintiffs experts in prior cases presumably analyzed. What plaintiffs ultimately seek here is raw, non-aggregated, SAS data that plaintiffs' expert may then manipulate or modify. But they cannot compel NPC to adopt the burden of producing data that is already replicated in an aggregated form in other sources that NPC has already produced to plaintiffs.[5]

---

[5] In addition to the document production burden involved, the manipulation or modification of any SAS data by plaintiffs or their expert following NPC's production may render any resulting output subject to strong *Daubert* challenges and thus inadmissible. NPC would also be unable to authenticate any data that plaintiffs or their expert manipulate or modify. Plaintiffs would have to produce any analysis of the raw data performed by Madigan, including any that did not support or undercut any of plaintiffs' claims.

**C.     Plaintiffs Have Failed to Establish the Relevance of Any Requested Raw SAS Data That NPC Has Not Already Produced.**

With respect to any raw SAS data that NPC has not produced, plaintiffs fall far short of meeting their "initial burden of proving the requested discovery is relevant and proportional." *Gov't Emps. Ins. Co. v. Merced*, No. 8:20-CV-802, 2021 WL 1405488, at *1 (M.D. Fla. Apr. 14, 2021). Although the Court instructed plaintiffs to be "concrete" in explaining "why this information needs to be disclosed," 2/7/2022 Status Conf. Tr. 11:12 14 (ECF No. 81), plaintiffs only offer generalized accounts for the relevance of the raw SAS data they seek. Their generalized claims of relevance are, at any rate, inadequate.

Madigan suggests that the "raw data are essential to enable the analyst to ensure that pre-specified analyses were indeed carried out as specified and to enable that analyst to conduct analyses that the sponsor failed to carry out or failed to record." Decl. of David Madigan ¶ 9. Plaintiffs' account for why the raw SAS data at issue is relevant suggests they intend to independently assess the raw data and, in effect, audit the clinical trials in order to challenge the adequacy of NPC's disclosures to the Food and Drug Administration. Under *Buckman Co. v. Plaintiffs' Legal Comm.*, however, any state law claim predicated on the failure to report adverse events to the FDA is impliedly preempted. *See* 531 U.S. 341 (2001); *see also, e.g.*, *Byrnes v. Small*, 60 F. Supp. 3d 1289, 1297 (M.D. Fla. 2015). Thus, to the extent plaintiffs are demanding the raw SAS data in order to challenge NPC's

disclosures to the FDA, such a claim would be preempted under *Buckman* and any discovery directed at that claim would be impermissible.

Furthermore, to the extent plaintiff's rationale for demanding the raw SAS data is to reassess the classifications of the alleged adverse events reported in the clinical trials, Madigan lacks the expertise to make any such assessments. By his own account, Madigan is an expert in statistics and epidemiology, not pharmacology, cardiology, rheumatology, gastroenterology, neurology, vascular biology, or any other medical discipline relevant to Tasigna®.[6] *See* Decl. of David Madigan ¶¶ 1-3. He is not a medical doctor and has never held a position at a medical school. He has no clinical background or experience, no expertise in weighing the risks and benefits of medicines, and no expertise in the clinical decision to prescribe medicine. Because Madigan plainly lacks the expertise to make any medical or clinical assessments related to the classification of the raw, non-aggregated data, plaintiffs have failed to demonstrate the relevance of that data to their expert's analysis.

According to plaintiffs, in *Jones v. Novartis Pharmaceuticals Corporation*, a "[p]laintiff's expert's opinion [was found] unreliable in part because he did *not*

---

[6] Although Madigan's academic training and employment history is **solely** in statistics and mathematics, he also purports to be "an epidemiologist and an expert in epidemiology." Decl. of David Madigan ¶ 1. This is at odds with his claims in prior cases where he only claimed to be an expert in statistics. *See, e.g.*, Expert Report of David Madigan, ¶ 1, *In re Vioxx Prods. Liab. Litig.*, No. 2:05-MD-01657 (E.D. La. Dec. 8, 2013) (ECF No. 65166-3), 2013 WL 12063955 (**Ex. E**). At any rate, Madigan's purported expertise in epidemiology does not qualify him to diagnose or reclassify adverse events in clinical trials.

analyze raw data, but instead performed a post hoc analysis based only on data published in an article." Pls.' Mot. 9 (emphasis in original) (citing *Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1284 (N.D. Ala. 2017), *aff'd in part*, 720 F. App'x 1006 (11th Cir. 2018)). The plaintiff's expert in that case, another statistician, had reassessed a clinical trial by reclassifying one diagnosis as another. *Id.* at 1284. The court found that expert's analysis unreliable because, as a mere statistician, he lacked the medical expertise to reclassify alleged adverse events. *Id.* In reaching that conclusion, the court added that "[the statistics expert] has not claimed he relied on the raw data from [a medical doctor's] analysis; instead, he performed a *post hoc* analysis based on the evidence as presented by [the medical doctor]." *Id.* NPC was the defendant in *Jones*, and plaintiffs claim that "NPC seeks to restrict Plaintiffs from accessing the very data that would allow their experts to satisfy this anticipated criticism and avoid such an attack in this case." Pls.' Mot. 10. But NPC did not argue in *Jones* that the statistician in that case had to analyze the raw statistical data before he could reclassify alleged adverse events; rather, NPC argued, as it does here, that the statistician lacked the expertise reclassify adverse events in the first instance. At any rate, the *Jones* court did not address whether discovery was allowed given the particular balancing of burden, benefit, and alternative sources raised in ***this*** case.

None of the other cases plaintiffs cite shed any light on the discoverability of the type of raw data plaintiffs demand here. In *In re Denture Cream Product*

*Liability Litigation*, the court addressed the reliability of an expert's use of certain raw data under *Daubert*, but the court was entirely silent on what type of data is discoverable and under what circumstances. *See* No. 09-MD-2051, 2015 WL 392021, at *16 (S.D. Fla. Jan. 28, 2015), *aff'd sub nom. Jones v. SmithKline Beecham*, 652 F. App'x 848 (11th Cir. 2016); *see also In re Denture Cream Prod. Liab. Litig.*, No. 09-MD-2051, 2013 WL 214672, at *9 (S.D. Fla. Jan. 18, 2013) (not addressing discovery, but instead whether defendant, in the context of motion to unseal, had waived its right to keep raw data confidential); *In re Zyprexa Prod. Liab. Litig.*, No. 04-MD-1596, 2005 WL 2237793, at *1 (E.D.N.Y. Apr. 7, 2005) (not addressing discovery, but only the format of raw data that might be produced); *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 16-17039, 2021 WL 311865, at *4 (E.D. La. Jan. 29, 2021) (citing Madigan's claim that "a Sanofi document" differed from "[clinical] trial SAS data[,]" but remaining silent about whether such data is discoverable or even what specific data was at issue), *reconsideration denied*, No. 16-17039, 2021 WL 1295090 (E.D. La. Apr. 7, 2021); *In re Pfizer Inc. Sec. Litig.*, No. 04-CV-9866, 2010 WL 11579504, at *4 (S.D.N.Y. Mar. 22, 2010) (noting expert "relied on SAS data" in the context of financial data in a securities action, but saying nothing about discoverability or even what specific data was at issue), *as amended* (Mar. 29, 2010). None of the cases plaintiffs cite directly addresses whether raw SAS data is generally discoverable (*i.e.*, relevant and proportional) over the producing party's objections, and they certainly do not

14

address whether such data would be relevant and proportional given plaintiffs' specific claims in this case and the documents NPC has already produced.

### D.   The Burden to NPC In Producing the Data at Issue Substantially Outweighs Any Marginal Benefit Plaintiffs May Have in Securing That Data.

Even if the information the requesting party seeks is relevant, discovery remains inappropriate if that information "is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Wagner v. Viacost.com*, No. 06-CV-81113, 2007 WL 1879914, at *1 (S.D. Fla. June 29, 2007). Consistent with this, the Court has instructed the parties "to include as one of your elements of focus the marginal utility of these documents compared to everything that's been done." 2/7/2022 Status Conf. Tr. 26:4-6 (ECF No. 81).

The raw data at issue is of marginal relevance to plaintiffs' claims, if at all. Plaintiffs cannot demand that NPC bear the burden of producing raw SAS data for which plaintiffs lack any proper use; as explained above, Madigan lacks the expertise to reassess and reclassify the raw data sought, and plaintiffs cannot demand raw data in support of claims that are preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). NPC has, however, already produced (or agreed to produce) ***thousands*** of pages of the type of individual anonymized patient-level data a statistician like Madigan might actually need to conduct a proper, independent analysis of the clinical trials at issue. That

15

information includes, among other things, demographic information, medical histories and therapies, compliance data, efficacy data, and adverse event listings, all identified on an individualized basis. Any proper statistical analysis can be performed with this voluminous patient-level data.

Indeed, Madigan himself concedes in his declaration that "[s]ome aspects of the raw data can be distilled from the clinical study report. . . ." Decl. of David Madigan ¶ 9. Doing so would not be unprecedented, even in the context of the exact claims raised in this litigation. In the prior Tasigna® cases, plaintiffs' expert prepared his own meta-analysis of cardiovascular events in NPC's Tasigna® trials without using the type of raw SAS data that plaintiffs demand here. Plaintiffs' expert instead relied on NPC's trial data produced from, among other sources, the REDI and ARGUS databases, as well as trial publications.

Madigan insists that in six previous product liability cases in which he has testified, he was provided "complete study documentation," and that "enabled [him] to conduct independent analyses that shed entirely new light on key questions related to safety and efficacy." Id. ¶ 11. Madigan's testimony in those cases, however, raises questions about the extent to which he relied upon or even had access to the type of raw SAS data plaintiffs demand here.

For instance, in the Fosamax litigation, Madigan was designated in the first federal atypical femur fracture bellwether case. Publicly filed deposition transcript excerpts confirm that, although he had access to certain unspecified SAS data from

the defendant in that case, the opinion he provided in his expert report and at his deposition did not require the assessment or even use of that data. *See* Excerpt of Deposition of David Madigan, at 52:1-53:6; 126:12-127:5, *Glynn v. Merck Sharp & Dohme Corp., et al.*, 3:11-CV-05304 (D.N.J. Dec. 7, 2012) (ECF No. 33-4) (**Ex. B**). Rather, Madigan conducted a disproportionality analysis of adverse event data from FDA's adverse event reporting system (FAERs data)—not raw statistical data—to assess a potential signal of problematic over-suppression of bone turnover and associated atypical femur fracture syndromes existed for Fosamax. *See* Excerpt of Defendant's Memorandum of Law in Support of Omnibus *Daubert* Motion, at 42, *Glynn v. Merck Sharp & Dohme Corp., et al.*, No. 3:11-CV-05304, (D.N.J. Jan. 15, 2013) (ECF No. 28-1) (**Ex. C**) ("Dr. Madigan conducted a computerized search of the FDA [F]AERS database for adverse event reports for Fosamax and other osteoporosis drugs that included certain words or terms."). The analysis of FAERS data that Madigan conducted in the Fosamax litigation is the same analysis that plaintiffs' expert conducted in the prior Tasigna® cases. That analysis can be performed using publicly available data.

Likewise, in the Valsartan litigation, Madigan did not rely on SAS data; instead, he rendered opinions regarding the strength of association of cancers reported in certain dietary and occupational observation studies that examined exposure to NDMA and/or NDEA. All of those studies were from the public literature and provided to him by another plaintiff expert in that case, Dr. Mayhar

Etminan. *See* Excerpt of Deposition of David Madigan, at 69:24-70:5, *In re: Valsartan Prods. Liab. Litig.*, 1:19-MD-02875, (D.N.J. Nov. 1, 2021) (ECF No. 1715-5) (**Ex. D**) ("Q: Did you understand that these were studies that plaintiffs had selected for you to review? . . . A: So the set of studies that I included in my analysis are studies that are pursuant to a [literature] search that Dr. Etminan did.").

Similarly, in the Vioxx litigation, Madigan does not appear to rely on any review or assessment of SAS data that was mentioned in his expert report. *See* Expert Report of David Madigan, ¶ 1, *In re Vioxx Prods. Liab. Litig.*, No. 2:05-MD-01657 (E.D. La. Dec. 8, 2013) (ECF No. 65166-3), 2013 WL 12063955 (**Ex. E**). Rather, Madigan criticized Merck's studies regarding the cardiovascular effects of Vioxx and criticized Merck's conclusions about the studies and what they did or did not show. *Id.* at 76 ("Merck's public statements concerning Vioxx's cardiovascular safety . . . were not supported by the evidence available to Merck (indeed, often flatly contradicted by that evidence) and were not grounded in reasoned and rigorous scientific testing.").[7]

---

[7] In light of the publicly available information related to Madigan's claim that in his previous cases he had access to and relied upon the type of raw SAS data at issue here, NPC requests the Court's leave to depose Madigan to ascertain whether he actually had access to raw SAS data in those previous cases, and, if so, whether and to what extent he used or assessed that data in rendering his opinions. Confidentiality orders in the other litigations limit third parties' ability to evaluate the details of plaintiffs' and Madigan's claims about the types and sources of data to which Madigan had access and on which he relied in those cases. Accordingly, the Court should not give consideration or weight to Madigan's declaration unless NPC has had the opportunity to first examine him on his work in those cases.

In sum, compared with the burden NPC will bear in producing the data at issue, any information NPC has not already produced here would be of marginal benefit to plaintiffs because Madigan can—as he has done in prior cases—perform his proposed statistical analysis without the raw SAS data plaintiffs demand. Accordingly, the discovery plaintiffs demand is neither warranted nor appropriate. *See Walker v. Credit Prot. Ass'n, LP*, 309 F.R.D. 668, 671 (M.D. Fla. 2015) (court must limit discovery that "can be obtained from some other source that is more convenient, less burdensome, or less expensive, or the burden or expense of [the] proposed discovery outweighs its likely benefit").

## CONCLUSION

NPC respectfully requests the Court enter an Order denying in its entirety Plaintiff's Motion to Compel Production from Novartis Pharmaceuticals Corporation's Non-Custodial Sources.

February 23, 2022                          Respectfully Submitted,

                                          By: */s/ Robert E. Johnston*
                                          Robert E. Johnston, Esq.
                                          Joe G. Hollingsworth, Esq.
                                          Andrew L. Reissaus, Esq.
                                          Hollingsworth LLP

                                          1350 I Street Northwest
                                          Washington, District of Columbia 20005
                                          (202) 898-5800

                                          *Attorneys for Defendant Novartis Pharmaceuticals Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 23rd day of February 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, causing all counsel of record to be served by electronic means.

By: /s/ *Robert E. Johnston*
Robert E. Johnston, Esq.
*Attorney for Defendant*
*Novartis Pharmaceuticals Corporation*
