# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

- - -

IN RE: FOSAMAX (ALENDRONATE : MDL No. 2243
SODIUM): PRODUCTS LIABILITY : Civ. Action No.
LITIGATION : 08-08(JAP)
:
:
THIS DOCUMENT RELATES TO: :
Bernadette Glynn and Richard :
Glynn v. Merck Sharp & Dohme :
Corp., et al. :
Civ. Action No. 3:11-cv-05304:

- - -

Friday, December 7, 2012

- - -

CONFIDENTIAL INFORMATION -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

Deposition of DAVID MADIGAN, Ph.D., held at Seeger Weiss LLP, 77 Water Street, 26th Floor, New York, New York, on the above date, beginning at 9:27 a.m., before Kimberly A. Overwise, a Certified Realtime Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 50

```
 1   give me your best guess -- strike that.
 2           If you had to give me your best
 3   estimate for how long you spent browsing the
 4   narratives in the WAES database, what would
 5   that be?
 6           MR. BUCHANAN:  It's the same
 7       objection as my earlier one.
 8           If you're able.
 9           THE WITNESS:  A few hours,
10       certainly fewer than ten.
11   BY MR. HECHT:
12       Q   Fewer than ten.  Okay.  Is it fair
13   to say, Doctor, that your browsing of the
14   narratives from the WAES database was not for
15   the purpose of excluding reports that you
16   thought were irrelevant to the issues of
17   oversuppression or atypical fracture?  Is that
18   fair?
19       A   Certainly not.
20       Q   Just not something you're qualified
21   to do; is that right?
22       A   Well, it's something I'm not
23   qualified to do, but I'm a little concerned
24   that that answer might imply that I would
```

Page 51

```
 1   think it is reasonable to go in and exclude
 2   reports.  It might or might not be.  It would
 3   depend.  But, in any event, I do not have the
 4   expertise to really evaluate these narratives.
 5       Q   Do you believe there would be
 6   anything wrong with taking the output that you
 7   created in terms of the identification of the
 8   reports that underlie your data and
 9   scrutinizing them to determine if any of them
10   actually relate to atypical femur fractures or
11   oversuppression of bone turnover?  Is that not
12   a reasonable thing to do?
13       A   It's certainly not unreasonable to
14   review them, but the analysis stands.  You
15   know, these are the preferred terms that Merck
16   said were of interest and related to this
17   issue, and the analysis is what it is.
18           Is there a signal for these terms?
19   Yes, there is a signal for these terms.  And
20   we can see when the signal first became
21   apparent.
22       Q   So obviously we're going to talk
23   about that for quite a bit.  Let me just get
24   through some of our preliminary.
```

Page 52

```
 1           List of all materials the witness
 2   has reviewed.  So are there other Merck
 3   documents that you were provided by counsel
 4   that you -- and, again, we'll just keep this
 5   at a yes or no for now -- that you did not
 6   bring with you today?  Let's do that.
 7           MR. BUCHANAN:  Can I interject
 8       one issue, counsel?
 9           MR. HECHT:  Sure, please.
10           MR. BUCHANAN:  The witness has
11       consulted on a different issue concerning
12       Fosamax.  I will tell you that it relates
13       to something he has not rendered any
14       opinions on and will not be rendering any
15       opinions on without an additional report.
16       The witness has been provided with
17       additional materials in that context.
18       And I'll just state it relates to SAS
19       data.
20           So the materials that you've
21       been provided and frankly that I asked
22       the witness to gather were distinct from
23       those he was provided for a separate
24       analysis, which you may or may not be
```

Page 53

```
 1       aware there were some issues around
 2       getting appropriate SAS data.
 3           So I just give that to you as
 4       advice.  I give it to the witness so that
 5       the witness can answer in that context
 6       too.
 7   BY MR. HECHT:
 8       Q   Okay.  So let's keep the two
 9   separate for a second.  Excluding any
10   documents that relate to SAS data sets from
11   clinical trials, which I assume is what we're
12   talking about, are there documents that you
13   were provided by counsel, Merck documents or
14   Merck data, that you did not bring with you
15   today?
16       A   That are germane to this work?
17       Q   No.  Just in general that you were
18   provided.
19       A   There may be, but I don't believe
20   there are any that are relevant to this work
21   that I'm doing here.
22       Q   So, in other words, you weren't
23   given a larger set of documents from which you
24   subselected the ones that we have in front of
```

Page 126

```
 1    think is very clear from his report but
 2    just to be confirmatory on the record,
 3    I'm looking for an understanding as to
 4    areas that the doctor has not provided
 5    opinions on.
 6         MR. BUCHANAN:  We can stipulate
 7    on the record the doctor will not be
 8    tendering any opinions as it relates to
 9    efficacy based on his current report.
10         MR. HECHT:  All right.
11  BY MR. HECHT:
12    Q    Doctor, is it also fair to say that
13    you've not conducted a thorough review of the
14    Fosamax clinical trial data with regard to
15    safety or adverse events seen in the clinical
16    trials?
17         MR. BUCHANAN:  If I could
18    provide that same stipulation to you that
19    he's not going to tender any opinion with
20    regard to what the aggregate clinical
21    trial program shows from that data set.
22    Obviously there are clinical trial
23    reports among those in the data he did
24    look at, but I want to be clear.  The
```

Page 127

```
 1    doctor is looking at statistically the
 2    SAS data independent of it and that's not
 3    a tendered opinion.  And he will not be
 4    rendering a tendered opinion on the
 5    aggregate clinical trial program.
 6  BY MR. HECHT:
 7    Q    Doctor, is it true that the
 8    spontaneous reports that you reviewed and that
 9    are at least tabulated numerically in Appendix
10    A4 include reports from the clinical trials or
11    no?
12    A    They might.  That's not something I
13    looked at specifically.
14    Q    You didn't specifically -- I
15    apologize.  I thought you specifically
16    excluded -- I thought it was limited to
17    postmarketing data.  It's not; is that what
18    you're saying?  Or --
19    A    It is not.
20    Q    Doctor, is it fair to say that there
21    is no statement that you provided in your
22    report offering any opinion about a
23    cause-and-effect relationship between Fosamax
24    and atypical femur fractures?
```

Page 128

```
 1    A    Sorry.  You asked me did I express
 2    an opinion about a causal association
 3    between --
 4    Q    Did you express an opinion in your
 5    report about a cause-and-effect relationship
 6    between Fosamax and atypical fractures?
 7    A    No, I did not.
 8    Q    Did you express an opinion in your
 9    report about a cause-and-effect relationship
10    between Fosamax and oversuppression of bone
11    turnover?
12    A    No, I did not express an opinion
13    about the causal association.
14    Q    Did you express an opinion in your
15    report about any conclusions you draw from any
16    observational studies or epidemiologic studies
17    that have been conducted regarding
18    bisphosphonates and femur fractures?
19    A    Did I express opinions about them?
20    No, I did not.
21    Q    Can I -- can we agree, sir, that
22    since you did not express those types of
23    opinions in your report, you will not be
24    offering them at the time of trial, at least
```

Page 129

```
 1    in this case?
 2    A    That's a question for Mr. Buchanan.
 3    I'm aware of many of these studies.  And if I
 4    was asked to provide an opinion about them, I
 5    certainly could.  So I can't answer that
 6    question.
 7    Q    You were aware of those studies, but
 8    you chose not to comment on them in your
 9    report; correct?
10    A    That's not what I was asked to do,
11    not my choice.  I was asked to look at --
12    specifically at AERS.  The question is in here
13    what I was exactly asked to do:  Using
14    standard pharmacovigilance techniques and data
15    sources.  That's what I did.
16    Q    Did you feel that you were limited
17    in some way in terms of the references that
18    you could include in your report or things of
19    that nature in terms of what you could say in
20    your report?
21    A    No, not at all.
22    Q    Okay.  And so at some level you
23    chose not to say certain things in your report
24    or chose not to reference certain things in
```

Page 130

1  your report; correct?
2  A  Fair enough. I confined myself to
3  what I did. There are many other dimensions
4  that I could have. You just touched on two of
5  the clinical trials and epidemiological
6  studies. That basically is not within scope
7  of what I did. I have nothing against doing
8  it.
9  Q  I'm not trying to create more work
10 for you. I'm just trying to make sure that we
11 have a level playing field at the time of
12 trial. If I use the term "hierarchy of
13 scientific evidence," I know you know what
14 that means.
15 A  Sure.
16 Q  Is it fair to say that you ascribe
17 to the hierarchy of scientific evidence?
18      MR. BUCHANAN: I'll object to
19    form.
20      THE WITNESS: Did I --
21 BY MR. HECHT:
22 Q  Do you ascribe to it? I'm sorry.
23 A  Ascribe to it?
24 Q  Do you believe in it? Do you agree

Page 131

1  with it?
2  A  Well, we'd have to talk about what
3  it is because it is not uniquely defined. The
4  idea that there are different -- that the
5  quality of the evidence provided by different
6  kinds of studies varies, sure, I accept that.
7  But the specifics of what the pecking order
8  is, we'd have to get into the details.
9  Q  Well, can we generally agree that in
10 the hierarchy of scientific evidence, the best
11 evidence at the top includes clinical trial
12 data; somewhere in the middle is observational
13 data like epidemiologic studies, whether
14 case-control or cohort, whether retrospective
15 or prospective; and at the bottom are case
16 reports, case series, individual opinions,
17 things of that nature? Can we generally agree
18 in terms of the top, middle, and bottom
19 without getting too specific about it?
20      MR. BUCHANAN: Objection to
21    form.
22      THE WITNESS: Where are you
23    putting spontaneous reports?
24

Page 132

1  BY MR. HECHT:
2  Q  Case reports and case series.
3  A  Yes. No, I don't accept that.
4  Q  You don't accept that?
5  A  No, I do not accept that.
6  Q  You believe that --
7  A  I accept the clinical trials,
8  randomized clinical trials, all things being
9  equal, assuming a high-quality trial, are at
10 the top of the heap.
11 Q  Okay.
12 A  But I do not accept that necessarily
13 an epidemiological study, a cohort study or a
14 case-control study, is necessarily better than
15 an analysis done of spontaneous reports. And
16 this is a topic I've thought very carefully
17 about over a long period of time.
18      There isn't an ounce of evidence out
19 there that -- of objective, empirical evidence
20 that that is the case. To the contrary, I
21 mean, in the context of the research I'm
22 doing, involved in in the last few years,
23 something called the Observational Medical
24 Outcomes Partnership, in fact, recently we

Page 133

1  have developed evidence that, in fact, there
2  isn't a clear winner amongst spontaneous
3  report analyses and, say, cohort studies of
4  large observational databases, which is new.
5  Nobody has quantified this previously.
6  Q  I was just about to say, if I wanted
7  to be find published support for that concept,
8  it does not exist yet?
9  A  That's correct. It's in progress.
10 Q  Is that one of the two or three
11 papers that we talked about earlier that are
12 sort of in press or in manuscript form, or are
13 we at a more ethereal level with that?
14 A  Two concepts. One is -- I'll just
15 answer your question. The paper doesn't yet
16 exist.
17 Q  Okay.
18 A  It's close to existing. We're close
19 to that point.
20 Q  You can feel free to just answer my
21 question anytime.
22 A  I'm sorry. I was going to provide
23 some context, but it's not necessary.
24 Q  Would you agree with me that you

Page 286

```
 1   run on it.  And if you're looking for
 2   clarity, I just want to make sure you
 3   understand that.  That was at least my
 4   understanding of what those DAT files
 5   represented.  So that may explain --
 6           MR. HECHT:  Yeah, I understand.
 7           MR. BUCHANAN:  Okay.  I wanted
 8   to make sure.
 9           THE WITNESS:  Can we take a
10   break fairly soon?
11           MR. HECHT:  Yes, let's do it
12   now.  Please.  This is a good time.
13           (Short recess.)
14   BY MR. HECHT:
15       Q   So, Doctor, just as I understand it,
16   we had a discussion towards the end of the
17   last session and then a little bit off the
18   record about whether or not the DAT files that
19   Mr. Buchanan provided last Friday to counsel
20   are the files from the AERS database after the
21   files were deduped as opposed to potentially
22   before they were deduped.  And you've
23   graciously offered, as I understand, to make
24   sure, verify that they are and if they aren't,
```

Page 287

```
 1   to give us the ones that are deduped; is that
 2   fair?
 3       A   That's correct, yes.
 4           (Madigan Exhibit No. 16 was
 5       marked for identification.)
 6   BY MR. HECHT:
 7       Q   I'm going to hand you what I'm
 8   marking as Deposition Exhibit No. 16, which
 9   is -- so this is hopefully not
10   controversial -- data from two of your parts
11   of the report.  So the preferred term column
12   on this chart are exactly the same preferred
13   terms that you used in connection with your
14   report.  The second column, the year that
15   alendronate had a signal of disproportionate
16   reporting hopefully corresponds to the chart
17   on Page 10 of your report in terms of the year
18   that's listed in the alendronate column.
19   You'll correct me if I'm wrong.
20       A   I'm just quickly checking.  I'm sure
21   it's fine.
22       Q   Yes, sir, please do.
23           MR. BUCHANAN:  And what did we
24       mark this as, 16?
```

Page 288

```
 1           MR. HECHT:  16.
 2           THE WITNESS:  Yes.
 3   BY MR. HECHT:
 4       Q   Okay.  And then the third column
 5   is -- since we confirmed that I'm reading
 6   Appendix A4 correctly, I'll take it one step
 7   further now.  And so the third column is
 8   representing the number of reports on which
 9   the signal of disproportionate reporting is
10   based.  And so as I see you're already doing,
11   just quickly confirm that my numbers are
12   correct.  And we can obviously make any
13   adjustments we need to if they are not.
14       A   Yep.
15       Q   Okay.  Great.  As you sit here
16   today, Doctor, let's take the first row there,
17   fracture delayed union.  There were ten
18   reports with that preferred term in
19   alendronate users by the end of 2004 per your
20   analysis; correct?
21       A   Correct.
22       Q   Are you able to say as you sit here
23   today how many of those reports are actually
24   reports of atypical femur fractures?
```

Page 289

```
 1       A   No, I am not.
 2       Q   Are you able to say how many of
 3   those reports are actually reports of patients
 4   with, quote, oversuppressed bone turnover?
 5       A   I cannot.
 6       Q   If we go to the next row, fracture
 7   malunion, according to your analysis, based on
 8   three reports you found a signal of
 9   disproportionate reporting in 2002; correct?
10       A   Correct.
11       Q   Of those three reports, are you able
12   to tell me how many of them are atypical femur
13   fractures as you sit here today?
14       A   No, I am not.
15       Q   Are you able to tell me how many of
16   them are reports of oversuppressed bone
17   turnover?
18       A   No, I am not.
19       Q   Are you able to tell me that any of
20   them are actually reports of atypical femur
21   fracture or reports of oversuppressed bone
22   turnover?
23           MR. BUCHANAN:  Objection to
24       form.
```

**Page 290**

1  You can answer.
2  THE WITNESS: No. What I'm
3  telling you are the signals vis-a-vis the
4  preferred terms that Merck said were the
5  search terms they used for atypical femur
6  fractures and oversuppressed bone
7  turnover.
8  BY MR. HECHT:
9  Q  Third row, fracture nonunion, as I
10  understand your analysis, based on nine
11  reports you identified a signal of
12  disproportionate reporting for alendronate and
13  fracture nonunion in '05; correct?
14  A  Correct.
15  Q  And, again, you're not able to tell
16  me as you sit here today how many of them, if
17  any, are atypical femur fractures; correct?
18  A  I do not know how many are atypical
19  femur fractures.
20  Q  And you're not able to tell me how
21  many, if any, are reports of oversuppressed
22  bone turnover; correct?
23  A  Correct.
24  Q  Just to shortchange this a little

**Page 291**

1  bit, I assume your answers are going to be the
2  same for the number of reports of atypical
3  femur fracture and the number of reports of
4  oversuppressed bone turnover for every row in
5  this chart; is that right?
6  A  That's correct. And I would
7  probably keep interjecting the explanation as
8  to why I looked at those terms.
9  Q  And we're going to get to that in
10  just a second. I understand. All right.
11  Actually, before we leave that exhibit, sir,
12  is it in your opinion scientifically
13  appropriate to rely on signal detection when
14  you're dealing with in some cases single digit
15  numbers of reports?
16  A  The whole idea behind using EB05 in
17  particular is to deal in a sensible way with
18  small numbers. This is the problem with some
19  of the older methods. EB05 deals with it in a
20  statistically very sensible and reasonable
21  way. So absolutely, yes.
22  Q  You said in your report, sir, that
23  historically these types of calculations have
24  typically omitted adverse events with fewer

**Page 292**

1  than a hundred reports. Do you remember
2  saying that, sir? It's Paragraph 31.
3  A  Yep, yep. And I said why in my
4  report, computational considerations that are
5  no longer relevant.
6  Q  Nevertheless, you did not do that
7  here, you did not omit terms that had fewer
8  than a hundred reports; right?
9  A  Nor would I ever -- I would never --
10  I would not be a proponent of doing that. I
11  don't think that's desirable or necessary
12  anymore.
13  Q  If you had done it here -- I
14  understand your position that you don't think
15  it's appropriate or desirable, whatever you
16  just said. But if you had, as we can just see
17  from this chart, it would have meant that
18  you'd only be talking about pathological
19  fracture and bone disorder and fracture
20  delayed union; right?
21  A  But this is like saying if I divided
22  all my EB05s by ten, we wouldn't have any
23  signals. It's just not something I would do.
24  Q  Is there any part in your report

**Page 293**

1  where you suggest that anyone's ever divided
2  all their EB05s by ten?
3  A  Fair enough. No, there isn't.
4  Q  But there is a part in your report
5  where you suggest that historically people
6  have omitted adverse events with fewer than a
7  hundred reports; right?
8  MR. BUCHANAN: Objection;
9  misstates the paragraph in the report.
10  THE WITNESS: So there's a
11  paragraph in my report where I discuss
12  that historically people used to do that,
13  but I don't do it and the reason for
14  doing it is no longer valid and there's
15  no reason to do it.
16  BY MR. HECHT:
17  Q  So, sir, if we were to fill out the
18  rest of this chart in terms of what you can
19  tell us --
20  A  Sorry. I need to make a correction.
21  Something I misunderstood I think in our
22  earlier communication there now.
23  Q  Go ahead.
24  A  This isn't quite right. It's drugs