EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: FOSAMAX (ALENDRONATE SODIUM): PRODUCTS LIABILITY LITIGATION** | **DOCUMENT FILED ELECTRONICALLY** |
| | **MDL No. 2243** |
| **THIS DOCUMENT RELATES TO:** | Master Docket No. 08-08 (JAP) |
| *Bernadette Glynn and Richard Glynn v. Merck Sharp & Dohme Corp., et al.* | Civil Action No. 11-5304(JAP)(LHG) |
| Civil Action No.: 3:11-cv-05304 | |

## DEFENDANT MERCK SHARP & DOHME CORP.'S
## MEMORANDUM OF LAW IN SUPPORT OF OMNIBUS *DAUBERT*
## MOTION

**STERNS & WEINROTH,**
A Professional Corporation
50 West State Street, Suite 1400
Trenton, New Jersey 08607

**KING & SPALDING LLP**
1180 Peachtree Street, NE
Atlanta, GA 30309-3521

**VENABLE LLP**
750 E. Pratt Street
Suite 900
Baltimore, Maryland 21202

Attorneys for Defendant Merck Sharp & Dohme Corp.

# **TABLE OF CONTENTS**

Introduction ………………………………………...……………...................1

Factual Background ...... …………………………………………………………4

    I.    Fosamax and Osteoporosis....................................................4

    II.    Bisphosphonates and Atypical Femur Fractures....................................6

Argument…………………………………………………………………….....8

    I.    Legal Standard....................................................................8

    II.    Dr. Cornell......................................................................9

        A. Background on epidemiology ........................................9

        B. Dr. Cornell is not qualified to render opinions based on epidemiological studies................................................13

        C. Dr. Cornell has not demonstrated that he applied a reliable "weight of the evidence" methodology in reaching his general causation opinion........................................................15

        D. Because Dr. Cornell cannot opine on general causation he cannot opine on specific causation, and his specific causation opinion is unreliable in any event ................................................23

        E. The Court should exclude Dr. Cornell's opinions on the efficacy of Fosamax on several grounds ........................................25

    III.    Dr. Klein......................................................................31

        A. The Bradford Hill criteria apply to epidemiological studies, but Dr. Klein has not addressed such studies ............................32

        B. Dr. Klein concedes that the mechanism as to how BPs may be causing AFF has not been established ...........................................34

IV.   Dr. Madigan ......................................................................................... 40

      A. Dr. Madigan's analysis ................................................................... 41

      B. Dr. Madigan's data mining analysis is irrelevant to Plaintiff's
         claims and is therefore inadmissible ............................................ 42

      C. Dr. Madigan's methodology is unreliable because neither he nor
         Dr. Blume reviewed the substance of the adverse event reports ... 45

V.    Dr. Cheryl Blume ................................................................................ 48

      A. The Court should exclude Dr. Blume's opinions as to the legal
         requirements governing pharmaceutical manufacturers and
         Merck's compliance with those requirements ............................... 49

      B. The Court should exclude Dr. Blume's opinion that Merck waited
         too long to add information about femur fractures to the Adverse
         Reactions section of the Fosamax label ......................................... 51

      C. The Court should preclude Dr. Blume from offering an opinion
         that Merck should have added a Warning or Precaution about
         femur fractures to the Fosamax label before Plaintiff's injury in
         2009 ................................................................................................ 54

      D. The Court should exclude Dr. Blume's opinion that Merck did not
         timely investigate a potential link between Fosamax and AFF ..... 56

      E. The Court should preclude Dr. Blume from testifying about
         Merck's alleged motives or state of mind ...................................... 57

      F. The Court should preclude Dr. Blume from testifying about the
         causation or mechanism of AFF .................................................... 57

      G. The Court should preclude Dr. Blume from testifying that the drug
         Evista is "safer" than Fosamax ...................................................... 58

VI.   Plaintiff's Treating Physicians ............................................................ 59

      A. Dr. Britton Limes ........................................................................... 61

B.  Dr. Robert Busch ............................................................................62

C.  Frederick Fletcher ..........................................................................62

D.  Dr. Robert Lindsay .........................................................................63

Conclusion……………………………………………………………...........64

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bammerlin v. Navistar Int'l Transp. Corp.*,
30 F.3d 898 (7th Cir. 1994) .................................................................50

*Berckeley Inv. Group, Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) ........................................................... 49, 50

*Bland v. Verizon Wireless, L.L.C.*,
538 F.3d 893 (8th Cir. 2008) ...............................................................59

*Buxton v. Lil' Drug Store Prods., Inc.*,
2007 WL 2254492 (S.D. Miss. Aug. 1, 2007).................................... 24

*D&D Associates, Inc. v. Bd. of Educ. of N. Plainfield*,
2009 WL 1162859 (D.N.J. April 28, 2009)........................................60

*Daubert v. Merrell Dow Pharms, Inc.*,
509 U.S. 579 (1993)........................................................................8, 42

*Dean v. Thermwood Corp.*,
2012 WL 90442 (N.D. Okla. Jan. 11, 2012) .......................................53

*Dunn v. Sandoz Pharms. Corp.*,
275 F. Supp. 2d 672 (M.D.N.C. 2003) ................................................34

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)..............................................................................29

*Green v. McAllister Bros., Inc.*,
2005 WL 742624 (S.D.N.Y. Mar. 25, 2005)........................................59

*Haller v. AstraZeneca Pharms., Inc.*,
598 F. Supp. 2d 1271 (M.D. Fla. 2009)................................................24

*Hines v. Wyeth*,
2011 WL 2680842 (S.D.W.Va. Jul. 8, 2011) ......................................53

*Huss v. Gayden*,
571 F.3d 442 (5th Cir. 2009) ........................................................16, 36

*In re Accutane Prods. Liab. Litig.*,
    511 F. Supp. 2d 1288 (M.D. Fla. 2007)..................................................16, 34, 36

*In re Bausch & Lomb, Inc. Contact Lens Solution Prods. Liab. Litig.*,
    2009 WL 2750462 (D.S.C. Aug. 26, 2009)..................................................23, 24

*In re Breast Implant Litig.*,
    11 F. Supp. 2d 1217 (D. Colo. 1998)............................................................19, 22

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 164 (S.D.N.Y. 2009) ...............................................................55, 57

*In re Fosamax Prods. Liab. Litig.*,
    742 F. Supp. 2d 460 (S.D.N.Y. 2010) ...............................................................30

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ...........................................................................24, 58

*In re Prempro Prods. Liab. Litig.*,
    2010 WL 5663003 (E.D. Ark. Sept. 16, 2010).......................................44, 50, 56

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..........................................................55, 57

*In re Viagra Prods. Liab. Litig.*,
    658 F. Supp. 2d 950 (D. Minn. 2009)......................................................14, 24, 32

*Jones v. Synthes USA Sales, LLC*,
    2010 WL 3311840 (D.N.J. Aug. 19, 2010) (Pisano, J.) ......................................8

*Magistrini v. One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584 (D.N.J. 2002) (Hochburg, J.), *aff'd*, 68 F. App'x 356
    (3d Cir. 2003)...................................................................................................passim

*McClain v. Metabolife Intern., Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ........................................................................16

*McClellan v. I-Flow Corp.*,
    710 F. Supp. 2d 1092 (D. Or. 2010) .................................................................21

*Miller v. Stryker Instruments*,
    2012 WL 1718825 (D. Ariz. Mar. 29, 2012)....................................................53

*Miller v. U.S.*,
    287 F. App'x 982 (3d Cir. 2008) ........................................................................59

*Moorestown Twp. Bd. of Ed. v. S.D.*,
    2010 WL 4062182 (D.N.J. Oct. 15, 2010) .......................................................49

*Patterson v. Howard*,
    2010 WL 1050052 (D.N.J. Mar.18, 2010) ........................................................60

*Rosen v. Ciba-Geigy Corp.*,
    78 F.3d 316 (7th Cir. 1996), *cert. denied*, 519 U.S. 819 (1996) .........................1

*U.S. v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ...........................................................................51

*U.S. v. Scop*,
    846 F.2d 135 (2d Cir. 1988) .............................................................................50

*U.S. v. Zhou*,
    2008 WL 4067103 (D.N.J. Aug. 25, 2008) (Pisano, J.) ..............................21, 22

*Vanderwerf v. SmithKlineBeecham Corp.*,
    529 F. Supp. 2d 1294 (D. Kan. 2008).........................................................23, 63

*Wells v. SmithKline Beecham Corp.*,
    2009 WL 564303 (W.D. Tex. Feb. 18, 2009) ...................................................15

*Yarchak v. Trek Bicycle Corp.*,
    208 F. Supp. 2d 470 (D.N.J. 2002)...................................................................61

**STATUTES, RULES AND REGULATIONS**

21 CFR § 201.57 ......................................................................................51, 59

Fed. R. Civ. P. 26 ...............................................................................51, 59, 60

Fed. R. Evid. 702 ...............................................................................................13

Fed. R. Evid. 702(a)...........................................................................................27

Fed. R. Evid. 703 ...............................................................................................34

**OTHER AUTHORITIES**

Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 552
(3d ed. 2011) ................................................. 7, 10, 11, 12, 18, 19, 21, 22, 32, 33

U.S. Dept. of Health and Human Services, *Bone Health and Osteoporosis: A Report of the Surgeon General* 41 (2004). ...........................................4, 5,11, 12

www.mayoclinic.com/health/stress-fractures/DS00556.........................................46

# INTRODUCTION

As Judge Posner has stated: The "[l]aw lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996), *cert. denied*, 519 U.S. 819 (1996).  Plaintiff Bernadette Glynn ("Plaintiff") will ask a jury to conclude that her use of Fosamax® caused her to suffer an atypical femur fracture ("AFF").  But, the scientific consensus is that a causal relationship between bisphosphonates ("BPs") such as Fosamax and AFF has not been established.  Indeed, the FDA reached that conclusion in 2011 after thoroughly examining the epidemiological evidence regarding BPs and AFF, and the current FDA-approved class-wide labeling for BPs says: "Causality has not been established as these fractures also occur in osteoporotic patients who have not been treated with bisphosphonates."  (Ex. 1, June 2012 Fosamax Package Insert ("PI") at 5, § 5.5).[1]

In her effort to prove that the FDA and the scientific consensus are wrong (*i.e.,* to have the law lead science), Plaintiff has proffered two expert witnesses: Drs. Charles Cornell and Michael Klein.  Neither witness, however, offers an admissible opinion based on proper scientific methodology.

Dr. Cornell purports to have "weighed" the epidemiological evidence to reach his conclusion that BPs cause AFF.  Preliminarily, Dr. Cornell is an

---

[1] References throughout this memorandum to "Ex. __" refer to the correspondingly numbered exhibits attached to the Declaration of Karen A. Confoy filed by Merck concurrently with and in support of Merck's Omnibus Daubert Motion.

orthopedic surgeon, not an epidemiologist.  He concedes he has no training or expertise in epidemiology, and at his deposition he demonstrated that he lacks an understanding of basic epidemiological terms and concepts.  Simply put, he is not qualified to render an opinion based on epidemiology.  Moreover, under this Court's ruling in *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 602 (D.N.J. 2002) (Hochberg, J.), *aff'd*, 68 F. App'x 356 (3d Cir. 2003), Dr. Cornell's "weight-of-the-evidence" opinion is inadmissible because he has not explained his "scientific method of weighting" the epidemiological studies.  *Id.* at 607.  Without such an explanation, his opinion is nothing more "than a mere conclusion-oriented selection process."  *Id.*

Additionally, the epidemiological studies that Dr. Cornell references were not designed to answer the question of whether Fosamax increases the risk of experiencing a fracture that otherwise would not have occurred.  None of the referenced epidemiological studies compares the risk of experiencing an AFF while on BPs against the risk for a comparable group of patients who are not on BPs.  The referenced epidemiological studies simply do not address, and the authors candidly conclude could not address, the issue of whether Fosamax increases the risk for having a fracture that would otherwise not have occurred.

Dr. Klein is a pathologist and he does not make treatment decisions for patients.  He is also not an epidemiologist, and his report makes no mention of the

epidemiological evidence regarding BPs and AFF.  Instead, Dr. Klein's report discusses studies that other researchers have done of bone biopsies taken from animals and small groups of humans.  From these studies, Dr. Klein proffers theories on possible mechanisms by which BPs may cause AFF.  But, at deposition Dr. Klein conceded that "scientifically" the "mechanism has not been established." Because Dr. Klein concedes that no scientific methodology has established a mechanism by which BPs allegedly cause AFF, and because Dr. Klein has offered no other basis for his opinion that BPs cause AFF, his causation opinion is not based on scientific methodology and is thus unreliable and inadmissible.

Plaintiff also proffers two expert witnesses – statistician Dr. David Madigan and "regulatory consultant" Dr. Cheryl Blume – on issues relating to the timeliness of Merck's response to reports of AFF.  But, as is explained in more detail below, neither of those experts offers an admissible opinion.

# FACTUAL BACKGROUND

## I.   Fosamax and Osteoporosis.

Fosamax is in a class of drugs known as bisphosphonates ("BPs").  Since 1995 the FDA has approved Fosamax as a "safe and effective" medication for osteoporosis on six separate occasions.[2]

Osteoporosis "is a disease characterized by low bone mass and deterioration of bone structure that causes bone fragility and increases the risk of fracture."  U.S. Dept. of Health and Human Services, *Bone Health and Osteoporosis: A Report of the Surgeon General* 41 (2004).[3]  The "most common" osteoporotic fractures "occur at the spine, wrist, and hip."  *Id.* at 30.  There are approximately "1.5 million osteoporotic fractures in the United States each year," including approximately 300,000 hip fractures requiring hospitalization.  *Id.* at 88.

Osteoporosis results from an imbalance in the bone remodeling process. Throughout a person's life, his or her bones undergo a continuous process of remodeling, whereby mature bone is resorbed and replaced by new bone.  *Id.* at 20. Two of the components of bone remodeling are bone resorption (bone breakdown) by cells called osteoclasts and bone formation (the creation of new bone) by cells

---

[2] (Ex. 2, compendium of FDA approval letters).

[3] Available at www.surgeongeneral.gov/library/reports/bonehealth/content.html (last accessed Jan. 14, 2013).

4

called osteoblasts.  *Id.* at 21-25.  The living bone itself, however, is comprised of a third kind of cells, called osteocytes.  *Id.*  When a woman ages, the rapid reduction of estrogen levels associated with menopause stimulates the loss of bone by over-activating osteoclasts and the process of resorption.  *Id.* at 28, 43-44.  As a result, the remodeling process becomes unbalanced – the overactivated osteoclasts remove more bone than would otherwise be the case, outpacing the bone production by osteoblasts, and the body begins losing bone.  *Id.*  If bone mass continues to decline, a person may become osteoporotic.  *Id.* at 30-32.

Fosamax reduces the overstimulated osteoclastic activity, thereby re-establishing the balance between osteoclastic and osteoblastic activity.  (Ex. 3, Dempster Rpt. 9).  Fosamax retains bone mass, maintains the strength of bones, and reduces the risk of osteoporotic fracture, including those of the hip and spine. For example, as described in the FDA-approved Fosamax label, in one fracture study, Fosamax reduced the risk of hip fracture by 51%, spine fracture by 47% – 54% (depending on the type of spine fracture), all symptomatic (painful) fractures anywhere in the body by 26%, and wrist fractures by 48%.  (Ex. 1, June 2012 Fosamax PI at 16, § 14.1).

## II. Bisphosphonates and Atypical Femur Fractures.

The American Society for Bone and Mineral Research ("ASBMR") has established criteria for diagnosing an AFF. The criteria are divided into "major features," all of which are necessary to confirm an AFF, and "minor features," none of which are necessary.[4] Use of a BP is a "minor feature" only – and thus not a required feature – for a diagnosis of AFF because, as even Dr. Cornell concedes, AFFs occur in patients who have never taken a BP.[5] Indeed, Dr. Cornell concedes "it is likely" that osteoporosis and low bone mineral density ("osteopenia") can cause AFF. (Ex. 5, Cornell Dep. 242:7-11).

The scientific consensus is that a causal relationship between BPs and AFF has not been established. There have been a number of epidemiological studies

---

[4] The major features for an AFF are: (1) located anywhere along the femur from just distal to the lesser trochanter to just proximal to the supracondylar flare; (2) associated with no trauma or minimal trauma, as in a fall from a standing height or less; (3) transverse or short oblique configuration; (4) noncomminuted; and (5) complete fractures which extend through both cortices and may be associated with a medial spike, or incomplete fractures involving only the lateral cortex. (Ex. 4, E. Shane et al., *Atypical Subtrochanteric and Diaphyseal Femoral Fractures: Report of a Task Force of the American Society for Bone and Mineral Research*, 25 J. OF BONE AND MINERAL RESEARCH 2267, 2269, Table 1 (2010)). The minor features for an AFF are (1) localized periosteal reaction of the lateral cortex; (2) generalized increase in cortical thickness of the diaphysis; (3) prodromal symptoms such as dull or aching pain in the groin or thigh; (4) bilateral fractures and symptoms; (5) delayed healing; (6) comorbid conditions (*e.g.*, vitamin D deficiency, rheumatoid arthritis, hypophosphotasia); and (7) use of pharmaceutical agents (e.g., bisphosphonates, glucocorticoids, and proton pump inhibitors). *Id.*

[5] (Ex. 5, Cornell Dep. 225:20-24).

6

that have examined a potential relationship between BPs and AFF.  As Dr. Cornell notes, some of these studies report an "association" between BPs and AFF, while others have not found an association.  (Ex. 6, Cornell Rpt. 14-18).  But, Dr. Cornell concedes that an "association" does not mean "causation."  (Ex. 5, Cornell Dep. 262:8-16).  *See also* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 552 (3d ed. 2011) ("an association is not equivalent to causation").  And, even the authors of those studies reporting an association acknowledge that their studies have not established causation.[6]

Indeed, after examining all of the epidemiological evidence available in July 2011, the FDA concluded that "causality has not been determined."[7]  Other scientific organizations that have studied the issue have also concluded that the scientific evidence has not established that BPs cause AFF.  For example, the ASBMR's expert panel has stated that "a causal association between BPs and atypical fractures has not been established."[8]  As another example, the

---

[6] (*See, e.g.,* Ex. 7, R. Meier et al., *Increasing Occurrence of Atypical Femoral Fractures Associated With Bisphosphonate Use*, 172 ARCHIVES OF INTERNAL MED. 930, 934 (2012) (noting that the study's "retrospective design does not allow definitive conclusions on causality")).

[7] (Ex. 8, FDA Background Document for Sept. 2011 Advisory Committee Meeting at 21, 23).

[8] (Ex. 4, E. Shane et al., *Atypical Subtrochanteric and Diaphyseal Femoral Fractures: Report of a Task Force of the American Society for Bone and Mineral Research*, 25 J. OF BONE AND MINERAL RESEARCH at 2267).

International Osteoporosis Foundation has stated that BPs "as the cause of" AFF is "still merely a hypothesis."[9]  Neither Plaintiff nor her experts can identify any medical or scientific organization that has concluded that a causal association has been established between BPs and AFFs, yet that is exactly what they propose to tell the jury in this case.

## ARGUMENT

### I.    Legal Standard.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under the Supreme Court's *Daubert* decision, Rule 702 requires proffered expert testimony to be based on a reliable methodology and helpful to the trier of fact. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 592-93 (1993).

Proffered expert testimony passes *Daubert* muster only if the following three requirements are met: "(1) the witness is qualified as an expert in a particular field; (2) the methodology applied by the witness is sufficiently reliable; and (3) the witness's testimony 'fits' the facts of the case in dispute."  *Jones v. Synthes USA Sales, LLC*, 2010 WL 3311840, at *4 (D.N.J. Aug. 19, 2010) (Pisano, J.).  The

---

[9] (Ex. 9, R. Rizzoli et al., *Subtrochanteric fractures after long-term treatment with bisphosphonates: a European Society on Clinical and Economic Aspects of Osteoporosis and Osteoarthritis, and International Osteoporosis Foundation Working Group Report*, 22 OSTEOPOROSIS INT'L 373, 387 (2011)).

to "depleted fracture resistance in bone due to increased brittleness." (Ex. 25, Klein Rpt. 31). But, he conceded that it has not "been demonstrated scientifically that bisphosphonates' effect on glycation [end-]products are the mechanism by which atypical femur fractures occur." (Ex. 26, Klein Dep. 236:16-21). Moreover, he cited only a dog study for his theory (Ex. 25, Klein Rpt. 31; Ex. 26, Klein Dep. 373:11 – 374:13), and he does not know whether any of the animal studies cited in his report are translatable to the human femoral shaft, (Ex. 26, Klein Dep. 147:15 – 148:11).

Finally, Dr. Klein opines that Fosamax may reduce the ability to heal from a stress fracture, and that such delayed healing may lead to AFF. (Ex. 25, Klein Rpt. 23-24). But, he conceded at deposition that he has no data from controlled studies in humans to prove that theory. (Ex. 26, Klein Dep. 368:21 – 371:21).

## IV. Dr. Madigan.

Dr. Madigan chairs the statistics department at Columbia University in New York City. (Ex. 30, Madigan Rpt. 1, ¶ 1). Plaintiff has not asked Dr. Madigan to offer an opinion on causation or on the epidemiological evidence regarding BPs and AFF, and his written report contains no such opinions. (Ex. 31, Madigan Dep. 127:20 – 130:8). Instead, at the direction of Plaintiff's counsel, Dr. Madigan conducted a computerized "data mining" analysis of the FDA's Adverse Event Reporting System ("AERS") database and concluded that starting in 2001 there

were "signals for Fosamax for various terms related to oversuppression of bone turnover and associated atypical femur fracture concerns." (Ex. 30, Madigan Rpt. 9-10, ¶ 35). Based on this analysis, Plaintiff's "regulatory expert," Dr. Cheryl Blume, opines that Merck should have discovered a link between Fosamax and AFF in the "early 2000s" and added information about AFF to the Fosamax label "as early as 2002." (Ex. 32, Blume Dep. 56:12-17; Ex. 33, Blume Rpt. 17, ¶ 31).

As is explained below, Dr. Madigan's analysis is simply not relevant to Plaintiff's claims because neither Dr. Madigan nor Dr. Blume has identified a standard of care requiring Merck to conduct such a data mining analysis at any time, let alone in the "early 2000s." Moreover, Dr. Madigan's analysis is unreliable because neither he nor Dr. Blume have reviewed the actual adverse event reports underlying Dr. Madigan's analysis to see if any of the reports actually described patients experiencing oversuppression of bone turnover or AFF.

## A.     Dr. Madigan's analysis.

The FDA's AERS database contains medication adverse event reports submitted to the FDA by healthcare professionals, consumers, drug manufacturers, and others. (Ex. 34, *FDA Adverse Event Reporting System* (2012), http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillan ce/AdverseDrugEffects/default.htm (last accessed Jan. 14, 2013)). Because the "FDA does not require that a causal relationship between a product and an event be

proven," in order to submit an adverse event report, "there is no certainty" that the event "was actually due to the product." *Id.*

Dr. Madigan conducted a computerized search of the FDA AERS database for adverse event reports for Fosamax and other osteoporosis drugs that included certain words or terms. For example, he searched for reports that included the term "fracture malunion." (Ex. 30, Madigan Rpt. 8, ¶ 26). He then applied mathematical algorithms to his results to determine whether there was a disproportionate number of reports for that term in Fosamax patients when compared to the number of reports for that term in patients taking other drugs. For example, Dr. Madigan identified three Fosamax reports in 2002 that contained the term "fracture malunion," and based on mathematical algorithms he determined that this was a disproportionate number of reports for that term.[36]

### B. Dr. Madigan's data mining analysis is irrelevant to Plaintiff's claims and is therefore inadmissible.

Dr. Madigan's data mining analysis is simply not relevant to Plaintiff's claims. *See Daubert*, 509 U.S. at 589 ("under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is *not only relevant*, but reliable") (emphasis added).

---

[36] (Ex. 30, Madigan Rpt. 10, ¶ 6; Ex. 31, Madigan Dep. 287:23 – 290:7; Ex. 35, [Madigan Dep. Ex. 16]).

The FDA does not require pharmaceutical companies to conduct data mining,[37] and neither Dr. Klein nor Dr. Blume can point to the existence of a reasonable standard of care that otherwise required pharmaceutical manufacturers to conduct data mining at any point in time, let alone before Merck sought to add AFF to the Fosamax label in 2008.

To the contrary, Dr. Madigan's own statements during the relevant timeframe refute any assertion that the reasonable standard of care required Merck to conduct data mining. For example, Dr. Madigan published a paper in 2005 in which he wrote that "there is currently no scientific or regulatory basis to claim that DMAs [data mining algorithms] are a required element of good pharmacovigilance practice." (Ex. 37, M. Hauben, D. Madigan, et al., *The role of data mining in pharmacovigilance*, 4 EXPERT OPINION IN DRUG SAFETY 929, 944 (2005)). As another example, at some point after Dr. Madigan joined the faculty at Columbia in 2007, he gave a PowerPoint presentation on data mining entitled, "Signal Detection in Observational Databases: Does Anyone Know if it Works?" (Ex. 38, [Madigan Dep. Ex. 19]). The follow-up slide shows a picture of a young girl shrugging her shoulders and the words: "Nobody knows. But we are getting there . . ." (*Id.*) (ellipsis in original).

---

[37] (*See* Ex. 36, FDA, *Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment* 9 (2005) ("Use of data mining techniques is not a required part of signal identification or evaluation.")).

Dr. Blume cites past editions of Dr. Brian Strom's well-known textbook on pharmacoepidemiology for the proposition that Merck should have conducted data mining during the relevant timeframe.  (Ex. 32, Blume Dep. 505:16-19).  But, the 2005 edition of Dr. Strom's textbook states that "[t]he practical utility" of data mining "is still being tested, and there is a pressing need to validate these methods before they significantly enhance decision-making about potential safety issues." (Ex. 10, B. Strom ed.*,* PHARMACOEPIDEMIOLOGY at 82).  And, Dr. Strom also wrote in 2005 that "the value of statistical algorithms" in signal detection "remains unproven."  (Ex. 39, B. Strom, *Evaluation of Suspected Adverse Drug Reactions*, 293 J. OF THE AM. MED. ASS'N 1324, 1324 (2005)).

Simply put, there is no authority for the proposition that the reasonable standard of care requires a pharmaceutical manufacturer to utilize a signal detection method when "nobody knows" if the method works or the value of the method "remains unproven."  Because neither Dr. Madigan nor Dr. Blume can point to a reasonable standard of care that required Merck to conduct data mining, let alone the data mining that Dr. Madigan performed for his report, any evidence about Dr. Madigan's data mining calculations for Fosamax are irrelevant and thus inadmissible.  *See In re Prempro Prods. Liab. Litig.*, 2010 WL 5663003, at *2 (E.D. Ark. Sept. 16, 2010) (holding that Dr. Blume could not opine that drug manufacturers had a duty to conduct certain post-marketing tests because she "is

unable to point to the existence of a reasonable standard of care" requiring such tests).

### C. Dr. Madigan's methodology is unreliable because neither he nor Dr. Blume reviewed the substance of the adverse event reports.

Even if Dr. Madigan employed proper search terms and an appropriate algorithm for his calculations, his methodology is unreliable because neither he nor Dr. Blume conducted a substantive review of the reports that formed the basis of his calculations.[38]  The very textbook that Dr. Blume cites as the basis for her reliance on Dr. Madigan's calculations makes clear that once data mining identifies a disproportionate number of reports containing a relevant search term, medically-trained professionals must actually review those reports to determine if any of the reports provide evidence of a possible safety concern.  (*See* Ex. 10, B. Strom ed., PHARMACOEPIDEMIOLOGY at 117 (stating that any signals from data mining "must be confirmed by detailed evaluation by skilled clinicians and epidemiologists of the case reports that generated the signal"); *id. at* 171 (stating that it is "important to recognize that" data mining calculations "are not a substitute for detailed review

---

[38] Indeed, Dr. Madigan testified that he is not qualified to conduct such a review. (Ex. 31, Madigan Dep. 50:2 – 51:4).

of cases, but an aid to deciding which series of cases most warrant further review")).[39]

The reason for careful review of the reports by medically-trained personnel is simple.  Without a review of the reports themselves, there is no way to know whether any of the reports actually involve an event relevant to the medical condition at issue.

For example, one of Dr. Madigan's search terms was "stress fracture," and he concluded that there was a signal for stress fracture in 2003 because there were nine Fosamax case reports with that term in 2003. (Ex. 30, Madigan Rpt. 10).  But, people can experience stress fractures in bones other than the femur, such as bones in the lower leg and the foot.[40]  Therefore, one would need to actually examine a case report containing the word "stress fracture" in order to determine whether the event could have been an atypical femur fracture.  Neither Dr. Madigan nor Dr. Blume conducted a review of the case reports underlying Dr. Madigan's analysis to see if they involved events that could have been an AFF (or events of oversuppression of bone turnover).

---

[39] (*See also* Ex. 10, *id.* at 83 ("For the near future at least, signal detection using spontaneous report data will need to continue to incorporate rigorous clinical-based criteria and reviewer assessment to assess drug safety accurately.")).

[40] *See* www.mayoclinic.com/health/stress-fractures/DS00556 (stating: "Stress fractures are most common in the weight-bearing bones of the lower leg and foot.") (last accessed on Jan. 14, 2013).

Dr. Madigan conceded that he does not know whether *any* of the reports that underlie his analysis involved patients who experienced an AFF or oversuppression of bone turnover.

> Q:     If we go to the next row, fracture malunion, according to your analysis, based on three reports you found a signal of disproportionate reporting in 2002, correct?
>
> A:     Correct.
>
> Q:     Of those three reports, are you able to tell me how many of them are atypical femur fractures as you sit here today?
>
> A:     No, I am not.
>
> Q:     Are you able to tell me how many of them are reports of oversuppressed bone turnover?
>
> A:     No, I am not.
>
>                \*       \*       \*
>
> Q:     Just to shortchange this a little bit, I assume your answers are going to be the same for the number of reports of atypical femur fracture and the number of reports of oversuppressed bone turnover for every row in this chart; is that right?
>
> A:     That's correct.

(Ex. 31, Madigan Dep. 289:6-18, 290:24 – 291:6; Ex. 35, [Madigan Dep. Ex. 16]).

"[T]he requirement of reliability, or 'good grounds,' extends to every step in an expert's analysis all the way through the step that connects the work of the

expert to the particular case." *In re Paoli*, 35 F.3d at 743.  As a result, "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Id.* at 745 (emphasis omitted).  Here, neither Dr. Madigan nor Dr. Blume bothered to perform a required step in the use of data mining – review of the underlying reports.  For that reason alone, Dr. Madigan's testimony is inadmissible.

## V.      Dr. Cheryl Blume.

Dr. Blume is not a medical doctor; she is a pharmacologist and toxicologist, and President of Pharmaceutical Development Group, Inc. ("PDG").  (Ex. 33, Blume Rpt. 1, ¶ 1).  Dr. Blume contends that PDG "specializes" in "pharmaceutical development and registration activities." (*Id.*).  But, PDG's website devotes an entire page to the company's "litigation support" work, including "expert testimony" in product liability cases.[41]  This "litigation support" work must keep Dr. Blume busy, as her Rule 26(a)(2)(B)(v) list of deposition and trial testimony for the past four years is nearly four pages long.  (Ex. 33, [Blume Rpt. Ex. 3]).  Dr. Blume offers various opinions on Merck's research on and labeling of Fosamax, as well as other topics.  The Court should exclude her opinions.

---

[41] (Ex. 40, www.pharmdevgroup.com/legal-support/ (last accessed Jan. 14, 2013)).