# EXHIBIT D

Case 6:21-md-03006-RBD-DAB   Document 89-4   Filed 02/23/22   Page 2 of 8 PageID 1880
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 2 of 354 PageID: 41097
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 56 of 354 PageID: 41151

```
                                                        Page 1
 1          UNITED STATES DISTRICT COURT
 2             DISTRICT OF NEW JERSEY
 3                CAMDEN VICINAGE
 4
 5   - - - - - - - - - - - - - - - - - x
 6   IN RE:
 7   VALSARTAN, LOSARTAN,          MDL No. 2875
 8   and IRBESARTAN PRODUCTS
 9   LIABILITY LITIGATION
10   - - - - - - - - - - - - - - - - - x
11
12        PARTICIPANTS APPEARING VIA ZOOM
13
14     VIDEO DEPOSITION of DAVID MADIGAN, PhD
15        Thursday, August 5, 2021 - 9:32 a.m.
16
17
18
19   Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR
```

                                                        Page 55
```
 1       Q    Are you familiar with plaintiffs'
 2   attorney Adam Slater, who is involved in the
 3   litigation?
 4       A    No.
 5       Q    To your knowledge, have you ever
 6   worked with Adam Slater or the firm Mazie
 7   Slater?
 8       A    Not to my knowledge.
 9       Q    Have you -- are you familiar with
10   David Stanoch?
11       A    No.
12       Q    Ever worked with David Stanoch or
13   his firm, to your knowledge?
14       A    Not to my knowledge.
15       Q    Are you familiar with an attorney
16   by the name of Ruben Honik?
17       A    No.
18       Q    Ever worked with Ruben Honik or his
19   firm?
20       A    No.
21       Q    Familiar with a Conlee Whiteley?
22       A    No.
23       Q    Ever worked with her firm?
24       A    No.
25       Q    I'm missing somebody.  I don't mean
```

                                                        Page 56
```
 1   to leave them out.
 2            All right.  Let's get back to
 3   the invoice.
 4            Okay.  So you don't have any
 5   knowledge of what you reviewed in December of
 6   2019.
 7       A    I do not.
 8       Q    Okay.
 9            And you don't have any record
10   of what you were sent in your original
11   package from plaintiffs' counsel; is that
12   right?
13            MR. NIGH:  Form objection.
14       A    I never said there was an initial
15   package.  I just don't recall.
16       Q    Okay.
17            Was there an initial package
18   that came from plaintiffs when you were
19   retained?
20       A    Not in the mail.  Did they send me
21   some papers at the outset?  I don't remember.
22       Q    So typically when you're retained,
23   are there certain things you ask for, like
24   complaint or depositions or things of that
25   nature, or do you leave it to the attorneys
```

                                                        Page 57
```
 1   to decide what's sent to you?
 2            MR. NIGH:  Form objection.
 3       A    So it all depends.  If -- in this
 4   particular case, I was asked to do an
 5   analysis of a particular set of studies, and
 6   that's what I did.
 7       Q    And so when you were asked to do
 8   the analysis of that particular set of
 9   studies, did plaintiffs' counsel provide
10   those studies to you?
11            MR. NIGH:  Form objection.
12       A    I don't recall the exact sequence
13   of events.
14       Q    All right.
15            So I will mark as Exhibit 3
16   the next invoice in the case.  And this is an
17   invoice dated July 26, 2020.
18            (Exhibit 3 marked for
19   identification.)
20   BY MS. LOCKARD:
21       Q    Does that appear to be a true and
22   correct copy of your invoice?
23       A    Yes.
24            MR. NIGH:  Can I see it?
25            (Counsel read document.)
```

Veritext Legal Solutions  800-227-8440  973-410-4040

Case 6:21-md-03006-RBD-DAB   Document 89-4   Filed 02/23/22   Page 3 of 8 PageID 1881
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 59 of 354 PageID: 41154
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 60 of 354 PageID: 41155

Page 58

```
 1        MS. LOCKARD:  And for the
 2   record, for the court reporter, he probably
 3   needs to have his Social Security/tax number
 4   redacted.
 5        MR. NIGH:  Absolutely.
 6   BY MS. LOCKARD:
 7   Q    Okay.
 8        So this invoice appears to
 9   have the total hours of 19 hours.  And were
10   you charging $800 at the time?
11   A    Yes.
12   Q    All right.
13        So the total invoice amount is
14   $15,200, correct?
15   A    Yes.
16   Q    Has that been paid?
17   A    Yes.
18   Q    All right.
19        So it looks like again during
20   the period March 2020 to May 2020, you were
21   doing some additional literature review, you
22   had one call, and then you did an NDEA
23   review, correct?
24   A    Yes.
25   Q    What is meant by NDEA review?
```

Page 59

```
 1   A    I don't recall.
 2   Q    When you were first retained in the
 3   case, what were you told about what
 4   nitrosamines were or what they were -- or
 5   which ones were at issue?
 6        MR. NIGH:  I'm actually going
 7   to instruct him not to answer.  Seeking
 8   attorney-client privilege.
 9   Q    Let me ask it this way:  When you
10   were first retained, were you asked to give
11   any opinions regarding NDEA studies?
12   A    I was certainly asked to give
13   opinions about NDMA and NDEA, but
14   specifically the way you asked it there was
15   at the outset.  I don't recall whether I was
16   asked that right at the outset or if that was
17   added later, I don't remember.
18   Q    Yeah, I mean, it -- the conclusion
19   that I drew from reviewing Exhibit 3 is that
20   in May of 2020, it appeared that the NDEA
21   issue was raised or called to your attention.
22        Does that seem like a fair
23   conclusion from the documentation?
24        MR. NIGH:  Form objection.
25   A    It's a speculation.  I just don't
```

Page 60

```
 1   know.
 2   Q    All right.
 3        And you don't recall what
 4   literature review you did or whether it was
 5   provided to you by counsel?
 6   A    I don't remember.
 7   Q    And when you keep notes of your
 8   time, you don't keep any more detailed notes
 9   other than just this two-word entry,
10   "literature review"?
11   A    Correct, I do not.
12   Q    Do you know who the call was with
13   on March 20th?
14   A    I don't.
15   Q    Do you recall what was the purpose
16   of the call?
17   A    I do not.
18   Q    Let's take a look at the next
19   invoice, which we'll mark as Exhibit 4.  And
20   it's dated April 17, 2020.
21        (Exhibit 4 marked for
22   identification.)
23   BY MS. LOCKARD:
24   Q    Does this look like a true and
25   correct copy of your invoice in this case?
```

Page 61

```
 1   A    Yes.
 2        MR. NIGH:  Can I see a copy.
 3        (Counsel read document.)
 4   Q    And this invoice is for 20.5 hours
 5   at $800, and you billed 16,400.
 6   A    Correct.
 7   Q    And was this invoice paid?
 8   A    Yes.
 9   Q    Is your payment coming from the
10   Levin Papantonio firm?
11   A    I don't know.
12   Q    You don't know who the check is
13   from?
14   A    Sitting here this minute, I don't
15   know, yeah.
16   Q    So in terms of the work that was
17   done during this period -- let me ask you
18   this:  So you look at the date of this
19   invoice is April 17, 2020.  However, the
20   first --
21   A    That should be 2021.  That's an
22   error.
23   Q    Okay.
24   A    Yeah.
25   Q    So invoice which is Exhibit 4
```

Case 6:21-md-03006-RBD-DAB   Document 89-4   Filed 02/23/22   Page 4 of 8 PageID 1882
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 63 of 354 PageID: 41158
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 64 of 354 PageID: 41159

```
                                              Page 62
 1   should actually -- it has an error on the
 2   date, correct?
 3       A    Yeah, yeah.
 4       Q    All right.
 5            So we can assume this is
 6   actually sent on April 17, 2021, correct?
 7       A    Yes.
 8       Q    So if you look at the work that was
 9   done there, there's a call, and then there's
10   the word "analysis."
11            What do you mean by "analysis"
12   in your billing records?
13       A    I don't know.  I was in -- it just
14   means I was doing work.  I was doing an
15   analysis, whether it means I was reading
16   papers, doing any kind of statistical
17   calculation, it's nonspecific.
18       Q    Okay.
19            So is it going to be
20   interchangeable with review of materials or
21   does it indicate you're actually doing some
22   sort of calculations?
23       A    It's ambiguous.
24       Q    All right.
25            So the word "analysis" on here
```

```
                                              Page 63
 1   is ambiguous?  You can't provide us any more
 2   information about that?
 3       A    I can't.
 4       Q    Okay.
 5            It looks like from this
 6   document that your report was actually
 7   started on April 4.
 8            Is that right?
 9       A    So it seems, yeah.
10       Q    Okay.
11            So when you start your report,
12   is that when you actually -- you open up the
13   document and start drafting the text of the
14   report?
15       A    It might have been.  I can't be
16   certain I didn't do that earlier.
17       Q    We don't see anything on your
18   invoice related to a report before April 4,
19   2021.
20       A    We do not, but that doesn't mean
21   that I wasn't doing it.
22       Q    Okay.
23            So it looks like at this point
24   in time, on April 4, it looks like you -- if
25   you look at the three invoices, you had spent
```

```
                                              Page 64
 1   four hours reviewing documents, less than ten
 2   hours on analysis, and 15 hours on literature
 3   review.
 4       A    Okay.  If you say so.
 5       Q    And one hour on NDEA.
 6            Is that accurate?
 7       A    Three.  Three.
 8       Q    So it's not accurate?
 9       A    You said one.  It's three.  Right?
10       Q    All right.
11            So you had -- at that point in
12   time, you had spent -- let me get it.
13            When you started the report,
14   you had some phone calls, you had spent three
15   hours on NDEA review, you had spent four
16   hours on reviewing literature, less than ten
17   hours on analysis, and another 15 hours on
18   literature review.
19            Is that correct?
20       A    I mean, I --
21            MR. NIGH:  Form objection?
22       A    -- if you want me to do the
23   arithmetic -- I don't doubt you're doing it
24   right, but...
25       Q    But any work you'd done up until
```

```
                                              Page 65
 1   that point on April 4, 2021 is reflected in
 2   your invoices?
 3       A    April 14, 2021, yes, it is.
 4       Q    But any work that you've done on
 5   the case up until April 4, 2021, is reflected
 6   on these invoices?
 7       A    Why are you saying 4th?  14th.
 8       Q    Your invoice says April 4th is when
 9   you started your report.
10       A    Oh, sorry, I'm not following what
11   you're talking about.
12            No, I'm not sure that's the
13   date I started my report.
14       Q    Okay.
15            But any work that you did
16   prior to April 4 is going to be documented on
17   your invoices, right?
18            MR. NIGH:  Form objection.
19       A    Sure.
20       Q    Okay.
21            Let's look at the fourth and
22   final invoice.  This will be Exhibit 5.
23            (Exhibit 5 marked for
24   identification.)
25   BY MS. LOCKARD:
```

Case 6:21-md-03006-RBD-DAB   Document 89-4   Filed 02/23/22   Page 5 of 8 PageID 1883
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 67 of 354 PageID: 41162
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 68 of 354 PageID: 41163

Page 66

1  Q    Okay.
2       And this was dated July 18,
3  2021. And is this a true and correct copy of
4  your fourth invoice?
5  A    Yes.
6  Q    And you billed for 50 hours at $800
7  an hour for a total of $40,000, correct?
8  A    Yes.
9  Q    And if you add up the prior
10 invoices plus this one, and you can do the
11 arithmetic on this, I would ask you to if you
12 need to, it looks to me like the total
13 bill --
14      (Technical difficulties.)
15      (Reporter clarification.)
16 Q    Adding the total of these four
17 invoices, Dr. Madigan, it appears that you
18 have billed and been paid a total of $78,400
19 in the case so far?
20 A    Yes.
21 Q    Is that accurate?
22 A    Yes.
23 Q    And is there any additional work
24 that you've done prior to today that has not
25 been billed?

Page 67

1  A    There are a few hours spent
2  preparing for today.
3  Q    How many hours did you spend
4  preparing for today?
5  A    I don't recall.
6  Q    Did you meet with counsel before
7  today?
8  A    Yes.
9  Q    Did you meet with counsel
10 yesterday?
11 A    Yes.
12 Q    How many hours did you spend
13 yesterday?
14 A    Couple of hours, something like
15 that.
16 Q    Do you have any intention to do
17 additional work on the case prior to any
18 trial or Daubert testimony?
19      MR. NIGH:  Form objection.
20 A    Not unless I'm asked. Right now, I
21 don't.
22 Q    Is there -- are there any materials
23 that you're awaiting to review?
24      MR. NIGH:  Form objection.
25 A    No.

Page 68

1  Q    When you met with counsel
2  yesterday, was it with both counsel who are
3  present today defending the deposition?
4  A    Yes.
5  Q    Was anybody else in the meeting
6  with you?
7  A    No.
8       (Pause.)
9  Q    Do you have any other cases with
10 the Levin Papantonio firm other than the
11 valsartan litigation currently?
12 A    Not that I'm aware of.
13 Q    Prior to being contacted by the law
14 firm in this case, were you aware of the
15 issue involving nitrosamines in valsartan?
16 A    I don't know.  I might have read
17 about it.  There's a certain amount of
18 publicity.
19 Q    But as you sit here today, you
20 don't remember one way or the other if you
21 had seen any publicity on the recall or the
22 issues?
23 A    I do not.
24 Q    Is it fair to assume you were --
25 you did not take valsartan?  You're not a

Page 69

1  patient who took valsartan?
2  A    No, I'm not.
3  Q    Okay.
4       Do you do any monitoring of
5  newly filed litigation --
6  A    No.
7  Q    -- in your office?
8  A    No.
9  Q    So when you were contacted by
10 plaintiffs' firm in this case you knew you
11 were being contacted on behalf of plaintiffs'
12 counsel.
13      Is that correct?
14 A    Yes, probably.
15 Q    So you knew you were being asked to
16 review studies that supported the plaintiffs'
17 case from your first interaction.
18      Is that fair?
19      MR. NIGH:  Form objection.
20 A    No.  The way you phrased it was
21 just awkward:  I was asked to review studies
22 that were in favor of.  No, I was asked to
23 review studies.
24 Q    Did you understand that these were
25 studies that plaintiffs had selected for you

Case 6:21-md-03006-RBD-DAB   Document 89-4   Filed 02/23/22   Page 6 of 8 PageID 1884
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 71 of 354 PageID: 41166
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 72 of 354 PageID: 41167

```
                                          Page 70
 1   to review?
 2              MR. NIGH:  Form objection.
 3        A     So the set of studies that I
 4   included in my analysis are studies that are
 5   pursuant to a search that Dr. Etminan did.
 6        Q     And had you worked on cases
 7   involving Dr. Etminan as an expert before?
 8        A     Not that I can recall.  I've never
 9   met him.
10        Q     So you don't know Dr. Etminan?
11        A     I do not.
12        Q     And you don't recall ever reviewing
13   any studies that Dr. Etminan had relied on in
14   other litigation?
15        A     Reviewing studies that Dr. Etminan
16   had relied on in another litigation.  Not
17   that I can recall.  I recall using or
18   incorporating one of his studies in a
19   previous litigation, in a report I did in a
20   previous litigation.
21        Q     Maybe --
22        A     That's not the question you're
23   asking, though.  Right?  So you're asking a
24   different question.
25        Q     Right.
                  Veritext Legal Solutions
800-227-8440                              973-410-4040
```

```
                                          Page 71
 1              The studies that you reviewed
 2   in generating your opinions in this case, who
 3   selected those studies --
 4              MR. NIGH:  Form objection.
 5        Q     -- for review?
 6        A     So I was asked to review the
 7   studies that Dr. Etminan -- that came out of
 8   Dr. Etminan's search.  They're the ones I
 9   reviewed.
10              Now, as we discussed, I did
11   some of my own searching as well.  I searched
12   to see was there anything -- any update for
13   Song.  I also looked -- as I read through the
14   papers, I looked to see were there references
15   to other studies that were missed.  There
16   weren't.
17        Q     But every study that is cited in
18   your report is also cited in Dr. Etminan's
19   report.
20              Isn't that right?
21        A     That's the way it turned out.
22              MR. NIGH:  Form objection.
23        Q     Have you reviewed Dr. Etminan's
24   report?
25        A     No, I have -- I have the list of
                  Veritext Legal Solutions
800-227-8440                              973-410-4040
```

```
                                          Page 72
 1   studies -- I have the reference list from his
 2   report.
 3        Q     Who provided that to you?
 4        A     The attorneys.
 5        Q     Have you ever had any direct
 6   discussions with Dr. Etminan?
 7        A     No.
 8        Q     Any emails with Dr. Etminan?
 9        A     No.
10        Q     Any in-person contact with
11   Dr. Etminan?
12        A     No.
13        Q     And even as you sit here today, you
14   still haven't reviewed his report?
15        A     I've not seen it.
16              (Pause.)
17        Q     In preparing your report or
18   opinions in this case, did you ask for any
19   materials from plaintiffs that were not
20   provided?
21        A     No.
22        Q     Did you attempt to locate any
23   materials on your own for use in your
24   opinions in your report that you could not
25   locate?
                  Veritext Legal Solutions
800-227-8440                              973-410-4040
```

```
                                          Page 73
 1        A     No.
 2        Q     So have you reviewed any other
 3   expert report issued in this case, other than
 4   your own?
 5        A     No.
 6        Q     Have you in any other litigation
 7   ever been provided a collection of literature
 8   relied on by another expert and asked to
 9   assess that set of literature?
10              MR. NIGH:  Form objection.
11        A     Not -- I'm not certain.  That might
12   have happened in -- I did work on Actos
13   litigation, Actos, years ago.  Might have
14   happened in that context.  I don't remember.
15        Q     So you think you might have been
16   asked in the Actos litigation to -- to review
17   another expert's collection of literature
18   that he or she had relied on?
19        A     Yeah, I'm not certain, but I think
20   I might have done that in Actos.
21        Q     Do you recall who the expert was?
22        A     No.  It was a long time ago.
23        Q     So other than the Actos, you don't
24   ever recall performing the function that you
25   were asked to perform in this case, which is
                  Veritext Legal Solutions
800-227-8440                              973-410-4040
```

Case 6:21-md-03006-RBD-DAB   Document 89-4   Filed 02/23/22   Page 7 of 8 PageID 1885
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 75 of 354 PageID: 41170
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 76 of 354 PageID: 41171

Page 74

1   take a look at these articles that are relied
2   upon by another expert and give us your
3   statistical assessment?
4           MR. NIGH:  Form objection.
5       A   Are you framing that in litigation?
6       Q   Yes.
7       A   Okay.  Because I've done it in
8   other contexts.
9               In litigation, as I say, I
10  think that's what happened in Actos.  There
11  may have been others that I don't recall.
12      Q   But you can't recall any other
13  cases as you sit here today, right?
14      A   No.
15      Q   In what other context have you been
16  asked to do such an exercise?
17      A   It's actually something I've done
18  routinely in consulting.
19      Q   Consulting for whom?
20      A   Pharma companies.
21      Q   And that involves they give -- the
22  pharma company gives you a discrete set of
23  literature and says assess the --
24      A   Yeah.
25      Q   -- statistical significance of

Page 75

1   these articles?
2       A   No.  That's putting words in my
3   mouth.  It's they hand -- they've said here's
4   a set of studies that are germane to a
5   question we're interested in.  Please take a
6   look, and -- and do an analysis with respect
7   to question A, B, and C, whatever the topic
8   might be.
9       Q   And in those -- how many times has
10  that happened in a consulting scenario?
11      A   I don't know.
12      Q   A couple?
13      A   Like half a dozen, maybe ten times.
14      Q   And in those scenarios, you didn't
15  do any additional research on your own to
16  identify additional articles or literature to
17  review?
18          MR. NIGH:  Form objection.
19      A   I don't recall specifically, but I
20  can tell you that I fairly routinely have
21  been asked, you know, here's a collection of
22  studies, we're interested in the following
23  question or questions, please analyze them.
24      Q   And that's essentially what you
25  were asked to do in this case.

Page 76

1           MR. NIGH:  Form objection.
2       Q   Is that right?
3       A   Pretty much, yeah.
4       Q   Okay.
5               And -- all right.  So what was
6   the following question or questions that you
7   were asked to analyze in this case?
8       A   I answered that question already.
9   So I was asked -- do you want me to read it
10  again?
11      Q   Yes.  If that's your answer.
12      A   It's the answer.  "I was asked to
13  perform a statistical analysis to evaluate
14  the strength of association, dose-response
15  and increased risk of the cancers reported in
16  certain dietary and occupational studies
17  which specifically examined exposure to NDMA
18  or NDEA.  Specifically, I considered the
19  studies considered by Dr. Etminan that
20  estimated NDMA or NDEA effect sizes."
21      Q   Let's get a copy of your report
22  marked as Exhibit 6.
23      A   I do have a correction.
24      Q   Yes, let's do that now.
25              I'm going to mark this as

Page 77

1   Exhibit 6 now.  This is a report dated
2   July 7, 2021.
3               (Exhibit 6 marked for
4   identification.)
5   BY MS. LOCKARD:
6       Q   Does this look like the --
7       A   Yes.
8       Q   -- report that was produced in this
9   case?
10      A   Yes.
11      Q   Okay.
12              Now, I understand from our
13  discussion off the record that you do have
14  some changes you would like to make to your
15  report, correct?
16      A   Yes.
17      Q   All right.
18              Can you just -- before you
19  make the changes, can you just describe them
20  for the record?
21      A   Sure.
22              So one of the studies, it's
23  the Goodman study, gave a -- a milligrams
24  per -- what I thought was milligrams per day,
25  but in actual fact -- which is what's usually

Case 6:21-md-03006-RBD-DAB   Document 89-4   Filed 02/23/22   Page 8 of 8 PageID 1886
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 79 of 354 PageID: 41174
Case 1:19-md-02875-RBK   Document 1715-5   Filed 11/01/21   Page 80 of 354 PageID: 41175

```
                                              Page 78
 1    provided in these studies, but in fact it was
 2    milligrams per week.  And I missed that.
 3              So the accumulative exposure
 4    is therefore seven times too large and needs
 5    to be divided by seven.
 6       Q    Is that the only change or are
 7    there others?
 8       A    No, that's it.  It -- it is --
 9    impacts a number in three different places in
10    the report.  It's the same issue.  The one
11    change is in three places.
12       Q    Did someone point that error out to
13    you or did you discover it on your own?
14       A    All on my own.
15       Q    I assume before your testimony,
16    it's your practice to re-review your report,
17    correct?
18       A    Yes.
19       Q    And as part of that re-review, do
20    you do a careful review to make sure there
21    are no errors or misstatements?
22       A    Precisely.
23       Q    Okay.
24              And is that what led you to
25    discover this error today?
```

```
                                              Page 79
 1       A    Yes.
 2       Q    All right.
 3              So are you prepared to make
 4    the correction in your report?
 5       A    Sure.  So if you go to page 7,
 6    Table 1, go down to Goodman, two entries, so
 7    both of those numbers, the 16,363, both of
 8    those numbers should be 2,338.
 9       Q    Okay.
10              How -- what was the cause of
11    this error?  Did you misread something in the
12    article or your calculation was erroneous?
13       A    So as I just told you, in the
14    paper, what was quoted was milligrams per
15    week, and I mistook that for milligrams per
16    day.  Milligrams per week is unusual.  I
17    hadn't seen that anywhere else.
18       Q    All right.
19              So did you correct the number
20    on that -- here, can you just highlight it
21    with the orange so I can not miss it?
22       A    Actually, this is going to make a
23    mess, because it's pink, but anyway.
24              (Deponent complies.)
25       Q    Good enough.  All right.
```

```
                                              Page 80
 1       A    And then the two other places that
 2    I --
 3       Q    Yes.
 4       A    So as a consequence, if you go to
 5    paragraph 24 -- I'll highlight it first.
 6    Paragraph 24, the number there that is 4,303
 7    in paragraph 24 should be 2,338.
 8       Q    Mm-hmm.
 9       A    And similarly, the exact same thing
10    in paragraph 33, there's a number there that
11    is 4,303.  Same thing.  That should be 2,338.
12       Q    All right.
13              So can you just make that
14    notation on both of those pages and highlight
15    them?
16              You did.  All right.
17              Okay.  So with these revisions
18    in mind, does this change your ultimate
19    opinion?
20       A    No.
21       Q    Okay.
22              And that modification was in
23    paragraph 33 which is part of your conclusion
24    section, correct?
25       A    Yeah.  I probably answered that
```

```
                                              Page 81
 1    other question too quickly.  I mean, it
 2    doesn't qualitatively change my opinion.  It
 3    quantitatively changes because the number
 4    changed.
 5       Q    And so the Goodman case, as I
 6    recall, it was a lung cancer -- excuse me.
 7    The Goodman article was a lung cancer
 8    article, right?
 9       A    That's correct.
10       Q    So despite the change that you've
11    just described, you continue to hold the
12    opinion that there is a statistically
13    significant increased risk demonstrated by
14    the Goodman article?
15       A    Yes.
16       Q    If you look at paragraph 32 of your
17    report --
18       A    Okay.
19       Q    -- there's a reference discussing
20    the Hidajat study, and the statement is
21    "Exposure in the Hidajat, et al., study is
22    via inhalation rather than ingestion, but
23    Dr. Panigrahy has told me that NDMA and NDEA
24    are similarly carcinogenic via either route
25    (except that my calculations are conservative
```