**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

IN RE: TASIGNA (NILOTINIB)
PRODUCTS LIABILITY LITIGATION

Case No. 6:21-md-03006-RBD-DAB
(MDL No. 3006)

This document relates to
Member Case No. 6:21-cv-01327-RBD-DAB

_____

## NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION TO SHIFT COSTS FOR CLINICAL TRIAL DATA ANONYMIZATION

Defendant Novartis Pharmaceuticals Corporation ("NPC") moves the Court to require plaintiffs to share in the costs and expenses – approximately $320,000 – associated with performing data anonymization on raw data sets from clinical trials. The data anonymization process is necessary to comply with privacy requirements for study participants' personal data and must be completed before data may be produced to plaintiffs. This Court's order requiring NPC to produce raw statistical data from specified studies recognized that steps would be required before NPC could comply with the Court's order. *See* ECF No. 95. With the guidance provided by the Court's order, NPC has gathered raw statistical data sets for the specific studies that the Court ordered to be produced and has obtained a quote to complete the required data anonymization work. Absent this litigation and the requirement to produce the raw data, NPC would not be undertaking this data anonymization work on these specific 20 studies. This necessary expense to anonymize data to avoid the risk of re-identification of study participants using personal data is separate and apart

from the standard and routine (for litigation) expenses associated with the collection, review, storage, and production of documents that NPC must undertake in the ordinary course of discovery in litigation.

When the Court ordered the production of the raw datasets (ECF No. 95), NPC was not aware of the significant costs it would have to incur to respond to plaintiffs' requests because it was not known whether NPC would be compelled to produce any of the raw datasets from the thirty-eight clinical trials that plaintiffs requested. With the benefit of the Court's guidance, the expense associated with this production has become clear, and cost shifting is appropriate. Plaintiff does not consent to the relief that NPC seeks in this motion.

## I.    Background

On March 15, 2022, the Court ordered NPC to produce the raw data sets for twenty-six clinical trials.[1] Plaintiffs sought "patient-level data that has *not* been analyzed or manipulated by NPC in any way." Pls' Mot. to Compel at 13 (ECF No. 84) (emphasis in original). As the Court recognized, privacy concerns, which arise under U.S. and foreign data privacy laws and study participants' informed consents, must be addressed before these datasets are produced.[2] To date, plaintiffs have been

---

[1] Plaintiffs initially sought the raw data sets from thirty-eight clinical trials. However, the Court's order denied plaintiffs' demand for data from twelve studies that are either still ongoing or were conducted by a third party.

[2] A single example under U.S. law is the Health Insurance Portability and Accountability Act (HIPAA), which requires the "de-identification of health information," and the related HIPAA

provided access to raw data from six of those studies.[3] The required data anonymization for these six studies was already completed independent of this litigation, so they could be produced without incurring new expense to comply with privacy requirements.

NPC had not anonymized the raw data sets from the remaining twenty clinical trials in the normal course of business, and would not be doing so now but for plaintiffs' production requests. Decl. of Kevin Poirier ¶ 8 ("Poirier Decl."). NPC must comply with privacy obligations not to disclose identifiable patient information – which arise under U.S. and foreign data privacy laws and study participants' informed consents – by performing the data anonymization process before the raw datasets can be produced. *Id.* ¶¶ 4-5. This data anonymization expense is separate and apart from any expense that NPC regularly incurs with review of documents like emails during litigation. *Id.* ¶¶ 6, 8. NPC works with a third-party company, Privacy Analytics, to anonymize personal data contained in its study databases. *Id.* ¶ 7. Prior to the Court's order that defined the scope of the production of raw clinical trial data

---

Privacy Rule, which provides the standard for de-identification of protected health information that includes eighteen identifiers that must be removed. *See* 45 CFR § 164.514(a). *See also Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[3] Plaintiffs have indicated that they have not yet successfully used the provided platform to access the data. NPC has given plaintiffs a personal point of contact at SAS to address any technical problems that plaintiffs may be experiencing.

(including by identifying which studies must be produced), the actual cost to comply with NPC's privacy obligations was unknown. NPC recently obtained a quote for $320,000 from Privacy Analytics to complete required data anonymization for the raw datasets from the remaining twenty studies on an expedited basis for use within SAS's secured lockbox platform. *Id.* ¶ 8. This quote does not include possible "complexity uplift" fees for studies that have large numbers of data tables or data fields. In its review to date, Privacy Analytics has identified three studies that require uplift fees of $11,480 in total. *Id.* ¶ 12 (CAMN107D1201, CAMN107A2203, and CAMN107AIC05). Privacy Analytics' quote includes a discount based on an existing business relationship between NPC and Privacy Analytics and the volume of work. As a part of the expediting process here, Privacy Analytics will be performing data anonymization for multiple studies at one time, which is above and beyond the company's standard agreement with NPC, which provides for anonymization of four studies per month. *Id.* ¶ 10. NPC has provided data to Privacy Analytics for seventeen of the remaining twenty studies. NPC is continuing its work to collect, process, and transmit to Privacy Analytics available data for the remaining three studies. The vendor anticipates that it will take approximately four months to complete its data anonymization work for the twenty studies. *Id.* ¶ 14. NPC has instructed Privacy Analytics to begin its work, focusing on the largest studies first, and Privacy Analytics will provide anonymized data on a rolling basis. ¶ 14.

4

Plaintiffs have not agreed to cost-shifting of any type. NPC remains available to confer with plaintiffs regarding cost-shifting with this scope of production.

## II.    Legal Standard

Generally, "the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978). However, a district court may issue an order protecting the responding party from undue burden or expense by "conditioning discovery on the requesting party's payment of the costs of discovery." *Id.* at 358. Florida district courts recognize that courts have the discretion to shift all or part of the costs of production to the requesting party "when electronic discovery imposes an 'undue burden or expense on the responding party.'" *Kabelis v. NCL (Bahamas) Ltd.*, No. 20-21430-CIV, 2021 WL 790067, at *4 (S.D. Fla. Mar. 2, 2021) (internal citation omitted); *see also Classic Soft Trim, Inc. v. Albert*, No. 6:18-cv-1237, 2020 WL 6734369, at *9 (M.D. Fla. June 15, 2020) (recognizing that "[t]he Court has the discretion . . . to shift all or part of the costs of production to the requesting party") *FDIC v. Brudnicki*, 291 F.R.D. 669, 676 (N.D. Fla. 2013) (stating that "courts have held that Rule 26(c) permits cost shifting as part of enforcing proportionality limits").

Courts have specifically held that cost shifting does *not* apply only in cases of inaccessible electronic discovery, but instead permits cost shifting as part of enforcing proportionality limits. *E.g.*, *Brudnicki*, 291 F.R.D. at 676 (requiring the

requesting party to pay some of the cost of producing the ESI, notwithstanding the discovery at issue did not fall within the definition of inaccessible ESI). Indeed, Rule 26 was amended in 2015 "to include an express recognition of protective orders that allocate expenses for disclosure or discovery" to "forestall the temptation that some parties may feel to contest" a court's authority to issue such orders. Fed. R. Civ. P. 26(c)(1); *see also Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 3288058, at *8-9 (D. Kan. June 18, 2020), *aff'd*, No. 18-1100-EFM, 2020 WL 6939752 (D. Kan. Nov. 24, 2020) (rejecting plaintiff's argument that the court may only shift costs for ESI that is not reasonably accessible and noting that Rule 26(c) "is not limited to non-reasonably accessible discovery, and it was amended in 2015 to make clear that the court may allocate discovery expenses for good cause in order to protect a party from undue burden or expense").

## III.    Argument

In determining whether cost shifting with discovery is appropriate, courts consider the following factors in enforcing proportionality limits:

(1) The specificity of the discovery requests;

(2) The likelihood of discovering critical information;

(3) The purposes for which the responding party maintains the requested data;

(4) The relative benefit to the parties of obtaining the information;

(5) The total cost associated with the production;

(6) The relative ability of each party to control costs and its incentive to do so; and

(7) The resources available to each party.

*Albert*, 2020 WL 6734369, at *9; *Brudnicki*, 291 F.R.D. at 676-77.

Here, as explained below, the lack of specificity of plaintiffs' discovery requests, the minimal likelihood of discovering critical information, the high cost of the sought discovery, and plaintiffs' lack of incentive to control cost, all weigh in favor of shifting costs. Accordingly, plaintiffs should be required to bear some of the cost associated with the data anonymization.

## A. The Specificity Of The Discovery Requests

Plaintiffs' request for the raw datasets from clinical trials is not tailored to discover relevant information. As plaintiffs acknowledged, they have propounded "many requests that relate to clinical trial documents and raw, patient-level data," including "[a]ll documents that relate to proposed, completed, partially completed, and/or proposed but never begun clinical investigations, trials, studies and/or tests concerning the use and/or effects of Tasigna in humans." Pls.' Mot. to Compel. at 3 n.2. As a result, plaintiffs' requests are far-reaching, broad and do not call for the production of specifically targeted documents that may assist in proving plaintiffs' claims. Consequently, there will be a significant amount of irrelevant information in the produced raw datasets. Accordingly, this factor favors cost shifting.

## B. The Likelihood Of Discovering Critical Information

Plaintiffs are unlikely to discover critical information from the remaining raw datasets at issue. NPC has already produced raw data from six studies to plaintiffs, including registration studies that supported Tasigna®'s FDA approvals. More than 2,800 patients were enrolled in these six studies. NPC has already provided voluminous patient-level trial data from the regulatory file, NPC's clinical study database (CREDI), and safety database reports. As NPC has previously noted, in just one sample of the clinical trial reports that NPC has already produced, plaintiffs will find, ***1017 pages*** of ***individual*** anonymized ***patient-level*** data, including: demographic information such as each trial participant's history of disease, relevant medical history, and prior therapies; "compliance and drug concentration data"; "individual efficacy response data"; "adverse event listings" for "each patient"; "individual laboratory measurements by patient"; and individual "vital signs and other observations related to safety." *See, e.g.*, TREDI01361254-71.

Moreover, there is no guarantee that the raw datasets will be used by the one plaintiffs' expert who purports to need them. According to plaintiffs' expert, "[t]he raw data are essential to enable the analyst to ensure that pre-specified analyses were indeed carried out as specified and to enable that analyst to conduct analyses that the sponsor failed to carry out or failed to record." Decl. of David Madigan ¶ 9. The Court also acknowledged that plaintiffs' expert might not offer an opinion on the

raw datasets. *See* 3/15/2022 Order at 2 n.1 (ECF No. 95). Essentially, plaintiffs' expert is on a fishing expedition to audit the datasets for hoped-for anomalies in the datasets, without any basis to believe there actually are any.[4] Thus, the "critical" nature of the sought information is speculative and tangential. "[W]here the cost of producing documents is very significant, the Court has the power to allocate the cost of discovery, and doing so is fair. If plaintiffs' counsel has confidence in the merits of its case, they should not object to making an investment in the cost of securing documents from defendant and sharing costs with defendant." *Boeynaems v. LA Fitness Int'l, LLC*, 285 F.R.D. 331, 335 (E.D. Pa. 2012).

Accordingly, this factor favors cost shifting.

## C. The Purposes For Which The Responding Party Maintains The Requested Data

As explained above, NPC does not maintain anonymized raw datasets for the twenty clinical trials at issue and has no plans to generate anonymized raw datasets for these studies outside this litigation. To comply with the Court's production order, NPC must comply with privacy obligations before the datasets can be produced (as the Court's order recognizes), which requires data anonymization. As a result, the information requested by plaintiffs is not regularly maintained in a usable format for

---

[4] For instance, in their motion to compel, plaintiffs speculated that "if NPC chose to limit or exclude a certain safety analysis or define cardiovascular events in a certain way, Plaintiffs and their experts are forced to accept those determinations, without any ability to challenge them." Pls. Mot. to Compel at 9 (ECF No. 84).

sharing with third parties and for use in this litigation. Accordingly, this factor favors cost shifting. *Cook v. Shelby Cnty. Healthcare Corp.*, No. 08-2061, 2009 WL 10700550, at *5 (W.D. Tenn. May 27, 2009) (finding this factor weighed in favor of cost-shifting where responding party did not maintain the requested information in its normal course of business).

### D. The Relative Benefit To The Parties Of Obtaining The Information

NPC will have to expend additional resources for data anonymization in order for raw datasets to be in a format that can be produced to plaintiffs, even though detailed study information was already produced and is available to plaintiffs from other sources. NPC derives no benefit in this litigation from data anonymization and production of the raw datasets from these twenty studies; the raw datasets are not necessary to NPC's defense. Accordingly, this factor favors cost shifting. *See Multitechology Servs., L.P. v. Verizon Sw f/k/a GTE Sw Inc.,* No. Civ. 4:02-CV-702-Y, 2004 WL 1553480 (N.D. Tex. July 12, 2004) (shifting costs to requesting party where there was no benefit to the responding party from the discovery).

### E. The Total Cost Associated With The Production

As explained above, the estimated cost associated with the data anonymization of the raw clinical trial data for the twenty remaining studies is $320,000. This is not a typical cost in litigation, such as collecting, storing, reviewing and producing documents (for which NPC does not seek costs). This is

not a cost that NPC would incur but for plaintiffs' production requests and the need to comply with privacy laws. The application of proportionality is particularly appropriate when a party has already produced significant quantities of documents, where the expense of responding to a party's discovery demands is disproportionate to the likely benefit of such efforts, and where the additional ESI sought is "sweeping" and concerns matters of "questionable relevance." *Wood v. Capital One Servs., LLC,* No. 09-CV-1445 NPM/DEP, 2011 WL 2154279, at *3, 7 (N.D.N.Y. Apr. 15, 2011) (denying motion to compel and limiting discovery even of matters admitted to have relevance where burden of responding "far outweighed" possible relevance and the amount at stake, but permitting additional discovery if plaintiff – the party seeking additional discovery – agreed "to bear the expense of production"). *Id.* at *13. Accordingly, this factor favors cost shifting.

### F.  The Relative Ability Of Each Party To Control Costs And Its Incentive To Do So

Discovery in this MDL thus far has been a one-way street. NPC has had to respond to plaintiffs' continuous discovery requests. In contrast, plaintiffs have not had to face similar basic discovery obligations to test plaintiffs' individual claims, given the Court's decision not to engage in case-specific deposition discovery at this stage. NPC's discovery efforts thus favor cost shifting. *See Conn. Gen. Life Ins. Co. v. Earl Scheib, Inc.,* No. 11-CV-0788-GPC WVG, 2013 WL 485846, at *4 (S.D. Cal. Feb. 6, 2013) (court held it would "not order defendant to absorb the incredible

expense associated with responding to [the requested discovery], especially when defendant has been working to produce documents and information in response to plaintiff's various other discovery requests.").

NPC does not have the ability to control the cost associated with the data anonymization process for these twenty clinical trials that have not yet been produced to plaintiffs. Moreover, given that the predominant majority of the discovery burden has fallen on NPC, absent an order requiring plaintiff to share in discovery costs, there is no incentive for plaintiffs to reasonably tailor their discovery demands. Plaintiffs, therefore, lack adequate incentive to control costs, here, and in this litigation more broadly. Accordingly, this factor weighs in favor of shifting costs.

### G.  The Resources Available To Each Party

Although NPC is a large corporation, that does not grant plaintiffs license to seek unlimited discovery without proportionality considerations. As this District noted, "[w]hile proportionality requires that all parties have access to relevant information, the concept of proportionality exists to prevent one party . . . from leveraging that asymmetry to obtain a tactical advantage over the Defendants." *Dig. Assurance Certification, LLC v. Pendolino*, No. 6:17-CV-72-ORL-41TBS, 2017 WL 4342316, at *11 (M.D. Fla. Sept. 29, 2017). Cost-shifting is appropriate when the requesting party can afford to bear some of the discovery costs, such as when

there is a coordinated set of three plaintiffs' firms responsible for all of the pending cases. "[I]t is not unheard of for plaintiff's firms to front huge expenses when multi-million dollar recoveries are in sight." *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 288 (S.D.N.Y. 2003). Indeed, plaintiffs' counsel argued that an MDL would enable the pooling of resources among plaintiffs' counsel in this litigation. Accordingly, this factor supports cost shifting here.

## IV.   Conclusion

For the foregoing reasons, the Court should grant NPC's request to shift costs to plaintiffs for the data anonymization to the raw datasets for the clinical trials that must be produced.

Dated: May 13, 2022                    Respectfully Submitted,

                                       By: /s/ Robert E. Johnston
                                       Joe G. Hollingsworth, Esq.
                                       Robert E. Johnston, Esq.
                                       Andrew L. Reissaus, Esq.
                                       Hollingsworth LLP
                                       1350 I Street Northwest
                                       Washington, District of Columbia 20005
                                       (202) 898-5800

                                       *Attorneys for Defendant*
                                       *Novartis Pharmaceuticals Corporation*

## **CERTIFICATE OF COMPLIANCE**

In accordance with Local Rule 3.01(g), counsel for Defendant Novartis Pharmaceuticals Corporation certify that they have conferred with counsel for plaintiffs about this motion and plaintiffs do not consent to the relief requested in this motion.

## **CERTIFICATE OF SERVICE**

I certify that on this 13th day of May 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, causing all counsel of record be served by electronic means.

/s/ Robert E. Johnston
Robert E. Johnston, Esq.
*Attorney for Defendant*
*Novartis Pharmaceuticals Corporation*