## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

IN RE: TASIGNA (NILOTINIB)
PRODUCTS LIABILITY LITIGATION

Case No. 6:21-md-03006-RBD-DAB
(MDL No. 3006)

This document relates to all actions.

---

### PLAINTIFFS' OPPOSITION TO NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION TO SHIFT COSTS FOR CLINICAL TRIAL DATA ANONYMIZATION

Pursuant to the Court's order dated May 10, 2022 (ECF No. 116), Plaintiffs submit this opposition to Novartis Pharmaceuticals Corporation's ("NPC") motion seeking to shift costs for clinical trial data anonymization to Plaintiffs. *See* ECF No. 118 ("NPC's Motion").

## I.     Background

Plaintiffs first moved to compel the production of the raw clinical data for thirty-eight (38) of NPC's clinical trials on February 11, 2022. *See* ECF No. 84 ("Plaintiffs' MTC"). NPC filed its opposition to Plaintiffs' MTC on February 23, 2022 and this Court ruled on March 15, 2022 that the raw datasets for twenty-six (26) of the requested clinical trials be produced. *See* ECF Nos. 89 ("NPC's Opposition") & 95 (the "Order"). Apparently, at no point between Plaintiffs' MTC

back in February and the parties' meet and confer of May 4, 2022[1] did NPC endeavor to determine the cost associated with producing the requested raw data. It was during this May 4th meet and confer that NPC first informed Plaintiffs it would seek cost-sharing for the incomplete anonymization of the raw data sets for the remaining twenty (20) of twenty-six (26) clinical trials ordered to be produced. It was also the first time Plaintiffs learned that data anonymization for these twenty (20) trials would take approximately four months to complete.[2]

Oddly, there is not a single reference to cost in NPC's Opposition to Plaintiffs' MTC regarding this discovery. This is odd, since, as the Order notes, Novartis objected "to supplying this additional information largely on grounds of *burden* and the cumulative nature of the information." ECF No. 95 at 1 (emphasis added); *see also id.* at 2 ("Novartis … again asserts that *any* burden of production is too much, as it would be cumulative."). On this issue, the Court's Order was clear:

> As with the non-CML nature of the information about the trials, the Court finds these arguments unavailing. The burden of production is small, and it is for Plaintiffs and their expert to determine what use they need to make of available data, subject ultimately to cross examination.

---

[1] The parties met and conferred on this date in preparation for the joint notice of discovery status filed on May 5, 2022, nearly three (3) months after Plaintiffs' MTC was filed.

[2] NPC now ambiguously states that its vendor, Privacy Analytics, can complete 4 studies in May, 4 in June, 6 in July, and 6 in August [Decl. of Kevin Poirier ¶ 9 ("Poirier Decl.")], but also maintains that it will take approximately four months if produced on a rolling basis [Poirier Decl. at ¶ 14]. Assuming the anticipated four (4) months is from the date of Mr. Poirier's declaration, or even the May 5th joint status update, that brings the parties into September before complete data from all the ordered trials would be provided. This enduring ambiguity is further support for Plaintiffs' Motion to Extend Case Management Deadlines. *See* ECF No. 117.

*Id*. at 2. Notably, despite NPC's Opposition asserting that Plaintiffs failed to demonstrate the relevance of the requested data [ECF No. 89 at 7], this Court did not even undertake a relevance analysis in its Order, instead focusing only on NPC's "small" burden of production. *See* ECF No. 95 at 2.

Having failed to allege its current, cost-associated burden in the first instance—or apparently even look into it prior to the instant request—NPC now attempts to re-litigate a settled issue. Indeed, NPC's Motion states that the company only "*recently* obtained a quote for $320,000 from Privacy Analytics to complete required data anonymization…" *See* ECF No. 118 at 4 (emphasis added). Nowhere in NPC's Motion, nor the appended Declaration from Mr. Poirier, does NPC state *when* the quote was obtained. Even assuming the quote was obtained shortly before NPC informed Plaintiffs on May 4th, that is nearly three (3) months *after* Plaintiffs' MTC was filed and even further beyond the time from which the parties began negotiating this particular issue.

NPC's strained and transparent attempt to blame its delay on not being "aware of the significant costs it would have to incur to respond to plaintiffs' requests because it was not known whether NPC would be compelled to produce any of the raw datasets … that plaintiffs requested" should be flatly rejected. There was nothing that would have prevented NPC from requesting this information months earlier in anticipation of a negative order, or, more importantly, to include as part of its original

burden argument. NPC had ample time to seek and obtain this information, but failed to do so, choosing instead to railroad Plaintiffs in an attempt to re-litigate an already settled burden issue. It is also inexplicable how NPC would not already have a clear understanding of the cost of data anonymization. This is a process it undertakes on a regular basis and had already done for the six (6) studies it already produced to Plaintiffs. NPC's lack of diligence as it relates to the data anonymization burden should constitute waiver of same and this Court should deny NPC's Motion outright.

Moreover, with NPC having raised this suspected cost burden recently, and for the first time, it remains unclear to Plaintiffs what NPC actually seeks. First, despite its attempt to blame its own dilatory tactics on waiting for the Court's Order [ECF No. 118 at 3-4], NPC is still unable to provide full transparency regarding the actual costs, noting that the $320,000 quote from Privacy Analytics does not include "complexity uplift" fees, which do not appear to be finalized. *See* ECF No. 118 at 3-4 (wherein NPC states that prior to the Court's order "the actual cost to comply with NPC's privacy obligations was unknown" before failing to provide an actual, final cost estimate). NPC also makes reference to an ambiguous discount based on an existing business relationship and the volume of work. *Id*. at 4. More importantly, NPC argues that cost shifting is "appropriate" [ECF No. 118 at 2] and that Plaintiffs "should be required to bear *some* of the cost associated…" [*Id*. at 7 (emphasis added)], but makes no clear demand. Regardless of this complete lack of a demand

and the fact that NPC has never made an actual offer to Plaintiffs during the meet and confer process, for the reasons set forth herein, Plaintiffs do not agree that *any* cost-sharing is appropriate here.

NPC also contends that, if not for Plaintiffs' request, it would not be undertaking anonymization of data for the remaining twenty (20) studies in the normal course of business. *See* ECF No. 118 at 3. However, in the Declaration submitted on behalf of NPC's own Director and Data Sharing Portfolio Officer, it states that "[d]ata anonymization is a process regularly used in the pharmaceutical industry to ensure compliance with privacy obligations…" [ECF No. 118-1 at ¶ 5] and, further, that NPC's quote "includes a discount based on NPC's and Privacy Analytics existing relationship and the volume of work involved in this project, *and notwithstanding the fact that Privacy Analytics does not usually perform data anonymization of raw datasets for more than four studies per month for NPC.*" *Id.* at ¶10 (emphasis added). NPC admits that it not only has a standing relationship with Privacy Analytics, but has an ongoing, monthly relationship to perform the very data anonymization it requires here. *See* ECF No. 118 at 4. So, while anonymization of the data for these exact studies may not be complete, NPC undoubtedly performs this exact task on a monthly basis and should have been able to raise this issue when Plaintiffs first requested the data.

That "NPC does not maintain raw datasets from clinical trials containing data

that can be produced to third parties without first undergoing anonymization processes" [ECF No. 118-1 at ¶ 6] is no fault of Plaintiffs. As Magistrate Judge Baker said during the October 26, 2021 status conference:

> But particularly for, I'd say, pharmaceutical businesses, with drugs like this, the defendants know to a moral certainty there's going to be litigation. And defendants' businesses have the opportunity to choose how to organize their businesses, how they shouldn't organize their business to keep litigators happy.

October 26, 2021 Status Conf. Tr. at 24:6-12. Plaintiffs should not now be saddled with additional costs due to NPC's practices.

## II.   Legal Standard

There is a presumption that the responding party must bear the expense of complying with discovery requests. *Kabelis v. NCL (Bahamas) Ltd.*, 2021 WL 790067, at *4 (S.D. Fla. 2021), *citing Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978). While the Court has the discretion to shift costs to the party requesting discovery, the responding party has the burden of proof on a motion for cost-shifting. *Id*. Further, cost-shifting should be considered "only when electronic discovery imposes an undue burden or expense on the responding party." *Id*., *citing Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003). Whether production of documents is unduly burdensome or expensive turns primarily on whether they are kept in an accessible or inaccessible format. *Zubulake*, 217 F.R.D. 309 at 318, 323 ("A court should consider cost-shifting *only* when electronic data is

relatively inaccessible, such as in backup tapes" (emphasis added)). The responding party bears the burden of showing that "identified sources are not reasonably accessible in light of the burdens and costs required to search for, retrieve, and produce whatever responsive information may be found." *Quail Cruises Ship Management Ltd. v. Agencia De Viagens CVC Tur Limitada,* 2012 WL 12949753, *2 (S.D. Fla. 2012), *citing* Fed. R. Civ. P. 26(b)(2)(B), Advisory Committee's note to 2006 Amendment. In meeting this burden, the responding party should present details sufficient to allow the requesting party to evaluate the costs and benefits of searching and producing the identified sources. *Id.*

## III.   Argument

NPC has provided little to no details sufficient to allow Plaintiffs (or the Court) to evaluate the costs of producing the relevant data. Instead, NPC makes only vague, conclusory statements that it must anonymize the data for the remaining clinical trials at the cost of approximately $320,000. It remains unclear what information must be removed or redacted from the data as it currently exists, nor whether such action is even necessary under the law. Indeed, NPC suggests this "necessary expense" is to "avoid the risk of re-identification" of study participants.[3]

---

[3] Plaintiffs have no intention (nor incentive) to attempt to reverse-engineer the data they are provided in order to uncover the identities of the patients that participated in NPC's clinical trials. In fact, as a requirement to access the data, NPC required Plaintiffs to agree, in writing, that anyone accessing it on behalf of Plaintiffs would make no efforts of any kind to identify clinical trial patients. Plaintiffs agreed.

ECF No. 118 at 1. Yet, NPC fails to demonstrate with any particularity how this anonymization procedure is necessary to avoid running afoul of any law or regulation and, instead, generally references informed consents (without providing the relevant documents or provisions) and the Health Insurance Portability and Accountability Act.

Further, NPC's application fails to meet the standard articulated in *Zubulake* and followed by courts in this circuit. Under the *Zubulake* standard, unless the relevant documents/data are inaccessible, cost shifting is inappropriate, the seven-factor test need not be performed, and the inquiry ends. *See Kabelis 2021 WL 790067 at *4 (*"As outlined in *Zubulake I*, 217 F.R.D. at 322, *if the responding party is producing data from inaccessible sources*, a seven-factor analysis is considered to determine whether shifting the cost of production is appropriate") (emphasis added).

Here, NPC concedes that this data *is* accessible, but nonetheless, citing *FDIC v. Brudnicki*, 291 F.R.D. 669 (2013), argues proportionality considerations warrant the application of the seven-factor test to determine if cost-shifting is appropriate.[4]

---

[4] Plaintiffs note that the seven-factor test outlined in *Brudnicki* differs slightly from the test outlined in *Zubulake* and *Kabelis*.  Notably, *Brudnicki* draws its factors from *Rowe Entertainment, Inc. v. William Morris Agency, Inc.,* 205 F.R.D. 421, 428–29 (S.D.N.Y.2002). These factors were later modified by the *Zubulake* court as it found the *Rowe* factors undercut the presumption that the responding party pays the expense of complying with discovery requests. *See Zubulake*, 217 F.R.D. 309, at 316. Accordingly, the factors from *Rowe* (and relied upon by *Brudnicki*) were modified by the *Zubulake* court to the following: (1.) The extent to which the request is specifically tailored to discover relevant information; (2.) The availability of such information from other sources; (3.) The total cost of production, compared to the amount in controversy; (4.) The total cost of production, compared to the resources available to each party; (5.) The relative ability of

Notably, NPC does not cite a single case where a court determined that the need to anonymize patient data was sufficient to rebut the presumption against cost-shifting.

Based on the above, the Court should deny NPC's novel request for cost-shifting outright, without even performing the seven-factor test suggested by NPC. That said, even if the Court decides the seven-factor test is warranted here, for the reasons set forth below, under both the more defendant-friendly *Brudnicki* standard, and the updated *Zubulake* standard, all of the relevant factors weigh in Plaintiffs' favor and counsel against cost-shifting.[5]

### A. The Specificity of The Discovery Requests[6]

Examining the specificity of the requested discovery, NPC makes the unusual argument that Plaintiffs' request for the raw datasets from clinical trials is not tailored to discover relevant information. *See* ECF No. 118 at 7. While the data from clinical trials involving the drug at issue are clearly relevant and Plaintiffs' MTC sought the underlying raw data for a discrete (specific) subsection of trials, the issue of relevance has already been settled by this Court. As stated above, the Court did not undertake a relevance analysis in its Order, instead focusing only on NPC's

---

each party to control costs and its incentive to do so; (6.) The importance of the issues at stake in the litigation; and (7.) The relative benefits to the parties of obtaining the information. *Id*. at 322.

[5] In order to maintain the presumption that the responding party pays, the cost-shifting analysis must be neutral; close calls should be resolved in favor of the presumption. *Zubulake*, 217 F.R.D. at 320.

[6] The *Zubulake* Court modifies this factor to be "the extent to which the request is specifically tailored to discover relevant information."

"small" burden of production. *See* ECF No. 95 at 2. The Order thus plainly demonstrates that the information sought by Plaintiffs is relevant. The information sought is also specific, requesting data from a discrete set of clinical trials involving Tasigna, and this factor therefore counsels against cost-shifting.

### B. The Likelihood of Discovering Critical Information[7]

As established in Plaintiffs' MTC, without the raw data from the clinical trials, Plaintiffs are limited to the published papers and clinical study reports authored by NPC. ECF No. 84 at 8. This means if NPC chose to limit or exclude a certain safety analysis or define important cardiovascular adverse events in a certain way, Plaintiffs and their experts would be forced to accept those determinations, without any ability to challenge them or perform their own analyses. *Id*. In the context of a failure to warn claim, where Plaintiffs allege that NPC knew about dangerous cardiovascular events associated with its drug and failed to warn prescribing physicians and patients of same, it does not get more critical than raw, clinical data.

NPC additionally argues that Plaintiffs are on a fishing expedition to audit datasets. As with the specificity of Plaintiffs' requests, the issue here is not the discoverability of the raw data. The Court has already ordered it be produced. The issue is whether Plaintiffs must help bear the cost of discovery critical to their case. As the presumption directs, they should not.

---

[7] The *Zubulake* Court deleted this factor from the test.

## C. The Purposes for Which the Responding Party Maintains the Requested Data[8]

NPC maintains the raw datasets the Court ordered to be produced. Its claim that it does not maintain *anonymized* raw datasets is of no moment. To be certain, NPC's own position regarding the six (6) datasets already produced to date indicate that they do not maintain any raw datasets in an anonymized manner, but rather the anonymization for those six (6) studies was completed independent of this litigation. Moreover, NPC's Mr. Poirier declares that the data anonymization process is "regularly used," [Poirier Decl. at ¶ 5] including by NPC, who uses Privacy Analytics to perform data anonymization of raw datasets for four studies per month pursuant to its standard agreement. *See* NPC's Motion at 4; Poirier Decl. at ¶ 10.

## D. The Relative Benefit to The Parties of Obtaining the Information

As with the other elements, NPC again relies on an issue it already had the opportunity to litigate in analyzing the relative benefit to the parties. NPC contends that the raw datasets are cumulative of information already produced. Again, the Court already found these arguments unavailing. *See* ECF No. 95 at 2. Stating that it derives no benefit from the data anonymization process for the remaining twenty studies, NPC states that the raw datasets are not necessary to NPC's defense. However, the way NPC chose to analyze the data, and the decisions it made in that

---

[8] The *Zubulake* Court deleted this factor from the test

regard, directly relate to the warnings NPC provided to physicians about the product, along with the adequacy of same. Multiple NPC witnesses, including Karen Habucky and Leila Alland, have already testified that data drove what the company included in the labeling.

### E. The Total Cost Associated with The Production[9]

The total cost associated with the production remains unknown. As NPC's Motion states, the *estimated* cost, absent certain additional factors, is $320,000. Based on NPC's representations to date, including its briefing on this issue, Plaintiffs do not know the total cost. NPC contends that proportionality should be considered when a part has already produced significant quantities of documents, but that is not the issue here. That issue—the burden on NPC of producing the raw data—is settled. Only now does NPC assert a last-ditch cost burden in an attempt to delay production and further prejudice Plaintiffs. Indeed, NPC cites *Wood v. Capital One Servs., LLC*, 2011 WL 2154279 (N.D.N.Y. Apr. 15, 2011), which was decided in the context of a motion to compel. Plaintiffs' MTC was already decided. The issue before the Court now is *NPC's motion* for cost-sharing, for which it bears the burden. What is more, the *estimated* (again, the total has not been determined) cost associated with

---

[9] The *Zubulake* Court modifies this element to include comparators to the amount in controversy and the resources available to each party. *See* FN 4 above.

producing this ordered discovery appears to Plaintiffs to be inconsequential considering the resources of NPC [*see* Section III(G), *infra*].

### F.  The Relative Ability of Each Party to Control Costs and Its Incentive to Do So

Only one party has the ability to control costs in this scenario: NPC. In addition, as discussed above, NPC has only been able to provide an estimated cost to date. Plaintiffs fear that NPC has no incentive to control any additional costs, especially having now sought cost-sharing. This counsels against cost-sharing.

NPC's argument on this element is also interpreted relevant to its discovery productions to date, as opposed to this one, discrete production issue. Moreover, NPC's contentions regarding Plaintiffs incentives are inapposite.[10] Plaintiffs have already made its discovery demands pertaining to this issue. The Court has ruled. There are no costs for Plaintiffs to control here. Plaintiffs' counsel merely requested the discovery it believes is necessary to fully and competently prosecute this matter in the best interest of their clients.

### G. The Resources Available to Each Party

There is no doubt that the final factor favors the Plaintiffs. NPC's parent company, Novartis AG, is one of the world's largest pharmaceutical companies with

---

[10] NPC's contentions that discovery has been a one-way street is patently incorrect. Plaintiffs have, in fact, produced significant discovery to NPC in the form of comprehensive Plaintiff Fact Sheets, Interrogatory Responses (for most cases), all medical records in Plaintiffs' possession, and other relevant documents. In addition, depositions of a number of Plaintiffs were completed prior to the formation of this MDL.

a market cap of approximately one hundred and ninety-five billion dollars ($195B) at the time of this filing. Notably, NPC sold over two billion dollars ($2B) of Tasigna worldwide in 2021 alone.[11] While it is true that Plaintiffs here are represented by three small to mid-sized Plaintiffs firms, their collective resources are not even in the same stratosphere as NPC's.

### H.  The Factors from *Zubulake* Also Counsel Against Cost-Sharing

The factors considered under the *Zubulake* seven-factor test that are not included in the *Brudnicki* test are: 1) the availability of such information from other sources and 2) the importance of the issues at stake in the litigation. Both of these factors counsel against cost-sharing.

First, this information is not available from any other source. While it is true that Plaintiffs have been provided other clinical trial data, it is the unique nature of the raw clinical data at issue here, that persuaded the Court to grant Plaintiffs' MTC to begin with. As articulated in Plaintiffs MTC, only the raw data provides Plaintiffs the ability to perform fresh and unbiased analyses. *See* ECF No. 84 at 8-9.

Second, the importance of the issues at stake in this litigation cannot be overstated. Across both the MDL and New Jersey State MCL, this litigation involves hundreds of individuals who allegedly suffered life-altering injuries as a result of their use of Tasigna. These are significant allegations that implicate important public

---

[11] *See* https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2021.pdf.

health concerns and these Plaintiffs are entitled to obtain relevant discovery necessary to expose the alleged wrongful conduct of NPC.

## **CONCLUSION**

Accordingly, and for the reasons stated above, the Court should deny NPC's Motion to shift costs to Plaintiffs for the data anonymization of the raw datasets for the clinical trials this Court ordered to be produced back on March 15, 2022.

Dated: May 16, 2022                  Respectfully Submitted,
                                     By: */s/ Raymond C. Silverman*
                                     Raymond C. Silverman, Esq.
                                     Christopher Oxx, Esq.
                                     Harrison M. Biggs, Esq.
                                     Parker Waichman, LLP
                                     6 Harbor Park Drive
                                     Port Washington, NY 11050
                                     (516) 466-6500
                                     (516) 466-6665 (fax)
                                     rsilverman@yourlawyer.com
                                     oxx@yourlawyer.com
                                     hbiggs@yourlawyer.com


                                     By: */s/ Richard M. Elias*
                                     Richard M. Elias, Fla. Bar No. 38471
                                     Elias LLC
                                     231 S. Bemiston Avenue, Ste. 800
                                     St. Louis, MO 63105
                                     (314) 391-6820
                                     relias@EliasLLC.com

By: */s/ Lawana S. Wichmann*
Lawana S. Wichmann, Esq.
OnderLaw, LLC
110 E. Lockwood Avenue
St. Louis, MO 63119
(314) 963-9000
(314) 963-1700 (fax)
wichmann@onderlaw.com

*Attorneys for Plaintiffs*

16

## <u>**CERTIFICATE OF SERVICE**</u>

I certify that on this 16th day of May 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, causing all counsel of record be served by electronic means.

<u>/s/ *Raymond C. Silverman*</u>
Raymond C. Silverman, Esq.
*Attorney for Plaintiffs*