**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| IN RE: TASIGNA (NILOTINIB)<br>PRODUCTS LIABILITY LITIGATION<br><br>This document relates to all actions.<br>_____ | Case No. 6:21-md-03006-RBD-DAB<br>(MDL No. 3006) |

**NOVARTIS PHARMACEUTICALS CORPORATION'S
RENEWED MOTION TO SHIFT COSTS FOR
<u>CLINICAL TRIAL DATA ANONYMIZATION</u>**

Defendant Novartis Pharmaceuticals Corporation ("NPC") renews its motion requesting that the Court require plaintiffs to share in the substantial costs necessitated by plaintiffs' demand for production of raw datasets from clinical trials, which plaintiffs did not use in any fact deposition or in their disclosed experts' reports.

On March 15, 2022, the Court granted plaintiffs' motion to compel certain raw statistical data related to various clinical trials conducted by NPC. *See* 3/15/22 Order (ECF No. 95). Producing the raw data at issue required NPC to engage a third-party vendor, Privacy Analytics, to perform a data anonymization process in order to comply with privacy requirements for study participants' personal data. In total, NPC and its third-party vendor anonymized raw datasets from nineteen clinical trials pursuant to the Court's order. Given the limited evidentiary value of the raw data and the high burden and expense associated with securing it, NPC moved to allocate to plaintiffs the expected cost of this data anonymization process. The actual

cost of the anonymization of the raw datasets for production was $335,538.37.[1] *See* Decl. of Kevin Poirier at ¶ 10 ("Poirier Decl."). NPC advised all along that the requested data was irrelevant and cumulative, and the discovery plaintiffs sought was therefore unduly burdensome. Yet plaintiffs insisted on its full production with full knowledge of the high cost of the required data anonymization process.

In denying without prejudice NPC's cost-sharing motion, the Court noted that "the ultimate utility of the data is yet to be determined." 6/15/22 Order at 2 (ECF No. 123). Its utility has now been determined. Plaintiffs claimed the raw data was relevant on two grounds. First, plaintiffs insisted their expert David Madigan needed the raw data to support his expert opinion.[2] But plaintiffs withdrew him as an expert without producing a report; Dr. Madigan will not be offering any opinions at all, let alone any based on this data. And plaintiffs' four disclosed experts did not suggest that they used or relied on the raw datasets. Second, plaintiffs insisted they needed this raw data because it would be "instrumental in [p]laintiff's questioning of fact witnesses."[3] But plaintiffs did not pose ***a single question*** to ***a single witness*** about the produced data. Plaintiffs simply dragged NPC through a costly, year-long

---

[1] The total amount that Privacy Analytics charged NPC to complete work on the nineteen clinical trials was $526,615.25. NPC's legal function was invoiced for $335,538.37—the portion of the total cost necessarily incurred to comply with the Court's order and plaintiffs' litigation request. *See* Poirier Decl. ¶ 10. NPC seeks cost-shifting of only this portion of the total cost ($335,538.37).

[2] Pls.' Mot. to Compel Prod. from NPC's Non-Custodial Sources, at 9-10, 12 (ECF No. 84).

[3] Pls.' Mot. to Extend Case Mgmt. Deadlines, at 4 (ECF No. 117).

discovery saga to obtain data that they did not need, will not use, and seemingly barely even reviewed. The $335,538.37 cost of this fruitless fishing expedition should fall on plaintiffs, not NPC.

## BACKGROUND

In their February 11, 2022 motion to compel, plaintiffs sought an order compelling NPC to produce "raw, patient-level data sets associated with certain clinical trials involving Tasigna." Pls.' Mot. to Compel, at 8 (ECF No. 84). Plaintiffs insisted they were entitled to "patient-level data that has *not* been analyzed or manipulated by NPC in any way." *Id.* at 13 (emphasis in original). NPC explained to the Court in its opposition to plaintiffs' motion that the raw data at issue is not relevant, and, at any rate, the burden of producing that data far outweighs any potential evidentiary value it may have. *See* NPC's Opp'n to Pls.' Mot. to Compel Prod. from NPC's Non-Custodial Sources, at 11-19 (ECF No. 89). Moreover, NPC had already largely produced the same data in a different format, and plaintiffs' request was therefore duplicative and cumulative. *Id.* at 9-10. After briefing and oral argument, the Court issued its March 15 Order requiring NPC to produce the raw datasets for twenty-six clinical trials. *See* 3/15/2022 Order, at 2 n.1 (ECF No. 95).[4] NPC commenced a rolling production of the raw data.

---

[4] Plaintiffs initially sought the raw datasets from thirty-eight clinical trials. The Court's order, however, denied plaintiffs' demand for data from twelve studies that were ongoing or were conducted by a third party. NPC ultimately located and produced raw datasets for twenty-five

3

Two months before the close of fact discovery on July 15, 2022, plaintiffs requested that the Court extend the discovery deadlines by 45 days. *See* Pls.' Mot. to Extend Case Mgmt. Deadlines (ECF No. 117). Plaintiffs sought that extension on the ground that NPC's production of the anonymized raw datasets for a few of the clinical studies might extend beyond the July 15 discovery deadline. *Id.* at 2-5. Plaintiffs argued they had "thus far refrained from requesting certain depositions to allow this [raw] data to be produced and analyzed by their expert in advance of said depositions." Pls.' Mot. to Extend Case Mgmt. Deadlines, at 4 (ECF No. 117). The Court extended the discovery deadlines by 45 days as requested. Pretrial Order No. 6 (ECF No. 141).

NPC initially produced to plaintiffs in May the required data anonymization for six studies that had already been completed independent of this litigation. Those six studies' raw datasets could be produced without incurring new expenses to comply with privacy requirements. *See* Poirier Decl. ¶ 8 fn. 2. As to the remaining nineteen clinical trials, NPC worked with a third-party company, Privacy Analytics, to anonymize personal data contained in its study databases. *See* Poirier Decl. ¶ 8.[5]

---

clinical trials. *See* Notice of J. Proposed Agenda & Status Briefing for Aug. 10, 2022 Conf., at 2 (ECF No. 145).

[5] As previously explained, under U.S. and foreign data privacy laws (and as required to secure study participants' informed consent), NPC must comply with privacy obligations not to disclose identifiable patient information; thus, NPC must perform the data anonymization process before the raw datasets can be produced. *See* Poirier Decl. ¶¶ 4-5. This data anonymization expense is separate from any expense that NPC regularly incurs in reviewing documents like emails during

NPC paid Privacy Analytics $335,538.37 to complete the data anonymization for the raw datasets from the nineteen studies on an expedited basis for use within a secured lockbox platform. *Id.* ¶ 10.[6]

In light of the high cost of Privacy Analytics' data anonymization services, NPC sought an order requiring plaintiffs to share the high cost associated with that service. *See* NPC's Mot. to Shift Costs for Clinical Trial Data Anonymization (ECF No. 118). On June 1, 2022, the Court denied that motion, but it did so "without prejudice to potential reconsideration at the close of discovery." *See* 6/1/22 Order, at 2 (ECF No. 123). The Court explained that NPC "is well able to bear the cost of anonymizing in the first instance, so deferring decision on possible cost allocation would create no issue of delaying discovery." *Id.*

NPC continued to produce the anonymized datasets on a rolling basis and completed the production on October 1, 2022. Plaintiffs have not agreed to cost shifting of any type and do not consent to the relief NPC seeks in this motion.

---

litigation. *Id.* ¶¶ 6, 7. This Court "recognize[d] that anonymizing is appropriate here." 6/1/22 Order, at 2 (ECF No. 123).

[6] The cost for the anonymization included a discount based on an existing business relationship between NPC and Privacy Analytics and the volume of work. As a part of the expediting process here, Privacy Analytics performed data anonymization for multiple studies at one time, which is above and beyond the company's standard agreement with NPC, which provides for anonymization of four studies per month. *See* Poirier Decl. ¶ 11.

## LEGAL STANDARD

Generally, "the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978). A district court may, however, issue an order protecting the responding party from undue burden or expense by "conditioning discovery on the requesting party's payment of the costs of discovery." *Id.* at 358. Courts have the discretion to shift all or part of the costs of production to the requesting party "when electronic discovery imposes an 'undue burden or expense on the responding party.'" *Kabelis v. NCL (Bahamas) Ltd.*, No. 20-CV-21430, 2021 WL 790067, at *4 (S.D. Fla. Mar. 2, 2021) (quoting *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003)); *see* Fed. R. Civ. P. 26(c); *see also Classic Soft Trim, Inc. v. Albert*, No. 18-CV-1237, 2020 WL 6734369, at *9 (M.D. Fla. June 15, 2020) ("The Court has the discretion . . . to shift all or part of the costs of production to the requesting party."); *FDIC v. Brudnicki*, 291 F.R.D. 669, 676 (N.D. Fla. 2013) ("[C]ourts have held that Rule 26(c) permits cost shifting as part of enforcing proportionality limits[.]").[7]

---

[7] Courts have specifically held that cost shifting does *not* apply only in cases of inaccessible electronic discovery, but instead permits cost shifting as part of enforcing proportionality limits. *E.g.*, *Brudnicki*, 291 F.R.D. at 676 (requiring the requesting party to pay some of the cost of producing the ESI, notwithstanding the discovery at issue did not fall within the definition of inaccessible ESI). Indeed, Rule 26 was amended in 2015 "to include an express recognition of protective orders that allocate expenses for disclosure or discovery" to "forestall the temptation that some parties may feel to contest" a court's authority to issue such orders. Fed. R. Civ. P. 26(c)(1); *see also Lawson v. Spirit AeroSystems, Inc.*, No. 18-CV-1100, 2020 WL 3288058, at *8-9 (D. Kan. June 18, 2020), *aff'd*, 2020 WL 6939752 (D. Kan. Nov. 24, 2020) (rejecting plaintiff's argument that the court may only shift costs for ESI that is not reasonably accessible).

In determining whether cost shifting is appropriate, Florida courts consider the seven-factor test forth in *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309 (S.D.N.Y. 2003). *See Classic Soft Trim*, 2020 WL 6734369, at *9 (applying *Zubulake* factors); *Kabelis*, 2021 WL 790067, at *4 (same). Those factors are:

> (1) the specificity of the discovery requests; (2) the likelihood of discovering critical information; (3) the purposes for which the responding party maintains the requested data; (4) the relative benefit to the parties of obtaining the information; (5) the total cost associated with the production; (6) the relative ability of each party to control costs and its incentive to do so; and (7) the resources available to each party.

*Classic Soft Trim*, 2020 WL 6734369, at *9 (citing *Brudnicki*, 291 F.R.D. at 676); *Kabelis*, 2021 WL 790067, at *4. These factors are not a "check-list," and courts cannot simply "add up the factors" in order to "resolv[e] the issue in favor of whichever column has the most checks." *Zubulake*, 217 F.R.D. at 322. Rather, "[w]hen evaluating cost-shifting, the central question must be, does the request impose an 'undue burden or expense' on the responding party? Put another way, 'how important is the sought-after evidence in comparison to the cost of production?'" *Id.* at 322-23 (citations and footnotes omitted). Accordingly, the seven factors must be weighed in order of importance. *See id.* at 323. All seven factors weigh in favor of cost-shifting here.

# ARGUMENT

## I. The Specificity Of The Discovery Requests.

As explained in NPC's initial cost-shifting motion, plaintiffs' request for the raw datasets from clinical trials was not tailored to discover relevant information. Plaintiffs propounded "many requests that relate to clinical trial documents and raw, patient-level data," including "[a]ll documents that relate to proposed, completed, partially completed, and/or proposed but never begun clinical investigations, trials, studies and/or tests concerning the use and/or effects of Tasigna in humans." Pls.' Mot. to Compel. at 3 n.2. In fact, as NPC pointed out in its initial opposition to plaintiffs' motion to compel, some of the raw data sought were for clinical trials to evaluate Tasigna® as a treatment for gastrointestinal stromal tumors and melanoma, not chronic myeloid leukemia (CML)—the condition for which all plaintiffs in this MDL contend they used Tasigna® to treat. *See* NPC's Opp'n to Pls.' Mot. to Compel, at 8 n.4 (ECF No. 89). Plaintiffs' requests were unduly broad and did not call for the production of specifically targeted documents that are relevant to plaintiffs' claims.

## II. The Likelihood Of Discovering Critical Information.

The likelihood of discovering critical information is "the most important" factor when considering a cost-shifting motion. *Zubulake*, 217 F.R.D. at 323. In weighing this factor, courts employ a marginal utility test: "[t]he more likely it is that the [requested data] contains information that is relevant to a claim or defense,

8

the fairer it is that the [responding party] search at its own expense," and "[t]he less likely it is, the more unjust it would be to make the [responding party] search at its own expense." *Id.* After NPC spent hundreds of thousands of dollars and countless hours securing and producing the raw data at issue, plaintiffs did not access that data for several months[8] and ultimately failed to use the data for *any* of the purported reasons for which it was sought.[9] Plaintiffs' stated grounds for the relevance of and need for this data was mistaken at best, and a convenient pretext to justify a fishing expedition at worst.

When they initially sought the production of raw data from clinical studies, plaintiffs insisted they needed this data because "[p]laintiffs' current expert [David Madigan] has requested the raw data," and plaintiffs cited cases regarding experts' use of raw data. Pls.' Mot. to Compel Prod. from NPC's Non-Custodial Sources, at 9-10, 12 (ECF No. 84). Dr. Madigan suggested the "raw data are essential to enable the analyst to ensure that pre-specified analyses were indeed carried out as specified and to enable that analyst to conduct analyses that the sponsor failed to carry out or

---

[8] NPC made rolling productions of the requested raw data on May 2, June 10, July 6, August 3, September 14, and October 1, 2022. Plaintiffs initially accessed the lockbox that contained the studies in May but did not access the lockboxes again until late August.

[9] In August 2022 and October 2022, plaintiffs inquired about certain variables in the data that they claimed were either missing or prevented them from matching treatments to patients in some of the studies. To the extent plaintiffs may contend this prevented them from using some of the data, NPC resolved plaintiffs' questions about the data, including providing updated anonymized tables where necessary.

failed to record." Decl. of David Madigan ¶ 9. As NPC argued in opposing plaintiffs' motion to compel, this amounted to little more than an attempt to go on a fishing expedition to audit NPC's clinical trials in order to challenge the adequacy of NPC's disclosures to the FDA. But the existence of inadequate disclosures to FDA is speculative, and, at any rate, any such challenge would be preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). *See* NPC's Opp'n to Pls.' Mot. to Compel Prod. from NPC's Non-Custodial Sources, at 11-19 (ECF No. 89). Whether or not Dr. Madigan had a legitimate need for this data, plaintiffs have now withdrawn him as an affirmative expert without producing a report. *See* Pls.' Am. Expert Witness Disclosures (Nov. 7, 2022) (Ex. A). Thus, after a year of wrangling over this data, after repeated claims by plaintiffs that securing this data was indispensable to their expert's analysis, and after NPC ultimately spent over $335,538.37 to produce the data, plaintiffs have now simply waived the whole thing off, and they have not and will not use any of the data produced.

The only other rationale for the relevance of the raw data—questioning witnesses at depositions—was just as transparently unavailing. To secure an extension to the discovery deadline, plaintiffs pivoted to claiming that the raw data from clinical studies was not only relevant to Dr. Madigan's expert analysis, but also that the data would somehow be used to question NPC fact witnesses who were involved in product development. *See* Pls.' Mot. 3-4 (ECF No. 117). According to

plaintiffs, the raw data was not merely relevant but "*instrumental* in [p]laintiffs' questioning of fact witnesses who held roles in the relevant departments at NPC." Pls.' Mot. to Extend Case Mgmt. Deadlines, at 4 (ECF No. 117) (emphasis added); *see also* J. Notice of Disc. Status as of May 5, 2022, at 8 (ECF No. 115) ("Plaintiffs intent is also to use the non-custodial documents to question certain Novartis witnesses."). Plaintiffs insisted the raw data was so critical that they sought a 45-day extension of discovery (which this Court granted) so that they would have the raw data in hand before deposing those witnesses. *See* J. Notice of Disc. Status as of May 5, 2022, at 8 (ECF No. 115) (claiming that "noticing additional witnesses cannot be determined without the benefit of complete production"). But when plaintiffs had the opportunity to depose Dr. Neil Gallagher, a co-author of the protocol for a pivotal Tasigna® clinical trial, plaintiffs asked *no questions whatsoever* about the clinical trial data. Likewise, in deposing an NPC employee who oversaw clinical trials, Dr. Aby Buchbinder, plaintiffs did not ask a single question about the produced raw clinical trial data.[10] Indeed, plaintiffs failed to ask any question in any deposition

---

[10] Plaintiffs also requested that the deposition of another witness, Dr. Roger Waltzman, be postponed until they received all the raw data, but they later withdrew that notice. *See* Email from C. Oxx to A. Reissaus (Sept. 22, 2022) (Ex. B).

11

about the raw clinical trial data plaintiffs sought despite insisting that NPC must bear the expense to secure that data.[11]

Given this record, plaintiffs' grounds for why the raw data are relevant were at least mistaken, if not pretextual. As NPC argued in its opposition to the motion to compel, this was a fishing expedition to find support for the speculative claim that data may not have been reported to the FDA—even if plaintiffs found support for that claim, it would be preempted under *Buckman*. Plaintiffs presumably found no support for their claim, and the Court should not compound the problems created by plaintiffs' fishing expedition by requiring NPC to finance it. It would be plainly unjust to allow plaintiffs to require NPC to spend hundreds of thousands of dollars to produce data that was foreseeably irrelevant and cumulative in the first instance, never used to question any witnesses, and now rendered moot by the withdrawal of the expert for whom plaintiffs claimed the data was sought. If the results of a discovery request reflect no relevant information, the requesting party should bear the cost of production. *See Radian Asset Assur., Inc. v. Coll. of the Christian Bros. of New Mexico*, No. 09-CV-0885, 2010 WL 4928866, at *5 (D.N.M. Oct. 22, 2010)

---

[11] Although plaintiffs' counsel asked Dr. Buchbinder certain general questions about "patient-level data"—specifically, who receives, reviews, and has access to such data, as well as how the data is generally analyzed—none of the questions were based on any of the actual data that NPC produced to plaintiffs in this litigation. *See* Aby Buchbinder Dep. at 12:8-20:3 (Oct. 13, 2022) (Ex. C) (inquiring into NPC's general procedures for receiving and reviewing patient-level data). Plaintiffs' counsel could have asked those questions even before plaintiffs filed their motion to compel, and the questioning at the fact deposition did not rely on the actual raw datasets that NPC produced, all of which was provided to plaintiffs before Dr. Buchbinder's deposition.

("[T]he Court finds that there is good cause to enter a protective order under rule 26(c)(1), because the significant expense involved in restoring and searching the tape backups in light of their ***largely irrelevant content*** makes the burden and expense of searching the tape backups outweigh its likely benefit." (emphasis added)); *see cf. Zubulake III*, 216 F.R.D. at 287 (noting that because the result of the data sampling resulted in discovering relevant e-mails, the marginal utility of restoration was potentially high and thus weighed against shifting the cost from the producing party to the requesting party).

### III. The Total Cost Associated With The Production.

The Court previously observed that the $320,000 estimated cost (actual cost was $335,538.37) of producing the requested data "exceed[s] even the first year salary of a new law school graduate." 6/15/22 Order, at 2 (ECF No. 123). The Court correctly concluded that "the associated costs are substantial." *Id.* In denying NPC's cost-sharing motion, the Court reasoned that it was proper to "defer[] decision on possible cost allocation" because NPC "is well able to bear the cost of anonymizing in the first instance." *Id.* It would be the height of discovery abuse to require NPC to bear the entire cost all in the name of producing entirely irrelevant data. As previously explained, the application of proportionality is particularly appropriate when a party has already produced significant quantities of documents, where the expense of responding to a party's discovery demands is disproportionate to the

13

likely benefit of such efforts, and where the additional ESI sought is "sweeping" and concerns matters of "questionable relevance." *Wood v. Capital One Servs., LLC*, No. 09-CV-1445, 2011 WL 2154279, at *3, 7, 13 (N.D.N.Y. Apr. 15, 2011) (denying motion to compel with respect to matters admitted to have relevance where burden of responding "far outweighed" possible relevance and the amount at stake, but permitting additional discovery if requesting party agreed "to bear the expense of production"). The Court denied NPC's initial cost-shifting motion due in part to "uncertainties as to the amount of reasonable costs (both in total and any allocable share) and the significance of the data to be produced." 6/15/22 Order, at 2 (ECF No. 123). But the cost of the production is now certain, and it is evident that the raw data was not used and not needed. Cost shifting is warranted.

## IV.     The Resources Available To Each Party.

Although NPC is a large corporation, that does not grant plaintiffs license to seek unlimited discovery without proportionality considerations. "While proportionality requires that all parties have access to relevant information, the concept of proportionality exists to prevent one party . . . from leveraging that asymmetry to obtain a tactical advantage over the Defendants." *Digital Assurance Certification, LLC v. Pendolino*, No. 17-CV-72, 2017 WL 4342316, at *11 (M.D. Fla. Sept. 29, 2017). Cost-shifting is appropriate when the requesting party can afford to bear some of the discovery costs, such as when there is a coordinated set

of three plaintiffs' firms responsible for all of the pending cases. "[I]t is not unheard of for plaintiff's firms to front huge expenses when multi-million dollar recoveries are in sight." *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 288 (S.D.N.Y. 2003). Indeed, plaintiffs' counsel argued that an MDL would enable the pooling of resources among plaintiffs' counsel in this litigation. *See* Br. in Supp. of Pl's Mot. to Transfer Actions, at 9-10, *In re: Tasigna (Nilotinib) Prods. Liab. Litig.*, No. 21-MD-3006 (M.D. Fla. Apr. 14, 2021) (ECF No. 1-1).

## V. The Relative Ability Of Each Party To Control Costs And Its Incentive To Do So.

The Court's June 15 Order required NPC to bear the cost "in the first instance" for the required data anonymization, 6/1/22 Order, at 2 (ECF No. 123), and thus, there was no guarantee that those costs would be shifted to plaintiffs. Accordingly, NPC had ample incentive to control the costs necessary to comply with the Court's order, and it took action to that effect. First, NPC requested that plaintiffs consider narrowing their request to minimize the cost. Specifically, NPC noted that many of the studies were smaller in size and proposed narrowing the request to the studies that were most likely to be relevant. Plaintiffs declined NPC's request and, in fact, sought to expand the number of studies for which raw data would be produced by challenging NPC's identification of third-party and ongoing studies.[12] Second, NPC

---

[12] The Court's June 15 Order denied plaintiffs' demand for data from ongoing or third-party studies. *See supra* note 3.

worked with its third-party vendor, Privacy Analytics, to identify the most cost-effective way to minimize the cost of the required data anonymization. *See* Poirier Decl. ¶¶ 8, 11. Third, NPC does not seek to shift the considerable cost and expense it incurred in the lost employee time required to produce the 25 raw datasets and to respond to plaintiffs' numerous questions about those datasets that came after the original close of general fact discovery.[13] NPC's discovery efforts thus favor cost shifting. *See Conn. Gen. Life Ins. Co. v. Earl Scheib, Inc.*, No. 11-CV-0788, 2013 WL 485846, at *4 (S.D. Cal. Feb. 6, 2013) (court held it would "not order defendant to absorb the incredible expense associated with responding to [the requested discovery], especially when defendant has been working to produce documents and information in response to plaintiff's various other discovery requests").

---

[13] NPC employees took significant time away from their normal job-related obligations to respond to plaintiffs' request for the raw clinical data at issue here. *See* Poirer Decl. ¶ 13. For example, Mr. Poirier personally spent twenty-four business hours to locate and review documents plaintiffs claimed Dr. Madigan needed to analyze the raw datasets NPC produced. *Id.* at ¶ 14. Other NPC employees spent an additional 370 estimated business hours to respond to plaintiffs' inquiries about the raw datasets and assist with the production of the raw datasets (including reviewing the anonymized studies for quality control). *Id.* at ¶ 15. In addition, because NPC is contracted for a specific number of projects each year with Privacy Analytics, this litigation request used a lot of resources that would have gone to an academic research group to investigate data for a novel research project. *Id.* at ¶ 18. Furthermore, because NPC prioritized the anonymization of the data that was going to be produced for this litigation, the projects of five separate research teams was adversely impacted. *See id.* at ¶ 19.

## VI. The Purposes For Which The Responding Party Maintains The Requested Data.

As explained above, NPC does not maintain anonymized raw datasets for the nineteen clinical trials at issue and had no plans to generate anonymized raw datasets for these studies outside this litigation. To comply with the Court's production order, NPC had to comply with privacy obligations before the datasets could be produced (as the Court's order recognizes), which required data anonymization. The information requested by plaintiffs was not regularly maintained in a usable format for sharing with third parties and for use outside this litigation. There has been no request outside of the litigation for the nineteen trials that were not previously anonymized. Poirer Decl. ¶ 18. Accordingly, this factor favors cost shifting. *Cook v. Shelby Cnty. Healthcare Corp.*, No. 08-CV-2061, 2009 WL 10700550, at *5 (W.D. Tenn. May 27, 2009) (finding this factor weighed in favor of cost-shifting where responding party did not maintain the requested information in its normal course of business).

## VII. The Relative Benefit To The Parties Of Obtaining The Information.

NPC expended tremendous resources for data anonymization in order for raw datasets to be in a format that can be produced to plaintiffs, even though detailed study information was already produced and is available to plaintiffs from other sources. NPC derives no benefit in this litigation from data anonymization and production of the raw datasets from the nineteen studies that were anonymized for

17

the litigation—the raw datasets are not necessary to NPC's defense and their anonymization was unnecessary for NPC's internal use of the data. Accordingly, this factor favors cost shifting. *See Multitechnology Servs., L.P. v. Verizon Sw. f/k/a GTE Sw. Inc.*, No. 02-CV-702, 2004 WL 1553480, at *2 (N.D. Tex. July 12, 2004) (shifting costs to requesting party where there was no benefit to the responding party from the discovery).

## CONCLUSION

For the foregoing reasons, the Court should grant NPC's renewed request to shift costs to plaintiffs for the expenses NPC incurred in securing data anonymization of the raw datasets requested by plaintiffs.

Dated: December 1, 2022　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　By: /s/ Robert E. Johnston
　　　　　　　　　　　　　　　　Joe G. Hollingsworth, Esq.
　　　　　　　　　　　　　　　　Robert E. Johnston, Esq.
　　　　　　　　　　　　　　　　Andrew L. Reissaus, Esq.
　　　　　　　　　　　　　　　　HOLLINGSWORTH LLP
　　　　　　　　　　　　　　　　1350 I Street Northwest
　　　　　　　　　　　　　　　　Washington, District of Columbia 20005
　　　　　　　　　　　　　　　　(202) 898-5800

　　　　　　　　　　　　　　　　*Attorneys for Defendant*
　　　　　　　　　　　　　　　　*Novartis Pharmaceuticals Corporation*

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 3.01(g), counsel for Defendant Novartis Pharmaceuticals Corporation certify that they have conferred with counsel for plaintiffs about this motion and plaintiffs do not consent to the relief requested in this motion.

## CERTIFICATE OF SERVICE

I certify that on this 1st day of December 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, causing all counsel of record be served by electronic means.

>/s/ Robert E. Johnston
> Robert E. Johnston, Esq.
> *Attorney for Defendant*
> *Novartis Pharmaceuticals Corporation*