## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

IN RE: TASIGNA (NILOTINIB)
PRODUCTS LIABILITY LITIGATION

Case No. 6:21-md-03006-RBD-DAB
(MDL No. 3006)

This document relates to all actions.

## PLAINTIFFS' OPPOSITION TO NOVARTIS PHARMACEUTICALS CORPORATION'S RENEWED MOTION TO SHIFT COSTS FOR CLINICAL TRIAL DATA ANONYMIZATION

Novartis Pharmaceuticals Corporation's ("NPC") renewed motion seeking to shift costs for clinical trial data anonymization to Plaintiffs [ECF No. 187 ("NPC's Motion")] should be denied in its entirety as both procedurally and substantively deficient. Despite NPC's rhetoric throughout its motion, there is no basis to overcome the well-settled presumption that the responding party pay its own costs in producing discovery. NPC's argument that, since Plaintiffs' expert did not ultimately issue a report using this data, the cost for its anonymization should shift to Plaintiffs, does not overcome the presumption. This is especially true where the information sought remains relevant and discoverable, and the decision to forego an expert report was largely due to limitations imposed by the very anonymization performed by NPC.[1] *See* Declaration of David Madigan, attached hereto as Exhibit A, at ¶ 9 ("All dates in the raw clinical data on the server were adulterated and did not represent the *actual* dates on which events occurred. Instead, event dates were altered to reflect the length of time

---

[1] The same anonymization process for which it now seeks to shift costs.

a patient was in a study rather than the actual calendar date on which an event occurred.").

Further, NPC waived its entitlement to seek cost-shifting by failing to raise this issue on Plaintiff's original motion to compel [ECF No. 84] and further failing to discharge its meet and confer obligations at every turn in this process, even up until the filing of this very motion. Finally, NPC has failed to demonstrate that the production of the raw clinical data was unduly burdensome such that it warrants any cost-shifting.

For each of these reasons, NPC's Motion should be denied.

## BACKGROUND

Plaintiffs first moved to compel the production of the raw clinical data for thirty-eight (38) of NPC's clinical trials on February 11, 2022. *See* ECF No. 84 ("Plaintiffs' MTC").[2] NPC opposed Plaintiffs' MTC on February 23, 2022, without ever raising the cost associated with anonymization of the raw data as part of its claim of undue burden. *See* ECF No. 89.

On March 15, 2022, this Court granted Plaintiffs' motion to compel raw statistical data from various NPC clinical trials involving Tasigna, noting that "[t]he burden of production is small, and it is for Plaintiffs and their expert to determine what use they need to make of available data…" ECF No. 95 at 2.

On May 13, 2022, NPC moved for cost-shifting for the anonymization of

---

[2] As explained in their original motion, Plaintiffs' request was narrowly tailored to certain studies involving a minimum number of study participants exposed to Tasigna.

clinical trial data. ECF No. 118. Plaintiffs filed an opposition and this Court ultimately

denied NPC's motion. *See* ECF Nos. 121, 123, respectively. In denying NPC's original

motion, the Court noted that:

> [i]ssues of the costs of properly producing the requested information could and
> should have been raised in connection with the original arguments regarding
> production. Indeed, Novartis apparently keeps a firm on retainer specifically to
> perform anonymizing such data. The Court views the parties' failure to
> consider and discuss the matter earlier as a further example of their incomplete
> and ineffective discharge of meet-and-confer obligations.

ECF No. 123 at 1-2.

As of the filing of this opposition, NPC has never requested that the parties meet

and confer to discuss the cost (or cost-shifting) of data anonymization, nor the process

through which the data would be anonymized. As with NPC's original attempt to shift

costs,[3] Plaintiffs first found out about the final cost to anonymize the data via NPC's

motion. *See* NPC's Motion. As such, NPC's claim that Plaintiffs possessed "full

knowledge of the high cost of the required data anonymization process" is unfounded.

*Id*. at 2. Plaintiffs were likewise unaware of, nor afforded the opportunity, to provide

input into the process through which NPC planned to anonymize the data. This is

particularly important where, as here, NPC now purportedly seeks to shift the entire

cost of the anonymization process to Plaintiffs. *See* NPC's Motion at 18 ("For the

foregoing reasons, the Court should grant NPC's renewed request to shift costs to

---

[3] Plaintiffs first learned that the estimated cost of the raw data production was approximately
$320,000.00 when NPC filed its first motion for cost shifting, which included said estimate.

plaintiffs for the expenses NPC incurred in securing data anonymization of the raw datasets requested by Plaintiffs.").[4]

NPC ultimately anonymized and produced raw datasets from nineteen (19) clinical trials, pursuant to the Court's order.[5] *See* NPC's Motion at n. 2. While NPC produced the trial data in a rolling fashion, it took well over two-hundred days (232 to be exact) to fully produce the clinical data, originally ordered by the Court in March. This time period was fraught with unanticipated issues and delays that, while significant, need not be detailed in a granular fashion here. Ultimately, due to issues with the production, NPC did not discharge its discovery duty until November 2, 2022 [*see* ECF No. 187-1 at n. 2], which was two weeks after the Court-ordered date for Plaintiffs' expert disclosures and one day *after* the necessitated and agreed-upon minor extension for Dr. Madigan's report.[6]

Plaintiffs did not ultimately conclude, until close to the agreed-upon deadline for Dr. Madigan's report, that the anonymization process employed by NPC made it

---

[4] Of particular note, this appears to be a new request, not a renewed request for which NPC was granted leave to seek by prior order. At best, NPC has previously been vague in its cost-shifting requests. In the May 5, 2022 status report [ECF No. 115], NPC asked "that the Court require Plaintiffs to share *some of the cost* of this specific production in light of the significant burden and expense that NPC will be forced to incur…" (emphasis added). Likewise, NPC's initial motion began with "[NPC] moves the Court to require plaintiffs to *share* in the costs and expenses … associated with performing data anonymization…" ECF No. 118 at 1 (emphasis added). NPC now seeks to shift the entire $335,538.37 anonymization cost to Plaintiffs. NPC's Motion at n. 1.

[5] As noted, and discussed further below, this anonymization process left the data with limited utility to Plaintiffs and their expert. *See generally* Ex. A.

[6] NPC's representation that it completed production of the data on October 1, 2022 [NPC's Motion at 5] is thus patently false, as there continued to be technical difficulties with accessing and assessing the data from certain of the clinical trials beyond that time.

impossible for him to conduct one of his key intended analyses. *See* Ex. A at ¶¶ 8-12. Plaintiffs had been patiently awaiting a full production of the raw data from Defendant – for over 200 days – to facilitate Dr. Madigan running certain analyses. *See id*. at ¶¶ 12. There was no reason for him to look at an incomplete data production prior to that time. *Id*. Despite extensive efforts to find a work-around, Dr. Madigan ultimately concluded, along with Plaintiffs' counsel, that the anonymization process undertaken by NPC (one he had never before seen) foreclosed his ability to perform a signal detection analysis, an intended and distinct purpose of his report. *See id*. at 8-10. At no point during the 200+ day process did NPC explain to Plaintiffs the way in which the data would be anonymized. Had NPC done so, Plaintiffs could have consulted with Dr. Madigan, as they have since requesting this data in February [ECF No. 84], and worked with NPC to produce the data in a usable format. Instead, Plaintiffs were denied the opportunity to participate in the production process and are now retroactively being asked to bear the cost of the same.

For the foregoing reasons and the further argument set forth below, the cost of data anonymization should remain with the gatekeeping party.

## LEGAL STANDARD

There is a well-settled presumption that the responding party must bear the expense of complying with discovery requests. *Kabelis v. NCL (Bahamas) Ltd*., 2021 WL 790067, at *4 (S.D. Fla. 2021), *citing Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978). While the Court has the discretion to shift costs to the party requesting discovery, the responding party has the burden of proof on a motion for cost-shifting.

*Id*. Further, cost-shifting should be considered "only when electronic discovery imposes an undue burden or expense on the responding party." *Id*., citing *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003). Whether the production of documents is unduly burdensome or expensive turns primarily on whether they are kept in an accessible or inaccessible format. *Zubulake*, 217 F.R.D. 309 at 318, 323 ("A court should consider cost-shifting *only* when electronic data is relatively inaccessible, such as in backup tapes" (emphasis added)). The responding party bears the burden of showing that "identified sources are not reasonably accessible in light of the burdens and costs required to search for, retrieve, and produce whatever responsive information may be found." *Quail Cruises Ship Management Ltd. v. Agencia De Viagens CVC Tur Limitada,* 2012 WL 12949753, *2 (S.D. Fla. 2012)*, citing* Fed. R. Civ. P. 26(b)(2)(B), Advisory Committee's note to 2006 Amendment. In meeting this burden, the responding party *should present details sufficient to allow the requesting party to evaluate the costs and benefits of searching and producing the identified sources*. *Id*. (emphasis added).

## ARGUMENT

NPC's Motion fails to overcome the presumption that the producing party bears its own costs in replying to discovery requests. Indeed, it is largely predicated upon the argument that – since Plaintiffs' expert ultimately did not serve a report – the clinical trial data was demanded in bad faith and/or was irrelevant in this first instance. This is simply false.

The data was provided to Plaintiffs' expert and diligently explored, at significant expense to Plaintiffs. *See* Ex. A at ¶ 13. It was only upon the conclusion that a certain, crucial aspect of Dr. Madigan's report could not be performed, that he was withdrawn as an expert in this matter. Dr. Madigan's intended signal detection analysis, the precise analysis he has commonly performed with raw clinical data in the past, could not be done with the way NPC anonymized the data. *See id*. at ¶ 6; ¶¶ 8-12. Dr. Madigan expressed to Plaintiffs' counsel that he had performed his anticipated signal analysis numerous times in the past and had "never encountered" the type of anonymization that was utilized with NPC's data. *Id*. at ¶ 8. Plaintiffs worked extensively with Dr. Madigan to try to figure out a way around the data anonymization issue, but ultimately could not develop a viable solution. *See id*. at ¶ 10. This signal analysis is what would have differentiated Dr. Madigan's report from other experts engaged by Plaintiffs. It has consistently been one of Plaintiffs' contentions throughout this litigation that NPC had enough information – some of which was obtained through its clinical trials – to update the label for Tasigna well before January 2014.[7]

The decision to withdraw Dr. Madigan was not made lightly – to say the least – but is consistent with the Court's admonition against utilizing cumulative experts or expert reports. *See* September 28, 2021 Status Conference Transcript 28:3-8 ("We're not going to have a huge stable of experts that are going to consume a lot of time in

---

[7] Plaintiffs maintain that the January 2014 label update remains inadequate.

discovery, and then you get an opportunity to sort of, you know, mix and match and decide who you're going to use and plug in by developing, you know, three or four people that have cumulative testimony.").

Additionally, despite NPC's proffered conjecture [NPC's Motion at 12], Dr. Madigan's analysis of the raw data did not hurt Plaintiffs' cause. Rather, it demonstrated that the clinical trials conducted by NPC showed a statistically significant increased hazard ratio for several different cardiovascular endpoints of Nilotinib (Tasigna) as compared to Imatinib (Gleevec). *See* Ex. A at ¶ 11. However, such an opinion would have been cumulative of the report submitted by Plaintiffs' expert epidemiologist, Dr. Sonal Singh.[8]

Significantly, the import and relevance of the raw clinical data remains unchanged. Plaintiffs' (or their expert's) ultimate use of it is of no moment, despite NPC's attempts to pass judgment otherwise, in classic *ex post facto* fashion. The data was, in fact, instrumental in Dr. David Madigan's expert report. So much so, that Plaintiffs were unfortunately obligated to withdraw Dr. Madigan as an expert because he was unable to utilize the data for a signal detection analysis, given the anonymization process utilized by NPC (again, a process that Plaintiffs were given no opportunity to participate in). *See* Ex. A at ¶¶ 8-10.

NPC also falsely charges Plaintiffs with misrepresenting their intention to

---

[8] To wit, there is a statistically significant increased risk of cardiovascular events for patients taking Tasigna over Gleevec.

question NPC's corporate witnesses regarding the clinical trial data. Plaintiffs did, in fact, consult with their expert regarding questions to present to NPC witnesses associated with the raw data. As NPC admits, some of those questions, including questions related to how the data was analyzed by NPC, were asked to NPC's Global Clinical Program Head for Tasigna, Aby Buchbinder. *See* NPC's Motion at n. 11. Moreover, the data was not fully available to Plaintiffs' counsel until well after the final depositions were taken. The process of noticing and taking NPC witness depositions could not continue indefinitely. Plaintiffs were faced with a difficult choice, as the Court had already admonished the parties for scheduling depositions outside of the originally scheduled time.[9]

Additionally, while not relevant to the issue at bar, Plaintiffs are compelled to address the self-serving, contrived history presented by NPC related to Plaintiffs' request for an extension. At the time Plaintiffs moved for an extension of the discovery deadlines, the simple fact was that the production of the ordered clinical data had not even neared completion. *See* ECF No. 117 at 2-3. The lack of data production was a wholly appropriate reason to extend the deadline. In addition, the lack of data production was not the only grounds advanced by Plaintiffs in support of an extension.

Furthermore, because NPC never raised this issue in opposition to Plaintiffs' original motion to compel, it should be considered to have waived its right to seek such

---

[9] Status Conference on September 7, 2022 8:5-9, "I'm always unsettled for a couple of reasons when lawyers agree to set depositions outside the discovery deadline. I often wonder why it is they think they can do that. You didn't ask anybody whether you could do that. You just did it."

relief. Instead, NPC waited until after the data production was completed to simply demand, for the first time, that Plaintiffs pay the entire production cost of $335,538.37. Prior to its instant application, the only information Plaintiffs had received regarding costs was an estimate supported by vague, conclusory statements that the cost to anonymize the data would be approximately $320,000.00. In addition, NPC's prior application simply asked that Plaintiffs "share in the costs and expenses associated with data anonymization." *See* ECF No. 118 at 1; *see also* n. 4, *supra*. Now, NPC insists Plaintiffs bear the entire cost of anonymization.

Finally, NPC's failure to discharge its meet and confer obligations prior to attempting to shift costs to Plaintiffs also renders its instant motion unjust. NPC neglected, throughout the entire process, to provide details sufficient to allow Plaintiffs (or the Court) to evaluate the costs of producing the relevant data. *See Miller v. Ghiradelli Chocolate Co.*, 2013 WL 6774072, *5 (N.D. Cal. 2013) ("One good insight that a meet-and-confer process gives is how much it might cost to get the discovery, which in turn will guide Plaintiff's decision about what to ask for (knowing that costs can be shifted) and the court's inquiry about whether to shift costs.").

At no time during the process were Plaintiffs advised what methods NPC would be using to anonymize the data, whether there were alternative, lower cost methods, or most importantly, if methods were available that would have allowed Dr. Madigan to conduct the analyses he planned to conduct. Instead, NPC exercised 100% control over the data, which resulted in a production format that prevented it from being used as contemplated. *See generally* Ex. A. If NPC intended on demanding Plaintiffs

contribute to the production costs of this data, the law required it to be transparent surrounding the costs and production process.

Under these facts, NPC's application clearly fails to meet the standard articulated in *Zubulake* and followed by courts in this Circuit. Under the *Zubulake* standard, unless the relevant documents/data are inaccessible to the producing party, cost shifting is inappropriate, the seven-factor test need not be performed, and the inquiry ends. *See Kabelis*, 2021 WL 790067 at *4 ("As outlined in *Zubulake I*, 217 F.R.D. at 322, *if the responding party is producing data from inaccessible sources*, a seven-factor analysis is considered to determine whether shifting the cost of production is appropriate." (emphasis added)).

Here, NPC concedes that this data *is* accessible, but nonetheless, citing *FDIC v. Brudnicki*, 291 F.R.D. 669 (2013), argues proportionality considerations warrant the application of the seven-factor test to determine if cost-shifting is appropriate.[10] Notably, NPC does not cite a single case where a court determined that the need to anonymize patient data was sufficient to rebut the presumption against cost-shifting.

---

[10] Plaintiffs note that the seven-factor test outlined in *Brudnicki* differs slightly from the test outlined in *Zubulake* and *Kabelis*. Notably, *Brudnicki* draws its factors from *Rowe Entertainment, Inc. v. William Morris Agency, Inc.,* 205 F.R.D. 421, 428–29 (S.D.N.Y.2002). These factors were later modified by the *Zubulake* court as it found the *Rowe* factors undercut the presumption that the responding party pays the expense of complying with discovery requests. *See Zubulake*, 217 F.R.D. 309, at 316. Accordingly, the factors from *Rowe* (and relied upon by *Brudnicki*) were modified by the *Zubulake* court to the following: (1.) The extent to which the request is specifically tailored to discover relevant information; (2.) The availability of such information from other sources; (3.) The total cost of production, compared to the amount in controversy; (4.) The total cost of production, compared to the resources available to each party; (5.) The relative ability of each party to control costs and its incentive to do so; (6.) The importance of the issues at stake in the litigation; and (7.) The relative benefits to the parties of obtaining the information. *Id*. at 322.

Based on all of the above, the Court should deny NPC's request for cost-shifting outright, without even performing the seven-factor test suggested by NPC. However, even if the Court decides the seven-factor test is warranted here, for the reasons set forth below, under both the more defendant-friendly *Brudnicki* standard, and the updated *Zubulake* standard, all of the relevant factors weigh in Plaintiffs' favor and counsel against cost-shifting.[11]

## I.   The Specificity of The Discovery Requests.[12]

NPC attempts to revive its previous argument asserting that Plaintiffs' requests for the raw datasets from clinical trials were not tailored to discover relevant information. NPC's Motion at 8. While the data from clinical trials involving the drug at issue are clearly relevant and Plaintiffs' MTC sought the underlying raw data for a discrete (specific) subsection of trials, the issue of relevance has repeatedly been settled by this Court. Moreover, this type of data has been routinely produced in pharmaceutical cases for years, often without objection by the producing party. *See* ECF No. 84 at 9. As stated above, the Court did not undertake a relevancy analysis in its Order, instead focusing only on NPC's "small" burden of production. *See* ECF No. 95 at 2. The Order thus plainly demonstrates that the information sought by Plaintiffs is relevant. NPC remains the custodian of this data and the data was kept in electronic

---

[11] In order to maintain the presumption that the responding party pays, the cost-shifting analysis must be neutral; close calls should be resolved in favor of the presumption. *Zubulake*, 217 F.R.D. at 320.

[12] The *Zubulake* Court modifies this factor to be "the extent to which the request is specifically tailored to discover relevant information."

format in the ordinary course of business by NPC. The information sought was also specific and tailored, requesting data from a discrete set of clinical trials involving individuals exposed to Tasigna,[13] and this factor therefore counsels against cost-shifting.

## II.   The Likelihood of Discovering Critical Information.[14]

Despite how NPC has chosen to characterize it, this factor is prospective, not retrospective. The test to be applied here is not whether "critical information" *was* ultimately discovered, but rather whether it was likely, at the outset, that "critical information" *would* be discovered. As Plaintiffs explained previously, without the raw data from the clinical trials, Plaintiffs would be limited to the published papers and clinical study reports authored by NPC. ECF No. 84 at 8. This means if NPC chose to limit or exclude a certain safety analysis or define important cardiovascular adverse events in a certain way, Plaintiffs and their experts would be forced to accept those determinations, without any ability to challenge them or perform their own analyses. *Id*. Data of this nature has been produced in numerous product liability litigations in the past and has proven invaluable in many, including in the context of reports submitted by Dr. Madigan. *See* Ex. A at ¶ 6. NPC's assertion that Dr. Madigan was simply on a "fishing expedition" is entirely unfounded. That the data did not

---

[13] NPC's argument that because some of the studies requested involved different indications (*i.e.*, gastrointestinal stromal tumors) or were unfinished was already addressed and rejected by this Court in its prior Order and fail to demonstrate that the requests lacked specificity.

[14] The *Zubulake* Court deleted this factor from the test.

ultimately support a unique expert report from Dr. Madigan, does not act retroactively to diminish the expected utility at the outset. Without access to this data, Plaintiffs had no way of knowing if it would show an outcome at odds with Dr. Singh's conclusions.

NPC further argues that Plaintiffs failed to use the data for any of the reasons for which it was sought. *See* NPC's Motion at 9. This is simply not true. Dr. Madigan spent significant time working with the data provided, ultimately reaching opinions that were similar to and corroborative of those provided by Dr. Singh. He also spent significant time attempting to find a work-around that would allow him to conduct the signal detection analysis originally intended. *See* Ex. A at ¶ 10. All of this was done at considerable cost to Plaintiffs. *See id*. at ¶ 13. Further, the clinical trial data sets were requested by Plaintiffs as a collection, and a signal analysis was to be performed on the data provided *as a whole*. *See id*. at ¶ 12. Proper stratification and recognition of trends should only be performed with a complete data set that is anonymized in a manner that can be analyzed with various statistical programs. *See id*. The clinical trial data, as furnished by NPC, was not in a format that made such an analysis possible. *See id*. at ¶ 8-10 Therefore, NPCs' arguments as to the frequency of Plaintiffs access to the *incomplete* data are irrelevant and have no bearing on this issue. *See id.* at ¶ 12.

As with the specificity of Plaintiffs' requests, the issue here is not the discoverability of the raw data. The Court has already ordered it be produced. The issue is whether Plaintiffs must bear the cost of the discovery. The likelihood of relevant and important information being discovered through this production was high, Plaintiffs intended and attempted to utilize the data. Unfortunately, the manner

14

in which NPC anonymized the data limited its utility to analyses which yielded opinions that were cumulative of other experts. This has no impact on the discovery of such information in the first instance. As the presumption directs, Plaintiffs should not bear the cost of discovery here.

## III.   The Total Cost Associated with The Production.[15]

The specific amount expended by NPC in the data anonymization they claim was necessary was first revealed to Plaintiffs in NPC's renewed motion. These costs are not substantial, and in relation to the ample resources of Defendant, they hardly qualify as significant, especially when the size of the instant litigation is taken into account. In fact, when the Court denied NPC's initial cost-shifting motion it reasoned Defendant was "well able to bear the cost of anonymizing in the first instance." *See* ECF No. 123 at 2. Nothing has changed for NPC financially since the filing of that motion.

NPC regurgitates the flawed application of proportionality from its prior motion – one in which it never raised the cost of anonymization as part of its argument – asserting that proportionality should be considered "when a party has already produced significant quantities of documents…" and "a party's discovery demands [are] disproportionate to the likely benefit..." NPC's Motion at 13-14. This argument has no bearing here. That issue – the burden on NPC of producing the raw data – is settled. NPC parrots the previously inappropriate case law, again citing *Wood v. Capital*

---

[15] The *Zubulake* Court modifies this element to include comparators to the amount in controversy and the resources available to each party. *See* FN 4 above.

*One Servs., LLC*, 2011 WL 2154279 (N.D.N.Y. Apr. 15, 2011), which was decided in the context of a motion to compel. The issue before the Court now is NPC's *renewed motion* for cost-shifting, for which it bears the burden of overcoming the presumption against its requested relief. What is more, the cost associated with producing this ordered discovery is reasonable, considering the size of this litigation and the resources of NPC [*see* Section (IV), *infra*].

## IV.    The Resources Available to Each Party.

Plaintiffs are once again prompted to address the assertion that the resources of NPC are burdened by meeting the discovery demands of this litigation. NPC's parent company, Novartis AG, is one of the world's largest pharmaceutical companies with a market cap of over approximately one hundred ninety-six billion dollars[16] ($196B) at the time of this filing. Notably, NPC sold over two billion dollars ($2B) of Tasigna worldwide in 2021 alone.[17] Using simple math, this comes out to approximately $235,000 an hour, enough to cover the cost of the data anonymization sought from Plaintiffs in this litigation every 90 minutes. While it is true that Plaintiffs here are represented by three small to mid-sized firms, to compare the respective resources of the parties in this litigation is nothing short of fantastic.

---

[16] A nineteen (19) billion dollar increase since Plaintiffs first Opposition to Cost-Shifting. *See* ECF No. 121 at 14.

[17] *See* Novartis Annual Report 2021, https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2021.pdf (last accessed, December 15, 2022).

Defendant claims that Plaintiffs are attempting to leverage the resource imbalance to "obtain a tactical advantage over the Defendants." *See* NPC's Motion at 14, citing *Digital Assurance Certification, LLC v. Pendolino*, No. 17-CV-72, 2017 WL 4342316, at *11 (M.D. Fla. Sept. 29, 2017). However, NPC has failed to illuminate what this tactical advantage is. NPC's suggestion that Plaintiffs' resources are remotely comparable to NPC's, not to mention *greater* than NPC's, is absurd.

## V. The Relative Ability of Each Party to Control Costs and Its Incentive to Do So.

There remains only one party that had the opportunity to control costs in this scenario: NPC. Prior to NPC filing a renewed motion to shift costs, it had only provided an estimated cost in its original motion. NPC is the ultimate gatekeeper of the clinical data and NPC keeps such data, whether in anonymized format or raw format, in the regular course of business. NPC gave a nebulous estimate of $320,000 in their original motion for cost-shifting, a number which has now increased to $335,538.37. As previously noted, at no point during the entire 200+ day production timeline did NPC attempt to meet and confer with Plaintiffs about cost. As such, Plaintiffs were provided no opportunity to participate in the efforts, if any were made, to control same.

Accordingly, there exist no costs for Plaintiffs to control in this instance. Plaintiffs' counsel merely requested the discovery it believed necessary, and that this Court ordered be produced, to prosecute this matter fully and competently in the best

interest of their clients. As with prior elements, this factor counsels against cost-shifting.

## VI.   The Purposes for Which the Responding Party Maintains the Requested Data.[18]

NPC maintains the raw datasets the Court ordered to be produced. Its claim that it does not maintain *anonymized* raw datasets is of no consequence. Moreover, NPC, uses Privacy Analytics to perform data anonymization of raw datasets for four studies per month pursuant to its standard agreement. *See* NPC's Motion at 4. NPC's claims that it must comply with unnamed privacy obligations do not offer any support that this factor weight in its favor. The information required of NPC was housed and collected in the regular course of business. The alleged burden of anonymization is necessarily a consequence of NPC's role as gatekeeper and custodian of the clinical data. This factor bolsters the argument against cost-shifting.

## VII.   The Relative Benefit to The Parties of Obtaining the Information.

The raw datasets requested by Plaintiffs contained different study subjects, at different study stages, on different study protocols, in different locales and are thus distinct from other discovery received. Moreover, this issue has already been litigated in this Court and decided in Plaintiffs' favor. *See* ECF No. 95 at 2. Accordingly, cost-shifting is not warranted in this instance.[19]

---

[18] The *Zubulake* Court deleted this factor from the test.

[19] Interestingly, NPC states they "expended tremendous resources for data anonymization in order for raw datasets to be in a format that can be produced to Plaintiffs," and yet the reason Plaintiffs expert cannot utilize the data in certain manners is *because* of the format in which it was produced. NPC's Motion at 18.

VIII.    **The Factors from *Zubulake* Also Counsel Against Cost-Shifting.**

The factors considered under the *Zubulake* seven-factor test that are not included in the *Brudnicki* test include: 1) the availability of such information from other sources; and 2) the importance of the issues at stake in the litigation. Both factors strongly counsel against cost-shifting.

First, the information sought was not available from any other source. While Plaintiffs have been provided other clinical trial data, it is the unique nature of the raw clinical data at issue here that persuaded the Court to grant Plaintiffs' MTC. As articulated in Plaintiffs MTC and previous Opposition, only the raw data could have provided Plaintiffs the ability to perform fresh and unbiased analyses. *See* ECF No. 84 at 8-9.

Second, the importance of the issues at stake in this litigation cannot be overstated. Across both the MDL and New Jersey State MCL, this litigation involves hundreds of individuals who suffered life-altering injuries as a result of their use of Tasigna. Thus, cost-shifting goes against the presumption, and is inappropriate and, unwarranted.

## CONCLUSION

Accordingly, and for the reasons stated above, the Court should deny NPC's renewed Motion to shift costs to Plaintiffs for the data anonymization of the raw datasets for the clinical trials.

Dated: December 15, 2022             Respectfully Submitted,

By: */s/ Raymond C. Silverman*
Raymond C. Silverman, Esq.
Christopher Oxx, Esq.
Harrison M. Biggs, Esq.
Parker Waichman, LLP
6 Harbor Park Drive
Port Washington, NY 11050
(516) 466-6500
(516) 466-6665 (fax)
rsilverman@yourlawyer.com
oxx@yourlawyer.com
hbiggs@yourlawyer.com

By: */s/ Richard M. Elias*
Richard M. Elias, Fla. Bar No. 38471
Elias LLC
231 S. Bemiston Avenue, Ste. 800
St. Louis, MO 63105
(314) 391-6820
relias@EliasLLC.com

By: */s/ Lawana S. Wichmann*
Lawana S. Wichmann, Esq.
OnderLaw, LLC
110 E. Lockwood Avenue
St. Louis, MO 63119
(314) 963-9000
(314) 963-1700 (fax)
wichmann@onderlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Rule 3.01(g), counsel for Plaintiffs certify that they have conferred with counsel for NPC on the issues raised in this motion. The parties were unable to reach a resolution.

**CERTIFICATE OF SERVICE**

I certify that on this 15th day of December 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, causing all counsel of record be served by electronic means.

/s/ Raymond C. Silverman
Raymond C. Silverman, Esq.
*Attorney for Plaintiffs*