**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

IN RE: TASIGNA (NILOTINIB)
PRODUCTS LIABILITY LITIGATION           Case No. 6:21-md-03006-RBD-DAB
                                                              (MDL No. 3006)

This document relates to
Member Case 8:22-cv-1644 (*Menear*)

**PLAINTIFF'S OPPOSITION IN RESPONSE TO DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT IN _MENEAR_**

## INTRODUCTION

Novartis's motion is based entirely on the false premise that Plaintiff Allen Menear's oncologist, Dr. Michael Craig, was adequately informed about the risks of vascular occlusive disease associated with Tasigna and prescribed the drug anyway. But Dr. Craig's own testimony establishes that he was unaware of the risk of rapidly developing, treatment resistant, and severe peripheral vascular disease associated with Tasigna. It is because of this ignorance that he prescribed Tasigna to Plaintiff for two whole years while he watched Plaintiff develop peripheral vascular disease and watched it progress, despite multiple invasive interventions, to limb necrosis resulting in the loss of Plaintiff's leg—a progression that Dr. Craig characterized as "remarkable." It was not until he did his own research and discovered published literature (known by Novartis) describing the true nature of the risk that he realized that Tasigna was the cause, and he ceased Tasigna treatment immediately. Dr. Craig testified, unequivocally, that the purported "warnings" about peripheral vascular disease in the product label and consent forms did not adequately inform him of this risk.

He further testified that had he known of these risks: (1) he would not have prescribed Tasigna to Plaintiff, who was doing well on Gleevec, (2) even if would have prescribed Tasigna, he would have discontinued the drug when Plaintiff first developed peripheral vascular disease, long before it progressed to a leg amputation, and (3) he would have followed any recommendations about monitoring Plaintiff for developing disease, including the recommendations Plaintiff contends should have been in the label. Further, Plaintiff himself testified that had he been informed that he could

1

potentially lose his leg by taking Tasigna, he never would have agreed to take the drug.

These facts clearly create a genuine issue of material fact on proximate causation. For these, and the reasons discussed below, Novartis's motion should be denied in full.

<u>**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**</u>

**A.    Novartis Was Aware that Tasigna Causes Vascular Events by No Later than 2010.**

Tasigna causes vascular occlusive events, including peripheral vascular disease, ischemic heart disease (heart attacks), and cerebrovascular disease (strokes). *See* Pls.' Ex. 1, Declaration of Dr. Sonal Singh at ¶¶ 1-2 and attached Ex. 1, at p. 2. A clear safety signal as to this causal association emerged no later than 2010. *See* Pls.' Ex. 2, Declaration of Dr. Darren Scheer, at ¶¶ 1-3; ECF No. 234, Unredacted Report of Darren Scheer, at ¶ 19.[1] Novartis was informed of this clear safety signal through multiple avenues, including published literature, its own clinical investigators, and domestic and foreign regulators.

<u>The Published Literature</u>

As early as 2010, the association between Tasigna and severe peripheral vascular disease has been described in the medical literature.  For example, in 2010, a published extract reported on cases of "rapidly progressive and overwhelming" peripheral arterial disease occurring in patients with no known risk factors. ECF No. 234, Scheer

---

[1] Dr. Scheer's report is not attached to his declaration because the report has been previously filed under seal.  Rather than duplicate this filing under seal, his declaration refers to the previously filed document (ECF No. 234) and incorporates it by reference.  For sake of ease, citations to the Scheer Report hereafter will be to the filed report (ECF No. 234), without reference to the declaration.

Report, at ¶ 89.  Another article addressed a broader vascular issue, reporting that 9 of 34 Tasigna patients (26.5%) developed atherosclerosis-related vascular diseases, resulting in repeated surgeries and amputations, and recommended that patients receiving Tasigna be monitored for developing disease.  *Id.* at ¶ 90.

By 2011, multiple peer-reviewed articles were published in reliable medical journals reporting on this safety issue.  *Id.* at ¶ 91.  Notably, the authors reported the continuing concern of rapidly developing disease occurring among patients (which some described as "severe and unrelenting") and the critical need that patients be monitored for developing disease while on Tasigna, particularly if they have risk factors.  *Id.*

The literature describing the association between Tasigna and vascular occlusive disease continued to mount in 2012 through present and is too expansive to recount in detail here. *See generally* ¶¶ 92-112.  In summary, the literature, retrospective studies, controlled and uncontrolled observational studies, meta-analyses, disproportionality analyses, and data from Novartis's clinical trials, including the ENESTnd trial, have all demonstrated a significant association between Tasigna and vascular occlusive events, many of which were described as rapidly progressive and aggressive.  *Id.*

Reports from Clinical Investigators

Novartis's clinical investigators saw this information first-hand and urged Novartis to take immediate action to warn doctors by updating the label *and* by sending

a Dear Healthcare Professional Letter (DHCP Letter) to alert physicians of the risk.

Noteworthy examples include:

- A letter from Dr. Peter Valent, one of Novartis's clinical investigators and "Key Opinion Leaders," dated February 10, 2011, where Valent expressed his frustration that Novartis was not cooperating with his clinic on the vascular occlusive events occurring among his Tasigna patients. *See* Pls.'s Ex. 3, at pp 1-2. He reported that 25 percent of his patients developed severe vascular occlusive events and that in "many patients these events are unexpected…, extremely severe, or extremely unusual [adverse events], such as [upper extremity] arterial stenosis or [central nervous system] infarction." *Id.* He urged Novartis to send a DHCP Letter to all physicians and to send a dossier to the FDA that included his letter and explained the severity of the risk. *Id.*

- A presentation by Dr. Valent to Novartis that same month that described the risks of Tasigna and peripheral artery disease and potential mechanisms of action. *See* Pls.' Ex. 4. The presentation warned that a "Tsunami of Vascular [serious adverse events] may crush us!" *Id.* at pp. 15-16. It also noted that efforts to increase awareness of the issue had been "blocked down by Novartis." *Id.*

- A March 10, 2011 email from Dr. Valent to Novartis where he again urged Novartis to warn all patients and physicians about the risk of vascular events associated with Tasigna. *See* Pls.' Ex. 5. He stressed that "the issue and concern is not only PAOD [peripheral vascular occlusive disease] or the frequency of PAOD, but also and more importantly (because clinically relevant) the severity of PAOD in these patients." *Id.*

- An August 4, 2012 email where a Novartis employee reported on a conversation with certain oncologists who believed that the emergence of peripheral vascular disease "in young patients [a] few months after the start of [Tasigna] is seen as obvious proof of relationship to the drug…" and "wish[ed]" that Novartis had dealt with this up-front and proactively…." Pls.' Ex. 6, at p. 1.

- A June 6, 2013 email where Dr. Valent reported to Novartis that vascular events had now occurred in 40 percent of his Tasigna patients, and based on the "high number of rapid accumulation of such cases," he asked whether "Novartis is still willing and able to take the (heavy) responsibility and risk and can Novartis still regard [Tasigna] as a

relatively safe drug that has no causal relationship concerning vascular events?" Pls. Ex. 7, at p. 3. He concluded that Novartis and he were "obliged to prepare and send [a] special report [to health agencies, including the FDA] and point at the high risk and difficult situation we all have to face." *Id.*

Reports from Regulators

Novartis also received notice of the vascular risk from international health authorities who required Novartis to take action to mitigate the risk in those countries, which Novartis did not do in the United States. For example, in June of 2012, Novartis received notice from Health Canada, with a supporting 57-page signal assessment, concluding that "the data collected herein strongly suggest the existence of an association between [Tasigna] and the development/exacerbation of atherosclerotic-related diseases," and requested the risk be added to the Warnings and Precautions section of the Canadian Label. *See* Pls.' Ex. 8, at pp. 4-6; Pls.' Ex. 9, at pp. 41-43.

In April 2013, at the insistence of Canadian regulators, Novartis sent a DHCP Letter to Canadian physicians, warning of the atherosclerotic risk associated with Tasigna. *See* ECF No. 234, Scheer Report, at ¶ 156; Pls.' Ex. 10, Canadian DHCP Letter.  It also sent similar letters in Saudi Arabia, Turkey, and China. *See* ECF No. 234, Scheer Report, at ¶ 158. It did not send any such letter to United States doctors. *Id.*

Then, in June 2014, Health Canada required Novartis to elevate vascular occlusive events to the Serious Warnings and Precautions section of the Canadian label, which is the Canadian equivalent of a Black Box Warning in the United States. *Id.* at ¶ 169; Pls.' Ex. 11. The Canadian authority outlined its rationale for the

elevation, including the data from the ENESTnd trial, and multiple reports of peripheral vascular disease being rapidly progressive, resistant to treatment, affecting multiple sites, and progressing to necrosis and amputations despite aggressive interventions. Pls.' Ex. 11, at p. 2.

> The Canadian authority summarized its rationale to Novartis as follows:

> To summarize, atherosclerotic events occur frequently with the use of TASIGNA, and cases of aggressive, resistant to treatment atherosclerotic events have also been reported. It is imperative that healthcare professionals are able to see this information in a prominent section of the Product Monograph as it may influence prescribing practice and ultimately affect patient safety. The reported arterial occlusive events can be life threatening or result in long-term sequelae that diminish quality of life of patients. Given that CML patients have a good prognosis and potentially treated for a long-term period, these irreversible and severe adverse events require a serious warning.

*Id.*

The Canadian label was then updated with a box warning about the severe and rapidly progressive nature of peripheral vascular disease associated with Tasigna, which can affect multiple sites, require multiple revascularization procedures, and result in limb necrosis and amputations. ECF No. 234, Scheer Report, at ¶ 169; Pls.' Ex. 12, Canadian Tasigna Product Monograph, at pp. 5, 8. Novartis, however, did not take any such parallel action in the United States, nor did it request that it be able to do so.

**B.  Novartis Failed to Adequately Warn of the Risk of Vascular Disease in the United States.**

The United States Tasigna label contained no warning of vascular occlusive events prior to January 2014. ECF No. 234, Scheer Report, at ¶ 164. The label was

then updated to include the side effect of "cardiac and vascular events" in the Warnings and Precautions section of the Tasigna label at the direction of the FDA despite Novartis's efforts to "push back" against adding the warning. *Id.* at ¶¶ 160-164. The purported "warning," states that cardiac and vascular events "were reported" in patients taking Tasigna, citing the percentages from the ENESTnd trial. Def.'s Ex. 9, Tasigna Label, at § 5.4. It further advises that patients should be advised to seek immediate medical attention if acute signs or symptoms of cardiovascular events occur (as any doctor would advise any patient). *Id.* It further advises that a patient's cardiovascular status should be monitored, and a patient's cardiovascular risk factors should be monitored and managed "according to standard guidelines." *Id.*

This purported warning was deficient in several respects. ECF No. 234, Scheer Report, ¶ 9. First, it did not adequately describe the severity of the atherosclerotic risk, including, as described in the Canadian box warning, that the disease could be rapidly progressing, severe, attack multiple sites, require multiple revascularization procedures, and could lead to necrosis and amputations. *Id.* Second, the purported warning did not contain a specific recommendation that patients be monitored with ankle-brachial index (ABI) (a noninvasive way to monitor for peripheral vascular disease by comparing the pulses in the arms to the pulses in the legs) and duplex ultrasonography at the beginning of treatment and periodically thereafter. *Id.* at ¶ 9. Further, Novartis was deficient in failing to send a DHCP Letter about this important risk to United States doctors to prominently highlight this important safety information. *Id.*

**C.      Due to Lack of Adequate Warning, Plaintiff's Oncologist Prescribed Tasigna Despite a Rapidly Progressing, Treatment Resistant Peripheral Vascular Disease that Resulted in Multiple Amputations.**

Plaintiff Menear was diagnosed with CML in March 2011. Def.'s Ex. 2, Deposition Transcript of Dr. Craig, at 25:8-22. Dr. Craig initially prescribed Gleevec to Plaintiff. *Id.* at 38:16-18. Plaintiff Menear had an excellent response to Gleevec—at all times on Gleevec he was in hematologic remission (meaning his blood counts were normal) and he had an excellent molecular response. *Id.* at 39:24-40:1, 114:25-115:21.

In early 2014, even though Plaintiff was "doing very well" on Gleevec, Dr. Craig recommended that Plaintiff switch to Tasigna as part of a clinical trial, which was assessing whether patients could receive "treatment free remission." *Id.* at 39:14-40:1, 43:13-44.[2] Based on this recommendation, Plaintiff Menear switched to Tasigna. *Id.* Because Plaintiff Menear was doing so well on Gleevec, Dr. Craig would not normally have switched him to another TKI, but only suggested that he switch therapies so he could participate in the trial. *Id.* at 107:24-109:6. Dr. Craig was a clinical investigator in the trial for Novartis. *Id.* at 29:14-23. Plaintiff Menear took Tasigna for the next four years. *Id.* at 70:17-25.

Beginning in 2016, and over the course of the next two years, Dr. Craig learned that Plaintiff Menear had multiple vascular occlusive events, including a progressive

---

[2] Although Novartis conducted a clinical trial with respect to treatment free remission with Tasigna, guidelines, including the CML guidelines from the National Comprehensive Cancer Network, provide that treatment free remission can be considered equally for patients on other TKIs, including Gleevec and Sprycel, if the criteria for discontinuation are met. Pls.' Ex. 14, NCCN CML Guidelines, at p. 18.

peripheral vascular disease that, despite multiple interventions, led to two amputation surgeries on the same leg. *Id.* at 67:6-68:1, 95:6-21. Plaintiff Menear's peripheral vascular disease was "remarkable in its progression." *Id.* at 95:22-24. Specifically, the disease "was much more refractory [non-responsive to treatment]… and it progressed at a pace that was much more rapid and much more resistant to treatment than would normally be expected… for a patient in his age group and those things." *Id.* at 95:25-96:10.

> As Dr. Craig testified:

> Many people who have peripheral vascular disease if they have a stent placed and the stent works well, you know, they would be able to go for years with a good finding, and that didn't happen to [Plaintiff Menear]. He had progressive and recurrent issues, despite excellent stenting, you know, drug modifications, therapy, and anticoagulation. His outcome is certainly not a very common or expected outcome.

*Id.* at 84:15-24.

Despite the remarkable progression of the vascular disease, Dr. Craig did not suspect Tasigna as a cause of Plaintiff's disease from 2016 to 2018. *Id.* at ¶ 69:11-70:5. And while there were references in the United States label about peripheral vascular disease, as well as references in the investigator brochure and consent form from the clinical trial, Dr. Craig testified that *none* of this material imparted to him the severity of the risk associated with Tasigna. *Id.* at 99:2-11.

He acknowledged that the Novartis material described "that there would be an associated increased risk in vascular disease," but testified that "a life-threatening event and a significant increase would not be as you would expect here." *Id.* at 99:13-100:4.

He continued:

> For example, in the [consent] form above where it says, you know, like less than one percent of people or like five people in some number of thousands of them. And even in the package insert and the black box warning, the black box warning discusses arrythmia, but it doesn't discuss like losing your leg and these types of things very clearly in that insert.
>
> And the severity of the vascular disease is not well described in the consent form or in any of the usual literature you would see.

*Id.*

In May of 2018, Dr. Craig took Plaintiff Menear off Tasigna. *Id.* at 70:17-25. He did so after he *independently* found a published article describing the risk of peripheral vascular disease associated with Tasigna (which he could not specifically recall but believed it was published by MD Anderson), and, as he testified, "[w]hen I started to look into the literature, that is what helped me realize the likely problem." *Id.* at 71:1-72:8. It was then that he finally made the connection between Plaintiff's disease and Tasigna: "And I felt at this time that the drug was the main driver of his progressive and refractory and much worse vascular disease than the average patient…." *Id.* at 73:3-21. Dr. Craig testified that at this time he "absolutely… did suggest stopping it, but the reality was [he] was refus[ing] to prescribe to [Plaintiff]—[he] would have refused to prescribe it even if [Plaintiff] were to ask [him] to continue." *Id.*

Dr. Craig reported all Plaintiff Menear's vascular events to Novartis as they occurred, as the clinical trial required that he report all hospitalizations, surgeries, or medical issues to Novartis. *Id.* at 68:2-14, 110:14-23. From 2016 to 2018, when reporting to Novartis on Plaintiff's recurring vascular events, Dr. Craig wrote that he did not suspect the events were related to Tasigna. *Id.* at 69:3-70:5, 110:14-23. At no time did Novartis, after receiving these reports, contact Dr. Craig and tell him that Plaintiff's

rapidly-progressing, refractory peripheral vascular disease could be related to Tasigna. *Id.* at 110:24-111:17. As he testified: "No one [from Novartis], despite years of this problem, ever mentioned that I need—you know, you need to think beyond what's happening. That never happened. No one ever wrote me a letter from Novartis on the study that says this patient's course is worrisome. No, that never happened." *Id.* at 138:20-25.

Dr. Craig expected, given Novartis's knowledge of the reports of similar progression with other patients, that the company would have informed him of this information and that the drug could be related to Plaintiff's progressive disease. *Id.* at 111:7-17. In 2018, after Dr. Craig made his own connection, based on his own research, that Tasigna was causing Plaintiff's vascular disease, he changed his prior reports to Novartis to indicate that he believed the evens were in fact related to Tasigna. *Id.* at 110:19-23.

At his deposition, Dr. Craig was shown the notice from Health Canada to Novartis described above (Pls.' Ex. 11) outlining the evidence, including the clinical trial data, the multiple published articles describing the rapidly evolving and refractory nature of the vascular disease, and the multiple Tasigna patients who had to have limb amputations. *See generally* Def.'s Ex. 2, at 103:6-110:13, 112:4-114:5. Dr. Craig testified from the time he prescribed Tasigna in 2014 until the time he did his own literature search in 2018 and discovered the true nature of the risk, he was not aware of the information provided in that document. *Id.* at 105:7-25, 106:1-25, 107:1-19, 109:7-110:13, 112:4-23. Dr. Craig testified that "knowing this now," he never would have

11

prescribed Tasigna to Plaintiff Menear, particularly because he does not "typically change the therapy in patients unless they have progression [of CML] or resistance so that isn't something [he] would standardly do." *Id.* at 107:24-109:6.

He further testified that if he would have been aware of the risks then like he is today, he would have stopped Tasigna sooner once he learned Plaintiff Menear had vascular disease. *Id.* at 109:7-110:13. He stated that he "didn't make the understanding in the very beginning," and that he "did not feel that [the vascular risk] is easily found and it requires a deep, in-depth investigation to understand the risks of the drug." *Id.*

He further reiterated his expectation that someone from Novartis would have informed him of this risk once he started reporting the progressive vascular events during the course of the clinical trial:

> Because [Plaintiff] was actually on trial where these events were being reported very regularly and they had events from all patients and I feel that that's a tragedy, too, for this patient, specifically because every time he had another procedure, I reported it, and I just wish—I wish I would have recognized the issue sooner. I'm grateful the patient didn't die.

*Id.*

He further testified that if the label had provided monitoring recommendations, such as taking of ABIs or duplex ultrasonography at baseline and periodically thereafter, he would have followed those recommendations. *Id.* at 120:21-121:14.

After Tasigna was discontinued, Plaintiff remained off TKI therapy for some time, and then began taking Sprycel. *Id.* at 70:17-71:5. Sprycel controlled his CML, and, on Sprycel, he had no hematologic evidence of CML in his blood. *Id.* at 118:19-24. He is currently back on Gleevec, with his CML well controlled and no side effects. *See* Pls.'

Ex. 13, Deposition Transcript of Allan Menear, at 191:4-10, 202:1-9.

Plaintiff Menear testified, unequivocally, that he would not have taken Tasigna if he had been informed that Tasigna could cause him to lose his leg. *Id.* at 199:16-19.

## LEGAL STANDARD

Under Rule 56, a court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.,* 748 F. App'x 212, 215 (11th Cir. 2018) (quoting *Atheists of Fla., Inc. v. City of Lakeland,* 713 F.3d 577, 589 (11th Cir. 2013)). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007).

Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Where, the moving party for summary judgment bears the burden of proof on an issue, as here, on an affirmative defense, that party must show *affirmatively* the absence of a genuine issue of material fact" *Humleker v. Bos. Sci. Corp.*, 2020 WL 6870852 at *15 (M.D. Fla. Oct. 2, 2020) (citations and internal quotations omitted). "In other

13

words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Id.*

## **ARGUMENT**

Florida law provides that a drug manufacturer's duty to warn is "directed to the physician rather than the patient." *Small v. Amgen, Inc.,* 723 F. App'x 722, 724 (11th Cir. 2018) (citing *Buckner v. Allergan Pharm., Inc.,* 400 So.2d 820 (Fla. 5th DCA 1981)). A drug manufacturer can satisfy this duty by providing an adequate warning to the physician who prescribes the drug. *Id.* The adequacy of a warning is generally a question of fact and can only "become a question of law where the warning is accurate, clear, and unambiguous." *Felix v. Hoffmann–La Roche, Inc.,* 540 So.2d 102, 105 (Fla.1989). Even where a risk is described, a warning can be inadequate for failing to, among other things, describe "frequency, severity, or duration of the[] risks." *Bayless v. Boston Scientific Corp.*, 2020 WL 10058197, at * 4 (M.D. Fla. 2020). At the summary judgment stage, a defendant asserting that its warnings were adequate must demonstrate that it is "inconceivable that reasonable persons could disagree as to the adequacy of the warnings." *Felix*, 540 So.2d at 105.

To "prevail on a failure to warn claim under strict liability or negligence, [a plaintiff] must prove that the warnings to the prescribing physician were inadequate, and that the inadequate warnings proximately caused [the plaintiff's] injury." *Kirchman v. Novartis Pharms. Corp.*, 2014 WL 2158519, at *5 (M.D. Fla. 2014) (applying

14

Florida law). A plaintiff "establishes proximate cause by showing that the inadequacy of the warnings was a substantial factor in bringing about [the plaintiff's] injury." *Id.*

Importantly, and contrary to Novartis's principal argument, Florida law does not require a showing that the treating physician would have declined to prescribe the drug if he or she had known of the association at the time of prescription. *See Guenther v. Novartis Pharms. Corp.*, 990 F. Supp. 2d 1299, 1303-04 (M.D. Fla. 2014) (rejecting Novartis's argument that a prescribing physician must testify that he or she would have declined to prescribe the drug had the risk at issue been known as an "[in]accurate statement of Florida law"); *see also McWilliams v. Novartis AG,* 2018 WL 3369655, at *7 (S.D. Fla. 2018) (agreeing that "Florida law does not require a showing that the treating physician would have declined to prescribe the drug if he or she had known of the association at the time of prescription."). Rather, a plaintiff need only show that a different warning would have prevented the harm. *Guenter*, 990 F. Supp. 2d at 1303-04.

Further, where, as here, it is maintained that the warning was inadequate, a defendant must "demonstrate that the treating physician was otherwise aware of the particular risk" at issue. *Messina v. Ethicon, Inc.,* 2021 WL 1329072 at *3 (M.D. Fla. Mar. 31, 2021) (citation omitted). In determining whether a manufacturer has made this showing, the relevant question is whether the plaintiff's prescribing physician has substantially the same knowledge as the manufacturer in using the manufacturers product. *Id.* (*citing Horrillo v. Cook Inc.,* 2012 WL 6553611, at *3 (11th Cir. 2012) and *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.,* 711 F. Supp. 2d 1348,

1377 (M.D. Ga. 2010)).

Here, Plaintiff's statement of material facts makes clear that no later than 2010, Novartis was aware of an association between Tasigna and a *severe, rapidly progressing,* and *treatment-resistant* form of peripheral vascular disease associated with Tasigna. *See* Statement of Material Facts (SMF), *supra,* at pp. 2-7. The associated disease was known to present in multiple sites, require multiple revascularization procedures, and result in limb necrosis and amputations. *Id.* This information came from the published literature, health authorities, and Novartis's own clinical investigators who observed this phenomenon first-hand. *Id.*

Dr. Craig testified, unequivocally, that: (1) at the time he prescribed the Tasigna to Plaintiff, he was unaware of the severe, rapidly progressive, and treatment resistant nature of the disease associated with Tasigna, and (2) that the reference generically to "peripheral vascular disease" in the label, clinical trial consent form, and investigator brochure did not adequately describe the severity and nature of the side effect. *Id.* at 9-11.

For this reason, he prescribed Tasigna to Plaintiff Menear for two years while Plaintiff's vascular disease progressed from simple stenting procedures to multiple amputations. *Id.* at 9. And because he was ill-informed, Dr. Craig reported each one of these procedures to Novartis as not related to Tasigna. *Id.* at 11-12. It was not until he did his *own* research and discovered literature that discussed this phenomenon, that he realized the true nature of the risk, concluded that Tasigna was causing Plaintiff Menear's severe, rapidly progressing peripheral vascular disease, and permanently

discontinued Tasigna. *Id.* at 10-11. To his shock, despite his multiple reports to Novartis about Plaintiff's progressive disease, no one from Novartis ever informed him of the potential relationship to Tasigna. *Id.* at 11, 12-13.

On these facts, there is, at a minimum, a genuine issue of material fact on proximate causation. *First*, Dr. Craig testified that had he known the withheld information at the time of his initial prescribing decision, he would not have prescribed Tasigna. *See* Def.'s Ex. 2, Craig Tr., at 107:24-109:6. Novartis makes much of the fact that he answered the question, initially, with an "I don't know." *Id.* But he immediately followed that testimony with: "I mean in retrospect, obviously I would never have given him the drug under any circumstances," particularly because Plaintiff was doing well on Gleevec. *Id.* This testimony alone establishes that the prescribing decision would have been different had the warning been adequate.

*Second*, even if Dr. Craig would have prescribed Tasigna to Plaintiff in 2014, Dr. Craig testified that he would have stopped prescribing the drug before it progressed over a two-year period to limb necrosis and amputations. *Id.* at 109:14-110:13. Therefore, had Dr. Craig been properly warned, Plaintiff's disease never would have progressed to the point where he suffered multiple amputations. This fact also defeats summary judgment.

*Third,* if the label had included recommendations on taking ABIs and duplex ultrasonography at baseline and periodically thereafter to detect for progressive disease, as Plaintiff contends it should have, Dr. Craig would have followed those instructions. *Id.* at 120:21-121:14. Testimony by a treating physician that he or she

would have monitored the patient is sufficient to create a triable issue of fact on causation. *See McWilliams*, 2018 WL 3369655, at *7 (denying summary judgment even where warning would not have changed decision to prescribe, where physician testified it would have changed his prescribing practice); *Hill v. Novartis Pharms. Corp.*, No. 1:06-cv-00939, 2012 WL 6004161, at *4 (E.D. Cal. Nov. 30, 2012) (denying summary judgment where doctor testified he would have monitored patient); *Georges v. Novartis Pharms. Corp.*, No. CV 06-5207, 2012 WL 9083365, at *6 (C.D. Cal. Nov. 2, 2012) (same); *Stanley v. Novartis Pharms. Corp.*, 11 F. Supp. 3d 987, 1003 (C.D. Cal. 2014) ("While the evidence supports that Dr. Molina and Dr. Nakamura would have prescribed Aredia or Zometa even if they knew about the potential association between these drugs and [the side  effect at issue], changes to treatment and prescription procedures creates a triable question of fact on specific causation."). The fact that Dr. Craig would have monitored Plaintiff if properly advised also defeats summary judgment.

*Finally*, Plaintiff's unequivocal testimony that he would not have taken Tasigna had he been told he could lose his leg also defeats summary judgment. Pls.' Ex. 13, Menear Tr., at 199:16-19. Courts have held that such testimony creates a triable issue of fact on causation. *See Guenther*, 2013 WL 1498162, at *2 ("Guenther has testified that if she had been warned by her oncologists about the risk of ONJ, she would have refused to take Zometa, and that she did stop taking the drug once she was told of that risk….  Guenther's testimony is enough to create a genuine issue of material fact as to whether the allegedly insufficient warning was a proximate cause of her injury.");

*Kirchman*, 2014 WL 2158519, at *5 (triable issue of fact on causation where evidence was that plaintiff would not have taken drug had the doctor warned her of the side effect); *Gilliland v. Novartis Pharms. Corp.*, 34 F. Supp. 3d 960, 973 n.24 (S.D. Iowa 2014) (denying summary judgment where patient testified she would not have taken the drug had she been warned of the risk, and did in fact stop therapy after side effect manifested; citing myriad authority in accord).

Here, the evidence establishes that Dr. Craig passed on all known safety information about Tasigna to Plaintiff through the consent forms and other information that Dr. Craig gave to Plaintiff. As Plaintiff testified, had he known Tasigna could cause him to lose his leg, he would have declined the treatment—a reasonable statement given that Plaintiff was doing *well* on Gleevec. Thus, as *Guenther* and the above authority establish, this alone creates a triable issue of fact on proximate causation.

## **CONCLUSION**

For these reasons, Novartis's motion should be denied in full.

Dated: April 5, 2023                          Respectfully Submitted,

                                              By: */s/ Richard M. Elias*
                                              Richard M. Elias, Fla. Bar No. 38471
                                              Elias LLC
                                              231 S. Bemiston Avenue, Ste. 800
                                              St. Louis, MO 63105
                                              (314) 391-6820
                                              relias@EliasLLC.com

                                              By: */s/ Raymond C. Silverman*
                                              Raymond C. Silverman, Esq.

Christopher Oxx, Esq.
Harrison M. Biggs, Esq.
Parker Waichman, LLP
6 Harbor Park Drive
Port Washington, NY 11050
(516) 466-6500
(516) 466-6665 (fax)
rsilverman@yourlawyer.com
oxx@yourlawyer.com
hbiggs@yourlawyer.com

By: */s/ Lawana S. Wichmann*
Lawana S. Wichmann, Esq.
OnderLaw, LLC
110 E. Lockwood Avenue
St. Louis, MO 63119
(314) 963-9000
(314) 963-1700 (fax)
wichmann@onderlaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on this 5th day of April, 2023, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, causing all counsel of record be served by electronic means.

*/s/ Richard M. Elias*
Richard M. Elias, Esq.
*Attorney for Plaintiffs*