# Exhibit 13

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE MIDDLE DISTRICT OF FLORIDA

3

4    ALLEN MENEAR,            ) CASE NO.
                              )
5               Plaintiff,    ) 8:22-CV-1644-RBD-DAB
                              )
6    v.                       )
                              )
7    NOVARTIS PHARMACEUTICALS )
     CORPORATION,             )
8                             )
                Defendant.    )
9

10

11          ORAL DEPOSITION OF ALLEN RAY MENEAR,

12   called by the Defendant for examination, taken by

13   and before Ann Medis, RPR, CLR, CSR-WA, and Notary

14   Public, at the SpringHill Suites by Marriott

15   Bridgeport Clarksburg, 97 Platinum Drive,

16   Bridgeport, West Virginia 26330, on Thursday,

17   January 19, 2023, commencing at 10:08 a.m.

18

19

20

21

22

23

24

25

## Page 2

```
 1        A P P E A R A N C E S
 2  On behalf of Plaintiff
 3     ONDER LAW, LLC
       BY:  NICHOLAS G. HIGGINS, ESQUIRE
 4     110 East Lockwood
       Saint Louis, Missouri  63119
 5     314.963.9000
       nhiggins@onderlaw.com
 6
 7  On behalf of Defendant
 8     HOLLINGSWORTH LLP
       BY:  ALEKSANDRA RYBICKI, ESQUIRE
 9     1350 I Street, N.W.
       Washington, D.C.  20005
10     202.898.5800
       arybicki@hollingsworthllp.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                  * I N D E X *
 2  ALLEN RAY MENEAR                    PAGE
 3    EXAMINATION BY MS. RYBICKI        6, 202
      EXAMINATION BY MR. HIGGINS        199
 4
 5       * INDEX OF MENEAR EXHIBITS *
 6  NO.        DESCRIPTION           PAGE
 7  Exhibit 1  Notice of Deposition of Allen     19
      Menear
 8
    Exhibit 2  Complaint                   19
 9
    Exhibit 3  Plaintiff Fact Sheet         19
10
    Exhibit 4  3/17/11 WVU Medicine Cancer    41
11    Center Note by Mr. Malone
        MENEAR_ALLEN-FED-0874-00023 - 00026
12
    Exhibit 5  3/1/16 Xgene Diagnostics Cardiac   46
13    Health Profile
        MENEAR_ALLEN-FED-0001-00070 - 00077
14
    Exhibit 6  4/23/90 article regarding asphalt   49
15    accident
16  Exhibit 7  4/17/2012 West Virginia University   56
      Hospitals admission H&P
17      MENEAR_ALLEN-FED-0001-00387 - 00392
18  Exhibit 8  4/19/12 West Virginia University   74
      discharge summary
19      MENEAR_ALLEN-FED-0001-00414
20  Exhibit 9  5/10/12 West Virginia University   76
      Hospitals Discharge Summary
21      MENEAR_ALLEN-FED-0001-19618 - 19621
22  Exhibit 10 5/10/12 West Virginia University   82
      Hospitals, elevated blood sugar
23      MENEAR_ALLEN-FED-0001-19616 - 19617
24  Exhibit 11 7/25/14 Ruby-WVU Telephone Contact   83
      Summary
25      MENEAR_ALLEN-FED-0901-00769 - 00773
```

## Page 4

```
 1       * INDEX OF MENEAR EXHIBITS (Continued) *
 2  NO.        DESCRIPTION           PAGE
 3  Exhibit 12 10/22/14 WVU Medicine Return Patient   97
      Visit in Hematology/Oncology
 4      MENEAR_ALLEN-FED-0874-00798 - 00803
 5  Exhibit 13 10/29/14 WVU Medicine Nurses Notes   101
        MENEAR_ALLEN-FED-0901-16667
 6
    Exhibit 14 11/17/14 WVU Medicine Return Patient   106
 7    Visit in Hematology/Oncology
 8      MENEAR_ALLEN-FED-0874-00823 - 00827
 9  Exhibit 15 11/17/14 WVU Medicine Return Patient   111
      Visit in Hematology/Oncology
10      MENEAR_ALLEN-FED-0874-00851 - 00852
11  Exhibit 16 Tasigna Package Insert,        114
      Revised 9/2014
12  Exhibit 17 6/8/15 Dr. Malone office visit     119
13      MENEAR_ALLEN-FED-0966-00036 - 00038
14  Exhibit 18 11/2/15 WVU Medicine Return Patient   126
      Visit in Hematology/Oncology
15      MENEAR_ALLEN-FED-0874-00952 - 00956
16  Exhibit 19 Tasigna Clinical Study Informed    129
      Consent
17      MENEAR_ALLEN-FED-0874-00933 - 00951
18  Exhibit 20 3/14/16 Dr. Sedillo office visit   146
        MENEAR_ALLEN-FED-0001-00014 - 00017
19  Exhibit 21 5/16/16 Dr. Sedillo office visit   150
20      MENEAR_ALLEN-FED-0936-00073 - 00076
21  Exhibit 22 Tasigna Informed Consent       152
        MENEAR_ALLEN-FED-0874-01031 - 01049
22  Exhibit 23 8/1/16 Return Patient Progress Note   158
      by Dr. Craig
23      MENEAR_ALLEN-FED-0001-01137 - 01141
24  Exhibit 24 8/1/16 Oncology Nurses Note       164
        MENEAR_ALLEN-FED-0001-01126 - 01128
25
```

## Page 5

```
 1       * INDEX OF MENEAR EXHIBITS (Continued) *
 2  NO.        DESCRIPTION           PAGE
 3  Exhibit 25 8/1/16 Tasigna Clinical Study     167
      Consent Form
 4      MENEAR_ALLEN-FED-0874-01083 - 01102
 5  Exhibit 26 8/7/17 Return Patient Progress Note   174
      by Dr. Craig
 6      MENEAR_ALLEN-FED-0001-04507 - 04513
 7  Exhibit 27 9/6/18 Return Patient Progress Note   180
      by Dr. Craig
 8      MENEAR_ALLEN-FED-0001-09301 - 09306
 9  Exhibit 28 9/23/21 Return Patient Progress Note  187
      by Dr. Craig
10      MENEAR_ALLEN-FED-0874-02152 - 02158
11           - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Allan Menear

Page 6

PROCEEDINGS

- - - -

ALLEN RAY MENEAR,

having been first duly sworn, was examined

and testified as follows:

EXAMINATION

BY MS. RYBICKI:

Q. Good morning, Mr. Menear.

A. Good morning.

Q. My name is Aleksandra Rybicki. I'm with the law firm Hollingsworth, LLP. I represent Tasigna in this matter. I'm here to ask you a few questions today.

Will you please state your name and address for the record.

A. My full name?

Q. Yes.

A. Allen Ray Menear, 828 Maple Avenue, Grafton, West Virginia.

Q. Have you ever gone by any other name?

A. Red. I used to have red hair.

Q. Was that ever used on any official document?

A. No.

Q. This is just something your friends call

Page 7

you?

A. Yeah.

Q. Have you ever been deposed before, Mr. Menear?

A. Pardon?

Q. Have you ever been deposed before? Right now what we are doing is a deposition where I'm asking you questions as part of a case.

Have you ever been deposed before like this?

A. Yes.

Q. When were you deposed?

A. 1990.

Q. What type of case was this?

A. It was a lawsuit against the State of West Virginia.

Q. Did you file that lawsuit?

A. My lawyers.

Q. So you were the plaintiff in that case?

A. Yes.

Q. What was the subject matter of that case? Why did you file that case?

A. One of their trucks carrying hot asphalt hit me and poured it on me, burned me up.

Q. Was that the only time that you were

Page 8

deposed?

A. Yes.

Q. We'll talk about the asphalt incident a little bit later. I'm sure your attorney has told you what to expect today, but I would like to give you some general instructions. I know you were deposed before, but I want to remind you of what is expected of you today.

I will be asking you questions today. If you do not hear or understand my question, please let me know, and I will repeat it or rephrase it. Do you understand?

A. Yes.

Q. If you respond to a question that I've asked, I will assume that you understood my question. We cannot speak at the same time because the court reporter needs to take down what each one of us says. So please let me finish asking my question before you start answering. Okay?

A. Okay.

Q. You must answer the questions verbally. The court reporter cannot take down nods of the head or shaking of the head. Do you understand?

A. Yes.

Page 9

Q. You should not speculate. If you don't know an answer to a question or if you don't remember the information, you should just tell me that. Don't try to answer a question that you don't know the answer to. Do you understand that?

A. Yes, ma'am.

Q. If you need to take a break at any point, please let me know. But if there's a question pending, if I had just asked you a question, please answer that question and then we can take a break. Do you understand?

A. Yes.

Q. Now, do you understand that today you're under oath meaning that you have an obligation to tell the truth just as if you were in court today?

A. Yes, ma'am.

Q. Is there any reason why you cannot give full, accurate and complete testimony today?

A. No.

Q. Have you taken any medications in the last 24 hours that would impact your ability to hear and understand my questions and respond to them?

A. No. I don't hear real good. If you just speak up a little bit, it will help me.

Allan Menear

Page 10

1    Q.  Are you on any recreational drugs
2 currently?
3    A.  No.
4    Q.  Have you taken any alcohol in the last
5 24 hours?
6    A.  No.
7    Q.  Are you on any prescription medications?
8    A.  Oh, yes.
9    Q.  Have you skipped any medications in the
10 last 24 hours that a doctor told you to take?
11    A.  Yes.
12    Q.  Which?
13    A.  All my morning pills, I didn't take them
14 this morning, and that's -- I can't even tell you
15 what they are.  There's so many, I don't know.
16    Q.  Would you say there are five pills you
17 forgot or ten pills?
18    A.  Ten.
19    Q.  Approximately ten?
20    A.  Um-hum.
21    Q.  Are you able to tell me what they are?
22    A.  Pletal, baby aspirin, Gleevac.  That's
23 all I can't remember.
24    Q.  Have all these medications been
25 prescribed to you by doctors?

Page 11

1    A.  Yes.
2    Q.  Are any of them over the counter?
3    A.  No.
4    Q.  Which doctors prescribed you these
5 medications?
6    A.  My heart doctor, my vascular doctor.
7    Q.  Who is your heart doctor?
8    A.  Steve Nagey.
9    Q.  Any idea how to spell his last name?
10    A.  N-A-G-E-Y, I believe.
11    Q.  You said your vascular doctor.  Who is
12 that?
13    A.  Dr. Marrone.
14    Q.  Would that be M-A-R-O-N-E?
15    A.  Two Rs.
16    Q.  M-A-R-R-O-N-E?
17    A.  Yes.
18    Q.  Any other doctors prescribe you any of
19 the medications that you're currently taking?
20    A.  Yeah.  My lung doctor.
21    Q.  Who would that be?
22    A.  I don't know her name.  I go to so many
23 doctors, I don't...
24    Q.  That's fine.  I gave you the instruction
25 to not speculate, so you're doing well.  We have

Page 12

1 your heart, vascular and lung doctors.  Any other
2 doctors prescribe --
3    A.  My family doctor.
4    Q.  Who is that?
5    A.  James Malone.
6    Q.  Is that M-A-L-O-N-E?
7    A.  Yes, ma'am.
8    Q.  Anyone else?
9    A.  That's it.
10    Q.  Are you seeing an oncologist?
11    A.  No.
12    Q.  You mentioned you're taking Gleevec.
13 Did you see somebody for the prescription of
14 Gleevec?
15    A.  Yes.
16    Q.  Who was that?
17    A.  Just left my mind.  Dr. Craig.
18    Q.  When was the last time you saw
19 Dr. Craig?
20    A.  Probably six months ago.
21    Q.  Let's go back to just the general
22 questions.
23       MS. RYBICKI:  Before I begin with
24 additional questions, I will note for the record
25 that Novartis is still in the process of obtaining

Page 13

1 records from medical providers.  As a result,
2 Novartis reserves its right to continue the
3 deposition of plaintiff past today based upon any
4 additional documents or discovery being made
5 available.
6 BY MS. RYBICKI:
7    Q.  Mr. Menear, have you ever testified at
8 trial?
9    A.  No.
10    Q.  Now, specifically about this lawsuit,
11 have you ever read or heard anything about Tasigna
12 since filing this lawsuit?
13    A.  Yes.
14    Q.  What have you heard or read?
15    A.  I read the side effects form, what did
16 it cause.  It was diarrhea, vomiting, upset
17 stomach.  That's all I can remember what it said.
18 All this hit me at once.
19    Q.  Just to be clear, since you filed this
20 lawsuit, the only thing that you read or heard
21 about Tasigna was this side effect information, or
22 was there other information you read or heard
23 about Tasigna?
24    A.  No.  That's it.
25    Q.  And this side effect information that

Arran Mehear

Page 14

1  you just mentioned, where did you get it?
2      A.  Dr. Craig's assistant.
3      Q.  What's Dr. Craig's assistant's name?
4      A.  I don't know.
5      Q.  Did you request this information from
6  Dr. Craig's assistant or Dr. Craig, or did
7  Dr. Craig send it to you on his own?
8      A.  Dr. Craig gave it to me.
9      Q.  Do you have a copy of that information
10 about side effects?
11     A.  No.
12     Q.  How did Dr. Craig send that to you?  Was
13 it via email, mail, or did he have give you a hard
14 copy?
15     A.  It was a doctor's office appointment,
16 and he said there's a trial drug.  He wanted know
17 if I would be interested.  He thought it could
18 lower my numbers.
19     Q.  I think maybe we're misunderstanding
20 each other.  My question was originally since you
21 filed the lawsuit, and I believe you filed the
22 lawsuit in 2022; is that fair?
23     A.  Yes.
24     Q.  So after 2022, after you filed the
25 lawsuit, did you review or hear any information

Page 15

1  about Tasigna?
2      A.  No.
3      Q.  So this information about side effects
4  that Dr. Craig provided you with, that was before
5  you filed the lawsuit?
6      A.  Yes; oh, yes.
7      Q.  So again, just to make sure, since you
8  filed the lawsuit in 2022, you have not heard or
9  read any information about Tasigna?
10     A.  No.
11     Q.  Were you aware of whether other people
12 have filed a lawsuit against Tasigna?
13     A.  Yes.
14     Q.  How were you aware of that?
15     A.  I seen it on TV.
16     Q.  Do you remember what channel?
17     A.  No, ma'am.
18     Q.  Do you remember when you saw this on TV?
19     A.  2016, end of 2016, maybe 2017.
20     Q.  What exactly did you see on the news
21 about Tasigna either at the end of 2016 or
22 beginning of 2017?
23     A.  That there was lawsuits.  People was --
24 the side effect was causing, I don't know, special
25 side effects.  And then we called, talked to them.

Page 16

1      Q.  I'm going to need a little bit more
2  information about exactly what you saw on
3  television.
4          Let me just ask you:  These people on
5  television were representing that they had a
6  potential claim against Tasigna; is that accurate?
7      A.  Yes.
8      Q.  And their claim was that they had some
9  kind of side effect to taking Tasigna; is that
10 right?
11     A.  Yes.
12     Q.  What side effects do you remember those
13 people complaining --
14     A.  What I remember is vomiting, upset
15 stomach, headaches, diarrhea.
16     Q.  So in 2016 or early 2017, you saw a
17 commercial where people said that Tasigna possibly
18 caused their vomitting, upset stomach, headaches
19 and/or diarrhea.  How did you respond to that
20 information?
21     A.  We talked to Dr. Craig about it.
22     Q.  Were there any other side effects
23 mentioned in that television ad?
24     A.  No.
25     Q.  Nothing about coronary artery disease,

Page 17

1  by any chance?
2      A.  Not that I remember.
3      Q.  What about people taking Tasigna, any
4  issues with the heart?
5      A.  Yes.
6      Q.  What about in that television ad people
7  mentioning they took Tasigna and they have issues
8  with peripheral arterial occlusive disease or
9  issues with their legs or veins or arteries?
10     A.  No, not on the commercial.
11     Q.  What about death, did any of those
12 people complain about dying from taking Tasigna?
13     A.  No.
14     Q.  Do you know the types of injuries other
15 people alleged from taking Tasigna?
16     A.  No.
17     Q.  You mentioned that you saw this ad about
18 Tasigna at the end of 2016 or beginning of 2017
19 and you decided to talk to Dr. Craig about it; is
20 that fair?
21     A.  That's correct.
22     Q.  Do you remember when you went to
23 Dr. Craig to talk about this commercial or
24 advertisement?
25     A.  The first of 2017.

Page 18

1    Q.  When you say the first of 2017, do you
2 mean January 1 or the very beginning of 2017?
3    A.  Very beginning.
4    Q.  How did that conversation go?  Did you
5 explain to Dr. Craig what you had seen?
6    A.  Yes.
7    Q.  And how did Dr. Craig respond?
8    A.  He told me that he's not had any
9 information on any side effects.  And at this
10 time, I was having severe pain in my legs, both
11 legs.
12    Q.  So did Dr. Craig agree or disagree with
13 the people's allegations of injuries in that
14 commercial?
15    A.  No.  He didn't disagree or agree.  He
16 just stated the information he had didn't show any
17 side effects.
18    Q.  So in terms of your leg pain at the time
19 that you spoke to Dr. Craig, did he say it was a
20 possibility that it was being caused by Tasigna?
21    A.  No.
22    Q.  What about any of your other issues that
23 you had at the time, your medical issues, did he
24 say that any of those were caused by Tasigna at
25 the time?

Page 19

1    A.  No.
2    Q.  I'm going to mark three exhibits for the
3 record, the Notice of Deposition as Exhibit 1, the
4 Complaint as Exhibit 2 and the Plaintiff Fact
5 Sheet as Exhibit 3.
6       Mr. Higgins those will be at the end.
7 Let's start with the Notice of Deposition.  Let me
8 know when you have it in front of you and you're
9 ready to answer questions.
10       Have you seen this Notice of Deposition
11 before?
12    A.  No, ma'am.
13    Q.  How did you learn that we were going to
14 take your deposition today?
15    A.  Law firm.
16       THE WITNESS:  What's your law firm?
17       MR. HIGGINS:  Onder.
18       THE WITNESS:  Onder contacted me.
19 BY MS. RYBICKI:
20    Q.  Do you remember who from the law firm
21 contacted you?
22    A.  Malayia, Marie?
23       MR. HIGGINS:  Would that be Lawanna?
24       THE WITNESS:  Lawanna.
25

Page 20

1 BY MS. RYBICKI:
2    Q.  She notified you that you have a
3 deposition today?
4    A.  Yes.
5    Q.  How much advance notice did she give you
6 about your deposition?
7    A.  Two weeks.
8    Q.  So if you look at the Notice of
9 Deposition, you see that it's entitled Notice of
10 Deposition of Allen Menear.
11       Do you see that?
12    A.  Yes, ma'am.
13    Q.  And the very last sentence says, "The
14 Plaintiff shall bring to the deposition any
15 documents and tangible things responsive to the
16 Plaintiff Fact Sheet that have not already been
17 produced to NPC, including any documents obtained
18 or acquired since completion of the PFS and any
19 amendments thereto."
20       Do you see that?
21    A.  Yes.
22    Q.  Do you understand that to mean that you
23 should bring any documents relevant to the
24 Plaintiff Fact Sheet to this deposition?
25    A.  Yes.

Page 21

1    Q.  Did you bring any such documents with
2 you?
3    A.  No.  This was the first time I've seen
4 this.
5    Q.  So you were not told by Onder Law or any
6 of your attorneys to bring any documents
7 responsive to the Plaintiff Fact Sheet?
8       MR. HIGGINS:  Objection.
9 Attorney/client privilege.
10 BY MS. RYBICKI:
11    Q.  What efforts did you make to determine
12 whether you had responsive information to the
13 requests in the Notice of Deposition?
14    A.  I talked with my cancer doctor.
15    Q.  Who is your cancer doctor?
16    A.  Dr. Craig.
17    Q.  So you talked to Dr. Craig about having
18 any information relevant to this case?
19    A.  Yes.
20    Q.  When did you speak to Dr. Craig about
21 this?
22    A.  2017.
23    Q.  I think we're misunderstanding each
24 other.  In terms of this Notice of Deposition that
25 tells you that you're supposed to attend this

Page 22

1 deposition today and it says bring any relevant
2 documents with you, did you talk to anyone about
3 any documents that you should bring for this
4 deposition?
5     A.  No, ma'am.
6     Q.  So just to be clear, you did not talk to
7 Dr. Craig about bringing documents to the
8 deposition?
9     A.  No, no.
10        MR. HIGGINS:  Let her finish the
11 question.
12 BY MS. RYBICKI:
13     Q.  Do you think sitting here today that you
14 may have some documents that may be relevant to
15 this case --
16        MR. HIGGINS:  Objection.
17 BY MS. RYBICKI:
18     Q.  -- that you have not brought with you
19 today?
20        MR. HIGGINS:  Objection.  Calls for
21 speculation.
22        You can answer subject to the objection.
23 BY MS. RYBICKI:
24     Q.  Just to be clear, when he objects, when
25 your attorney objects, that's okay.  But you still

Page 23

1 have to answer the question.  So I'm going to
2 re-ask my question because you were probably
3 interrupted by the objection.
4        Do you think sitting here today that you
5 have or you may have some documents at home or
6 maybe in an office that are relevant to this case
7 that you did not bring to this deposition today?
8     A.  No.
9     Q.  Do any such documents exist?  I know you
10 said you don't have them, but do they exist?
11     A.  Yes.
12     Q.  And who would have these documents?
13     A.  Dr. Craig.
14     Q.  Would your attorneys have these
15 documents as well?
16     A.  Yes.
17     Q.  Let's move on to the Complaint, which is
18 Exhibit 2.  Have you seen this Complaint before?
19     A.  No.
20     Q.  Do you know what this is?
21     A.  No.
22     Q.  Do you see your name in the caption?
23 The caption is the part -- so if you turn to page
24 2 of the document, the caption is the part that's
25 on the upper left corner.  It's in that box, if

Page 24

1 you see it.  Do you see where it says Allen
2 Menear?
3     A.  Yes.
4     Q.  Plaintiff, versus Novartis
5 Pharmaceuticals Corporation.
6     A.  Yes.
7     Q.  Is this the lawsuit that you filed
8 against Novartis Pharmaceuticals Corporation?
9     A.  Yes.
10     Q.  Do you see on the header there on that
11 page it says that it was filed July 21, 2022 at
12 the very top?
13     A.  Yes.
14        MR. HIGGINS:  What was the date again?
15        THE WITNESS:  7/21/22.
16 BY MS. RYBICKI:
17     Q.  Did you help your attorney put this
18 Complaint together?
19     A.  Yes.
20     Q.  How did you help your attorney put this
21 Complaint together?
22     A.  My wife talked to him.
23     Q.  Did you speak to your attorneys about
24 the information contained in this Complaint?
25     A.  No.

Page 25

1     Q.  So the information that is in the
2 Complaint would be retrieved from your wife?
3     A.  Yes.
4     Q.  Your wife spoke to your attorneys about
5 what happened, and that is how your attorneys put
6 together the Complaint?
7     A.  Yes.
8     Q.  Mr. Menear, can you tell me as best as
9 you can, what do you think this case is about?
10     A.  Losing my leg.
11     Q.  Can you give me a little bit more
12 information about why exactly you brought this
13 case about losing your leg?
14     A.  At this time, Dr. Craig said he did some
15 research, and he found out that there was lawsuits
16 pending.
17     Q.  When you say at this time Dr. Craig
18 found out, what time are you referring to?
19     A.  When the lawsuit was filed.
20     Q.  So at the time the lawsuit was filed,
21 Dr. Craig told you that your loss of your leg was
22 caused by Tasigna, is that what you're saying?
23     A.  Yes.
24     Q.  Other than your amputation, your leg
25 amputation, do you think that Tasigna caused any

Arran Mercer

Page 26

1  other of your injuries?
2      A.   Yes.
3      Q.   Which ones?
4      A.   My right leg.
5      Q.   Can you be a little bit more specific?
6      A.   I had to have extensive surgery on my
7  right leg.
8      Q.   Any other injuries?
9      A.   No.
10     Q.   Specifically can you think of when you
11 decided to bring this lawsuit?
12     A.   When we seen the commercial.
13     Q.   And you testified that that was at the
14 end of 2016 or beginning of 2017?
15     A.   Probably 2017.
16     Q.   That's when you decided to bring this
17 lawsuit?
18     A.   Yes.
19     Q.   When did you first speak with an
20 attorney about a possible lawsuit?
21     A.   After seeing the commercial probably two
22 weeks' time.
23     Q.   Would that be also the beginning of 2017
24 then?
25     A.   Yes.

Page 27

1      Q.   And who initiated that conversation?
2      A.   My wife.
3      Q.   Your wife called an attorney to speak
4  about this commercial?
5      A.   Yes.
6      Q.   What, if any, steps did you take after
7  the conversation with the attorneys?
8      A.   They said they'd get back with me, which
9  they did, and they told us at that time --
10         MR. HIGGINS:  Objection.  I'm going to
11 instruct the witness not to divulge anything that
12 the attorneys told you.  That would be a waiver
13 your attorney/client privilege.  So I'm
14 instructing you not to answer that question at
15 this time.
16         MS. RYBICKI:  That's reasonable.
17 BY MS. RYBICKI:
18     Q.   You said your wife reached out to an
19 attorney.  Do you remember the name of the
20 attorney?
21     A.   No.  I don't remember.
22     Q.   Was it the OnderLaw firm?
23     A.   Yes.
24     Q.   Just to be clear, the OnderLaw firm did
25 not reach out to you about the lawsuit.  It was

Page 28

1  your wife who reached out to the OnderLaw firm
2  about the lawsuit?
3      A.   Correct.
4      Q.   We have Mr. Higgins here today.  What
5  other lawyers have you met with that represent
6  you?
7      A.   Just Mr. Higgins.
8      Q.   Did you or your wife do any research
9  about which lawyer to hire for this case?
10     A.   No.
11     Q.   Do you know how your wife selected the
12 OnderLaw firm to call about the commercial?
13     A.   There wasn't any other law firm.  She
14 just seen the commercial, and we went from there.
15     Q.   Now, generally about this lawsuit, at
16 any point in time, have you had any conversations
17 with anyone except your attorneys about this
18 litigation, Novartis or Tasigna or your injuries?
19     A.   No.
20     Q.   So, for example, have you spoken to your
21 doctors about this litigation?
22     A.   No.
23     Q.   Have you spoken to your cardiologist
24 about Tasigna?
25     A.   Yes.

Page 29

1      Q.   Have you spoken to your cardiologist
2  about Tasigna possibly causing your amputation?
3      A.   Yes.
4      Q.   You testified earlier that your
5  cardiologist was Mr. Nagey; is that right?
6      A.   Yes.
7      Q.   Did you speak to Mr. Nagey about Tasigna
8  possibly causing your amputation?
9      A.   Yes.
10     Q.   When did you speak to Mr. Nagey or
11 Dr. Nagey?
12     A.   Three-quarters of the way in 2017.
13         MR. HIGGINS:  I'm sorry.  Can we take a
14 short break?  I have a personal issue to tend to.
15         MS. RYBICKI:  Sure.
16         MR. HIGGINS:  Is there a question
17 pending?
18         MS. RYBICKI:  I would like another
19 minute just to finish this line of questioning.
20         MR. HIGGINS:  Sure.
21         MS. RYBICKI:  That way we can then move
22 on.
23 BY MS. RYBICKI:
24     Q.   So other than Dr. Nagey, have you talked
25 to any other doctors about Tasigna causing your

Page 30

1 amputation?
2    A.  No.
3    Q.  Have you spoken to your vascular doctor,
4 Dr. Malone, about your amputation or Tasigna
5 causing it?
6    A.  No.
7    Q.  I know you don't remember your lung
8 doctor's name, but have you spoken to her about
9 Tasigna causing any of your injuries?
10    A.  Yes.
11    Q.  Do you remember when that conversation
12 took place?
13    A.  Beginning of 2018.
14    Q.  And how did that conversation pan out?
15 What did you discuss?
16    A.  I was getting fluid in my lung, and I
17 had to see my lung doctor and told her then that
18 it could possibly be from Tasigna.
19    Q.  Would it be possible that these lung
20 issues -- strike that.
21        Would it be possible that you discussed
22 with your lung doctor that your lung issues were
23 associated with you taking SPRYCEL at the time?
24        MR. HIGGINS:  Objection.  Calls for
25 speculation.

Page 31

1        You can answer subject to the objection.
2        THE WITNESS:  Yes.
3 BY MS. RYBICKI:
4    Q.  What about your family doctor,
5 Dr. Malone, did you speak to Dr. Malone about
6 Tasigna possibly causing your injuries in this
7 case?
8    A.  I'm not sure.
9    Q.  Finally, Dr. Craig, I think you
10 testified earlier that you did speak to Dr. Craig.
11    A.  Yes.
12    Q.  You testified that you spoke to
13 Dr. Craig about Tasigna possibly causing your
14 injuries at the beginning of 2017; is that right?
15    A.  Correct.
16        MS. RYBICKI:  Now would be a good time
17 for a break.
18        MR. HIGGINS:  Thank you very much.
19        (Recess from 10:43 a.m. to 10:47 a.m.)
20 BY MS. RYBICKI:
21    Q.  In terms of preparing for today's
22 deposition, did you meet with your counsel at all?
23    A.  Yes.
24    Q.  How many times did you meet with them?
25    A.  Once.

Page 32

1    Q.  Who did you meet with?
2    A.  Nick.
3    Q.  Mr. Higgins; is that right?
4    A.  Um-hum.
5    Q.  How long was this meeting?
6    A.  Hour, hour and a half.
7    Q.  Did you review any medical records in
8 preparation for this deposition?
9    A.  No.
10    Q.  Did you review your Plaintiff Fact Sheet
11 for this deposition?
12    A.  No.
13    Q.  Did you review the medication guide or
14 labels for any pharmaceutical products that were
15 prescribed to you?
16    A.  No.
17    Q.  So you did not review any medication
18 guide or label for Tasigna to prepare for this
19 deposition?
20    A.  No.
21    Q.  Did you speak with anyone else to
22 prepare for this deposition?
23    A.  There was another fellow with Nick.  I
24 don't remember his name.
25    Q.  Was he an attorney?

Page 33

1    A.  I don't know.
2    Q.  Was he affiliated with Mr. Higgins?
3    A.  Yes.  They was talking to me about it.
4    Q.  Did you speak to your wife to prepare
5 for this deposition?
6    A.  Yes.
7    Q.  What did you speak about?
8    A.  I don't remember.
9    Q.  Was it a long conversation or a short
10 conversation?
11    A.  It was short conversation.
12    Q.  Did you speak to Dr. Craig to prepare
13 for this deposition?
14    A.  No, ma'am.
15    Q.  Did you speak to any friends to prepare
16 for this deposition?
17    A.  No.
18    Q.  Outside of Mr. Higgins and his associate
19 or colleague, did you speak with any other
20 attorney to prepare for this deposition?
21    A.  No.
22    Q.  Did you do anything to prepare for this
23 deposition?
24    A.  Just what Nick went over with me.
25    Q.  Did you watch any videos?

Allan McNear

Page 34

1   A.  No.
2   Q.  Did you read any informational papers?
3   A.  No.
4   Q.  Did you research anything on the
5 internet?
6   A.  No.
7   Q.  Did you have anyone like your wife
8 research anything on the internet for you?
9   A.  Dr. Craig did.
10   Q.  For preparing for this deposition?
11   A.  No.
12   Q.  Let's turn to your Plaintiff Fact Sheet,
13 Exhibit 3.  If you turn to page 3 of your
14 Plaintiff Fact Sheet.
15   A.  Where it says Confidential?
16   Q.  Yeah.  Just generally have you been
17 married since 1990?
18   A.  Yes.
19   Q.  How old were you when you got married?
20   A.  30.
21   Q.  Do you know your wife's date of birth?
22   A.  I don't remember, no.  It's coming up.
23   Q.  Do you know how old your wife is right
24 now?
25   A.  69.

Page 35

1   Q.  It states here in the address section in
2 the first chart there on page 3 that from 2014 on,
3 you have two addresses.  It seems like you have a
4 Grafton, West Virginia address and a Parish,
5 Florida address.
6      Do you see that?
7   A.  Yes.
8   Q.  Do you live at both locations currently?
9   A.  Yes.
10   Q.  Do you live at any location at any
11 specific part of the year?
12   A.  We go to Florida during the winter
13 months here, then come back and stay the summer
14 here.
15   Q.  So if you could tell me -- there's 365
16 days in a year.  How many days would you say that
17 you spend in West Virginia?
18   A.  I'm going to say seven months.
19   Q.  If I asked you what you would say is
20 your actual home, the place where you want to
21 reside in the future, what would that be?  Would
22 that be West Virginia or Florida?
23   A.  Florida.
24   Q.  Just to clarify, the place that you call
25 home, would that be West Virginia?

Page 36

1   A.  Yes.
2   Q.  Florida is just somewhere you go to
3 vacation basically?
4   A.  No.
5   Q.  You spend about four months a year in
6 Florida?
7      MR. HIGGINS:  I'm going to object.
8 Mischaracterizes the testimony.  I think he
9 probably spends five months a year there.
10 BY MS. RYBICKI:
11   Q.  You can answer.  About how many months a
12 year do you spend in Florida?  You already
13 testified you spend seven months in West Virginia;
14 is that right?
15   A.  Say half and half.  We spend evenly.
16   Q.  For your injuries that you're alleging
17 were caused by Tasigna, where did you receive most
18 of your treatment?  Was that in West Virginia or
19 Florida?
20   A.  West Virginia.
21   Q.  Did you receive any treatment in
22 Florida?
23   A.  Yes.
24   Q.  What percentage of treatment for your
25 Tasigna injuries would you say were treated in

Page 37

1 Florida?
2   A.  I got five stents put in in Florida.
3   Q.  Would that be about 5 percent then?
4   A.  Yes.
5   Q.  So on page 3 of your Plaintiff Fact
6 Sheet, you also list your employer as being
7 Grafton Housing Authority in the years 1989 to
8 2009.
9      Do you see that?
10   A.  Yes.
11   Q.  What kind of work did you perform as a
12 maintenance man?
13   A.  Take out old cabinets, replace with new;
14 replaced refrigerators, stove; work on water
15 leaks; put new siding on the buildings; painted;
16 cleaned; cut grass.
17   Q.  So would you say that your work as a
18 maintenance man for the Grafton Housing Authority
19 in the years 1989 to 2009 were labor intensive?
20   A.  Yes.
21   Q.  They required a lot of physical
22 activity?
23   A.  Yes.
24   Q.  Lifting heavy objects as well?
25   A.  Yes.

Page 38

1   Q.   Did you get paid hourly or salary?
2   A.   Hourly.
3   Q.   Do you remember how much you were paid
4   per hour?
5   A.   12.50.
6   Q.   Do you know how much you made in a year,
7   by any chance?
8   A.   I don't recall.
9   Q.   How many hours a week did you work?
10  A.   40.
11  Q.   And you worked the entire year.  You did
12  not have any breaks in that period between 1989 to
13  2009?
14  A.   Took vacation.
15  Q.   Just vacations.  Okay.  Did you receive
16  any education or training for that job?
17  A.   Yes.  I got educated on furnaces.
18  Q.   Where did you get this education?
19  A.   The Housing Authority supplied it.
20  Q.   Any other education or training for your
21  job?
22  A.   No.
23  Q.   Did you finish high school?
24  A.   Yes.
25  Q.   Which one?

Page 39

1   A.   Grafton.
2   Q.   What about college?
3   A.   No.
4   Q.   Why did you leave your job at Grafton
5   Housing Authority in 2009?
6   A.   I was unable to perform my duties.
7   Q.   Why is that?
8   A.   I was burnt up in a car accident, and my
9   burns was causing a lot of pain and agony.
10  Q.   I recall your car accident taking place
11  in 1990.
12  A.   Yes, ma'am.
13  Q.   So you're saying your burns were still
14  affecting you in 2009?
15  A.   Oh, yes.  They still affect me today.
16  Q.   Have you been employed since 2009?
17  A.   No, ma'am.
18  Q.   Speaking of your accident, I would like
19  to show you -- Exhibit 6 is an article about your
20  asphalt accident.
21       On page 5 of your PFS, you mentioned an
22  incident.  On page 5 of your PFS in letter M, it
23  says, "Have you ever brought a personal injury
24  lawsuit against anyone?"  And you said, "Yes."  Do
25  you see in section M.c. where you list the auto

Page 40

1   accident as the nature of the claim in the
2   lawsuit?
3   A.   Yes.
4   Q.   This is the 1990 car accident that you
5   were referring to; is that right?
6   A.   Yes.
7   Q.   We'll talk about that later.  Let's move
8   on to page 12 of your Plaintiff Fact Sheet.  On
9   page 12, you see a chart that has the word
10  Medication on the left column.
11       Do you see that?
12  A.   Yes.
13  Q.   Do you see where it says that you took
14  Gleevec between 2011 and 2013?
15  A.   Yes.
16  Q.   Do you know that Gleevec sometimes is
17  medically called imatinib?
18  A.   I don't recall.
19  Q.   Then it says that you took SPRYCEL from
20  2018 to the present.
21       Do you see that?
22  A.   Yes.
23  Q.   Are you aware that SPRYCEL is sometimes
24  referred to as dasatinib?
25  A.   Yes.

Page 41

1   Q.   On page 7 in Section 3 where it says
2   "Tasigna Use," it states that you used Tasigna
3   approximately from 2014 to May of 2018.
4       Do you see that?
5   A.   Yes.  Yes, I see it.
6   Q.   Are you aware that Tasigna is sometimes
7   referred to as nilotinib?
8   A.   Yes.
9   Q.   Do you typically refer to this
10  medication a nilotinib or Tasigna?
11  A.   Tasigna.
12  Q.   When we go over medical records in this
13  deposition, I will try to call it Tasigna, but I
14  want you to understand that sometimes the medical
15  records may sometimes say nilotinib.  Is that
16  okay?
17  A.   Yes.
18  Q.   Let's move on Exhibit 4, which would be
19  the March 17, 2011 medical record.  That should be
20  at the very beginning.
21  A.   I see it.
22  Q.   Mr. Menear, do you see in the middle of
23  the page, it says date of service, March 17, 2011?
24  A.   Yes.
25  Q.   You see your name is right there as

Allan Menear

Page 42

1  patient name, Allen Menear?
2      A.  Yes.
3      Q.  I'll bring up this document later.  For
4  now I want to use it to discuss your family
5  history.  Okay?
6      A.  Okay.
7      Q.  Can you please turn to the second page.
8  You see there's a title that says Past Medical
9  History.  Do you see that?
10     A.  Yes.
11     Q.  The past medical history section states,
12  1., hypertension for years, 2., history of gout,
13  3., history of cholelithiasis, 4., back surgery
14  times three, 5., history of skin grafting, 6.,
15  motor vehicle collision with multiple burns, 7.,
16  history of surgical procedures for skin grafting
17  and bone repair, and 8., history of total knee
18  replacement on his right.
19         Do you see that?
20     A.  Yes.
21     Q.  Is that a fair and accurate
22  representation of your medical history as of 2011?
23     A.  Yes.
24     Q.  Then if you go down on that same page,
25  there's a section called Family History.  Do you

Page 43

1  see that?  It's second from the bottom paragraph.
2      A.  Yes, ma'am.
3      Q.  Do you see where it says, "His farther
4  died from metastatic cancer at age 69 in his
5  lung"?
6      A.  Yes.
7      Q.  Is that true?
8      A.  Yes.
9      Q.  Did your father have any other health
10  problems?
11     A.  He got gout.
12     Q.  Did your father have diabetes?
13     A.  No.
14     Q.  Did your father have hypertension?
15     A.  No.
16     Q.  High blood pressure?
17     A.  I don't believe.
18     Q.  Heart disease?
19     A.  No, not to my knowledge.
20     Q.  Did your father have peripheral vascular
21  disease?
22     A.  No.
23     Q.  Next line, it says, "His mother died at
24  age 68 from heart disease."  Do you see that?
25     A.  Yes.

Page 44

1      Q.  Is that true?
2      A.  Yes.
3      Q.  Did she have a heart attack?
4      A.  Yes.
5      Q.  Do you know what led to her heart
6  attack?
7      A.  Blood clot.
8      Q.  Do you know if your mother had any other
9  heart problems?
10     A.  No.
11     Q.  Do you know if she had diabetes?
12     A.  No.
13     Q.  Do you know if she had high blood
14  pressure?
15     A.  I do believe so, yes.
16     Q.  What about heart disease?
17     A.  Not to my knowledge, no.
18     Q.  What about peripheral vascular disease?
19     A.  No.
20     Q.  Now, the next line in that section says,
21  "He has a half brother with coronary disease."  Do
22  you see that?
23     A.  No.  I don't see where...
24     Q.  It's in the family history section right
25  after the sentence about your mother that we just

Page 45

1  read.  It says, "He has a half brother with
2  coronary disease."
3      A.  Yes, I see it.
4      Q.  Is that true?
5      A.  Yes.
6      Q.  Which side is this brother from, your
7  mother's or your father's?
8      A.  My mom.
9      Q.  Is your half brother related to you by
10  blood?
11     A.  Yes.
12     Q.  Is he still suffering from coronary
13  artery disease?
14     A.  He still has it, yes.
15     Q.  Do you know what his symptoms are?
16     A.  I believe his heart will jump time, race
17  on him.
18     Q.  Do you know if he has any other health
19  problems?
20     A.  I don't believe he does.
21     Q.  In the last sentence there, it says, "He
22  has a full sister with diabetes mellitus."
23         Do you see that?
24     A.  Yes.
25     Q.  Is that true?

Allan Menear

Page 46

1    A.   Yes.
2    Q.   Is your sister still alive today?
3    A.   Yes, ma'am.
4    Q.   Does she have vascular problems in her
5    extremities?
6    A.   I don't believe so, no.
7    Q.   Do you know if your sister has any heart
8    problems?
9    A.   No.
10   Q.   Does she have high blood pressure?
11   A.   Yes.
12   Q.   Let's move on to our next exhibit,
13   Exhibit 5.  This would be the March 1, 2016
14   genetic testing.  Do you see where in the upper
15   right-hand section it says X-Gene Diagnostics?
16   A.   Okay.
17   Q.   Do you see that?
18   A.   Yes.
19   Q.   And this is entitled Abbreviated Cardiac
20   Health Profile.
21        Do you see that?
22   A.   Yeah.
23   Q.   It says that it's created for Allen
24   Menear.  Is that right?
25   A.   That's what it says.

Page 47

1    Q.   That's you; right?
2    A.   Yes.
3    Q.   Did Dr. Sedillo order this test for you?
4    A.   I believe so.
5    Q.   Dr. Sedillo is your cardiologist?
6    A.   No.  I believe he's the doctor I seen
7    down Florida.
8    Q.   What type of doctor is he?
9    A.   Vascular.
10   Q.   Do you remember why he ordered this test
11   for you?
12   A.   I had blockage in my legs.
13   Q.   Do you remember taking this test?
14   A.   Yes.
15   Q.   Let's go to page 4.  Do you see at the
16   bottom towards the center actually says coronary
17   artery disease?
18   A.   Yes.
19   Q.   Under that section it says,
20   "Significantly increased risk of coronary artery
21   disease."
22        Do you see that?
23   A.   Yes.
24   Q.   And then right below that where it says
25   "The risk of early onset," do you see that?

Page 48

1    A.   Yes.
2    Q.   I'm going to read it to you.  It says,
3    "The risk of early onset of coronary artery
4    disease is doubled as compared to the noncarriers
5    in patients with this genotype.  Additionally, the
6    risk of abdominal aortic aneurysm is increased by
7    70 percent, and the risk of coronary heard disease
8    is increased by 60 percent as compared to the
9    noncarriers."
10        Do you see that?
11   A.   Yes.
12   Q.   Did Dr. Sedillo go over these results
13   with you?
14   A.   Not that I believe.
15   Q.   Did he tell you your genetic makeup left
16   you at 70 percent greater risk for abdominal
17   aortic aneurysm?
18   A.   No.
19   Q.   Did he tell you that your genetic makeup
20   left you at 60 percent greater risk of heart
21   disease?
22   A.   No.
23   Q.   What did Dr. Sedillo tell you as a
24   result of this genetic test?
25   A.   Not much.  I don't recall any of this.

Page 49

1    Q.   Dr. Sedillo didn't relate your mother's
2    passing to your genetic testing, by any chance?
3    A.   Was she gone by then?  She was still
4    living.
5    Q.   What about your mother's heart disease?
6    A.   He possibly could have said something.
7    Q.   Does your genetic testing clarify
8    anything for you about your heart disease or
9    peripheral vascular disease?
10   A.   Not that I remember.
11   Q.   Let's turn to Exhibit 6, which is the
12   article about the asphalt incident.  I'm going to
13   read the first paragraph of that article.  Do you
14   see that it's entitled Asphalt Trap?
15   A.   Yes.
16   Q.   Do you see it says Story?  At the bottom
17   it starts with Story?
18   A.   Yes.
19   Q.   I'm going to read that first paragraph
20   to you to kind of refresh your recollection.  Then
21   I'm going to ask you some questions about the 1990
22   accident.
23        It says here, "On the morning of
24   April 23, 1990, outside of Grafton, West Virginia,
25   many Department of Highway trucks were out in

Allan Menear

Page 50

1 force to repair potholes and other road damage
2 left by winter weather. 30-year-old Allen Menear
3 and fiance, Dawn Keener, were westbound on U.S.
4 Route 50 that day taking their dog, Dana, to the
5 groomers not knowing that this drive would change
6 their lives forever."
7      Do you see that?
8   A.  Yes.
9   Q.  Does that sound right about your
10 accident?
11   A.  Yes.
12   Q.  Can you just tell us generally about
13 your car accident, what happened?
14   A.  They was coming around a curve, and we
15 was in the curve, and he ran off the berm and
16 jerked his truck back, and he started hopping up
17 the road and hit my car and busted the front
18 windshield out, and all the asphalt poured in on
19 me, me and my wife.
20   Q.  Do you remember when this took place?
21   A.  April 23.
22   Q.  Did you require surgery to fix your
23 injuries?
24   A.  Plenty of them, many.
25   Q.  Do you remember which type of surgeries?

Page 51

1   A.  Skin grafts.
2   Q.  Anything else?
3   A.  Total knee rebuild.
4   Q.  Anything else?
5   A.  I believe that's it.
6   Q.  The skin graft, which leg was that
7 performed on?
8   A.  The right leg.
9   Q.  Not the left?
10   A.  No.
11   Q.  What about the -- you said the knee
12 replacement; right?  Which knee was replaced?
13   A.  My right knee was burnt clear to the
14 bone.
15   Q.  Did you have damage to muscle in both
16 legs?
17   A.  No, just the right leg.
18   Q.  What about damage to the bone, which
19 leg?
20   A.  Right leg.
21   Q.  What about damage to the veins, which
22 leg?
23   A.  Right leg.
24   Q.  Did you have any vascular procedures, do
25 you remember?

Page 52

1   A.  No.
2   Q.  Would you say that the damage was more
3 severe in your right leg?
4   A.  Oh, yes.
5   Q.  Is it true that at some point you
6 discussed amputation with your doctor?
7   A.  Yes.
8   Q.  Was that for your right leg?
9   A.  Yes.
10   Q.  Why was that considered an option?
11   A.  They didn't believe they could save my
12 leg, and I told them I didn't want an amputation.
13   Q.  You got plastic surgery; right?
14   A.  Yes.
15   Q.  Do you have any medical records for any
16 of the procedures that we just discussed?
17   A.  I'm not really sure.
18   Q.  Did you try to get those records, by any
19 chance?
20   A.  Yes.
21   Q.  What did you do to try to get those
22 records?
23   A.  Our lawyers got all the records.
24   Q.  Did you see any of them, the records?
25   A.  Yes.

Page 53

1   Q.  Do your lawyers have the records?
2   A.  No.  I believe we do.
3   Q.  If you have the records about your
4 1990 -- specifically your medical records
5 pertaining to your 1990 accident, we would like
6 those records.
7      MR. HIGGINS:  Noted.
8 BY MS. RYBICKI:
9   Q.  I'll note for the record counsel can
10 introduce those.  You can just give those to your
11 attorneys and they can hand those over to us.
12      How long did it take you to recover from
13 this incident?
14   A.  A year and a half.
15   Q.  Did you ever regain full use of both of
16 your legs?
17   A.  Not full use, no.
18   Q.  How were you limited after the accident?
19   A.  My knee.
20   Q.  Can you explain how you were limited
21 with your knee?
22   A.  I couldn't straighten it or bend it as
23 much as I should.
24   Q.  So you weren't able to do squats, for
25 example?

Allan Menear

Page 54

1    A.  No.  Wasn't supposed to do squats or
2  anything like that.
3    Q.  As for everyday activities, can you tell
4  me what limitations you had because of your
5  injuries?
6    A.  I had to watch banging my leg because
7  since it was burnt, my skin was so soft, if I just
8  touched it, I would get a cut.  And I didn't have
9  much feeling.  A lot of times I'd bleed large
10 amounts.
11   Q.  What about things like going up the
12 stairs, were you able to do that?
13   A.  Not at first.
14   Q.  How long did it take you to be able to
15 walk up the stairs?
16   A.  Probably two years.
17   Q.  But ultimately since that incident, were
18 you able to walk again and do all your normal
19 physical activities?
20   A.  I wouldn't say all.  Yeah, I could walk
21 again.
22   Q.  When you say you wouldn't say all, what
23 things weren't you able to do?
24   A.  I couldn't get down on my knee.  I
25 couldn't put any weight on my knee.

Page 55

1    Q.  Did you take pain medications during
2  your treatment?
3    A.  Yes.
4    Q.  Do you remember which ones?
5    A.  Percocets.
6    Q.  How long did you take Percocet?
7    A.  Six months.
8    Q.  Did you take oxycodone?
9    A.  Yes.
10   Q.  For how long?
11   A.  Four months.
12   Q.  Did you take any other medications?
13   A.  No.
14   Q.  Did you ever become addicted to any of
15 the medication you took?
16   A.  No.
17   Q.  Were you able to work again after the
18 incident?
19   A.  Yes.
20   Q.  Where did you work?
21   A.  Grafton Housing Authority.
22   Q.  Just to make sure the record is clear,
23 you did not work anywhere else other than the
24 Grafton Housing Authority between 1989 and 2009?
25   A.  Correct.

Page 56

1    Q.  Let's move to Exhibit 7, which would be
2  an April 16, 2012 record.  Would be uncomfortable
3  2 probably?
4        MR. HIGGINS:  4/16?
5        MS. RYBICKI:  Yeah, 4/16/12.
6  BY MS. RYBICKI:
7    Q.  In the middle of the page there, do you
8  see where it says West Virginia University
9  Hospitals?
10   A.  Yes, ma'am.
11   Q.  So is it fair to say this is a record
12 from West Virginia University Hospital?
13   A.  Yes.
14   Q.  On the left-hand corner, do you see that
15 it's dated April 17, 2012?
16   A.  Yes.
17   Q.  Do you see your name is there as Allen
18 Menear?
19   A.  Yes.
20   Q.  Under that, do you see where it says
21 Chief Complaint:  Pain in joints?
22   A.  Yes.
23   Q.  Right below that it says HPI.
24       Do you see that?
25   A.  Yes.

Page 57

1    Q.  I'll represent to you that HPI stands
2  for history of present illness.  It says here,
3  "White male who presents with painful elbows,
4  knees and ankles."
5        Do you see that?
6    A.  Yes.
7    Q.  This pain that you had, did you have
8  this pain when walking, when at rest or both?
9    A.  Both.
10   Q.  A little further on, it says, "Over the
11 past two days, pain has worsened.  He was unable
12 to walk.  Pain uncontrolled with hydrocodone.
13 Pain currently 10 out of 10 and sharp."
14       Do you see that?
15   A.  Yes.
16   Q.  So in April of 2012, you described your
17 pain as 10 out of 10; is that right?
18   A.  Yes.
19   Q.  You were not able to walk?
20   A.  No.
21   Q.  This pain was in both of your legs;
22 right?
23   A.  Yes.
24   Q.  And more specifically your left knee and
25 your left ankle?  That's okay if you don't

Allan McNear

Page 58

1  remember.
2      A.  I don't remember.
3      Q.  We can go back to that HPI section, line
4  2 where it says, "Joints involved include left
5  knee, left ankle and both elbows."
6          Do you see that?
7      A.  Yes.
8      Q.  Is it fair to say that you had 10 out of
9  10 pain in your left knee and your left ankle?
10     A.  Yes.
11     Q.  If you go down to the section where it
12 says Past Medical, do you see that?
13     A.  Yes.
14     Q.  The fourth bullet point says gout.
15     A.  Yes.
16     Q.  Do you know what gout is?
17     A.  Yes.
18     Q.  What is gout?
19     A.  It's a form of arthritis.  And that's
20 what I had, was causing my pain in my joints.
21     Q.  When did you first experience gout?
22     A.  1994.
23     Q.  How severe was your gout in 1994?
24     A.  Second worst pain I ever had.
25     Q.  What was your first worst pain?  I think

Page 59

1  I know what it is, but tell me anyway.
2      A.  My burns.
3      Q.  Your gout was where in 1994?
4      A.  In my ankles.
5      Q.  So is it fair to say that you've had
6  gout from 1994 to the date of this record, which
7  is 2012?
8      A.  Yeah.
9      Q.  Is that a "yes"?
10     A.  Yes.
11     Q.  Do you have gout today?
12     A.  No, ma'am.
13     Q.  So did you ever see a doctor for your
14 gout?
15     A.  Yes.
16     Q.  Which doctor?
17     A.  I don't remember.
18     Q.  So it's fair to say you've seen a doctor
19 for your gout?
20     A.  Yes.
21     Q.  Have you seen more than one doctor?
22     A.  Yes.
23     Q.  You've seen these doctors from 1994 on?
24     A.  Yes.
25     Q.  Were you told to alter your lifestyle in

Page 60

1  any way for your gout, by any chance?
2      A.  Yes.
3      Q.  What were these life alteration?
4      A.  Don't eat rich foods, steaks, shrimp,
5  lobster.
6      Q.  All the good stuff.
7      A.  All the good stuff, yeah.
8      Q.  Stay away from the good stuff is what
9  the doctors say.  Anything else the doctors tell
10 you to alter your lifestyle?
11     A.  Don't drink beer.
12     Q.  Still with the good stuff.
13     A.  Yeah.
14     Q.  Anything else do you remember?
15     A.  That's it.
16     Q.  If you go back to that HPI section, in
17 the fourth line, there's a sentence that says,
18 "Normally flares respond to colchicine until he
19 developed diarrhea.  Symptoms did not improve."
20         So you is it fair to say that colchicine
21 was your gout medication?
22     A.  Yes.
23     Q.  Is it fair to say that you took your
24 gout medication, but you still had this 10 out of
25 10 pain in your left knee and your left ankle?

Page 61

1      A.  Occasionally, yes.
2      Q.  So sometimes the medicine would work and
3  sometimes it wouldn't?
4      A.  Yes.
5      Q.  If you go to page 2 where it says
6  Medications Prior to Admission, do you see that?
7      A.  What was it again?
8      Q.  Medications Prior to Admission.
9      A.  Yes.
10     Q.  You see there's a list of medications
11 that you were taking before you were admitted in
12 April 2012.  Do you see that?
13     A.  Yes.
14     Q.  Let's quickly go through those
15 medications so that we can figure out what you
16 were taking at the time.  Do you see where it says
17 oxycodone?
18     A.  Yes.
19     Q.  That's a pain medication; right?
20     A.  Yes.
21     Q.  What were you taking that for?
22     A.  The gout.
23     Q.  Anything else?
24     A.  Advil.
25     Q.  No.  I'm just saying did you take

Allan McNear

---

Page 62

1  oxycodone for any other reason?
2      A.  No.
3      Q.  Do you remember when you started taking
4  oxycodone?
5      A.  Right after the car accident when I come
6  home.
7      Q.  You started taking oxycodone for your
8  car accident in 1990 and you continued taking it
9  because your gout developed; is that right?
10     A.  Yes.
11     Q.  How often did you take it?
12     A.  Maybe every other day.
13     Q.  Then the next drug is Meloxicam.  Do you
14  see that?
15     A.  Yes.
16     Q.  Do you know what this drug is?  If I
17  told you that it was an anti-inflammatory
18  medication used to treat things like arthritis,
19  would that sound right?
20     A.  Yes.
21     Q.  Why were you on anti-inflammatories?
22     A.  Because they thought I had arthritis in
23  my joints.
24     Q.  Did you experience arthritis in your
25  joints?

---

Page 63

1      A.  Yes.
2      Q.  Did you take these anti-inflammatories
3  for your gout as well?
4      A.  Yes.
5      Q.  And were you having leg pain at the
6  time?
7      A.  Yes.
8      Q.  So you were taking this
9  anti-inflammatory for leg pain?
10     A.  Yes.
11     Q.  That would be leg pain in both of your
12  legs; right?
13     A.  Oh, yes.
14     Q.  Again, we're talking about 2012 right
15  now.  You realize that; right?
16     A.  Yes.
17     Q.  The next drug is tramadol.  Do you see
18  that?
19     A.  Yes.
20     Q.  This is another opioid pain medication;
21  right?
22     A.  Yes, I believe it is.
23     Q.  You agree this is a pain medication;
24  right?
25     A.  Yes.

---

Page 64

1      Q.  And this is also for your leg pain?
2      A.  Yes.
3      Q.  Both legs; right?
4      A.  Yes.
5      Q.  Do you remember when you started using
6  this drug?
7      A.  Probably 1991.
8      Q.  Do you know how often you took it?
9      A.  Maybe once a day.
10     Q.  Let's go down to the next drug.  It is
11  called diclofenac sodium.  Do you see that?
12     A.  Yes.
13     Q.  I believe this is a cream for arthritis.
14  Do you think that's right?
15     A.  Yeah.
16     Q.  Do you remember what you used this for?
17     A.  For arthritis.  It didn't work.  I
18  didn't use it.
19     Q.  But it was prescribed for you for both
20  legs?
21     A.  Yeah.
22     Q.  And your gout?
23     A.  And my arms.
24     Q.  Arms and legs?
25     A.  Yeah, and my elbows.

---

Page 65

1      Q.  What about the next drug, which is
2  furosemide.  Do you see that?  If I represented to
3  you this was a diuretic medication used to treat
4  fluid buildup due to heart failure and kidney
5  disease and high blood pressure, does that sound
6  right?
7      A.  Yes.
8      Q.  Do you know why you were taking this?
9      A.  I believe I had high blood pressure.
10     Q.  So you were diagnosed with high blood
11  pressure at this point?
12     A.  Yes.
13     Q.  Do you remember specifically when you
14  were diagnosed with high blood pressure?  This
15  record is from 2012, but it seems you might have
16  been diagnosed with high blood pressure earlier.
17     A.  Oh, yeah.  Probably 1996.
18     Q.  Do you remember who diagnosed you?
19     A.  Dr. Malone I believe.
20     Q.  You trusted Dr. Malone that this
21  condition needed to be treated; right?
22     A.  Yes.
23     Q.  You trusted Dr. Malone that this
24  medication was the best treatment for your high
25  blood pressure; right?

---

Allan McNear

Page 66

1    A.   That's what I was told.
2    Q.   The next drug is indomethacin.  Do you
3 see that this is also an anti-inflammatory; right?
4    A.   Yes.
5    Q.   Is it fair to say you were taking this
6 for your gout and leg pain as well?
7    A.   I can't recall.
8    Q.   That's okay.  There's a lot here.  I
9 don't expect you to remember everything.  Let's
10 move on to the next one.  Duloxetine, do you see
11 that?
12   A.   Yes.
13   Q.   I think it's also known as Cymbalta.
14   A.   Yes.
15   Q.   That's for depression; right?
16   A.   They gave it to me for, yeah,
17 depression.
18   Q.   Was your car accident the reason for
19 your depression?
20   A.   Yes.
21   Q.   Did your depression start right after
22 your car accident?
23   A.   Yes, ma'am.
24   Q.   How did you feel?
25   A.   Less of a man.

Page 67

1    Q.   Who diagnosed you with depression, do
2 you recall?
3    A.   Dr. Malone.
4    Q.   Would you say that your depression
5 continued on from 1990?
6    A.   I take it today.
7    Q.   Between 1990 and now, you were taking
8 Cymbalta for depression?
9    A.   Yes, ma'am.
10   Q.   The next drug is atenolol.  Do you see
11 that?
12   A.   Yes.
13   Q.   This is for hypertension?
14   A.   Yes.
15   Q.   You know hypertension is high blood
16 pressure; right?
17   A.   Yes.
18   Q.   So is it fair to say you were taking
19 this for your high blood pressure?
20   A.   Still do.
21   Q.   Do you remember when you started taking
22 that?  Do you think it was the same time as you
23 started taking your other drug for high blood
24 pressure in 1996?
25   A.   Yes.

Page 68

1    Q.   The next drug is Febuxostat.  Do you see
2 that?
3    A.   Yes, ma'am.
4    Q.   My understanding is this is a gout
5 medication.  Would you agree with that?
6    A.   Yes.
7    Q.   We've already covered your gout
8 problems.  But it's is it fair to say you were
9 taking this for your gout?
10   A.   When they started me on this, I never
11 had a bout with gout ever again.
12   Q.   So Febuxostat actually works for you?
13   A.   Yes.
14   Q.   When did you start taking it?
15   A.   '96.
16   Q.   Do you still take it?
17   A.   Yes.
18   Q.   Have you ever stopped taking it for any
19 reason?
20   A.   No.
21   Q.   How often do you take it?
22   A.   Once a day.
23   Q.   But not today.  You forgot your morning
24 pills; right?
25   A.   Well, I take it in the evening.

Page 69

1    Q.   Don't forget that.  So the next drug is
2 Colchicine which we discussed briefly earlier.  I
3 think this is the gout medication; right?
4    A.   Yes.
5    Q.   Did you also start taking that in 1996?
6    A.   Yes.
7    Q.   Do you still take it now?
8    A.   Yes, ma'am.
9    Q.   The next drug is rosuvastatin.  Do you
10 see that?
11   A.   Yes.
12   Q.   It also goes by Crestor; right?
13   A.   Yes.
14   Q.   Were you taking this for hyperlipidemia?
15   A.   Yes.
16   Q.   Do you remember when you were diagnosed
17 with hyperlipidemia?
18   A.   Probably '92, right after the accident.
19   Q.   Do you remember who diagnosed you?
20   A.   Dr. Malone.
21   Q.   The next drug is pregabalin.  Do you see
22 that?
23   A.   Yes.
24   Q.   Also goes by Lyrica; right?
25   A.   I don't remember.  I don't know.

Allan McHear

Page 70

1   Q.   If you look at the third one from the
2   bottom, where it says pregabalin, in parentheses
3   it says Lyrica.  Do you see that?
4   A.   Lyrica, yes.  I still take it.
5   Q.   What is that for?
6   A.   Nerves.
7   Q.   Can you give me a little bit more than
8   the nerves?  Explain that to me, please.
9   A.   It's supposed to help calm down my
10  nerves because I have tingling in my legs from the
11  accident.
12  Q.   When did you start taking it?
13  A.   '91.
14  Q.   Are you taking it every day -- have you
15  taken it consistently until today?
16  A.   Yes.
17  Q.   Is that because you had tingling in your
18  legs this entire time?
19  A.   Yes.
20  Q.   Do you know who prescribed this to you?
21  A.   Dr. Malone.
22  Q.   We're getting there.  We're almost
23  there.  Second to last one is zolpidem also known
24  as Ambien.  Do you see that?
25  A.   Yes.

Page 71

1   Q.   Is Ambien a sleeping pill?
2   A.   Yes.
3   Q.   Do you have trouble sleeping?
4   A.   Yes.
5   Q.   Is it fair to say you've had trouble
6   sleeping from the date of your accident in 1990
7   until today?
8   A.   Mostly it was when they told me I had
9   cancer.
10  Q.   Did you take Ambien in 1990 after your
11  accident?
12  A.   Yes.
13  Q.   And when did you stop taking it?
14  A.   I'm still taking it.
15  Q.   You've been taking it this entire time,
16  from 1990 to the present?
17  A.   Yes.
18  Q.   You just said you experienced difficulty
19  sleeping more because of your cancer diagnosis.
20  A.   Yes.
21  Q.   Have you experienced stress between 1990
22  and the present?
23  A.   Yes.
24  Q.   Have you experienced anxiety
25  consistently between 1990 and the present?

Page 72

1   A.   What do you mean by consistent?
2   Q.   That it didn't stop, meaning it was
3   always there.
4   A.   Yes.
5   Q.   So between 1990 and the present, you
6   always had anxiety?
7   A.   Yes.
8   Q.   Same thing about stress?
9   A.   Yes.
10  Q.   The same thing about the trouble
11  sleeping?
12  A.   Yes.
13  Q.   What about your depression?  I know you
14  mentioned that earlier, too.
15  A.   Yes.
16  Q.   Also consistent?
17  A.   Yeah.
18  Q.   The very last drug here is imatinib,
19  which is known as Gleevec.  We briefly discussed
20  that.  You know that's your cancer drug at this
21  point?
22  A.   Yeah.
23  Q.   So if we go to page 5, do you see the
24  Assessment/Plan section?  It's the second to last
25  page right in the center you should see

Page 73

1   Assessment/Plan.
2   A.   Yes.
3   Q.   Do you see where it says your primary
4   problem was a gout attack?
5   A.   Yes.
6   Q.   Then you had uncontrolled pain?
7   A.   Yes.
8   Q.   And DVT which is deep venous thrombosis?
9   A.   Yes.
10  Q.   And muscle pain?
11  A.   Yes.
12  Q.   So you were diagnosed with DVT here in
13  April of 2012; right?
14  A.   Yes.
15  Q.   If you go down another section, it says
16  DVT.  Let me know if you see that.
17  A.   Yes.
18  Q.   It says, "Recannulated.  Will treat with
19  Lovenox, known malignancy."  Do you see that?
20  A.   Yes.
21  Q.   It says, "Await surgical options prior
22  to starting warfarin."  Do you see that?
23  A.   Yes.
24  Q.   Do you know what Lovenox is?
25  A.   Lovenox, no, I don't.

Allan McNear

Page 74

1    Q.   If I said it's a blood thinner, would
2 that sound right?
3    A.   Yes.
4    Q.   If I said warfarin is a blood thinner as
5 well, would that sound right?
6    A.   Yes.
7    Q.   Did you trust your doctor at the time
8 that your DVT needed to be treated with these
9 medications?
10    A.   Yes.
11    Q.   Exhibit 8 would be the April 19, 2012
12 West Virginia University discharge summary.  Just
13 take a second to look at that document.  This is a
14 discharge summary; right?
15    A.   Yes.
16    Q.   It shows you stayed in the hospital from
17 April 16 until April 19, 2012; right?
18    A.   Yes.
19    Q.   Do you remember this visit was for pain
20 in your left leg?
21    A.   No.  I don't remember.
22    Q.   Let's take a look at the reason for
23 hospitalization and hospital course.  The second
24 sentence says, "On admission a LE duplex was
25 performed for swelling and a DVT was found."

Page 75

1         Do you see that?
2    A.   Yes.
3    Q.   Does this refresh your recollection that
4 this was for leg pain?
5    A.   Yes.
6    Q.   A little further down, it says you were
7 discharged on day three.  "Nutritionist was
8 consulted and spoke with patient about dietary
9 changes for both Coumadin therapy and a low uric
10 acid diet."
11         Do you see that?
12    A.   Yeah, I see it.
13    Q.   Do you remember a nutritionist speaking
14 to you about dietary changes?
15    A.   I don't remember.
16    Q.   Then it also says, "Patient will discuss
17 the need for long-term treatment with Coumadin
18 beyond the six-month point with his PCP and
19 oncologist, Dr. Craig."
20         Do you see that?
21    A.   Yes.
22    Q.   Coumadin is a blood thinner; right?
23    A.   Yes.
24    Q.   You needed that to prevent more clots?
25    A.   Yes.

Page 76

1    Q.   You were on Coumadin long term after
2 this; right?
3    A.   Yes.
4    Q.   Right below there it says Condition on
5 Discharge.  Do you see that section?
6    A.   Yes, ma'am.
7    Q.   Do you see it says, "Ambulation is full
8 with cane"?
9    A.   Yes.
10    Q.   So you needed a cane after this event?
11    A.   Yes.
12    Q.   Had you needed a cane prior to this
13 event?
14    A.   I don't think so, no.
15    Q.   So you needed a cane because of your DVT
16 and gout in your left leg; right?
17    A.   Yes.
18    Q.   Let's move on to the next exhibit.  It
19 would be the May 10, 2012 West Virginia University
20 record.  Just to make sure there's two May 10,
21 2012 records.  We're looking at the one that's the
22 West Virginia University discharge.
23         If you look at the top there, it says
24 West Virginia University Hospitals Discharge
25 Summary.  Do you see that?

Page 77

1    A.   Um-hum.
2    Q.   This is another discharge summary;
3 right?
4    A.   Yes.
5    Q.   This is an admission date of May 7, 2012
6 and a discharge date of May 10, 2012; right?
7    A.   Yes.
8    Q.   This is less than a month after the last
9 record we just talked about; right?
10    A.   Yes.
11    Q.   This was another three to four-day
12 hospital stay?
13    A.   Yes.
14    Q.   Quickly let's look at the discharge
15 medications below.  Do you see that section?
16    A.   Yes.
17    Q.   I'm going to list them real quick you
18 and tell me if they show up there.  Allopurinol?
19    A.   Yes.
20    Q.   Do you see colchicine?
21    A.   Yes.
22    Q.   Do you see prednisone?
23    A.   Yes.
24    Q.   Warfarin?
25    A.   I don't remember.

Page 78

1  Q.  So you don't remember warfarin?
2  A.  No.
3       MR. HIGGINS:  Is it listed on the
4  document?
5       MS. RYBICKI:  Very top of that page.
6       THE WITNESS:  I don't see it.
7  BY MS. RYBICKI:
8  Q.  Right here (indicating).
9  A.  That's not the top of the page.
10  Q.  Warfarin is a blood thinner for DVT;
11  right?
12  A.  Yes.
13  Q.  You're saying you're not sure if you
14  were taking it at the time?
15  A.  Not sure.
16  Q.  But that's what the record says that you
17  were taking.
18  A.  Yes.
19  Q.  Oxycodone, were you taking it at the
20  time?
21  A.  Yes.
22  Q.  Enoxaparin, were you taking that at the
23  time?
24  A.  Yes.
25  Q.  What about Voltaren?

Page 79

1  A.  No.  I wasn't taking that.  That's a
2  cream.
3  Q.  We discussed that wasn't working for
4  you, so you weren't taking it.
5  A.  No.
6  Q.  But it was prescribed to you for your --
7  A.  Yes.
8  Q.  Cymbalta, were you taking that at the
9  time?
10  A.  Yes.
11  Q.  What about Tinorman?
12  A.  Yes.
13  Q.  You were taking Tinorman for your
14  hypertension, chest pain?
15  A.  Yes.
16  Q.  Crestor, were you taking that?
17  A.  Yes.
18  Q.  And Lyrica, were you taking that?
19  A.  Yes.
20  Q.  Then Ambien and Gleevec, you were taking
21  those, too; right?
22  A.  Yes.
23  Q.  This list shows more than ten different
24  medications you were on to treat different various
25  conditions; right?

Page 80

1  A.  Yes.
2  Q.  Did your doctors explain to you why you
3  needed each one?
4  A.  No, he didn't.
5  Q.  Would that be mostly Dr. Malone then?
6  A.  Yes.
7  Q.  But did Dr. Malone explain to you what
8  the purpose at least most of these drugs was?
9  A.  Yes.
10  Q.  And did you trust Dr. Malone to make
11  that judgment?
12  A.  Yes.
13  Q.  Is that because Dr. Malone is a medical
14  professional who is trained and you trust him to
15  make such decisions?
16  A.  Yes.
17  Q.  Do you always follow your doctor's
18  advice?
19  A.  Yes, ma'am.
20  Q.  If you go to page 3, the reason for
21  hospitalization there, do you see it, the reason
22  for hospitalization section?
23  A.  Okay.
24  Q.  You see where it says, "This is a
25  51-year-old male with CML and recurrent gout who

Page 81

1  was admitted to be evaluated for gout versus
2  septic joint."
3       Do you see that?
4  A.  Yes.
5  Q.  That's why you were there, for your
6  continual recurrent gout and your septic joints?
7  A.  Yes.
8  Q.  You see where are it says "Ambulation
9  with crutches" again?
10  A.  Yes.
11  Q.  Do you remember how long you needed
12  crutches after this specific incident?
13  A.  A week.
14  Q.  So these last few records we saw were
15  from April and May of 2012; right?
16  A.  Yes.
17  Q.  And they showed that you were
18  hospitalized twice in that timeframe for your leg,
19  pain in your leg?
20  A.  Yes.
21  Q.  Specifically this was your left leg?
22  A.  No.  Both legs.
23  Q.  It's fair to say you had gout and DVT in
24  both of your legs?
25  A.  Yes.

Page 82

1    Q.  Let's go to the next exhibit,
2  Exhibit 10, which is the other May 10, 2012 record
3  from West Virginia University Hospitals.  This is
4  the one about elevated blood sugar.
5         MS. RYBICKI:  Do you see that,
6  Mr. Higgins?
7         MR. HIGGINS:  Here it is.
8  BY MS. RYBICKI:
9    Q.  Can you please take a look at the very
10  bottom of that page.  It says Date of Service:
11  5/10/2012.  It should be in the center there, Date
12  of Service, very bottom, Date of Service.
13    A.  Yes.
14    Q.  It also says Night Float Cross Coverage
15  Update; right?
16    A.  Yes.
17    Q.  If you go to the next page, at the top
18  it says, "Called by nurse.  Patient has elevated
19  blood sugar.  Is on prednisone and IV D5.  Started
20  sliding scale insulin, but family refused."
21       Do you see that?
22    A.  Yes.
23    Q.  Had you not been diagnosed with diabetes
24  at this point?
25    A.  No.  Nobody has he ever told me.

Page 83

1    Q.  Have you ever been diagnosed with
2  diabetes?
3    A.  No.
4    Q.  You weren't diagnosed with diabetes in
5  like 2017?
6    A.  That's when I had my leg amputation and
7  they stuck me -- I was in a lot of pain.  So they
8  said, yes, it probably would cause my finger stick
9  to be high.  That was the only thing I was told.
10    Q.  So the only time you were told about
11  diabetes is when you had your leg amputated, is
12  what you're saying?
13    A.  I didn't have diabetes.  Yes.
14    Q.  Has Dr. Evans ever spoken to you about
15  elevated glucose levels?
16    A.  Dr. Evans I don't remember.
17    Q.  Let me rephrase.  Has the doctor ever
18  spoken to you about your elevated glucose levels?
19    A.  No.
20    Q.  Let's go to the next exhibit,
21  Exhibit 11, which is the July 25, 2014 record.
22  Mr. Menear, do you see the date of service on top
23  as being July 25, 2014?
24    A.  Yes.
25    Q.  This is a record from the West Virginia

Page 84

1  University Medicine?
2    A.  Yes.
3    Q.  That's your name there; right?
4    A.  Yes, ma'am.
5    Q.  Do you see under chief complaint it says
6  syncope?
7    A.  Yeah.
8    Q.  Do you see where it says syncope?
9    A.  Yes.
10    Q.  Do you know what syncope mean?
11    A.  No, ma'am.
12    Q.  I'll represent syncope means fainting.
13  Does this refresh your recollection about you
14  having an episode of fainting in July of 2014?
15    A.  I don't recall.
16    Q.  Let's see if this will refresh your
17  recollection.  Do you see the HPI section?
18    A.  Yes.
19    Q.  You're going to become an expert at
20  reviewing medical records after this exercise.  If
21  you look at the HPI section, it says here, the
22  second line, "The patient was driving this morning
23  when he began to feel dizzy and extremely cold.
24  He also began to experience double vision, a
25  fever, chills and a headache.  The patient had

Page 85

1  chest pressure that he describes as punched in the
2  heart with shortness of breath.  He decided to
3  pull over and lay down.  He denies losing
4  consciousness.  The patient later developed nausea
5  and one episode of vomiting.  He also developed
6  tingling in his fingertips."
7         Does this help refresh your recollection
8  of what happened on July 25, 2014?
9    A.  Yes.
10    Q.  Can you explain to me the feeling in
11  your chest?
12    A.  Like somebody was taking a nail and
13  driving it in me.
14    Q.  Have you ever experienced something like
15  that before July of 2014?
16    A.  No.
17    Q.  It says that you pulled over and laid
18  down.  You didn't actually faint, did you?
19    A.  I don't believe so.
20    Q.  Do you remember if an ambulance took you
21  to the hospital?
22    A.  I don't remember that.
23    Q.  If I told you you were discharged from
24  the hospital a few days later, on July 29, would
25  that sound right?

Allan McNear

Page 86

1    A.  I don't remember.
2    Q.  Do you remember how long the hospital
3  stay was?
4    A.  No.
5    Q.  If I told you you were diagnosed with
6  pneumonia during this stay, does that sound right?
7    A.  I don't remember.
8    Q.  We're going to go back to Exhibit 4 now,
9  which is the March 17, 2011 record.  I would like
10 to bring us back to the time when your CML was
11 first diagnosed.  Do you understand what CML is?
12   A.  EML?
13   Q.  CML.
14   A.  Yeah, cancer, leukemia.
15   Q.  Is it fair to say that it's the chronic
16 myelogenous leukemia that you were diagnosed with?
17   A.  Yes.
18   Q.  Let's look at this record.  Do you see
19 that Date of Service says March 7, 2011?
20   A.  Yes.
21   Q.  Do you see Dr. Craig is your doctor?
22   A.  Yes.
23   Q.  In the history of present illness
24 section, it says, "The patient, his wife and
25 daughters were at the cancer center today to be

Page 87

1  evaluated.  He presented to see Dr. Malone, his
2  regular doctor, earlier this week, and he was at
3  that time found to have symptoms of fatigue and
4  night sweats."
5        Does that refresh your recollection
6  about what happened at your visit?
7    A.  Yes.
8    Q.  So you were experiencing fatigue and
9  night sweats before you were diagnosed with CML?
10   A.  Yes.
11   Q.  What other initial symptoms did you have
12 of CML?
13   A.  Gout.  That's how we found out that I
14 had leukemia.  They did bloodwork.
15   Q.  Then the History of Present Illness
16 section says, "I reviewed the peripheral smear
17 here.  It was consistent with probable CML."
18        Do you see that?
19   A.  Yes.
20   Q.  Is it fair to say that this is when you
21 were diagnosed with CML?
22   A.  Yes.  That's what it says.
23   Q.  Let's go to page 3.  There's a
24 discussion section at the bottom there.  The large
25 paragraph titled Discussion, do you see that?

Page 88

1    A.  Yes.
2    Q.  Do you see where it says, "I discussed
3  with the patient and his family the leukocytosis
4  and findings in the blood are consistent with
5  chronic myeloid leukemia"?
6        Do you see that?
7    A.  Yes.
8    Q.  The doctor then says he explained the
9  different phases of CML and that you appeared to
10 be in the chronic phase of CML; right?
11   A.  Correct.
12   Q.  He also says, "I also discussed the
13 historical significance of CML treated with
14 transplantation."
15        Do you see that?
16   A.  Yes.
17   Q.  Do you remember what he told you about
18 transplantation treatment for CML?
19   A.  No.  No, I don't.
20   Q.  Did you ever go through a
21 transplantation treatment for your CML?
22   A.  No, not that I know of.
23   Q.  Then the doctor says, "Currently, the
24 standard of care is to treat all patients with CML
25 with tyrosine kinase inhibitors."

Page 89

1        Do you see that?
2    A.  Yes.
3    Q.  Do you know what Dr. Craig meant when he
4  said standard of care?
5    A.  No, I don't.
6    Q.  He then says, "I described the CML as an
7  incurable chronic leukemia.  However, with
8  effective treatment, 80 percent of patients are
9  controlled usually for many years with tyrosine
10 kinase inhibitors."
11        Do you see that?
12   A.  Yes.
13   Q.  Do you remember Dr. Craig telling you
14 that these tyrosine kinase inhibitors, also known
15 as TKIs, offer the chance to live with CML for
16 many years?
17   A.  I don't recall.
18   Q.  Are you familiar with the term TKI?
19   A.  No.
20   Q.  Are you familiar with the term tyrosine
21 kinase inhibitor?
22   A.  No.
23   Q.  If I represented to you that Gleevec,
24 Tasigna, SPRYCEL, they're all tyrosine kinase
25 inhibitors or TKIs, would that sound right?

Allan McNeal

Page 90

1    A.   I don't know.
2    Q.   Can you tell me what Tasigna is?
3    A.   No, I can't.
4    Q.   You've taken Tasigna before?
5    A.   Yes.
6    Q.   Why did you take Tasigna?
7    A.   Cancer.
8    Q.   So was Tasigna -- did you take Tasigna
9 for the purpose of treating your cancer?
10   A.   Yes.
11   Q.   I'll represent to you that Tasigna,
12 SPRYCEL and Gleevec, all drugs that you were once
13 on, are TKIs.  Okay?
14   A.   Okay.
15   Q.   I'll represent that to you.  You've
16 taken Gleevec; right?
17   A.   Yes.
18   Q.   You've taken SPRYCEL; right?
19   A.   Yes.
20   Q.   You've taken Tasigna; right?
21   A.   Yes.
22   Q.   Those are the only three drugs you've
23 taken to treat your CML?
24   A.   Yes.
25   Q.   Which means you haven't had any other

Page 91

1 treatment for your CML.  Has any oncologist ever
2 recommended anything other than a TKI or Gleevec,
3 SPRYCEL or Tasigna for your cancer?
4    A.   No, no.
5    Q.   At this point when you were diagnosed
6 with CML, did the Dr. Craig tell you how long you
7 can live with CML if it remains untreated?
8    A.   I don't remember.
9    Q.   How did you feel about your CML
10 diagnosis?
11   A.   When he first told me, I was scared.
12   Q.   Why were you scared?
13   A.   Was you hear the word cancer.  I just
14 lost a friend.  It wasn't three days before I was
15 diagnosed with the same thing.
16   Q.   Did Dr. Craig tell you how serious of a
17 cancer this?
18   A.   Yes.
19   Q.   How serious did Dr. Craig say it was?
20   A.   He said if I don't take medicine, I
21 could possibly die.
22   Q.   Possibly die.  What were your chances if
23 you didn't take any medicine?
24   A.   I don't remember.
25   Q.   Do you remember if you left the meeting

Page 92

1 or the doctor's appointment feeling confident that
2 I will take medication and my CML will be cured?
3    A.   Yes.
4    Q.   So you did believe that if you took
5 medication, you had a really high chance of curing
6 your CML?
7    A.   Yes.
8    Q.   If you go to the next page, that would
9 be the last page of this document, do you see it
10 says Recommendations at the very top,
11 Recommendations?
12   A.   Okay.
13   Q.   Do you see number four says "Initiate
14 Gleevec"?
15   A.   Yes.
16   Q.   Does this refresh your recollection that
17 you started on Gleevec upon being diagnosed with
18 CML?
19   A.   Yes.
20   Q.   You started taking Gleevec right away;
21 right?
22   A.   Yes.
23   Q.   Do you recall Dr. Craig discussing
24 potential side effects of taking Gleevec with you?
25   A.   No, I don't.

Page 93

1    Q.   Do you recall reviewing the Gleevec
2 label or medication guide?
3    A.   Yes.
4    Q.   Did you do that before you started
5 taking it or after you started taking it?
6    A.   After.
7    Q.   Why did you review it?
8    A.   Because I heard it would do bodily harm.
9    Q.   Let's take a step back.  You were
10 diagnosed with CML.  Right away your doctor
11 prescribed you with Gleevec.
12   A.   Yeah.
13   Q.   And right away you started taking
14 Gleevec; right?
15   A.   No.  I was doing -- I can't remember.
16   Q.   We have these records to help you
17 remember because this was such a while ago.  The
18 record we're looking at right now is from March of
19 2011.  That is when you were diagnosed with CML.
20   A.   I don't think I was diagnosed to take
21 Gleevec at the beginning.
22   Q.   So the record we're looking at right
23 now, March 2011, says under the recommendation,
24 "Initiate Gleevec."
25   A.   Okay.

Allan McNear

Page 94

1    Q.   Does that refresh your recollection that
2  you started treating your CML with Gleevec?
3    A.   Yes.
4    Q.   So this is going to be a little
5  difficult for you to think back because it
6  happened such a long time ago and I know how
7  stressful finding out your diagnosis must have
8  been for you, but please try to remember your
9  discussion with Dr. Craig at the time when you
10  were diagnosed with CML.
11        Dr. Craig told you that you have CML;
12  right?
13    A.   Yes.
14    Q.   And he told you that we can treat your
15  CML with a certain drug; is that right?
16    A.   Yes.
17    Q.   And so Dr. Craig suggested that you take
18  Gleevec; is that right?
19    A.   Yes.
20    Q.   And you finding out about CML wanted to
21  treat it as soon as possible; is that fair to say?
22    A.   Yes.
23    Q.   So you agreed to take Gleevec for your
24  CML at that time?
25    A.   Yes.

Page 95

1    Q.   Please think back about your discussion
2  with Dr. Craig about this drug.  Did he tell you
3  about any side effects that you can have from
4  taking Gleevec?
5    A.   Yes.
6    Q.   Do you remember what side effects he
7  mentioned?
8    A.   Diarrhea, vomiting, upset stomach,
9  headaches, maybe a skin rash.
10    Q.   So you knew that these side effects may
11  happen if you took Gleevec?
12    A.   Yes.
13    Q.   But you decided to take Gleevec anyway;
14  right?
15    A.   Yes.
16    Q.   Why is that?
17    A.   Because I was told it would help my
18  cancer.
19    Q.   Your number one priority at that point
20  was to get rid of that cancer; is that right?
21    A.   Correct.
22    Q.   So at that point that Dr. Craig told you
23  about Gleevec, did you review the medication guide
24  or the label for Gleevec --
25    A.   No.

Page 96

1    Q.   -- to familiarize yourself with the drug
2  or its side effects?
3    A.   No.
4    Q.   Why not?
5    A.   Because I believed in Dr. Craig.
6    Q.   You trusted that Dr. Craig was going to
7  handle that analysis for you; right?
8    A.   Yes.
9    Q.   Is Dr. Craig a good oncologist?
10    A.   Yes.
11    Q.   When you were diagnosed with CML, did
12  Dr. Craig thoughtfully explain everything to you
13  about the cancer?
14    A.   Yes.
15    Q.   Is Dr. Craig generally good at
16  explaining risks and benefits to you?
17    A.   Yes.
18    Q.   Have you always trusted Dr. Craig?
19    A.   Yes.
20    Q.   Have you always followed Dr. Craig's
21  recommendation as your oncologist?
22    A.   Yes.
23    Q.   With respect to medications that
24  Dr. Craig has prescribed for you, did you ever
25  turn down his recommendations?

Page 97

1    A.   No.
2    Q.   Let's go to our next exhibit,
3  Exhibit 12, October 22, 2014.  If you look at the
4  top there in the shaded line, it says October 22,
5  2014.  Do you see that?
6    A.   Yes, ma'am.
7    Q.   Is Dr. Craig the author here?
8    A.   Yes.
9    Q.   So do you see on page 1, on that page at
10  the very bottom under the section Cancer Center
11  Notes, it says, "Clinical trial info if patient
12  participates"?  Do you see that?
13    A.   Yes.
14    Q.   If you move on to page 2, at the kind of
15  center there, it says WVU Healthcare Return
16  Patient Progress Note?
17    A.   Yes.
18    Q.   In the identification section, Dr. Craig
19  describes -- at the end of the second line, it
20  says, "He has been on Gleevec since March 2011,
21  400 milligrams daily, with an excellent
22  hematologic response and molecular response by
23  June 2011."
24        Do you see that?
25    A.   Yes.

Allan Menear

Page 98

1    Q.   So according to this, when you were
2  diagnosed with CML in March of 2011, you started
3  taking Gleevec; right?
4    A.   Yes.
5    Q.   And your Gleevec treatment was working;
6  right?
7    A.   Yes.
8    Q.   Then if you go to the bottom of page 5,
9  which -- let me find that for you.  If we go to
10  the bottom of page 5, do you see where it says
11  Assessment/Plan?
12    A.   Yes.
13    Q.   It says "CML with response to Gleevec"?
14    A.   Yes.
15    Q.   It then says, "We also have a trial
16  available.  Patients cross over nilotinib and if
17  have molecular remission, consider stopping med.
18  We reviewed this option, benefits and risks, and
19  he will consider it.  Reviewed the consented form
20  with him.  All questions answered.  He wants to
21  review his family as well."
22       Do you see that?
23    A.   Yes.
24    Q.   So just to kind of refresh your
25  recollection, this record is from October of 2014.

Page 99

1  It says, correct me if I'm wrong, that you have
2  CML and you've been taking Gleevec for it; right?
3    A.   Yes.
4    Q.   Then you reviewed continuing treatment;
5  right?
6    A.   Yes.
7    Q.   And then you were told about a trial
8  that was available; right?
9    A.   Correct.
10    Q.   And this trial included you switching
11  from Gleevec to nilotinib; right?
12    A.   Yes.
13    Q.   I think we discussed this earlier that
14  nilotinib is Tasigna; right?
15    A.   Yes.
16    Q.   So is it fair to say that at this visit
17  in October of 2014 is when you were told about the
18  Tasigna clinical trial?
19    A.   Yes.
20    Q.   And it was Dr. Craig that offered you
21  the option of switching to Tasigna?
22    A.   Yes.
23    Q.   Why did Dr. Craig recommend Tasigna to
24  you?
25       MR. HIGGINS:  I'm going to object.

Page 100

1  Calls for speculation.
2       You go ahead and answer.
3       THE WITNESS:  He believed it would get
4  my numbers down and could possibly cure me of
5  cancer.
6  BY MS. RYBICKI:
7    Q.   Would it be fair to say that Dr. Craig
8  believed that if you took Tasigna, it could cure
9  your CML to the point where you no longer have to
10  take any medication?
11    A.   Correct.
12       MR. HIGGINS:  Objection.  Calls for
13  speculation.
14       You can answer.
15  BY MS. RYBICKI:
16    Q.   Mr. Menear, what was your answer?
17    A.   Correct.
18    Q.   Was the goal of taking Tasigna to get
19  you off the medications ultimately?
20    A.   Yes.
21    Q.   And was that a benefit of Tasigna that
22  was not a benefit of Gleevec?
23    A.   Yes.
24    Q.   At this point, you had a goal of
25  eventually stopping your medications for CML?

Page 101

1    A.   Yes.
2    Q.   It also says that you reviewed the
3  options, benefits and risks, and that he will
4  consider it; right?
5    A.   Yes.
6    Q.   Do you remember what risks Dr. Craig
7  told you about?
8    A.   I don't remember any risk, no.
9    Q.   It says here you reviewed the consent
10  form with him; right?
11    A.   Yes.
12    Q.   Did Dr. Craig review the consent form
13  with you?
14    A.   Yes.
15    Q.   And Dr. Craig answered all your
16  questions about the consent form?
17    A.   Yes.
18    Q.   It says here, "He wants to review with
19  his family as well."
20       So is it fair to say at this point, you
21  took the consent form home to talk with your wife
22  about it?
23    A.   Yes.
24    Q.   Let's go to Exhibit 13.
25       MR. HIGGINS:  Would this be a good time

Allan Menear

Page 102

1  for us to take a break?
2      MS. RYBICKI:  We can do one more or we
3  can do it now.  It's up to you.
4      MR. HIGGINS:  Do you want to take a
5  break, or do you want to keep going?
6      THE WITNESS:  We can do one more.
7  BY MS. RYBICKI:
8  Q.  If you go to Exhibit 13, October 29,
9  2014, this is a one-page document, Mr. Menear.
10  It's dated October 29, 2014; right?
11  A.  Yeah.
12  Q.  This is just one week after that last
13  record we talked about; right?
14  A.  Yeah.
15  Q.  It's a nurse's note?
16  A.  Yes.
17  Q.  It says that you were there to consider
18  a clinical trial as treatment option for CML.
19      Do you see that?
20  A.  Yes.
21  Q.  Did you understand the concept of a
22  clinical trial?
23  A.  Yes, I believe so.
24  Q.  What did you understand was the concept
25  of the clinical trial?

Page 103

1  A.  That it would help me.  It would get my
2  numbers down and possibly cure the cancer.
3  Q.  Earlier you testified that you thought
4  that -- you said it would help you get your
5  numbers down.  You meant Tasigna will help you get
6  your numbers down; right?
7  A.  Yes.
8  Q.  My question to you now is a little
9  different.  It is:  What did you consider the
10  clinical trial to be?  Not taking Tasigna.  But
11  the notion of a clinical trial, what did you
12  understand that to be?
13  A.  To help me get better.
14  Q.  Did you understand that you were part of
15  a patient population being studied for a new
16  treatment?
17  A.  Yes.
18  Q.  Did you understand that as a clinical
19  trial, there was a risk that treatment wouldn't
20  work?
21  A.  Oh, yeah, yes.
22  Q.  It then says in that paragraph, "Patient
23  was given the ICF," which is the informed consent
24  form, "and biomarker ICF to take home last week
25  for review and share with family.  Patient said he

Page 104

1  read it and his wife read it as well and has
2  decided to participate in the trial.  He was given
3  the ICF again for review.  He and his wife read
4  over them.  Ample time was given for this process.
5  Then all of their questions were answered
6  satisfactorily prior to him signing the ICFs.  He
7  initialed and dated the bottom of each page, then
8  signed, printed, dated and timed the signature
9  page.  The provider did the same on the signature
10  page again after he was sure the patient didn't
11  have any further questions."
12      Does that sound accurate as to what
13  happened with the ICFs?
14  A.  Yes.
15  Q.  They gave you the informed consent form
16  before you started the trial; right?
17  A.  Yeah.
18  Q.  Then they gave you this consent form
19  again on October 29, 2014; right?
20  A.  Yes.
21  Q.  You and your wife read that consent
22  form; right?
23  A.  Yes.
24  Q.  You were given ample time to read it;
25  right?

Page 105

1  A.  Yes.
2  Q.  And it says that all of your and your
3  wife's questions were answered before you signed
4  the ICFs; right?
5  A.  Yes.
6  Q.  Do you remember the questions you asked,
7  if you asked any questions?
8  A.  How long would it take to see a result.
9  Q.  Any other questions do you remember
10  asking?
11  A.  No, not that I remember.
12  Q.  Was that question answered by Dr. Craig?
13  A.  Yes.
14  Q.  Did he tell you how long it will take?
15  A.  No.  He said he wasn't sure how long it
16  would take.
17  Q.  Do you have that form that you signed on
18  October 29, 2014?
19  A.  I don't believe so.  Probably not.
20  Q.  Would you do me a favor and look for
21  that document?
22  A.  I will, yes.
23  Q.  If you find it, can you please give it
24  to your attorney?
25  A.  Yes.

Allan Menear

Page 106

1    Q.   I have no questions on this document, so
2  let's take a break.
3         (Recess from 12:30 p.m. to 12:43 p.m.)
4  BY MS. RYBICKI:
5    Q.   I'm going to go to 11/17/14 next.
6  Exhibit 14 is the November 17, 2014 West Virginia
7  University Medicine medical record.
8    A.   Yes.
9    Q.   Mr. Menear, do you see on the bottom
10 under date, it says November 17, 2014?
11   A.   Yes.
12   Q.   And do you see that Dr. Craig is listed
13 as the author?
14   A.   Yes.
15   Q.   If you go to the next page, just below
16 the BCR/ABL, it starts with Consented.
17        Do you see that?
18   A.   Yes.
19   Q.   It says, "Consented for imatinib
20 stopping and change to nilotinib for possible
21 treatment free remission if MR obtained."
22        Do you see that?
23   A.   Yes.
24   Q.   The reason from changing from Gleevec to
25 Tasigna was for you to possibly attain treatment

Page 107

1  for your remission; is that right?
2    A.   Yes.
3    Q.   Do you remember what Dr. Craig told you
4  at this time about switching to Tasigna?
5    A.   No.  I don't remember.
6    Q.   Dr. Craig recommended that you change
7  your CML medication from Gleevec to Tasigna;
8  right?
9    A.   Yes.
10   Q.   Did you propose this idea, or did you
11 say you wanted to change medications?
12   A.   No.  He did.
13   Q.   Did he say why?
14   A.   To try to get my numbers down and maybe
15 cure me.  I wouldn't have to take any medicine at
16 all.
17   Q.   Let me just establish this.  You were
18 taking Gleevec, and it was working satisfactorily;
19 right?
20   A.   Yeah.
21   Q.   Were you having any side effects taking
22 Gleevec?
23   A.   Diarrhea.
24   Q.   What about nausea?
25   A.   No, not really, no.

Page 108

1    Q.   Any other symptoms other than diarrhea?
2    A.   That's it, diarrhea.
3    Q.   Gleevec successfully kept your numbers
4  down?
5    A.   But they dropped, and that's the reason
6  he tried Tasigna.  My numbers dropped a little
7  bit, and that's when he said, well, let's try it.
8  Would you mind trying a trial.
9    Q.   Again, I think we established this
10 already, but you wanted to take Tasigna because
11 Dr. Craig said it would get you treatment for your
12 remission?
13   A.   Yes.
14   Q.   And you understood that as curing your
15 CML so that you wouldn't have to take medications
16 any more?
17   A.   Yes.
18   Q.   You trusted Dr. Craig's judgment that
19 this was the best course of action at the time?
20   A.   Yes.
21   Q.   It also says consented for imatinib
22 stopping.  Did you sign a consent form at this
23 time?
24   A.   Yes.
25   Q.   Just to be clear, this record is from

Page 109

1  November 17, 2014.  So you're saying you signed a
2  consent form around that time?
3    A.   Yes.
4    Q.   Do you happen to have this consent form?
5    A.   I don't know.
6    Q.   Would you do me a favor and look for
7  that information, that consent formed from
8  November of 2014.  If you find it, would you
9  please give it to your attorney?
10   A.   Yes.
11   Q.   Thank you.  Going to the last page in
12 the Assessment/Plan section, let me know when
13 you're there.
14   A.   Okay.
15   Q.   Do you see where it says, "CML good
16 response to imatinib with persistent BPR/ABL.
17 Start nilotinib 300 milligram BID.  Reviewed food
18 and drug interactions.  ECG normal today.  Repeat
19 in one week after starting treatment.  Meds given
20 today."
21   A.   Yes.
22   Q.   Do you agree this is when you started
23 taking Tasigna?
24   A.   Yes.
25   Q.   You agree you started taking Tasigna on

Allan Mehear

Page 110

1  November 17, 2014?
2      A.  Yes.
3      Q.  How did you receive the Tasigna
4  medication?  In the mail or at the pharmacy?  Did
5  the doctor give it to you?
6      A.  Mail order.
7      Q.  The Tasigna medication came with
8  informational packets; right?
9      A.  Yes.
10     Q.  It came with a product label also?
11     A.  Yes.
12     Q.  And it came with a medication guide?
13     A.  Yes.
14     Q.  Did you review the medication guide and
15  label?
16     A.  I don't think so.  I don't know.
17     Q.  Why not?  Why didn't you review it?
18     A.  I don't know if I did.  I don't know.
19     Q.  Do you remember seeing a medication
20  guide and label for Tasigna?
21     A.  Yes.
22     Q.  When did you see it?
23     A.  The 14th, November 14.
24     Q.  What year?
25     A.  2014.

Page 111

1      Q.  Are you sure you don't mean November 14,
2  2017?
3      A.  Yeah.
4      Q.  So on November 17, 2014, you saw the
5  Tasigna medication guide and label; right?
6      A.  Yes.
7      Q.  Who gave it to you?
8      A.  Dr. Craig.
9      Q.  You went over all the risks and benefits
10  of Tasigna?
11     A.  Yes.
12     Q.  What were the risks that were told to
13  you?
14     A.  I don't remember the risks.  I don't
15  remember.
16     Q.  This also says that you took an ECG
17  before you took Tasigna; is that right?
18     A.  I don't remember that.
19     Q.  Let's go on to our next record.  That
20  would be Exhibit 15.  That's other November 17,
21  2014 record, but this is a nurse's note.  It says
22  at the bottom nurse's note.  Specifically it says
23  Nurses Note by Beal, Patricia.
24         Do you see that?
25     A.  Yes.

Page 112

1      Q.  This is dated November 17, 2014?
2      A.  Yes.
3      Q.  The same as the previous record that we
4  were just talking about.
5      A.  Yes.
6      Q.  This says, "Patient in for start of
7  CAMN107A study for CML.  The patient consented a
8  couple of weeks ago and is here for day one.  The
9  patient states he is still interested in
10  participating.  His wife is with him.  Reviewed
11  the procedures for this visit and then reviewed
12  dosing guidelines and instructions.  Explained
13  will go over them again when give him the
14  medication.  Patient had local labs done by
15  provider and then patient to clinic for visit with
16  provider."
17         Then it says, "Provider reviewed study
18  information with him and answered any questions he
19  had."  Does that sound right?
20     A.  I'm not sure.
21     Q.  So this is a nurse's note from
22  November --
23     A.  I remember the nurse.
24     Q.  But this says you were in for the start
25  of a clinical trial; right?

Page 113

1      A.  Yes.
2      Q.  You knew in November 2014 you were
3  entering a clinical trial?
4      A.  Yes.
5      Q.  Did you understand the goal of trial?
6      A.  To get me in remission.
7      Q.  It said you consented a couple weeks
8  ago, but you were still interested in
9  participating; right?
10     A.  Yes.
11     Q.  The provider reviewed study information
12  with you and then answered any questions you had;
13  right?
14     A.  Yes.
15     Q.  So again on this date, you reviewed the
16  study information?
17     A.  Yes.
18     Q.  Again, on this date you were given the
19  opportunity to ask questions?
20     A.  Yes.
21     Q.  And again, on this date if you had
22  questions, they were answered; right?
23     A.  Yes.
24     Q.  Do you remember what questions you had
25  about the drug at this point?

Allan McNear

Page 114

1    A.  No.  I don't remember.
2    Q.  Do you remember any questions about the
3  safety profile?
4    A.  No.  I don't remember any.
5    Q.  On the next page the paragraph
6  continues, and in the middle of the paragraph, it
7  says, "The investigational pharmacist brought it
8  and reviewed dosing as well as went over the
9  cartons of medication and how he is to take it.
10  The patient stated understanding of all
11  instructions."
12      So you met with an investigational
13  pharmacist as part of this study?
14    A.  Yes.
15    Q.  You reviewed the dosage?
16    A.  Yes.
17    Q.  You reviewed the cartons of medication?
18    A.  Yes.
19    Q.  You understood all the instructions as
20  to how to take the medication?
21    A.  Correct.
22      MS. RYBICKI:  Let's go to Exhibit 16,
23  which is the 2014 Tasigna label.  That's going to
24  be a little bit out of order, Mr. Higgins.
25

Page 115

1  BY MS. RYBICKI:
2    Q.  Do you see on the bottom right corner it
3  says "Revised September 2014"?
4    A.  Okay, yeah.
5    Q.  Then you see the title of the document
6  is Highlights of Prescribing Information?
7    A.  Yes.
8    Q.  Do you see a black box in the upper
9  left?
10    A.  Yes.
11    Q.  Do you see where it says, "Warning:  QT
12  prolongation and sudden deaths"?
13    A.  Yes.
14    Q.  So there was a boxed warning on the
15  first page of the Tasigna label in 2014 telling
16  you that Tasigna could suddenly kill you; right?
17    A.  Yes.  That's what it says.
18    Q.  But you took the drug anyway; right?
19    A.  Correct.
20    Q.  And was that a risk that you were
21  willing to take?
22      MR. HIGGINS:  Objection to form of the
23  question.
24      You can answer.
25      THE WITNESS:  I probably didn't know

Page 116

1  about the causing deaths.  I probably wasn't
2  listening or what.  But if that, I wouldn't have
3  took it.
4  BY MS. RYBICKI:
5    Q.  Let's just take a step back here.  Go to
6  the black box.  You see that; right?
7    A.  Yeah.
8    Q.  You see where it says, "Warning:  QT
9  prolongation sudden deaths"; right?
10    A.  Yeah.
11    Q.  So the Tasigna label in 2014 said that
12  there is a risk of sudden death when taking
13  Tasigna; right?
14    A.  Yes.
15    Q.  You just testified that you knew that at
16  the time; right?
17      MR. HIGGINS:  Objection.
18  Mischaracterizes testimony.  He said he didn't
19  read the label.
20      You can answer subject to that
21  objection.
22      THE WITNESS:  Yeah.  I never read this.
23  I don't remember seeing any of this.
24  BY MS. RYBICKI:
25    Q.  At the time that you took Tasigna, you

Page 117

1  did not know that you can suddenly die as a result
2  of taking it?
3    A.  No, ma'am.
4    Q.  Did Dr. Craig communicate this
5  information to you?
6    A.  No.
7    Q.  Is it correct that you just testified if
8  you knew there was a risk of sudden death when you
9  started taking Tasigna, you wouldn't have taken
10  Tasigna?
11    A.  Yes.
12    Q.  Why is that?
13    A.  I didn't want to die.
14    Q.  So if you go down at the bottom below
15  that black box, do you see there's a Warnings and
16  Precautions section?
17    A.  Yes.
18    Q.  So if you follow those bullet points and
19  you go to bullet point number four, can you please
20  read that bullet point to yourself that starts
21  with Cardiac and Vascular Events.  Let me know if
22  you need help finding it.
23    A.  Can you help me?
24    Q.  Do you see the section that says Cardiac
25  and Vascular Events?

Allan McNeal

Page 118

1    A.   Yes.
2    Q.   Can you please read that now?
3    A.   Cardiac and Vascular Events.
4    Q.   You can read it to yourself.  I want to
5  make sure you understand the information.
6    A.   Okay.
7    Q.   So this Tasigna label in 2014 is
8  specifically warning against cardiac and vascular
9  events; right?
10   A.   Yeah.
11   Q.   It's specifically warning against
12  ischemic heart disease; right?
13   A.   Yes.
14   Q.   And it's specifically warning that
15  taking Tasigna can cause peripheral arterial
16  occlusive disease; right?
17   A.   Yes.
18   Q.   You ended up getting peripheral arterial
19  occlusive disease; right?
20   A.   Yes.
21   Q.   And you ended up getting heart disease
22  also; right?
23   A.   Yes.
24   Q.   Did you go over this information with
25  Dr. Craig at the time that you were taking

Page 119

1  Tasigna?
2    A.   I don't think so, no.
3    Q.   Were you aware of this risk factor when
4  you decided to take Tasigna?
5    A.   No.
6    Q.   If you had seen this warning that taking
7  Tasigna can possibly lead to peripheral arterial
8  occlusive disease or heart disease, would that
9  have changed your mind as to whether or not to
10  take Tasigna?
11   A.   Possibly.
12   Q.   Presumably you would have seen a similar
13  warning in the consent form you that signed that
14  we talked about earlier; right?
15   A.   Yes.
16   Q.   Let's go to the next exhibit, 17,
17  June 8, 2015, Dr. Malone's office.
18   A.   Wow.
19   Q.   That's a tough one.  That's what happens
20  when the records are old and the print job is not
21  great.  I apologize for that.
22        This record is dated June 8, 2015;
23  right?
24   A.   Yes.
25   Q.   And it's a history and physical report?

Page 120

1    A.   Yes.
2    Q.   This is about seven months after
3  starting Tasigna.  So if we just said you started
4  taking Tasigna in March of 2014 -- hold on.
5  Strike that.
6        We just talked about you starting
7  Tasigna in November of 2014; right?
8    A.   Yes.
9    Q.   So this is a document from June 2015.
10  This is about seven months after you started
11  taking Tasigna?
12   A.   Okay.  Yes.
13   Q.   You see Dr. James Malone's name right by
14  History of Present Illness.  Do you see that?  Do
15  you see Dr. James Malone's name?
16   A.   Okay.
17   Q.   Is that a "yes"?
18   A.   Yes.
19   Q.   Was Dr. Malone your primary care
20  physician at Mountain State Primary Care?
21   A.   Yes.
22   Q.   In the History of Present Illness
23  section that I think you just found, it says that
24  you present with a complaint of tingling.
25        Do you see that?

Page 121

1    A.   Yes.
2    Q.   Then it says -- now I'm struggling to
3  see it myself.  It says, "Began about the same
4  time he was placed on a new CML drug."
5        Do you see that?  So this would be -- it
6  would be the third line.  The third line says,
7  "Began about the same time he was placed on a new
8  CML drug."
9        MR. HIGGINS:  We'll stipulate that it
10  says that.
11        THE WITNESS:  Yeah.
12  BY MS. RYBICKI:
13   Q.   At this point, Dr. Malone told you that
14  your tingling started at the same time that you
15  began Tasigna; right?
16   A.   No.
17   Q.   Let's simplify this a little bit.  I
18  know the record is hard to read.  But essentially
19  this is June 2015, seven months after you started
20  taking Tasigna, and you come to Dr. Malone for
21  tingling in your legs; is that right?
22   A.   Yes.
23   Q.   And so Dr. Malone says that your
24  tingling started when you started taking Tasigna;
25  is that right?

Allan Menear

Page 122

1    A.  Yes.
2    Q.  So at this point in June of 2015,
3  Dr. Malone associates the tingling in your legs to
4  the Tasigna that you were taking; right?
5    A.  I don't know.
6    Q.  You went to the doctor for tingling in
7  your legs; right?
8    A.  Yes.
9    Q.  Did you think Tasigna was causing your
10  tingling in your legs?
11    A.  No.  I didn't think, no.
12    Q.  Did Dr. Malone think that tingling in
13  your legs was the due to Tasigna?
14    A.  Now, what he might have done, he might
15  have upped my dosage because I've been on Lyrica
16  since 1990.  So that's hard to answer for me.
17    Q.  At the time that you went to Dr. Malone
18  in June of 2015, he thought that the tingling in
19  your legs was due to your Tasigna taking; right?
20    MR. HIGGINS:  Objection to what he
21  thought.
22    You can answer, if you know.
23    THE WITNESS:  I don't even know.
24  BY MS. RYBICKI:
25    Q.  What did Dr. Malone tell you was the

Page 123

1  cause of the tingling in your legs?
2    A.  At this date, I don't know.
3    Q.  I know you said you don't know what
4  Dr. Malone may have said at the time.  But this
5  record from June 2015 specifically says that your
6  tingling began at the same time that you were
7  placed on Tasigna; right?
8    MR. HIGGINS:  We'll stipulate the record
9  speak for itself and that is what it says.
10  BY MS. RYBICKI:
11    Q.  Mr. Menear, does this refresh your
12  recollection about the cause of your tingling of
13  your legs?
14    A.  No.
15    Q.  Can you tell me about the tingling that
16  you were experiencing?
17    A.  No.  I don't know, no.  I don't know
18  that.
19    Q.  Let's put the medical record aside.  I
20  don't want you to think you're limited to what it
21  says.  I want to know what you remember about what
22  happened.
23    A.  At this date, I don't remember any of
24  this.
25    Q.  In June 2015, you don't remember having

Page 124

1  tingling in your legs?
2    A.  No.
3    Q.  No?
4    A.  No, I don't.
5    Q.  Do you remember when you started
6  Tasigna, you had side effects; right?
7    A.  I don't remember.  We established --
8    MR. HIGGINS:  There's no question
9  pending.
10  BY MS. RYBICKI:
11    Q.  Did you talk to Dr. Craig about tingling
12  in your legs?
13    A.  I don't remember.
14    Q.  Let me ask you this:  You started taking
15  Tasigna November 2014.  How did you feel when you
16  were taking Tasigna?
17    A.  Okay.  When I first started taking it,
18  okay.
19    Q.  Did your CML improve?
20    A.  Yes.
21    Q.  And then you said when you first started
22  taking it, you were okay.  Did that change?
23    A.  Yes.
24    Q.  So what changed about how you were
25  feeling when you were taking Tasigna?

Page 125

1    A.  My legs were starting to hurt.
2    Q.  When did your legs start to hurt?
3    A.  2016.  I don't know the exact date.
4    Q.  So for the first two years of taking
5  Tasigna, you had no side effects?
6    A.  I don't know.  I don't know.
7    Q.  Mr. Menear, I'd like to remind you that
8  you filed a Complaint against Novartis stating
9  that Tasigna is a drug that you took for your CML
10  and that it led to several injuries of yours.  So
11  I'm trying to learn about these injuries and
12  possible side effects of Tasigna.  I appreciate
13  you thinking back in time to remember exactly what
14  happened and how you were feeling and how you were
15  reacting to Tasigna because these are very
16  important pieces of information to learn about
17  Tasigna.
18    So my question is:  You began to take
19  Tasigna in November 2014; right?
20    A.  Yes.
21    Q.  Can you tell me about the side effects
22  or any side effects you had from taking Tasigna?
23    A.  In 2014?
24    Q.  After you started taking it.
25    A.  I don't believe I had any side effects.

Page 126

1    Q.   Your heart disease is not a side effect
2 of your Tasigna taking; right?
3    A.   Yes.
4    Q.   Yes, it was or yes, it was not a side
5 effect?
6    A.   Yes, it was.
7    Q.   You just testified that you had no side
8 effects from taking Tasigna.  I'm trying to
9 understand exactly what issues you were facing or
10 faced because of taking Tasigna.  So would you be
11 able to tell me those?
12   A.   I can't answer.  I don't know.  I don't
13 know.
14   Q.   Let's move on to our next record.  This
15 will be Exhibit 18, November 2, 2015.  There's
16 going to be two November 2, 2015 documents.
17       Do you see this is a West Virginia
18 University Medicine medical record?
19   A.   Yes.
20   Q.   Do you see your name on top that?
21   A.   Yes.
22   Q.   And it's dated November 2, 2015?
23   A.   Yes.
24   Q.   This is a note from Dr. Craig; is that
25 right?

Page 127

1    A.   Yes.
2    Q.   Dr. Craig was your oncologist?
3    A.   Yes.
4    Q.   Halfway down the page, we see "May
5 2015 - complete molecular remission."
6       Do you see that?
7    A.   Yes.
8    Q.   Did you discuss with Dr. Craig what
9 complete molecular remission was?
10   A.   I don't remember.
11   Q.   Do you know what complete molecular
12 remission is?
13   A.   Yeah, when your cancer is in remission.
14   Q.   Did Dr. Craig discuss that with you,
15 your cancer was in complete remission at that
16 point?
17   A.   Yes.
18   Q.   Was he happy with the fact that you
19 reached complete molecular remission?
20   A.   Yes.
21   Q.   Did Dr. Craig believe that Tasigna was
22 working better for you than Gleevec at that time?
23   A.   Yes.
24   Q.   So if you go down to the Interval
25 History section, do you see that?

Page 128

1    A.   Yes.
2    Q.   Do you see where it says, "Continues to
3 complain of bilateral leg pain.  Begins in feet to
4 calves.  Sometimes sore to touch.  No skin
5 changes.  Some tingling and burning in feet.
6 Continues to be active, but sometimes pain limits
7 activities"?
8       Do you see that?
9    A.   Yes.
10   Q.   So you were continuing to complain of
11 bilateral leg pain which means pain in both legs;
12 right?
13   A.   Yes.
14   Q.   I believe you testified you continually
15 had leg pain from your accident in 1990; right?
16   A.   Yes.
17   Q.   So this leg pain that Dr. Craig is
18 talking about is just continuous from 1990?
19   A.   Yes.
20   Q.   Is there anything new about this leg
21 pain?
22   A.   No.
23   Q.   Did you discuss this leg pain with
24 Dr. Craig at the time?
25   A.   Yes.

Page 129

1    Q.   What did he say about the leg pain?
2    A.   I don't remember.
3    Q.   Did he mention to you that he thought
4 Tasigna may be the cause of the leg pain?
5    A.   No.
6    Q.   Did you, yourself, think that this leg
7 pain may be caused by Tasigna?
8    A.   Yes.
9    Q.   Did you consider coming off of Tasigna
10 at this point?
11   A.   No.
12   Q.   Why not?
13   A.   Because we wasn't sure if that's what
14 was causing my leg pain.
15   Q.   But you also were seeing really good
16 results; right?
17   A.   Yeah.
18   Q.   On page 5, which is the last page, do
19 you see the Plan section?
20   A.   Yes.
21   Q.   Do you see in item four it says, "New
22 consent signed today"?
23   A.   Yes.
24   Q.   Let's look at that consent form next as
25 Exhibit 19.  So it's the November 2, 2015 informed

Page 130

1 consent form. This is going to be another bad
2 printout. So please work with me, Mr. Menear. Do
3 you see at the top there it says West Virginia
4 University?
5     A.  Yes.
6     Q.  The title of the document -- I know it's
7 kind of hard to see, but it's titled CAMN107A US37
8 Informed Consent Type Version September 23, 2015?
9     A.  Yes.
10    Q.  Then on the right there, there's some
11 kind of sticker looking thing that has your name
12 on it with a bar code. Do you see it?
13    A.  Yes.
14    Q.  In the header there you see as
15 co-investigator Dr. Michael Craig is listed;
16 right?
17    A.  Yes.
18    Q.  Dr. Craig was the oncologist who
19 prescribed you Tasigna; right?
20    A.  Yes.
21    Q.  And on the bottom right, we see initials
22 AM and a date November 2, 2015; right?
23    A.  Yes.
24    Q.  You initialed that first page; right?
25    A.  Correct.

Page 131

1     Q.  That's your handwriting?
2     A.  Yes.
3     Q.  Dr. Craig went over this page with you?
4     A.  Yes.
5     Q.  And then you can flip through the
6 document if you'd like, but it seems like you
7 initialed and dated every page; right?
8     A.  Yes.
9     Q.  And your initials indicate that you
10 understood what was on each page; right?
11    A.  Yes.
12    Q.  You can take the time to look through
13 this document if you would like, but I would like
14 to direct your attention to the bottom of page 8,
15 the section that says Risks and Discomforts. I
16 can help you locate that if you would like. Last
17 Bates are 940. Do you see where it says Risks and
18 Discomforts?
19        MR. HIGGINS:  Bates 940?
20        MS. RYBICKI:  Yeah.
21        MR. HIGGINS:  I see side effects.
22        MS. RYBICKI:  I think you're looking at
23 the wrong page actually. That's 941.
24        MR. HIGGINS:  There we go.
25

Page 132

1 BY MS. RYBICKI:
2     Q.  Do you see Risks and Discomforts?
3     A.  Yes.
4     Q.  Do you see where it says right under
5 that, "Risks are possible side effects of the
6 study drug"?
7     A.  Yes.
8     Q.  So you were aware that Tasigna had side
9 effects; right?
10    A.  Yes.
11    Q.  And they were calling it a study drug,
12 so you were aware that this clinical trial was a
13 study; right?
14    A.  Yes.
15    Q.  On the next page do you see where it
16 says, "Some side effects could be serious"?
17    A.  Yes.
18    Q.  Do you see on the first bullet point?
19 It says, "Chest pain, high blood pressure, low
20 blood pressure, hardening of blood vessels,
21 clotting of blood, abnormal ECG, irregular heart
22 rhythm, palpitations, fainting, blue discoloration
23 of the lips, tongue or skin which are signs of
24 heart disorders."
25        Do you see that?

Page 133

1     A.  Yes.
2     Q.  These are listed as side effects of
3 Tasigna; right?
4     A.  Yes.
5     Q.  On the bottom there is your initial and
6 dating of the page; right?
7     A.  Yes.
8     Q.  So you read this information and you
9 were aware of it when you initialed it; right?
10    A.  I don't remember.
11    Q.  Those are your initials; right?
12    A.  Yeah.
13    Q.  And you remember signing those initials;
14 right?
15    A.  I don't remember.
16    Q.  We can go to page 11, which the bottom
17 Bates page number would be 943. In the middle of
18 the page it says, "Patients who take nilotinib may
19 develop decreased blood flow to the leg, the heart
20 or the brain, also called ischemic vascular or
21 cardiovascular events."
22        Do you see that?
23    A.  Yes.
24    Q.  So this informed consent form from
25 November 2, 2015 warned of cardiovascular events;

Page 134

1 right?
2     A.  Yes.
3     Q.  Then if you follow along, it continues.
4 It says, "Examples of ischemic vascular or
5 cardiovascular events include" and let's start
6 with the first bullet point, ischemic heart
7 disease.
8     A.  Okay.
9     Q.  Angina pectoris, which is chest pain due
10 to restriction of blood supply to the heart
11 muscle, coronary artery disease, which is the
12 major blood vessels that supply your heart with
13 blood and oxygen and nutrients become diseased,
14 acute myocardial infarction, which is a heart
15 attack, and coronary artery stenosis, which is an
16 abnormal narrowing in a major blood vessel which
17 supply your heart with blood, oxygen and
18 nutrients.
19         Do you see that?
20     A.  Yes.
21     Q.  The informed consent form that you
22 signed in November of 2015 specifically warned
23 taking Tasigna can have a side effect of coronary
24 artery disease?
25     A.  Yes.

Page 135

1     Q.  It even said you can get a heart attack
2 from taking Tasigna; right?  In the third line, it
3 says, "Acute myocardial infarction (heart
4 attack)."
5         Do you see that?
6     A.  Yes.
7     Q.  So this informed consent form that you
8 signed November 2, 2015 said you can get a heart
9 attack from taking Tasigna; right?
10     A.  Yes.
11     Q.  So then we're going to go on to the
12 second bullet point which talks about ischemic
13 cerebrovascular event, and it says ischemic
14 cerebrovascular accident, which is a stroke, and
15 transient ischemic attack, which is when blood
16 flow to a part of the brain stops for a brief
17 period of time.
18         Do you see that as a side effect of
19 Tasigna?
20     A.  Where are you?
21     Q.  I'm in the second bullet point, same
22 page, second bullet point.  Do you see one
23 potential side effect of Tasigna is stroke?
24     A.  Yes.
25     Q.  Then we'll go on the next bullet point,

Page 136

1 bullet point number three, where it says
2 peripheral artery occlusive disease; intermittent
3 claudication, which is cramping, pain and weakness
4 in the legs, especially the calves on walking that
5 disappears after rest, arterial stenosis limb
6 (abnormal narrowing of the blood vessels supplying
7 blood in limbs).
8         Do you see that?
9     A.  Yes.
10     Q.  This informed consent form you signed on
11 November 2, 2015 specifically warns that taking
12 Tasigna can lead to peripheral arterial occlusive
13 disease; right?  It's the third bullet point.
14     A.  I see it.  I don't remember.
15         MR. HIGGINS:  We'll stipulate that's
16 what the document says.
17 BY MS. RYBICKI:
18     Q.  And so this informed consent form that
19 you signed November 2, 2015 also says
20 claudication, which is cramping pain and weakness
21 in the legs, is a possible side effect of Tasigna;
22 right?
23     A.  Yes.
24     Q.  With all these warnings that we just
25 discussed in this document and the fact you've

Page 137

1 initialed every page, it's fair to that say you
2 were aware of that these side effects and warnings
3 at the time?
4         MR. HIGGINS:  Is that a question?
5         MS. RYBICKI:  Is it fair to say you were
6 aware?
7         MR. HIGGINS:  It was a statement.  I'm
8 going to object to the question if it's a
9 question.  I'm going to object to the form the
10 question.
11         Subject to the objection, you can
12 answer.
13 BY MS. RYBICKI:
14     Q.  If you would like me to re-ask the
15 question, I can.
16     A.  I don't know.
17     Q.  Let me re-ask the question.  There's a
18 lot of words said, and you may be confused.
19         With all of these warnings that we just
20 went over, all these side effects we just went
21 over in this informed consent form, is it fair to
22 say that you were aware of all these side effects
23 and potential results from taking Tasigna?
24         MR. HIGGINS:  Objection to form.
25         You can answer.

Allan McNear

Page 138

BY MS. RYBICKI:
Q.   When you signed the document.
        MR. HIGGINS:  Objection to the form.
        THE WITNESS:  No, I don't.  I don't remember.
        MS. RYBICKI:  I'm sorry.  What is the form that you're objecting to?
        MR. HIGGINS:  I'm not going to argue with you.  I made my objection and stated the reason why.  You asked him if he was aware.  I don't think he was aware.
        MS. RYBICKI:  But is it fair to say.
        MR. HIGGINS:  It's not fair to say he was aware.
        THE WITNESS:  No.
        MS. RYBICKI:  But it's not your question to answer.
        MR. HIGGINS:  You asked me a question.  I'm trying to answer.  We haven't established that he was aware of those warnings.  That's why I'm objecting to the form of the question.
BY MS. RYBICKI:
Q.   I'm going to re-ask my question and probably try to make it a little more simple to answer.

Page 139

        Everything we just discussed on this informed consent form, the warnings and the side effects of using Tasigna, you were aware of them when you signed it on November 2, 2015?
A.   No.
Q.   You were not aware when you signed this form that these were potential side effects of Tasigna, is that what you're saying?
A.   No.
Q.   So what did you know when you signed this form, every page of this form on November 2, 2015?
A.   That hopefully it was going to help me.
Q.   I think we're again misunderstanding each other.  I'm going to try to restate the question.
        So this informed consent form, did you understand why you were signing it?
A.   Yeah.
Q.   Why were you signing the informed consent form?
A.   To go on a trial.
Q.   Can you please explain to me what that means, to go on a trial?
A.   Take this trial drug, Tasigna.

Page 140

Q.   So you knew in order to take Tasigna, you needed to sign this informed consent form; is that right?
A.   Yeah.
Q.   So you signed, you initialed and dated each page of this informed consent form; is that right?
A.   Yeah.
Q.   And on these pages that you initialed, lots of those pages talk about the side effects of taking Tasigna; is that right?
A.   I didn't know then, no.
Q.   So we just went over them together.
A.   Yes.
Q.   It's kind of hard because the letters are small, but we managed to get through it.  We went through many of the side effects that are from taking Tasigna; right?
A.   Yes.
Q.   So you were aware that coronary artery disease was a side effect of taking Tasigna; is that right?
        MR. HIGGINS:  Objection to the form of the question.  He's already answered the question.
        THE WITNESS:  No, I wasn't.

Page 141

BY MS. RYBICKI:
Q.   And you were aware that a heart attack was a possibility of taking Tasigna?
        MR. HIGGINS:  Objection to form.
        You can answer.
        THE WITNESS:  No, I wasn't.
BY MS. RYBICKI:
Q.   And you were aware that peripheral arterial occlusive disease was a side effect of taking Tasigna?
        MR. HIGGINS:  Objection to the form.
        You can answer.
        THE WITNESS:  No, I wasn't.
BY MS. RYBICKI:
Q.   So when you signed this document and you initialed it on every page and you signed it at the end, what did that mean to you?
A.   I don't know.
Q.   Do you regularly just sign documents and initial every page?
        MR. HIGGINS:  Objection.  Argumentative.
        You can answer.
        THE WITNESS:  Yes, sometimes.  When I have a bunch of pages like this, I didn't read it all.

Allan Menear

Page 142

<sup>1</sup> BY MS. RYBICKI:
<sup>2</sup>    Q.   You had ample time to review it; right?
<sup>3</sup> We saw in the record that you took it home and
<sup>4</sup> talked to your wife about it and thought about it;
<sup>5</sup> right?
<sup>6</sup>    A.   Yes.
<sup>7</sup>    Q.   Then you asked questions about it;
<sup>8</sup> right?
<sup>9</sup>    A.   Yes.
<sup>10</sup>    Q.   And your questions were answered by
<sup>11</sup> doctors, Dr. Craig; right?
<sup>12</sup>    A.   That we had, yes.
<sup>13</sup>    Q.   Taking you back to that page, that same
<sup>14</sup> page with the three bullets that talked about the
<sup>15</sup> side effects of cardiovascular issues and events,
<sup>16</sup> do you see that?
<sup>17</sup>    A.   No.  I don't remember which one it was
<sup>18</sup> on.
<sup>19</sup>        MS. RYBICKI:  It's Bates 943, counsel,
<sup>20</sup> if you want to show him.
<sup>21</sup> BY MS. RYBICKI:
<sup>22</sup>    Q.   You remember we went over those three
<sup>23</sup> bullet points; right?
<sup>24</sup>    A.   Yes.
<sup>25</sup>    Q.   Right under those three bullet points,

Page 143

<sup>1</sup> it says, the majority of the cases reported were
<sup>2</sup> in patients with risk factors, such as advanced
<sup>3</sup> age, high blood pressure, smoking, diabetes
<sup>4</sup> mellitus and high cholesterol.  Additionally, many
<sup>5</sup> of these patients were reported to have had a
<sup>6</sup> preexisting peripheral vascular disease, which is
<sup>7</sup> a disease of the blood vessels, with common signs
<sup>8</sup> and symptoms such as lower extremity swelling and
<sup>9</sup> claudication, which is pain while walking.
<sup>10</sup>        Do you see that?
<sup>11</sup>    A.   Yeah.
<sup>12</sup>    Q.   You were being treated for high blood
<sup>13</sup> pressure at the time; right?
<sup>14</sup>    A.   Treated for what?
<sup>15</sup>    Q.   You were being treated for high blood
<sup>16</sup> pressure.
<sup>17</sup>    A.   Yes.
<sup>18</sup>    Q.   And you were being treated for high
<sup>19</sup> cholesterol at this time?
<sup>20</sup>    A.   Yes.
<sup>21</sup>    Q.   Mr. Menear, this informed consent form
<sup>22</sup> states that people who have high blood pressure,
<sup>23</sup> who have diabetes and high cholesterol, that's
<sup>24</sup> where the majority of the cases were reported of
<sup>25</sup> things like peripheral vascular disease and

Page 144

<sup>1</sup> coronary artery disease of taking Tasigna.  I want
<sup>2</sup> you to understand that's what this page says.  Do
<sup>3</sup> you understand what I'm saying?
<sup>4</sup>    A.   No.  That didn't mean nothing.
<sup>5</sup>        MR. HIGGINS:  You've answered the
<sup>6</sup> question.
<sup>7</sup> BY MS. RYBICKI:
<sup>8</sup>    Q.   Just to make clear, even though you were
<sup>9</sup> in -- strike that.
<sup>10</sup>        Just to be clear even though you had the
<sup>11</sup> risk factors such as high blood pressure and high
<sup>12</sup> cholesterol that were mentioned in this warning
<sup>13</sup> about people with high blood pressure and high
<sup>14</sup> cholesterol being in the majority of cases
<sup>15</sup> reported for these cardiovascular events, you
<sup>16</sup> decided to take Tasigna and continued taking
<sup>17</sup> Tasigna; is that right?
<sup>18</sup>        MR. HIGGINS:  Objection to the form.
<sup>19</sup>        You can answer.
<sup>20</sup>        THE WITNESS:  I don't remember.  But,
<sup>21</sup> yes, it -- yes.
<sup>22</sup> BY MS. RYBICKI:
<sup>23</sup>    Q.   At this point in November of 2015, you
<sup>24</sup> also had lower extremity issues and pain while
<sup>25</sup> walking; right?

Page 145

<sup>1</sup>    A.   I don't know.
<sup>2</sup>    Q.   We just saw a record when you saw
<sup>3</sup> Dr. Craig where you explained that you had pain
<sup>4</sup> while walking.  Do you remember that?
<sup>5</sup>    A.   No.
<sup>6</sup>    Q.   Let's go to the last page of that
<sup>7</sup> document.  The last page, it says Signatures.  Do
<sup>8</sup> you see where it says Signatures?
<sup>9</sup>    A.   Yes.
<sup>10</sup>    Q.   It's kind of in the middle of the page
<sup>11</sup> there.
<sup>12</sup>    A.   Yes, I see it.
<sup>13</sup>    Q.   Do you see where it says, "I have read
<sup>14</sup> this document/had its contents explained to me.  I
<sup>15</sup> understand the purpose of this study and what will
<sup>16</sup> happen to me in this study.  I do freely give my
<sup>17</sup> consent to join in the study as described to me in
<sup>18</sup> this document"?
<sup>19</sup>        Do you see that?
<sup>20</sup>    A.   Yes.
<sup>21</sup>    Q.   Is that your signature there?
<sup>22</sup>    A.   Yes.
<sup>23</sup>    Q.   And did you date that document?
<sup>24</sup>    A.   Yes, ma'am.
<sup>25</sup>    Q.   And did you put the time there as well?

Allan Menear

Page 146

1    A.   Yes.
2    Q.   Then Dr. Craig signed this ICF, too;
3 right?
4    A.   Yes.
5    Q.   And he also dated it and put the time?
6    A.   Yes.
7    Q.   And it seems like he signed it just one
8 minute after you did; right?
9    A.   Yes.
10    Q.   Let's move on to Exhibit No. 20.  That's
11 the March 14, 2016 Dr. Sedillo office visit.
12         Toward the bottom of the page, do you
13 see it's dated March 14, 2016?
14    A.   Yes.
15    Q.   Do you see that Dr. Gino Sedillo was the
16 doctor?
17    A.   Yes.
18    Q.   Who is Dr. Sedillo?
19    A.   He was a vascular doctor down in
20 Florida.
21    Q.   On page 2 do you see a Problems section?
22    A.   Yes.
23    Q.   One of the problems listed in bullet
24 point two is renal artery stenosis.
25         Do you see that?

Page 147

1    A.   Yes.
2    Q.   Do you know what stenosis in an artery
3 is?
4    A.   No.
5    Q.   I'll tell you it's the narrowing of
6 arteries that carry blood to your kidneys.  But do
7 you see the next bullet point is peripheral
8 vascular disease?
9    A.   Yes.
10    Q.   So in March of 2016, you had peripheral
11 vascular disease?
12    A.   Yes.
13    Q.   Did you have peripheral vascular disease
14 before March of 2016?
15    A.   I don't know.
16    Q.   If you go to the next page, there's a
17 Surgical History section.  It would be the third
18 page.  Is this the Surgical History section?
19    A.   Yes.
20    Q.   There's a lot of stuff there, but I want
21 you to focus on the two first bullets.  The first
22 one says peripheral artery intervention, and it
23 says February 26, 2016.  And then the second
24 bullet point says peripheral artery intervention
25 again, and this one is on February 16, 2016.

Page 148

1         Do you see that?
2    A.   Yes.
3    Q.   Do you recall having angioplasties on
4 both of those dates?  You don't need to think too
5 hard about it because in those two bullet points,
6 if you keep going after the date, it says balloon
7 angioplasty.  I'm just going to see if this
8 refreshes your recollection that you had
9 angioplasties on February 16 and 26, 2016.
10    A.   Who did it?
11    Q.   It doesn't say who did it, but it says
12 that this is a record from Dr. Sedillo.
13    A.   Okay.  Yeah.  Yes.
14    Q.   I mean, you remember having two
15 angioplasties; right?
16    A.   No, I don't.
17    Q.   Do you know what an angioplasty is?
18    A.   No.
19    Q.   We should have started with that.  An
20 angioplasty is a minimally invasive procedure that
21 widens your obstructed arteries or veins.
22 Essentially if you have a clot, they kind of open
23 it up and widen it.  Are you familiar with that?
24    A.   Yeah.
25    Q.   Do you remember having such procedures

Page 149

1 done?
2    A.   Yes.
3    Q.   Do you remember how many of them you
4 had?
5    A.   Five.
6    Q.   They placed stents into your arteries to
7 open them up; right?  Is that how you understand
8 it?
9    A.   Yes.
10    Q.   You know that the angioplasties that you
11 had were to help treat your peripheral vascular
12 disease; right?
13    A.   Yes.
14    Q.   Did Dr. Sedillo know that you were
15 taking Tasigna?
16    A.   No.
17    Q.   Did Dr. Sedillo tell you what he thought
18 was causing your peripheral vascular disease?
19    A.   No, he didn't.
20    Q.   In March of 2016, when you were
21 diagnosed with peripheral vascular disease, did
22 you suspect that this peripheral vascular disease
23 was related to your taking of Tasigna?
24    A.   No.
25    Q.   Mr. Menear seems to be bothered by the

Allan Menear

Page 150

¹ light.
²     A.  It's right in my eyes.
³         MR. HIGGINS:  Sorry.  There's no help
⁴ for it.
⁵ BY MS. RYBICKI:
⁶     Q.  Let's move on to Exhibit 21, which is
⁷ the May 16, 2016 cardio consult.  This is a
⁸ May 16, 2016 record from Dr. Sedillo's office, but
⁹ it appears that you saw Stacey Royce, a PA, on
¹⁰ this visit; right?
¹¹     A.  Yes.
¹²     Q.  If you look at the -- if you go to page
¹³ 2, on the bottom there you'll see a Surgical
¹⁴ History section.  Let me know if you see it.
¹⁵     A.  Yes.
¹⁶     Q.  Again, these are the bullet points with
¹⁷ the dates that we went over in a previous record.
¹⁸ Do you see in the first bullet point it says
¹⁹ peripheral artery intervention?
²⁰     A.  Yes, ma'am.
²¹     Q.  That's May 3, 2016?
²²     A.  Yes.
²³     Q.  Then the next bullet point says on
²⁴ April 20, 2016, you had a cardiac catheterization.
²⁵         Do you see that?

Page 151

¹     A.  Yes.
²     Q.  Then we have those two angioplasties
³ that we discussed previously on February 26, 2016
⁴ and February 16, 2016.  Do you see those in the
⁵ third and fourth bullets?
⁶     A.  Angioplasty?  I don't see it.
⁷     Q.  It will be right after the date.  It
⁸ will say balloon angioplasty.
⁹     A.  Okay.
¹⁰     Q.  Is it fair to say that between
¹¹ February 2016 and May 2016, we have four
¹² procedures?
¹³     A.  Yes.
¹⁴     Q.  These are four procedures for your
¹⁵ peripheral vascular disease; right?
¹⁶     A.  Yes.
¹⁷     Q.  Do you remember being diagnosed with
¹⁸ coronary sclerosis?  It was a general question.
¹⁹ It's not going to be in the records.
²⁰     A.  I don't remember.
²¹     Q.  Has a doctor ever recommended -- has
²² your cardiologist ever recommended open heart
²³ surgery?
²⁴     A.  Yeah.
²⁵     Q.  Do you remember when this was?

Page 152

¹     A.  I believe it was 2016, around December
² 2016.
³     Q.  The four procedures we just talked about
⁴ in relation to your peripheral vascular disease,
⁵ did you talk about these with Dr. Craig at all?
⁶     A.  I don't remember.
⁷     Q.  Let's move onto the next exhibit,
⁸ Exhibit 22, May 9, 2016 consent form.
⁹         MR. HIGGINS:  Have we talked about that
¹⁰ one yet?
¹¹         MS. RYBICKI:  No.
¹² BY MS. RYBICKI:
¹³     Q.  Do you see West Virginia University on
¹⁴ the top?
¹⁵     A.  Yes.
¹⁶     Q.  Do you see the title, it says Informed
¹⁷ Consent Site Version?
¹⁸     A.  Yes.
¹⁹     Q.  It's dated February 2, 2016?
²⁰     A.  Yes.
²¹     Q.  I'm sorry.  That's the version.  The
²² version is February 2, 2016.  If you look at the
²³ title, it says Informed Consent Site Version
²⁴ February 2, 2016; right?
²⁵     A.  Consent form.

Page 153

¹     Q.  If you look at the title, it says
² CAMN107A US37 Informed Consent Site Version
³ February 2, 2016.
⁴         MR. HIGGINS:  We'll stipulate that's
⁵ what it says.
⁶ BY MS. RYBICKI:
⁷     Q.  Dr. Craig is a co-investigator on this
⁸ document.  It's in the caption there.
⁹     A.  Co-investigator, yes.
¹⁰     Q.  This is another consent form for the
¹¹ Tasigna clinical trial; right?
¹²     A.  I don't know.
¹³     Q.  Let's look back at the title that you
¹⁴ just stipulated to.  It says Informed Consent Site
¹⁵ Version; right?
¹⁶     A.  Yeah.
¹⁷     Q.  Do you see that?  This is the consent
¹⁸ form for the Tasigna clinical trial; right?
¹⁹     A.  I don't know.
²⁰     Q.  Why don't you take time and find the
²¹ title of the document because I want you to feel
²² comfortable with what this document is.
²³         MR. HIGGINS:  We'll stipulate that it is
²⁴ a consent form.
²⁵         MS. RYBICKI:  But I want Mr. Menear to

Allan Menear

Page 154

1 review the front page.
2        MR. HIGGINS:  He can do that.
3        THE WITNESS:  Informed consent site
4 version, is that what you're talking about?
5 BY MS. RYBICKI:
6    Q.  Right.  Do you understand that this is
7 the informed consent form?
8    A.  No.
9    Q.  Do you see at the very top of the
10 document where it says consent form?
11    A.  Yes.
12    Q.  Does that refresh your recollection that
13 this is a consent form?
14        MS. RYBICKI:  Why don't we take a
15 two-minute break.  Then Mr. Menear can look
16 through the document and familiarize himself with
17 what this is.
18        MR. HIGGINS:  Okay.
19        (Recess from 2:04 p.m. to 2:06 p.m.)
20        MR. HIGGINS:  Have you had a chance to
21 review it, Allen?
22        THE WITNESS:  Yeah.
23 BY MS. RYBICKI:
24    Q.  Mr. Menear, I'm going to read the study
25 title to you.  It says a Phase II Randomized

Page 155

1 Multicenter Study of Treatment Free Remission in
2 Chronic Myeloid Leukemia in Chronic Phase Patients
3 Who Achieve and Sustain MR 4.5 After Switching to
4 Nilotinib (Tasigna).  Do you see that?
5    A.  Yes.
6    Q.  Do you understand that to mean that this
7 is a study of treatment free remission in CML for
8 people who are taking Tasigna?
9    A.  Yes.
10    Q.  Does this refresh your recollection that
11 this is an informed consent form that you signed
12 when taking Tasigna?
13    A.  Yes.
14    Q.  On the bottom right there, we see your
15 initials again and the date May 9, 2016; right?
16    A.  Right.
17    Q.  This form is very similar to the one we
18 just looked at earlier.  Again, feel free to read
19 it as much as you would like.  But I would like to
20 direct you to page 11, which is Bates 1041,
21 counsel.
22        If you look at the bottom right, you'll
23 see that you initialed AM there; right?
24    A.  Yes.
25    Q.  Then you dated it May 9, 2016?

Page 156

1    A.  Yes.
2    Q.  So you read this document on May 9,
3 2016?
4    A.  No.
5    Q.  You did not read this document on May 9,
6 2016?
7    A.  No.
8    Q.  So you signed it without reading it?
9    A.  Yes.
10    Q.  So you don't know what this document
11 says at all?
12    A.  No.
13    Q.  But this document here, which is the
14 informed consent form that you signed on May 9,
15 2016, it specifically warns of coronary artery
16 disease; right?
17        MR. HIGGINS:  Objection.  The document
18 speaks for itself.
19        You can answer.
20        THE WITNESS:  I don't know.
21 BY MS. RYBICKI:
22    Q.  If you look at the first bullet point,
23 it says ischemic heart disease.  And then it says
24 coronary artery disease.  Do you see that?
25    A.  Yes.

Page 157

1    Q.  So this informed consent form warns of
2 heart disease?
3    A.  Yes.
4    Q.  It specifically warns of coronary artery
5 disease?
6    A.  Yes.
7    Q.  This document also specifically warns of
8 peripheral arterial occlusive disease; right?
9    A.  Yes.
10    Q.  This document specifically warns of
11 heart attacks and strokes; right?
12    A.  Yes.
13    Q.  Then this document also says that people
14 who are in the high risk factor for developing
15 these side effects are people who have high blood
16 pressure and high cholesterol, among other things;
17 right?
18    A.  Yes.
19    Q.  And it's fair to say, and you won't
20 disagree with me, that you did have high blood
21 pressure and high cholesterol at this time?
22    A.  Yes.
23    Q.  Dr. Craig went over this information
24 with you on the day that you signed this document?
25    A.  No.

Page 158

1    Q.  Dr. Craig signed this document though;
2  right?
3    A.  Yeah, I think.
4    Q.  If look at the last page, you will see
5  his signature.  Do you see that?  Do you see
6  Dr. Craig's signature on the last page there?
7    A.  Yeah.
8    Q.  So if Dr. Craig testified at deposition
9  last week and he said that he went over every
10  single page of this document with you, would he
11  not be telling the truth?
12       MR. HIGGINS:  Object to the form of the
13  question.
14       You can answer.
15       THE WITNESS:  Yeah.
16  BY MS. RYBICKI:
17    Q.  Dr. Craig did not go over every single
18  page of this document with you?
19    A.  No.
20    Q.  Let's go to Exhibit No. 23, which is the
21  August 1, 2016 medical record.  There's going to
22  be three documents from August 1, 2016.  I'm going
23  to start with the one that's the oncology record
24  of Dr. Craig.
25       MR. HIGGINS:  The first is the oncology

Page 159

1  record?
2       MS. RYBICKI:  No.  The first is the
3  nurse's note.
4  BY MS. RYBICKI:
5    Q.  You're on the nurse's note?  This
6  document is dated August 1, 2016; right?
7    A.  Yes.
8    Q.  Do you see the Identification section?
9  It is Bates 1137 at the bottom.  Do you see the
10  Identification section?
11    A.  Yes.
12    Q.  Do you see right below, maybe seven
13  lines below, that it says May 2016?
14    A.  May 2015.
15    Q.  May 2016 should be right after that.
16    A.  Yes.
17    Q.  It says, "May 2016 - CAD/PVD with
18  several stents placed since last visit."
19       Do you see that?
20    A.  Yes.
21    Q.  At this time in August 2016, Dr. Craig
22  was aware of your ongoing coronary and peripheral
23  arterial diseases?
24    A.  Yes.
25    Q.  He was aware you were getting treatment

Page 160

1  for those diseases; right?
2    A.  Yeah.
3    Q.  Moving on to the fourth page in the
4  Assessment section, do you see the Assessment
5  section?
6    A.  Yes.
7    Q.  Assessment number one says, "CML with
8  nilotinib trial, NED."  Do you know what NED
9  stands for?
10    A.  No.
11    Q.  NED stands for no evidence of disease.
12  Does that sound right, that you were getting
13  treated for CML with Tasigna, and in August of
14  2016 you had no evidence of disease?
15    A.  Yes.
16    Q.  So the Tasigna was working?
17    A.  Yes.
18    Q.  Item 2 is "CAD/PVD."  I'll represent to
19  you that CAD is coronary artery disease and PVD is
20  peripheral vascular disease.  Do you see that as
21  an issue that you had in August of 2016?
22       MR. HIGGINS:  Objection to the form.
23       You can answer.
24       THE WITNESS:  What was that date again?
25

Page 161

1  BY MS. RYBICKI:
2    Q.  The date of this record is August 1,
3  2016.  Let's kind of take a step back.  This is
4  the Assessment section in a medical record with
5  Dr. Craig on August 1, 2016.  Okay?  Are you
6  following me?  Do you see the Assessment section?
7    A.  Yes.
8    Q.  Do you see number 2 says "CAD/PVD"?
9    A.  Yes.
10    Q.  Do you know that CAD means coronary
11  artery disease?
12    A.  Yes.
13    Q.  Do you know that PVD means peripheral
14  vascular disease?
15    A.  Yes.
16    Q.  So it's fair to say in August of 2016,
17  Dr. Craig diagnosed you with CAD and PVD; right?
18    A.  Yes.
19    Q.  And then number three says "Neuropathy";
20  right?
21    A.  Yes.
22    Q.  And then number four and number five,
23  number four says "DM," and number five says "DVT
24  history"; right?
25    A.  Yes.

Allan Menear

Page 162

1    Q.   In the Plan section, number two says
2   "Continue with nilotinib.  Answered questions
3   about drug and CAD risks."
4        Do you see that?
5    A.   Yes.
6    Q.   You know that nilotinib is Tasigna?
7    A.   Yes.
8    Q.   So at this point in time, Dr. Craig is
9   continuing you on Tasigna; is that right?
10   A.   Yes.
11   Q.   It says here he answered questions about
12   CAD risks.  Do you see that?
13   A.   Yes.
14   Q.   So he explained that there are coronary
15  artery disease risks associated with Tasigna, and
16  then he answered your questions about them; right?
17   A.   I don't know.  I don't believe I had any
18  questions.
19   Q.   Aside from your questions, Dr. Craig
20  still explained to you the risks, the coronary
21  artery disease risks affiliated with Tasigna;
22  right?
23       MR. HIGGINS:  Object to the form.  The
24  document speaks for itself.
25

Page 163

1   BY MS. RYBICKI:
2    Q.   I'm not asking you what the document
3   says, Mr. Menear.  I'm asking you what you
4   remember.  At this point on August 1, 2016,
5   Dr. Craig explained to you coronary artery disease
6   risks associated with Tasigna; right?
7    A.   I don't know.
8    Q.   That's what the record says; right?
9        MR. HIGGINS:  Objection.  The record
10  speak for itself.
11  BY MS. RYBICKI:
12   Q.   You may answer.
13   A.   I don't know.
14   Q.   I'm asking if that's what the record
15  says.
16       MR. HIGGINS:  Same objection.
17       THE WITNESS:  That's what's on the
18  paper.
19  BY MS. RYBICKI:
20   Q.   In the Plan section that we were just
21  in, do you see number three says, "New consent
22  today for possible recurrence of hepatitis B"?
23   A.   Yes.
24   Q.   Dr. Craig had you sign another consent
25  form on that day?

Page 164

1    A.   I don't remember.
2    Q.   Let me ask you this:  We're about to see
3   in a couple of exhibits another ICF, informed
4   consent form, that you had a hard time identifying
5   before.
6        My question to you generally right now
7   is:  Do you remember signing a bunch of these
8   informed consent forms to take Tasigna?
9    A.   No, I don't, no.  I don't remember.
10   Q.   Let's go to the other 8/1/16 record, and
11  that would be Exhibit 24, August 1, 2016 Dr. Craig
12  visit.  That would be Bates 1126.
13       Do you see on the bottom there where it
14  says Nurses Notes by Beal, Patricia on August 1,
15  2016?
16   A.   Yes, ma'am.
17   Q.   And do you see the note is titled ICF
18  Amendment Documentation?
19   A.   Yes.
20   Q.   I'm going to read this section to you.
21  It says; "Patient states overall he's feeling well
22  with no complaints.  Still has some pain in his
23  lower legs when he walks some distance, but it
24  isn't as bad as it had been prior to stents being
25  placed."

Page 165

1        Do you see that?
2    A.   No.  I haven't found that.
3    Q.   It's right on the bottom there, the
4   second line.  Did you see that statement?
5    A.   Yeah.
6    Q.   Then it also says, "His wife was with
7   him for this visit, and they had a lot of
8   questions regarding disease status, continuing
9   treatment, all of which were answered by the
10  providers and myself."
11       Do you see that?
12   A.   My wife asked the questions.
13   Q.   But this is generally what happened;
14  right?
15   A.   Yes.
16   Q.   Do you remember what questions your wife
17  asked, by any chance?
18   A.   No.
19   Q.   As we covered earlier, you had undergone
20  four different surgical procedures to treat your
21  cardiovascular problems at this point.  Did you
22  ask any questions about those cardiovascular
23  problems?
24   A.   My wife did.
25   Q.   Do you remember what questions she

Allan Menear

Page 166

1 asked?
2    A.   No.
3    Q.   Did she ask whether your cardiovascular
4 issues were related to Tasigna at all?
5    A.   No.
6    Q.   In the same paragraph it says, "Provider
7 reviewed labs and examined patient and stated for
8 him to continue on study treatment at current dose
9 of nilotinib, 300 milligrams, twice daily."
10       Does that sound right, that you
11 continued to take Tasigna at this point?
12    A.   Yes.
13    Q.   Then we see a table there, and the table
14 says Consent Statements/Questions with options,
15 Yes, No or No Answer.
16       Do you see that?  Do you see the table?
17    A.   Yes.
18    Q.   Number four says, "Protocol and consent
19 changes were thoroughly discussed by the treating
20 physician."  And do you see it was checked "Yes"?
21    A.   Yes.
22    Q.   Number six, "Discussion included any
23 changes to the purpose, risks, benefits, treatment
24 alternatives, study procedures, medications, study
25 duration and voluntary participation."  That was

Page 167

1 checked "Yes," too; right?
2    A.   Yes.
3    Q.   And number eight says, "Subject/LAR was
4 given ample time to read the consents in private,
5 to ask questions and to have questions answered."
6 And that was checked "Yes," too; right?
7    A.   Yes.
8    Q.   So at this visit, the doctor or the
9 nurse went over the risks and benefits of Tasigna
10 treatment with you; right?
11    A.   Yes.
12    Q.   You were given ample time to read and
13 talk in private and ask questions; right?
14    A.   Yes.
15    Q.   Do you remember if you had any questions
16 at this visit?
17    A.   No.
18       MS. RYBICKI:  The next exhibit is the
19 August 1, 2016 consent form.  It's Exhibit 25.
20 I'm going to gloss over it.  It's a similar
21 document.  I want to see what Mr. Menear was going
22 to say about it.
23 BY MS. RYBICKI:
24    Q.   Mr. Menear, yet again we see a similar
25 document.  I told you you were going to be an

Page 168

1 expert at reading medical records after this.
2       Do you see it says West Virginia
3 University on top?
4    A.   Yes.
5    Q.   And do you see the title is the funny
6 name and number.  Then it says Informed Consent
7 Site Version May 26, 2016.
8    A.   Okay, yes.
9    Q.   And then what looks like a little
10 sticker there with a bar code, it has your name on
11 it, Allen Menear.  Do you see that?
12    A.   Yes.
13    Q.   It has your date of birth?
14    A.   Yes.
15    Q.   And then in the study title it says that
16 this is a Phase II Randomized Multicenter Study of
17 Treatment Free Remission in Chronic Myeloid
18 Leukemia in Chronic Phase Patients Who Achieve and
19 Sustain MR 4.5 After Switching to Nilotinib
20 Tasigna.
21       Do you see that?
22    A.   Yes.
23    Q.   This is an informed consent form for
24 taking Tasigna?
25    A.   I don't know.  I'd have take time out

Page 169

1 and read it all.
2       MR. HIGGINS:  We'll stipulate that's
3 what it is.
4 BY MS. RYBICKI:
5    Q.   Are those your initials on the bottom of
6 page there?
7    A.   Yes.
8    Q.   And did you date page?
9    A.   Yes.
10    Q.   If you can go through every single page
11 of this document, of this informed consent form
12 and tell me if you initialed and dated each single
13 page.
14    A.   Yes.
15    Q.   If you go to the last page, you'll see
16 that you signed the document; right?
17    A.   Yes.
18    Q.   And you again dated it and then you put
19 in the time?
20    A.   Yes.
21    Q.   On August 1, 2016, you were aware that
22 you were going to continue taking Tasigna; right?
23    A.   Yes.
24    Q.   At this point, the nurses and the doctor
25 again reminded you of the side effects of taking

Allan McNear

Page 170

¹ Tasigna; right?
²           MR. HIGGINS:  Object to the form.
³           You can answer.
⁴           THE WITNESS:  Yes.
⁵ BY MS. RYBICKI:
⁶     Q.   And the doctor and the nurses
⁷ periodically reminded you of these Tasigna side
⁸ effects through forms like this one; right?
⁹           MR. HIGGINS:  Object to the form.
¹⁰           You can answer.
¹¹           THE WITNESS:  I can't answer.  I don't
¹² know.
¹³ BY MS. RYBICKI:
¹⁴     Q.   This is not the first form that we're
¹⁵ seeing today.  This is the third one we've looked
¹⁶ at together; right?
¹⁷     A.   Yes.
¹⁸     Q.   So it's fair to say that you were
¹⁹ reminded of these side effects several times;
²⁰ right?
²¹           MR. HIGGINS:  Object to the form.
²²           You can answer.
²³           THE WITNESS:  I can't answer it.
²⁴ BY MS. RYBICKI:
²⁵     Q.   What would help you answer that

Page 171

¹ question?
²     A.   Well, if it said a trial some place.
³     Q.   What about a study, would that work for
⁴ you, or does it have to be trial?
⁵     A.   Study would work.
⁶     Q.   If I direct your attention back to the
⁷ title on the first page, study title it says here
⁸ a Phase II Randomized Multicenter Study of
⁹ Treatment Free Remission.
¹⁰           Do you see that?
¹¹     A.   Yes.
¹²     Q.   Does that refresh your recollection that
¹³ this was a consent form that you needed to sign to
¹⁴ participate in the Tasigna study?
¹⁵     A.   Yes.
¹⁶     Q.   So this is the third one that you and I
¹⁷ have gone over today; is that right?
¹⁸     A.   Yes.
¹⁹     Q.   So is it fair to say this is the third
²⁰ informed consent form for the Tasigna trial that
²¹ we've seen today?
²²     A.   Yes.
²³     Q.   And you signed and dated every page of
²⁴ each one of them; right?
²⁵     A.   Yes.

Page 172

¹     Q.   It's fair to say that the doctor,
² Dr. Craig, and the nurses frequently or at points
³ reminded you of the side effects of taking
⁴ Tasigna?
⁵           MR. HIGGINS:  Object to the form.
⁶           Go ahead.  Answer.
⁷           THE WITNESS:  No.  I can't answer that.
⁸ BY MS. RYBICKI:
⁹     Q.   When you say you can't answer that, how
¹⁰ can I help you answer that?
¹¹     A.   They went over some symptoms, diarrhea,
¹² vomiting, headaches.
¹³     Q.   So you're saying when you signed each
¹⁴ one of these informed consent forms --
¹⁵     A.   No.  I'm not saying that.
¹⁶           MR. HIGGINS:  Let her finish the
¹⁷ question.
¹⁸ BY MS. RYBICKI:
¹⁹     Q.   When you were signing each one of these
²⁰ informed consent forms, the only side effect that
²¹ you were warned about by the doctor and the nurses
²² were diarrhea and nausea and vomiting and stuff
²³ like that, is that what you're testifying to
²⁴ today?
²⁵     A.   Correct.

Page 173

¹     Q.   So if Dr. Craig testified he
² specifically told you about the risks and side
³ effects of taking Tasigna other than diarrhea and
⁴ nausea, would he be incorrect?
⁵           MR. HIGGINS:  Objection.  Form.
⁶           THE WITNESS:  No.
⁷ BY MS. RYBICKI:
⁸     Q.   So he would be correct because he did --
⁹ I'm going to reword this question so it will be
¹⁰ easier for you to understand.
¹¹           Dr. Craig and maybe some of the nurses
¹² through these ICF forms that you signed several
¹³ times told you about these cardiovascular events
¹⁴ and cardiovascular risks; is that right?
¹⁵     A.   I don't remember.
¹⁶     Q.   When you signed these ICF forms, the
¹⁷ doctor and the nurses told you that if you took
¹⁸ Tasigna, you might get heart disease?
¹⁹     A.   No.
²⁰     Q.   Did they tell you if you took Tasigna,
²¹ you can get a heart attack?
²²     A.   No.
²³     Q.   And if you took Tasigna, you can get
²⁴ peripheral arterial occlusive disease?
²⁵     A.   No.

Allan McNear

Page 174

1    Q.   Did Dr. Craig ever tell you that your
2 vascular disease comes from your strong family
3 history?
4    A.   No.
5    Q.   Did Dr. Craig ever -- did Dr. Craig or
6 your heart doctor or your vascular doctor, as you
7 called him, tell you that any of your
8 cardiovascular issues are because of your family
9 history?
10    A.   No.
11    Q.   The next exhibit I believe is
12 Exhibit 26, which would be the August 7, 2017
13 oncology record of Dr. Craig.  Do you see that
14 this is a West Virginia University Medicine
15 medical record?
16       MR. HIGGINS:  Make sure we have the
17 right document.
18       MS. RYBICKI:  Is it 4507 at the bottom?
19       MR. HIGGINS:  Yes.
20 BY MS. RYBICKI:
21    Q.   It should be in the center there.  It
22 should say WVU Medicine.
23    A.   Return Patient Progress Notes.
24    Q.   Yes.  Do you see it's dated August 7,
25 2017?

Page 175

1    A.   Yes.
2    Q.   If you go to the Patient Identification
3 section, do you see that section?
4    A.   Yes.
5    Q.   Then go way lower to around
6 February 2017.
7       Do you see that?
8    A.   Yes.
9    Q.   The next line, it says, "Completed
10 nilotinib in May 2017, in molecular remission, per
11 protocol goes on observation now."
12       Do you see that?
13    A.   Yes.
14    Q.   Then says "June 2017 - BCR/ABL weakly
15 positive."
16       Do you see that?
17    A.   Yes.
18    Q.   If you go to the sixth page, which is
19 Bates 4513, there's a note by Dr. Craig that says,
20 "I personally saw and evaluated the patient.  See
21 midlevel's note for additional details.  My
22 findings/participation are CML, loss of molecular
23 remission while off TKI.  Restart nilotinib."
24       Do you see that?
25    A.   Yes.

Page 176

1    Q.   What this is saying is that you went off
2 of Tasigna and then your BCR/ABL levels started
3 going up again; is that right?
4    A.   Correct.
5    Q.   What he says is when you were off
6 Tasigna, you were losing molecular remission.
7 That's what he's saying; right?
8    A.   Yes.
9    Q.   So what he wants to do is restart
10 nilotinib, which is Tasigna; is that right?
11    A.   Yes.
12    Q.   Do you remember what Dr. Craig told you
13 at this point about Tasigna?
14    A.   No.  I don't remember.
15    Q.   Did he tell you your CML was coming
16 back?
17    A.   Yes.
18    Q.   And were you disappointed that your CML
19 was coming back?
20    A.   Yes.
21    Q.   You were kind of hoping that it would
22 stay in remission and you would continue without
23 any TKI treatment; right?
24    A.   Right.
25    Q.   That was the whole point of the clinical

Page 177

1 trial that we were talking about?
2    A.   Yes.
3    Q.   And it didn't work out the way it should
4 have; right?
5    A.   Right.
6    Q.   So you needed to go back on your Tasigna
7 to continue to treat your CML?
8    A.   Yes.
9    Q.   Did Dr. Craig explain to you why your
10 CML needed to be treated?
11    A.   He just explained my numbers were low.
12    Q.   Did he explain to you that if you don't
13 treat it, you can die?
14    A.   No.
15    Q.   If you don't treat CML, you can die.
16 You knew that; right?
17    A.   I don't recall.
18    Q.   CML is cancer; right?
19    A.   Yeah.
20    Q.   If you don't treat your CML, the result
21 is you can die?
22    A.   Yeah.  He told me that the first day.
23    Q.   Here when you started coming -- when you
24 came off of Tasigna, your levels started
25 increasing again; right?

Allan Menear

Page 178

1    A.  Yes.
2    Q.  There was a risk that if you didn't
3  treat your cancer, you would die; is that right?
4    A.  He never told me that, no.
5    Q.  But you knew you had to keep your levels
6  down?
7    A.  Yes.
8    Q.  And why were you keeping your levels
9  down?
10    A.  To survive.
11    Q.  At this point, you and Dr. Craig were
12  both aware of your cardiovascular problems; right?
13    A.  Yes.
14    Q.  That's because you both read and signed
15  multiple forms that talked about them; right?
16       MR. HIGGINS:  Object to the form of the
17  question.
18       You can answer.
19       THE WITNESS:  No.
20       MS. RYBICKI:  I'm going to object to you
21  coaching the witness every time you object.
22       MR. HIGGINS:  How did I coach him?
23       MS. RYBICKI:  You're objecting to form,
24  and I can form my questions however I want.  I
25  don't think there's anything wrong with my

Page 179

1  question.
2       MR. HIGGINS:  Well, I promise not to
3  coach him.  I'm not going to promise not to
4  object.
5       MS. RYBICKI:  I'm going to re-ask my
6  question, and it's going to be in a good form.
7       MR. HIGGINS:  I hope so.
8  BY MS. RYBICKI:
9    Q.  You just testified at this point you and
10  Dr. Craig were aware of your cardiovascular
11  problems; right?
12    A.  Yes.
13    Q.  And that's because you both read and
14  signed the consent forms that we talked about;
15  right?
16       MR. HIGGINS:  I object to the form.  I
17  also object to stating facts that are not in
18  evidence.  There's no evidence he read the form.
19  BY MS. RYBICKI:
20    Q.  You still have to answer my question.
21       MR. HIGGINS:  That's true.
22       THE WITNESS:  No.
23  BY MS. RYBICKI:
24    Q.  You made the decision to continue taking
25  Tasigna; right?

Page 180

1    A.  Yes.
2    Q.  Did Dr. Craig talk to you about any
3  other medications at this point?
4    A.  No.
5    Q.  Let's go to our next record.  I believe
6  it is Exhibit 27, and it is a September 6, 2018
7  oncology record from Dr. Craig.
8       Just to identify for the record, this is
9  a West Virginia University Medicine medical
10  record; right?
11    A.  Yes.
12    Q.  And it's dated September 6, 2018?
13    A.  Yes.
14    Q.  And that's your name there, Allen
15  Menear?
16    A.  Yes.
17    Q.  If you see in the patient identification
18  section, there's lots of dates.  It's kind of a
19  timeline.  Do you see that?
20    A.  Yes.
21    Q.  If you keep going down, you'll see
22  February 2017, May 2017, June 2017.  Do you see
23  that?
24    A.  Yes.
25    Q.  So if we focus on December 29, 2017, do

Page 181

1  you see that date?
2    A.  Let me find it here.
3    Q.  It would be the third line from the
4  bottom.
5    A.  Yeah.
6    Q.  Do you see December 29, 2017?
7    A.  Yes.
8    Q.  It says, "Left BKA secondary to chronic
9  critical ischemia with osteomyelitis left first
10  great toe."
11       Do you see that?
12    A.  Yes.
13    Q.  Do you know that BKA stands for below
14  the knee amputation?
15    A.  I didn't know that, no.
16    Q.  Does that sound right to you, that on
17  December 29, 2017, you had a below knee
18  amputation?
19    A.  Yes.
20    Q.  What amputation was that?
21    A.  What do you mean?
22    Q.  What was amputated?
23    A.  My left leg.
24    Q.  If you go down to the last entry of
25  May 10, 2018, it says, "BCR/ABL weakly positive."

Allan McNear

Page 182

1 Nilotinib discontinued due to PVD and h/o
2 amputation.  Literature review suggesting it can
3 be a contributing factor to vascular events.  On
4 observation."
5     Do you see that?
6   A.  Yes.
7   Q.  Were you taken off of Tasigna when you
8 had your amputation?
9   A.  No.  It was right after.
10   Q.  It was right after it?
11   A.  Yeah.
12   Q.  After you were off of Tasigna, your
13 levels started to go up again; is that right?
14   A.  Um-hum, and I asked Dr. Craig could all
15 my problems, the sores on my right leg be the
16 problem of Tasigna, and he told me, yes, probably
17 is for sure.
18   Q.  So that's exactly what this record is
19 saying.  I think Dr. Craig is saying literature
20 review suggesting it can be a contributing factor
21 to vascular event; right?
22   A.  Yes, yes.
23   Q.  So Dr. Craig is saying literature review
24 shows that vascular events can be contributing
25 factors; right?

Page 183

1   A.  Yes.
2   Q.  If we go to the fifth page, which is the
3 Assessment section, if you go to the Assessment
4 section -- let me know when you're there.
5   A.  Okay.
6   Q.  Do you see number one says, "CML with
7 relapse.  Restarting TKI"?
8     Do you see that?
9   A.  Yes.
10   Q.  So Dr. Craig saw that your CML was
11 coming back; right?
12   A.  Yes.
13   Q.  So he wanted to put you on a TKI again;
14 right?
15   A.  Yeah.
16   Q.  In the Plan section, it says number one,
17 "Will begin dasatinib, 100 milligram daily."
18     Do you see that?
19   A.  Yes.
20   Q.  We discussed earlier that dasatinib is
21 SPRYCEL.  Does that sound familiar?
22   A.  Yes.
23   Q.  It says, number two, "Consent signed
24 today.  Discussion of most common side effects
25 that may cause pleural effusions causing shortness

Page 184

1 of breath."
2     Do you see that?
3   A.  Yes.
4   Q.  Do you know what pleural effusions are?
5   A.  No.
6   Q.  If I told you it's a buildup of fluid in
7 the lungs, would that remind you of what that
8 means?
9   A.  Yes.
10   Q.  Did Dr. Craig make you aware pleural
11 effusions were a side effect of SPRYCEL?
12   A.  Yes.
13   Q.  But you started this drug anyway?
14   A.  Yes.
15   Q.  Why did you take the drug even though
16 you knew this was a side effect?
17   A.  Hopefully my numbers would get better.
18   Q.  Did you weigh the risk of side effect
19 against the benefit of treating your CML?
20   A.  No.
21   Q.  What was your thought process when you
22 heard about pleural effusions as a possible side
23 effect?  Did you consider it at all, or were you
24 like, I'm taking SPRYCEL no matter what?
25   A.  No.  I was on SPRYCEL.  Then I got

Page 185

1 fluid.  And nobody knew the first time.
2   Q.  Let's take a step back.  When you were
3 first prescribed SPRYCEL, which is what we're
4 talking about now, Dr. Craig told you, hey, if you
5 took SPRYCEL, if you take SPRYCEL, you could get
6 pleural effusions?
7   A.  No, he didn't.
8   Q.  He did not say that?
9   A.  No.
10   Q.  So this record that says discussion of
11 most common side effects that may include pleural
12 effusion, that did not happen?
13   A.  To where he told me?
14   Q.  If you look at the Plan section at the
15 very bottom, there's a Plan section, and number
16 two, do you see where it says number two, "Consent
17 signed today"?
18   A.  Yes.
19   Q.  Why don't you read that entire number
20 two.
21   A.  No.
22   Q.  I'm sorry?
23   A.  If Dr. Craig went over the side effects
24 of SPRYCEL.  None of that was mentioned, me
25 getting shortness of breath, which I had, and the

Allan Menear

Page 186

1 fluid in the lungs.
2    Q.   So he did not warn you of this before
3 you started taking SPRYCEL?
4    A.   No.
5    Q.   Were you aware of any side effect of
6 SPRYCEL?
7    A.   No.
8    Q.   When you started taking SPRYCEL, do you
9 remember if your numbers went down?
10    A.   Yes.
11    Q.   Did they go down?
12    A.   Yes.
13    Q.   So that means SPRYCEL was working;
14 right?
15    A.   Yes.
16    Q.   And then at some point, I'll represent
17 to you on March 22 your dose of SPRYCEL started to
18 get reduced.  Do you remember that?
19    A.   Yes.
20    Q.   Do you remember if your dose of SPRYCEL
21 was being reduced because of you exhibiting
22 symptoms of pleural effusion?
23    A.   Yes.
24    Q.   What is it like having pleural effusion?
25    A.   Having two-liter bottle of fluid in your

Page 187

1 lungs.
2    Q.   What are you feeling?
3    A.   You can't breathe.
4    Q.   Are you like coughing and spitting stuff
5 up?
6    A.   No.  Just shortness of breath.  It takes
7 your breath.  You can't sleep.
8    Q.   Did you ever require hospitalization for
9 your pleural effusion?
10    A.   Yes, I did.
11    Q.   Do you remember how many times?
12    A.   Once.
13    Q.   Sorry for going back to the timeline.
14 You started taking SPRYCEL in September of 2018.
15 Is it fair to say that you took SPRYCEL for three
16 years approximately?
17    A.   No.  It wasn't that long.
18    Q.   How long would you say you took SPRYCEL?
19    A.   Nine months.
20    Q.   We just established that you started
21 taking SPRYCEL in September 2018; is that right?
22    A.   Yeah.
23    Q.   Let me show you a record.  It's a
24 September 23, 2021 oncology record by Dr. Craig.
25 This is Exhibit 28.  The Bates is 2152.  If you

Page 188

1 look at this record, you see that it's a West
2 Virginia University Medicine document?
3    A.   Yes.
4    Q.   Do you see in the bottom where it says
5 Cancer Center Notes?  Dr. Craig is the author.
6    A.   Yes.
7    Q.   This is dated September 23, 2021; right?
8    A.   Yes.
9    Q.   If you look at page 2 in the Patient
10 Identification section and you look all the way on
11 the bottom, the last line says June 2021.
12    A.   I'm here.
13    Q.   It says, "Stable.  Small pleural
14 effusion.  Continues dasatinib.  BCR/ABL pending."
15       Do you see that?
16    A.   Yes.
17    Q.   So this is June 2021 we're talking
18 about.  It says you still have pleural effusion
19 and that you're taking dasatinib; right?
20    A.   Yes.
21    Q.   We discussed earlier that dasatinib is
22 SPRYCEL.
23    A.   Yes.
24    Q.   So in June 2021, you were still taking
25 SPRYCEL?

Page 189

1    A.   Yes.
2    Q.   Does this refresh your recollection that
3 you took SPRYCEL for approximately three years?
4    A.   Yes.
5    Q.   If you go to the page where the Bates
6 number is 2158, if you look kind of in the middle
7 of the page there, you'll see a note from
8 Dr. Craig, and it says, "I personally saw and
9 evaluated the patient.  See midlevel's notes for
10 additional details.  My findings/participation are
11 CML.  Restart Gleevec.  Recurrent effusion from"
12 -- it's supposed to say dasatinib.
13       Is it fair to say that -- it says here
14 that you got recurrent pleural effusion from
15 taking SPRYCEL; right?
16    A.   Yes.
17       MR. HIGGINS:  I'm going to have object
18 to the form of the question because you indicated
19 the document was supposed to say something.  Based
20 upon that objection, he already answered yes.
21 BY MS. RYBICKI:
22    Q.   Just for the record, the document says
23 D-A-A-T-I-N-I-B.  Do you see that, Mr. Menear?
24    A.   What is it again?
25

Allan McNear

Page 190

1    Q.   Do you see where says D-A-A-T-I-N-I-B?
2    A.   Yes.
3    Q.   Would you agree with me that that's
4  meant to say dasatinib?
5    A.   Yes.
6    Q.   Is it fair to say you were taking
7  SPRYCEL and you were getting pleural effusions
8  from the SPRYCEL?
9    A.   Yes.
10   Q.   And then the doctor says restart you on
11 Gleevec at this point?
12   A.   Yes.
13   Q.   So is it fair to say that you were taken
14 off of SPRYCEL because of your pleural effusions
15 and you were switched to Gleevec; is that right?
16   A.   Correct.
17   Q.   But you had already taken Gleevec
18 before; right?
19   A.   Um-hum.
20   Q.   And you were going to give Gleevec
21 another try; right?
22   A.   Yeah.
23   Q.   You were going to take Gleevec because
24 you needed to control your numbers?
25   A.   Correct.

Page 191

1    Q.   And you wanted to make sure you don't
2  die from the CML; is that right?
3    A.   Correct.
4    Q.   Are you still on Gleevec today?
5    A.   Yes.
6    Q.   Is it controlling your CML?
7    A.   Yes.
8    Q.   Do you have any side effects from taking
9  Gleevec?
10   A.   No.
11   Q.   According to your Plaintiff Fact Sheet
12 on page 10 -- there's no need to look at the
13 document -- but you're not making a claim for lost
14 wages or earning capacity?
15   A.   No.
16   Q.   To be clear, you're not claiming that
17 you missed time or income from work because of
18 Tasigna?
19   A.   No.
20   Q.   But according to your Plaintiff Fact
21 Sheet, you are seeking recovery for out-of-pocket
22 expenses associated with any health conditions
23 that you're claiming relate to your use of
24 Tasigna; is that right?
25   A.   Correct.

Page 192

1    Q.   You also state you're seeking
2  reimbursement for all medical billing costs?
3    A.   Correct.
4    Q.   The PFS also says that other than
5  medical billing costs, you're not seeking any
6  other out-of-pocket costs; is that right?
7    A.   I can't think of the word right now.
8  The hardship my wife endured.
9    Q.   Outside of the hardship that your wife
10 endured, what about your out-of-pocket costs.
11 That's limited to medical bills; is that right?
12   A.   Yeah.
13   Q.   And what medical bills are you seeking
14 payment for?
15   A.   My amputation, all the hospital visits.
16   Q.   Hospital visits for what?
17   A.   After the amputation.
18   Q.   Is it fair to say that the only
19 injury -- I'm getting the sense that the only
20 injury that you claim was caused by Tasigna is
21 your amputation of your leg.  Is that right or am
22 I wrong?
23       MR. HIGGINS:  Objection.  Calls for a
24 legal conclusion.
25       Subject to that, you can answer.

Page 193

1        THE WITNESS:  I don't know.
2  BY MS. RYBICKI:
3    Q.   You're suing Novartis, right, for the
4  negative effects from your taking of Tasigna.  I'm
5  trying to figure out what injuries are you
6  alleging from the use of Tasigna.
7        MR. HIGGINS:  Objection.  Legal
8  conclusion.  They're set out in the Complaint.
9        You can answer subject to my objection.
10       THE WITNESS:  Look at me.  Time out.  I
11 got to have time out.  That made me mad.
12       MR. HIGGINS:  Do you want to take a
13 break?
14       MS. RYBICKI:  Sure.  If he needs a
15 break, we should definitely take one.
16       (Recess from 3:04 p.m. to 3:05 p.m.)
17 BY MS. RYBICKI:
18   Q.   You said that you were seeking payment
19 for medical bills.
20   A.   Correct.
21   Q.   Did you have insurance at the time of
22 your CML diagnosis?
23   A.   Yes.
24   Q.   And did you have medical insurance from
25 the time your CML diagnosis in 2011 till present?

Allan McNeal

Page 194

1    A.   Yes.
2    Q.   That includes when you started using
3 Tasigna in 2014; right?
4    A.   Yes.
5    Q.   What type of health insurance do you
6 have or did you have?
7    A.   United.  And what is the other one?
8 Man, I just lost the words.  There's two of them.
9 Help me out.  It just went blank.
10   Q.   That's okay.  Let's move on.  At any
11 point between November 2014 and the present, did
12 you receive any disability or other compensation?
13   A.   No, ma'am.
14   Q.   Are you on Medicare or Medicaid?
15   A.   Medicare.  That's it.  I couldn't get
16 that out.
17   Q.   As your counsel represented, in your
18 Complaint in this lawsuit, you do set out injuries
19 that you are alleging were caused by your use of
20 Tasigna.
21        Now I want to get a complete list of any
22 physical or emotional problems you claim that came
23 from your use of Tasigna.  The first one I'm going
24 to say is peripheral arterial occlusive disease.
25 Does that sound familiar to you as something you

Page 195

1 were diagnosed with?
2    A.   No.
3    Q.   Has any doctor told you that your
4 peripheral arterial occlusive disease was caused
5 by Tasigna?
6    A.   No.  I don't know what that disease
7 you're telling me -- I don't know what it is.
8    Q.   Did you say that you are diagnosed with
9 coronary artery disease, heart disease?
10   A.   Yes.
11   Q.   Would you say that your heart disease
12 was caused by Tasigna?
13   A.   I don't know.
14   Q.   So we talked about this briefly, but
15 your left leg amputation, you are alleging that
16 was caused by Tasigna; is that right?
17   A.   Yes.
18   Q.   This is going to be kind of hard to
19 think back to possibly, but what activities were
20 you no longer able to do because of your
21 amputation?
22   A.   I was an avid hunter, fisherman, golfer,
23 outdoorsman.  I used to coach football right up to
24 this time, and I coached basketball for 25 years.
25 My quality of life, it's not there right now.

Page 196

1    Q.   This happened as soon as you received
2 that surgery; is that right?
3    A.   Yes.
4    Q.   We talked a little bit earlier about
5 your depression started from the incident in 1990.
6 Then we also talked about your trouble sleeping a
7 little bit, too.
8    A.   Um-hum.
9    Q.   Have you ever consulted with a
10 psychologist or psychiatrist or someone in the
11 mental health field about your CML diagnosis
12 specifically?
13   A.   Not my CML.
14   Q.   What about your amputation, did you
15 consult a mental health professional about it?
16   A.   Yes.
17   Q.   Who did you consult?
18   A.   Who was it?  Vicky Elkins.
19   Q.   Would that be E-L-K-I-N-S?
20   A.   Yes.
21   Q.   When did you consult Ms. Elkins or
22 Dr. Elkins?
23   A.   It was probably 2018.
24   Q.   Do you have records from your
25 consultation with Dr. Elkins?

Page 197

1    A.   I doubt it.  I'll look for them.
2    Q.   If you find them, can you please give
3 them to your counsel?
4    A.   Sure.
5    Q.   What was the nature of the therapy or
6 treatment?
7    A.   What she had me do?
8    Q.   Yeah.  What happened?
9    A.   Look through a mirror, stare at a mirror
10 at my amputee.  That helped me.  It's hard to
11 explain.  She had me do some exercises.
12   Q.   Did the exercises help you?
13   A.   Oh, yeah, yeah.  She had me with big
14 rubberbands working my stump.  She helped me do
15 that.
16   Q.   How long do you think you saw her for?
17   A.   Two weeks.
18   Q.   Why didn't you continue seeing her after
19 the two weeks?
20   A.   I just felt like I didn't need her after
21 that.  I could do the same things I was doing in
22 her office right there in my living room chair.
23   Q.   Let's kind of change up the topics here.
24 Have you ever spoken with anyone from the
25 federal -- have you ever spoken with anyone from

Page 198

1 the federal Food and Drug Administration?
2     A.   No.
3     Q.   Have you ever spoken to anyone from
4 Novartis Pharmaceuticals Corporation?
5     A.   No.
6     Q.   I'm going to take a two-minute break.
7 I'm almost finished.  I just want to make sure I
8 crossed the Ts and dotted the Is.
9         (Recess from 3:17 p.m. to 3:22 p.m.)
10 BY MS. RYBICKI:
11     Q.   I have just a couple of questions.
12 Mr. Menear, if I represented to you that there is
13 a June 2018 nurse's note about diabetes education
14 and that the nurse wrote, "The patient states that
15 he has had diabetes for about one year," would
16 that sound right to you, that in June of 2018, a
17 nurse said that you have had diabetes for one
18 year?
19     A.   I do remember something.  I could have
20 said it, yes.
21     Q.   If that's right, that would mean that
22 your diabetes began sometime in June of 2017.
23 Would that sound right?
24     A.   But I'm not taking nothing for diabetes.
25 I'm not on anything.

Page 199

1     Q.   In June of 2017, nobody told you that
2 you had diabetes is what you're staying?
3     A.   Yes, yes, they could have.
4     Q.   Is it possible that you had diabetes
5 starting in 2017 and then you still have it?  Is
6 it a possibility?
7     A.   No.  I've been tested.
8         MS. RYBICKI:  I have no further
9 questions.
10        MR. HIGGINS:  I have a couple.
11            RE-EXAMINATION
12 BY MR. HIGGINS:
13     Q.   First of all, Allen, I want to thank you
14 for showing up today, spending some time with us.
15 I feel bad about your injuries.
16        If anyone had warned you that taking
17 Tasigna would cause you to lose your leg, would
18 you have started taking it?
19     A.   No.
20     Q.   Could you please describe for us how you
21 came about having your left leg amputated?  What
22 led to the amputation?
23     A.   My vessels clogged up, hardened, and I
24 started getting black sores all over both legs.
25 And that was on both legs, right and the left leg.

Page 200

1 They first talked about taking my toe off.  And
2 then it went up my ankle and up my shin.  So then
3 they decided to just amputate below the knee.
4     Q.   Is that what they did?
5     A.   Yes.
6     Q.   Was there any subsequent amputations?
7     A.   Yes.
8     Q.   What happened there?
9     A.   I fell down.  I was getting fitted for
10 my prosthetic.  And I was just coming out of the
11 building, and there was a big curb there, and I
12 stepped down off of it.  And my right knee gave
13 out, and I drove my left leg right down in the
14 blacktop and busted it all open.
15     Q.   Are you saying the bone went through
16 your foot and hit it the blacktop?  Is that a yes
17 or no?
18     A.   I didn't have a foot.
19     Q.   That's true.  So your bone hit the
20 asphalt?
21     A.   Yes.
22     Q.   And there was a subsequent amputation?
23     A.   Yeah, above the knee.
24     Q.   And when did you first start noticing
25 these black sores?

Page 201

1     A.   Middle of 2017, I think.
2     Q.   Was that after you started taking
3 Tasigna?
4     A.   Oh, yeah.
5     Q.   Do you know whether or not Dr. Craig
6 received anything of value from Novartis to
7 encourage him to put you on to Tasigna?
8         MS. RYBICKI:  Objection.
9         THE WITNESS:  Not that I know of.
10 BY MR. HIGGINS:
11     Q.   Is it true that Dr. Craig was running
12 the clinical study for Novartis?
13     A.   Yes.
14     Q.   Do you know if he was paid by Novartis
15 to do that?
16     A.   I do not know.
17     Q.   Did you say anything to Dr. Craig when
18 you found out he was going to put you back onto
19 Gleevec?
20     A.   Gleevec, no.
21     Q.   You started with Gleevec after you got
22 CML; is that correct?
23     A.   Um-hum.
24     Q.   Can you answer "yes" or "no"?
25     A.   Yes.

Allan Menear

Page 202

1    Q.  You were on Gleevec for a while.  Then
2  you were changed to Tasigna?
3    A.  Tasigna.
4    Q.  You were on Tasigna for a while.  Then
5  you were changed to SPRYCEL; correct?
6    A.  Correct.
7    Q.  You were on SPRYCEL for a while and then
8  you were changed back to Gleevec; correct?
9    A.  Correct.
10    Q.  Did you have any discussions with
11  Dr. Craig about why he was putting you back on a
12  drug you had started with?
13    A.  Well, he went online, found literature
14  that Tasigna was causing these side effects,
15  amputee, and he had no idea it would cause an
16  amputee.
17    Q.  That's when he took you off?
18    A.  That's when he called me and told me get
19  off of it.
20      MR. HIGGINS:  That's all the questions I
21  have.
22           RE-EXAMINATION
23  BY MS. RYBICKI:
24    Q.  I just have one more question.  Do you
25  remember taking metformin?

Page 203

1    A.  Yes.
2    Q.  Is that a diabetes drug?
3    A.  Yes.  That was right after I was
4  amputated.  When I was in the hospital, they did
5  the finger sticks, and it was high, but before I
6  got out of the hospital, it was normal.
7    Q.  How long did you take metformin for?
8    A.  A couple weeks.
9    Q.  Have you taken it since?
10    A.  No.
11      MS. RYBICKI:  No further questions.
12      MR. HIGGINS:  We're finished.  We will
13  waive signature.
14      (Whereupon, at 3:30 p.m., the taking of
15  the instant deposition ceased.)
16
17
18
19
20
21
22
23
24
25

Page 204

1  COMMONWEALTH OF PENNSYLVANIA )
2  COUNTY OF ALLEGHENY        )    SS:
3        C E R T I F I C A T E
4      I, Ann Medis, RPR, CLR, CSR-WA and
5  Notary Public within and for the Commonwealth of
6  Pennsylvania, do hereby certify:
7        That ALLEN RAY MENEAR, the witness whose
8  deposition is hereinbefore set forth, was duly
9  sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11      I further certify the inspection,
12  reading and signing of said deposition were waived
13  by counsel for the respective parties and by the
14  witness.
15      I further certify that I am not related
16  to any of the parties to this action by blood or
17  marriage and that I am in no way interested in the
18  outcome of this matter.
19      IN WITNESS WHEREOF, I have hereunto set
20  my hand this 31st day of January, 2023.
21
22
23            _____
                    Notary Public
24
25