# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| IN RE: TASIGNA (NILOTINIB) PRODUCTS LIABILITY LITIGATION | Case No. 6:21-md-03006-RBD-DAB (MDL No. 3006) |
| This document relates to Member Case 8:22-cv-1644 (*Menear*) | |

**NOVARTIS PHARMACEUTICALS CORPORATION'S REPLY
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT IN *MENEAR***

The core premise of plaintiff's opposition to Novartis Pharmaceuticals Corporation's ("NPC") Motion for Summary Judgment ("Mot."), is that Mr. Menear's prescribing doctor, Dr. Michael Craig, did not know that Tasigna® could lead to "severe, rapidly progressive, and treatment resistant" cardiovascular events ("CVEs"). Pl.'s Opp'n in Resp. to Defs' Mot. for Summ. J. ("Opp'n") at 16, ECF No. 260. Dr. Craig, however, knew that Tasigna® could cause CVEs and had substantial information about the exact nature of the medical conditions plaintiff experienced, ischemic heart disease and peripheral arterial occlusive disease ("PAOD"), from multiple clinical trial consent forms he reviewed and signed, adverse event reports and investigator brochures he received as a co-investigator in a Tasigna® clinical study, and the 2014 Tasigna® label. These materials notified Dr. Craig of both the severity and frequency of potential CVEs. Dr. Craig's awareness of these risks breaks the causal chain and warrants summary judgment.

I.   **Dr. Craig Knew the Risk of Plaintiff's Specific Medical Conditions.**

Plaintiff does not, nor could he, dispute that Dr. Craig knew the risk of the specific conditions that plaintiff experienced. Under Florida law, "[m]anufacturers are only required to warn the prescribing physician of the *possibility* that the drug may cause the injury alleged by the plaintiff."[1] Dr. Craig testified that he reviewed and signed consent forms that specifically informed him of the risk of ischemic heart disease and PAOD. *See* Mot. at 5-6, ECF No. 237 (citing sections of consent forms).

---

[1] *Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260, 1266 (S.D. Fla. 2020) (emphasis added) (quoting *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1372 (M.D. Fla. 2015)).

He further testified that his role as an investigator in the Tasigna® clinical trial required that he review the investigator brochure that counseled investigators extensively about the risks of ischemic heart disease and PAOD. *See* Mot. at 8-11, ECF No. 237. Dr. Craig testified he also reviewed Tasigna®'s label, Dep. of Dr. Michael Craig at 56:16-23, ECF No. 237-2, and the very first page of that label explains the risk of "ischemic heart disease"[2] and "peripheral arterial occlusive disease," 2014 Tasigna® label at 1, ECF No. 237-9. By his own admission, Dr. Craig knew the risk of ischemic heart disease and PAOD, Craig Dep. Tr. at 44:7-18; 46:20-48:6, ECF No. 237-2, and he also knew that those CVEs could manifest rapidly and severely in amputation (PAOD) or heart attack (ischemic heart disease), *id.* at 46:20-48:6; 132:6-12.

II. **Dr. Craig Had Substantial Information on the Frequency and Severity of Tasigna®'s Potential CVE Risks, and NPC Was Not Required to Describe Those Risks as "Rapidly Progressive" or "Resistant to Treatment."**

Plaintiff opposes summary judgment claiming that, at the time Dr. Craig prescribed Tasigna® to plaintiff, he "was unaware of the severe, rapidly progressive, and treatment resistant nature of the [CVE] disease associated with Tasigna." Opp'n at 16. Plaintiff argues: "while there were references in the [Tasigna®] label about peripheral vascular disease, as well as references in the investigator brochure and consent form from the clinical trial, Dr. Craig testified that ***none*** of this material imparted to him the severity of the risk associated with Tasigna." Opp'n at 9 (emphasis in original). The label, investigator brochure, and consent forms, however, do not

---

[2] "Ischemic heart disease" is synonymous with "coronary artery disease." Centers for Disease Control & Prevention, *Coronary Artery Disease* (2021), www.cdc.gov/heartdisease/coronary_ad.htm (Ex. 1).

merely "reference" PAOD, as plaintiff misleadingly suggests; those materials contain voluminous information explaining the potential severity and frequency of CVEs.

The adverse events section of the investigator brochure specifically states: "Fourteen patients . . . had [adverse events] grouped under [ischemic heart disease] that were considered study drug-related. *Most of the [ischemic heart disease] events were considered serious* and were *grade 3/4*." Investigator's Brochure at 75, ECF No. 237-22 (emphases added). A grade 3 level adverse event indicates symptoms that are "severe or medically significant," and a grade 4 level adverse event indicates "life-threatening consequences" that require "urgent intervention."[3] The 2014 brochure also adds: "Since the beginning of the study there were 14 patients with reported PAOD . . . . *Serious PAOD events were reported for nine patients* . . . . Seven patients . . . had study drug related peripheral arterial occlusive disease." *Id.* (emphasis added). This is consistent with the information provided in the 2014 Tasigna® label, which outlines the exact frequency of the CVEs that occurred in the ENESTnd clinical trial through four years in the study. Mot. at 12, ECF No. 237 (quoting sections of Tasigna® label).[4]

Plaintiff also argues Dr. Craig was unaware that Tasigna® may lead to "rapidly progressing" and "treatment resistant" CVEs. Opp'n at 1, 7, 16. As a threshold matter, plaintiff's experts could not testify to a reasonable degree of scientific certainty that

---

[3] U.S. Dep't of Health & Human Servs., *Common Terminology Criteria for Adverse Events Version 4.0 (CTCAE)* (2009) at 1, ECF No. 237-24. The only higher level of adverse event indicates death. *Id.*

[4] Indeed, the label provides data showing higher rates of ischemic heart disease and PAOD for Tasigna® than for Gleevec®: "ischemic heart disease-related events (5.0% and 5.8% in [Tasigna®] . . . and 1.8% [Gleevec®]), peripheral arterial occlusive disease (1.8% and 2.2% in [Tasigna®] . . . and 0% in [Gleevec®])." 2014 Tasigna® label, at Section 5.4, ECF No. 237-9.

3

Tasigna® even causes treatment-resistant or rapidly progressing CVEs. *See* Mot. at 18 n.14, ECF No. 237. Moreover, the learned intermediary doctrine applies so long as a physician knows of a realistic "possibility of a causal relationship" between a medication and a plaintiff's alleged injury.[5] Dr. Craig had abundant notice of a realistic possibly of plaintiff's CVEs because he was "aware of [the] generalized risk of [plaintiff's alleged] adverse . . . reactions to the [medication] prescribed."[6] Dr. Craig readily admitted he knew Tasigna®'s possible CVE risks when he prescribed it.[7]

The Florida Supreme Court has rejected the same argument plaintiff makes here. The prescribing doctor in *Upjohn Co. v. MacMurdo* claimed that the defendant's contraceptive labeling did not inform him that patients could experience "excessive" and "continuous" bleeding. 562 So. 2d 680, 681 (Fla. 1990). The product's label, however, "explicitly state[d] that breakthrough bleeding, spotting, and change in menstrual flow" are possible. *Id.* at 683. *Id.* The Court disagreed that the doctor had insufficient information: "The fact remains that the insert warned of the possibility of abnormal bleeding outside of the menstrual period. It would be unreasonable to hold [the manufacturer] liable for not characterizing the bleeding as excessive, continuous, or prolonged." *Id.* (remanding with direction to enter summary judgment).

---

[5] *Hoffman-LaRoche*, 27 So. 3d at 77; *see also Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) ("[T]he more crucial question is whether the warnings were adequate to warn a physician[.]"); *Small*, 134 F. Supp. 3d at 1367 ("[T]he critical inquiry is whether it was adequate to warn the physician of the possibility that the drug may cause the injury alleged by the plaintiff.").

[6] *Fields v. Mylan Pharms., Inc.*, 751 F. Supp. 2d 1260, 1263 (N.D. Fla. 2009) (granting summary judgment where prescriber was generally aware of risks and did not read the label).

[7] Craig Dep. Tr. at 46:20-48:6; 132:6-12, ECF No. 237-2.

Dr. Craig testified that, as a medical professional, he understands PAOD can lead to amputation. Craig Dep. Tr. at 46:20-48:6; 132:6-12, ECF No. 237-2. And the investigator brochure specifically included information about the risk of *severe* or even *life-threatening* cardiovascular events. Investigator's Brochure at 75, ECF No. 237-22. As in *Upjohn*, it would be unreasonable to require NPC to specifically characterize Tasigna®'s potential risks as "rapidly progressing" or "resistant to treatment," given that NPC already gave Dr. Craig the information identified above detailing severe or life-threatening potential risks. Holding otherwise would mean manufacturers would have to include an endless list of warnings about every possible permutation of the adverse event at issue; manufacturers would never be able to word the warning in the exact manner that plaintiffs' counsel would find acceptable.[8]

## III. Dr. Craig Did Not Testify That Different Warnings Would Have Changed His Decision to Prescribe Tasigna® To Plaintiff.

Plaintiff claims Dr. Craig "would have stopped prescribing the drug before it progressed over a two-year period to limb necrosis and amputations" if properly warned. Opp'n at 17. Dr. Craig's testimony—"in retrospect, obviously, I would never have given [plaintiff] the drug under any circumstances"—is obvious hindsight

---

[8] Plaintiff also takes issue with NPC for not specifically recommending that patients be "monitored with ankle-brachial index . . . and duplex ultrasonography at the beginning of treatment and periodically thereafter." Opp'n at 7; *see also id.* at 17. The Tasigna® label does, however, recommend monitoring. *See* 2014 Tasigna® label at 1, ECF No. 237-9 ("Cardiovascular status should be evaluated and cardiovascular risk factors monitored and managed during Tasigna therapy."); *see also, e.g.*, Investigator's Brochure at 15, 16, 82, ECF No. 237-22 (recommending various forms of CVE monitoring). Moreover, under Florida law, a manufacturer "need only warn of complications stemming from the use of the Product—not the subsequent measures medical professionals may employ to treat those complications." *Dye v. Covidien LP*, 470 F. Supp. 3d 1329, 1341 (S.D. Fla. 2020).

testimony stemming from his patient experiencing the CVEs about which he was warned. Craig Dep. Tr. at 108:3-5, ECF No. 237-2.[9] The operative part of Dr. Craig's testimony is "I don't know," which he stated twice when asked whether additional information would have affected his decision. *See* Mot. at 19-20, ECF No. 237.

Finally, plaintiff's testimony regarding what *he* would have done had Dr. Craig given him a different warning is not relevant. *See* Opp'n at 18. Whether or not plaintiff—with the benefit of hindsight—would have taken the medication after having experienced adverse events has no bearing on the learned intermediary analysis. Under Florida law, the pertinent question is whether an objectively reasonable patient in plaintiff's position—not one with the benefit of hindsight—would have refused Tasigna® treatment if warned of the risk of amputation.[10] At any rate, plaintiff testified

---

[9] To the extent Dr. Craig now equivocates regarding what he would have done if he had received different information in 2014, that does not defeat summary judgment because ***plaintiff bears the burden*** to demonstrate proximate causation. To the extent Dr. Craig's testimony is ambiguous, plaintiff cannot satisfy his burden to establish causation. *See Swintelski v. Am. Med. Sys., Inc.*, 521 F. Supp. 3d 1215, 1219-20 (S.D. Fla. 2021) ("***[I]t is plaintiff's burden*** to establish the causation element by showing that adequate warnings would have altered the treating physician's decision to prescribe the device at issue." (emphasis added)); *Pringle v. Johnson & Johnson*, No. 13-CV-81022, 2020 WL 4501834, at *4 (S.D. Fla. Jan. 30, 2020) ("Florida courts continue to require the plaintiff to prove as part of her case that the physician would have acted differently if an adequate warning had been given."); *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1321 (11th Cir. 2017) ("[A] plaintiff must show that her treating physician would not have used the product had adequate warnings been provided."); *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992) ("the burden remains on the plaintiff").

[10] The cases plaintiff cites, Opp'n at 18-19, misconstrue the learned intermediary doctrine. As this Court has noted, "[t]o establish causation for a failure to warn claim, the plaintiff must show 'her treating physician would not have used the product had adequate warnings been provided.'" *Geery v. Ethicon, Inc.*, No. 6:20-CV-1975, 2021 WL 2580167, at *2 (M.D. Fla. Apr. 20, 2021) (Dalton, J.). To the extent plaintiff contends he should have been warned about the risk of amputation, his claim is against the doctor, not NPC, given the plethora of information NPC provided the doctor. *See Felix v. Hoffman-LaRoche Inc.*, 540 So. 2d 102, 105 (Fla. 1989) ("[I]t makes no difference that the mother testified that [the prescriber] did not warn her of the danger of taking Accutane while she was pregnant. While this would present a factual issue in a claim against the doctor, the drug manufacturer could not be penalized for the failure of the doctor to impart knowledge concerning the dangers of the

that he always trusted Dr. Craig, considers him a good oncologist, always followed his recommendations, and never turned down medications prescribed by him. Allen Menear Dep. Tr. (Ex. 2) at 95:22-97:1. There is no basis to now accept plaintiff's self-serving testimony that he would have, for the first time in years of treatment, rejected Dr. Craig's medical recommendation. The "[c]onclusory, uncorroborated allegations by a plaintiff . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion."[11] Plaintiff's personal belief that he would not have taken Tasigna® if given different warnings by his doctor is both irrelevant to the learned intermediary analysis and also does not suffice to defeat summary judgment.

For the foregoing reasons, the Court should grant this motion.

Dated: April 19, 2023

Respectfully Submitted,

By: /s/ Robert E. Johnston
Joe G. Hollingsworth, Esq.
Robert E. Johnston, Esq.
Grant W. Hollingsworth, Esq.
Andrew L. Reissaus, Esq.
Hollingsworth LLP
1350 I Street, NW
Washington, DC 20005
(202) 898-5800

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*

---

drug of which the doctor had been warned and was aware."); *see also E.R. Squibb & Sons, Inc. v. Farnes*, 697 So. 2d 825, 827 (Fla. 1997) ("whether the physician … passes [warnings] along to the recipient of the drug is irrelevant"); *Arnold v. Novartis*, 28 F. Supp. 3d 1268, 1272 (M.D. Fla. 2014) (precluding evidence that plaintiff "would not have taken [the drug] had she been warned").

[11] *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (noting that conclusory allegations based on the purely subjective beliefs of a plaintiff are insufficient to create a genuine dispute of material fact).

## **CERTIFICATE OF SERVICE**

I certify that on this 19th day of April 2023, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, causing all counsel of record be served by electronic means.

/s/ Robert E. Johnston
Robert E. Johnston, Esq.
*Attorney for Defendant*
*Novartis Pharmaceuticals Corporation*